# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **MATTHEW DICKSON, on behalf of** | § | |
| **himself and others similarly situated,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **C.A. NO. 5:18-cv-182** |
| | § | |
| **DIRECT ENERGY, LP, TOTAL** | § | |
| **MARKETING CONCEPTS, LLC, and** | § | |
| **SILVERMAN ENTERPRISES, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## DEFENDANT DIRECT ENERGY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.   SUMMARY OF THE ARGUMENT ................................................................... 1

II.  BACKGROUND ........................................................................................... 3

   A.  The Teleservices Agreement: Direct Energy Hires TMC as an Independent Contractor... 3

   B.  The RVM Campaign: Direct Energy Authorizes RVMs to Opt-Ins Only ......................... 4

   C.  The Lawsuit: Direct Energy Uncovers that TMC Breached its Agreements ..................... 5

      1.  TMC fabricates Plaintiff's opt-in and misrepresents its authenticity. ......................... 5

      2.  TMC Disregards Orders to Stop RVMs and Defaults on TrustedForms. .................... 6

   D.  Vicarious Liability: Direct Energy Did Not Approve or Ratify RVMs Without Opt-ins. . 7

      1.  Direct Energy never authorized non-TCPA compliant leads. ...................................... 7

      2.  Plaintiff has no evidence that TMC acted with apparent authority. ........................... 8

      3.  Plaintiff has no evidence that Direct Energy ratified TMC misconduct. ..................... 9

III. PLAINTIFF'S RULE 23 BURDEN OF PROOF ................................................. 10

IV.  ARGUMENT ............................................................................................. 11

   A.  Ascertainability: The Class Is Not Identifiable from JDI's RVM Records. ................... 11

      1.  Plaintiff (and the Court) cannot rely on the JDI/Magnify list to identify the class. ... 12

      2.  Ms. Verkhovskaya inaccurately identified the telephone numbers at issue. .............. 13

      3.  Courts regularly reject Ms. Verkhovskaya's "reverse append" methodology ........... 13

   B.  Numerosity: Plaintiff offers no reliable evidence about class members ......................... 16

   C.  Typicality and Adequacy: Dickson is not an appropriate class representative ............... 18

      1.  Plaintiff lacks a concrete injury sufficient for Article III standing. .......................... 19

      2.  Unique defenses undermine Plaintiff's ability to represent the class. ........................ 21

      3.  Plaintiff lacks a viable vicarious liability theory against Direct Energy. ................... 23

         a.  Direct Energy did not give TMC actual authority to drop RVMs without consent. ................................................................................................ 24

         b.  TMC did not act with any apparent authority from Direct Energy ................... 24

         c.  The record contradicts any claim of ratification. ............................................. 25

            i.   Direct Energy could not have known any relevant material facts. ............. 25

            ii.  Direct Energy did not gain any benefit from RVM to Plaintiff's phone. .. 27

ii

D. Commonality & Predominance: Individualized issues overwhelm any common ones.... 28

    1. Plaintiff submits no common evidence to resolve the issue of consent class-wide.... 29

    2. There is no evidence (common or otherwise) to establish vicarious liability............ 31

        a.    Apparent authority will raise individualized issues of reliance. ........................ 31

        b.    Plaintiff has no common proof of ratification.................................................... 32

    3. Standing will entail an individualized inquiry for each class member. ..................... 33

    4. There is no common evidence that class members played the RVMs....................... 34

E. Superiority: Plaintiff Cannot Show that Class is a Superior Form of Adjudication. ........ 35

V.  CONCLUSION & PRAYER ................................................................................................. 35

# **TABLE OF AUTHORITIES**

## Cases

*Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*,
  No. 16 C 9281, 2018 WL 3474444 (N.D. Ill. July 19, 2018) ........................... 16, 17

*American Copper & Brass*,
  757 F.3d 540 (6th Cir. 2014) ................................................ 11

*Balthazor v. Cent. Credit Services, Inc.*,
  10-62435-CIV, 2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) ........................... 29

*BancInsure, Inc. v. U.K. Bancorporation Inc.*,
  830 F. Supp. 2d 294 (E.D. Ky. 2011) ............................................ 27, 32

*Bank of Am. Nat. Ass'n*,
  804 F.3d 316 (3d Cir. 2015)..................................................... 22

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*,
  353 F. Supp. 3d 1070 (D. Colo. 2018) ............................................ 20

*Bentley v. Honeywell Intern., Inc.*,
  223 F.R.D. 471 (S.D. Ohio 2004) ............................................... 18

*Blair v. CBE Group, Inc.*,
  309 F.R.D. 621 (S.D. Cal. 2015) ............................................... 29

*Bouton v. Ocean Props., Ltd*,
  322 F.R.D. 683 (S.D. Fla. 2017)............................................. 31, 33

*Bridging Cmtys. Inc. v. Top Flite* Fin. Inc.,
  843 F.3d 1119 (6th Cir. 2016) ................................................. 30

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty.*,
  137 S. Ct. 1773 (2017)...................................................... 16, 17

*Burk v. Direct Energy*,
  No. 4:19-CV-663 (S.D. Tex. Dec. 27, 2019) ....................................... 6

*Castellanos v. Worldwide Distribution Sys. USA, LLC*,
  14-CV-12609, 2015 WL 13862060 (E.D. Mich. Aug. 19, 2015).......................... 16

*Cerdant, Inc. v. DHL Express (USA), Inc.*,
  2:08CV186, 2010 WL 3397501 (S.D. Ohio Aug. 25, 2010) ............................ 11

*Chavez v. Church & Dwight Co., Inc.*,
  No. 17 C 1948, 2018 WL 2238191 (N.D. Ill. May 16, 2018) ......................... 17

*Cochran v. Oxy Vinyls LP*,
  CIV. A. 306CV-364-H, 2008 WL 4146383 (W.D. Ky. Sept. 2, 2008) ................... 16

iv

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)..................................................................................... 28

*Cordoba v. DIRECTV, LLC*,
    942 F.3d 1259 (11th Cir. 2019) ................................................................ 34

*Courtney v. Smith*,
    297 F.3d 455 (6th Cir. 2002) ..................................................................... 19

*Cranor v. 5 Star Nutrition, LLC*,
    1-19-CV-908-LY, 2019 WL 8331601 (W.D. Tex. Nov. 27, 2019)...................... 20

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ..................................................................... 17

*Donaca v. Dish Network, LLC.*,
    303 F.R.D. 390 (D. Colo. 2014) ................................................................. 23

*Drazen v. GoDaddy.com, LLC*,
    CV 1:19-00563-KD-B, 2020 WL 2494624 (S.D. Ala. May 14, 2020) ................. 20

*Eldridge v. Cardif Life Ins. Co.*,
    266 F.R.D. 173 (N.D. Ohio 2010) .............................................................. 26

*Fallick v. Nationwide Mut. Ins. Co.*,
    162 F.3d 410 (6th Cir. 1998) ..................................................................... 19

*Gawry v. Countrywide Home Loans, Inc.*,
    640 F. Supp. 2d 942 (N.D. Ohio 2009)....................................................... 34

*Gawry v. Countrywide Home Loans, Inc.*,
    395 Fed. App'x 152 (6th Cir. 2010) ........................................................... 34

*Gene And Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008) .............................................................. 29, 35

*Glob. Towing, L.L.C. v. Marine Tech. Services, Inc.*,
    244 F.3d 138 (5th Cir. 2000) ..................................................................... 32

*Gooch v. Life Inv'rs Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) ..................................................................... 10

*Hodgin v. UTC Fire & Sec. Americas Corp.*,
    885 F.3d 243 (4th Cir. 2018) .............................................................. passim

*Hunter v. Time Warner Cable Inc.*,
    2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019) ............................................... 14

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir.1996) ........................................................... 10, 18, 28

*In re Cmty. Health Sys., Inc.*,
    No. 19-0509, 2019 WL 5549319 (6th Cir. Oct. 23, 2019) ............................... 21

*In re Fair Fin. Co.*,
  834 F.3d 651 (6th Cir. 2016) ................................................................................ 27

*In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*,
  223 F. Supp. 3d 514 (N.D.W. Va. 2016) ..................................................... 7, 9, 25

*Innovative Acct. Sols., Inc. v. Credit Process Advisors, Inc.*,
  2020 WL 1465981 (W.D. Mich. Mar. 26, 2020) .................................................. 11

*Jacobs v. Quicken Loans, Inc.*,
  2017 WL 4838567 (S.D. Fla. Oct. 19, 2017) ...................................................... 14

*Johansen v. HomeAdvisor, Inc.*,
  218 F. Supp. 3d 577 (S.D. Ohio 2016) ........................................................ 24, 27

*John B. v. Goetz*,
  531 F.3d 448 (6th Cir. 2008) ............................................................................. 22

*Jones v. All Am. Auto Prot., Inc.*,
  314CV00199LRHWGC, 2015 WL 7566685 (D. Nev. Nov. 24, 2015) ..................... 8, 17, 25

*Jones v. Royal Admin. Servs., Inc.*,
  887 F.3d 443 (9th Cir. 2018) .......................................................................... 7, 24

*Kahler v. Fid. Mut. Life, Inc.*,
  5:16CV287, 2018 WL 1365836 (N.D. Ohio Mar. 16, 2018) ......................... passim

*Kahler v. Fid. Mut. Life, Inc.*,
  No. 18-3349, 2018 WL 3494640 (6th Cir. June 18, 2018) .................................... 7

*Kauffman v. CallFire, Inc.*,
  141 F. Supp. 3d 1044 (S.D. Cal. 2015) .............................................................. 27

*Keating v. Peterson's Nelnet, LLC*,
  2014 WL 1891369 (N.D. Ohio May 12, 2014) .................................................... 25

*Keating v. Peterson's Nelnet, LLC*,
  615 F. App'x 365 (6th Cir. 2015) ................................................... 9, 23, 24, 25

*Kern v. VIP Travel Servs.*,
  No. 1:16-CV-8, 2017 WL 1905868 (W.D. Mich. May 10, 2017) ........................ 26

*Krakauer v. Dish Network LLC*,
  No. 1:14-cv-333 (M.D.N.C. May 4, 2020) ........................................................ 15

*Kristensen v. Credit Payment Servs. Inc.*,
  879 F.3d 1010 (9th Cir. 2018) .......................................................................... 26

*Kristensen v. Credit Payment Servs.*,
  12 F. Supp. 3d 1292 (D. Nev. 2014) ................................................................. 29

*Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*,
  18-CV-00649-LJV-JJM, 2020 WL 2395919 (W.D.N.Y. May 12, 2020) ............. 34

vi

*LaVigne v. First Cmty. Bancshares, Inc.*,
  215 F. Supp. 3d 1138 (D.N.M. 2016) ................................................................ 21

*Makaron v. GE Sec. Mfg., Inc.*,
  2015 WL 3526253 (C.D. Cal. May 18, 2015) .................................................. 25

*Mooradian v. FCA US, LLC*,
  286 F. Supp. 3d 865 (N.D. Ohio 2017).............................................................. 22

*Morris v. Unitedhealthcare Ins. Co.*,
  415CV00638ALMCAN, 2016 WL 7115973 (E.D. Tex. Nov. 9, 2016) .............. 35

*Morris v. Unitedhealthcare Ins. Co.*,
  4:15-CV-638, 2016 WL 7104091 (E.D. Tex. Dec. 6, 2016) .............................. 35

*N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*,
  124 F.3d 1094 (9th Cir. 1997) .......................................................................... 25

*Newhart v. Quicken Loans Inc.*,
  9:15-CV-81250, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016) .......................... 29

*Nghiem v. Dick's Sporting Goods, Inc.*,
  318 F.R.D. 375 (C.D. Cal. 2016) ......................................................... 21, 22, 23

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  332 F.R.D. 556 (M.D. Tenn.) ............................................................................ 21

*Oron 2015 LLC v. City of Southfield*,
  2019 WL 2502739 (E.D. Mich. June 17, 2019)................................................. 19

*Petri v. Mercy Health*,
  4:15 CV 1296 CDP, 2016 WL 7048893 (E.D. Mo. Dec. 5, 2016)............ 26, 28, 33

*Reyes v. BCA Fin. Servs. Inc.*,
  No. 1:16-cv-24077  (S.D. Fla. Mar. 18, 2020)................................................... 15

*Salcedo v. Hanna*,
  936 F.3d 1162 (11th Cir. 2019) ................................................................... 20, 21

*San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc.*,
  5:17-CV-03504-EJD, 2019 WL 6493978 (N.D. Cal. Dec. 3, 2019) .................. 23

*Sandoe v. Boston Sci. Corp.*,
  333 F.R.D. 4 (D. Mass. 2019)............................................................................ 14

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*,
  863 F.3d 460 (6th Cir. 2017) ............................................................... 10, 29, 35

*Sawyer v. KRS Biotechnology, Inc.*,
  1:16-CV-550, 2018 WL 2425780 (S.D. Ohio May 30, 2018)............................ 29

*Sawyer v. KRS Glob. Biotechnology, Inc.*,
  2018 WL 4214386 (S.D. Ohio Sept. 5, 2018) ........................................ 29, 30, 31

*Selby v. LVNV Funding, LLC*,
    13-CV-01383-BAS(BLM), 2016 WL 6677928 (S.D. Cal. June 22, 2016) ........................... 29

*Shamblin v. Obama for Am.*,
    2015 WL 1909765 (M.D. Fla. Apr. 27, 2015) ..................................................... 15

*Shuckett v. DialAmerica Mktg., Inc.*,
    No. 17CV2072-LAB (KSC), 2019 WL 3429184 (S.D. Cal. July 30, 2019) ......................... 20

*Sliwa v. Bright House Networks, LLC*,
    333 F.R.D. 255 (M.D. Fla. 2019).................................................................... 35

*Smith v. Aitima Med. Equip., Inc.*,
    No. EDCV1600339ABDTBX, 2016 WL 4618780 (C.D. Cal. July 29, 2016)...................... 20

*Smith v. Cash Am. Int'l, Inc.*,
    1:15-CV-00760-MRB, 2019 WL 2352921 (S.D. Ohio June 4, 2019)................................ 31

*Smith v. State Farm Mut. Auto. Ins. Co.*,
    30 F. Supp. 3d 765 (N.D. Ill. 2014) ............................................................ 28, 33

*Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*,
    376 F.3d 664 (7th Cir. 2004) ....................................................................... 33

*Spokeo, Inc. v. Robbins*,
    136 S. Ct. 1540 (2016)............................................................................... 20

*Stuart v. Cheek & Zeehandelar, LLP*,
    252 F.R.D. 387 (S.D. Ohio 2008) .................................................................. 11

*Swigart v. Fifth Third Bank*,
    288 F.R.D. 177 (S.D. Ohio 2012) ............................................................. 18, 19

*Telephone Science Corp. v. Asset Recovery Sols., LLC*,
    15-CV-5182, 2016 WL 4179150 (N.D. Ill. Aug. 8, 2016) ..................................... 22

*Tomeo v. CitiGroup, Inc.*,
    13 C 4046, 2018 WL 4627386 (N.D. Ill. Sept. 27, 2018)........................................ 29

*Toney v. Quality Res., Inc.*,
    75 F. Supp. 3d 727 (N.D. Ill. 2014) ........................................................... 17, 28

*Ung v. Universal Acceptance Corp.*,
    319 F.R.D. 537 (D. Minn. 2017).................................................................... 31

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................. 28, 31

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
    280 F.R.D. 332 (E.D. Mich. 2012) ................................................................ 10

*Wilson v. Badcock Home Furniture*,
    329 F.R.D. 454 (M.D. Fla. 2018)........................................................ 13, 14, 15

*Wooden v. Bd. of Regents of Univ. Sys. of Ga.*,
  247 F.3d 1262 (11th Cir. 2001) ..................................................................... 19

*Ybarra v. Dish Network, L.L.C.*,
  807 F.3d 635 (5th Cir. 2015) ................................................................... 34, 35

*Zemel v. CSC Holdings LLC*,
  2017 WL 1503995 (D.N.J. Apr. 26, 2017) ............................................... 20

**Statutes**

Ind. Code § 24-5-0.5-7(b) ............................................................................. 26

**Rules**

Fed. R. Civ. P. 23 .................................................................................... passim

**Secondary Sources**

Restatement (Third) Of Agency § 5.04 (2006) ....................................... 27

# I.   SUMMARY OF THE ARGUMENT

Plaintiff Matthew Dickson does not carry his Rule 23 burden for class certification—a burden he must meet with evidence that can withstand a "rigorous analysis" by the Court. He instead suggests TCPA class treatment is the default. He is wrong, and his showing falls short.

Plaintiff argues certification should be rubber-stamped simply because he has a list of 3.2 million ringless voicemails ("RVMs") allegedly sent to 2.8 million cell phones by non-parties (JDI and Magnify) that Direct Energy did not hire or even know about. But the list is unreliable under any analysis, much less a rigorous one. It is based on JDI/Magnify data that shows RVMs delivered to landlines, which Plaintiff and his expert agree is impossible. That data also shows a non-Direct Energy RVM delivered to Plaintiff's phone, though he testified he did ***not*** receive it. As stated in Jan Kostyun's Expert Report, such errors are frequent in RVM records and make the entire list unreliable. Further, even if the data could be trusted, Plaintiff's expert cannot reliably match numbers to people—as many courts have found—meaning the class is not ascertainable. And because there is no reliable method to verify which RVMs were received and by whom, Plaintiff cannot show numerosity. As a result, the only thing Plaintiff's credible evidence confirms is that one person received one RVM about Direct Energy: Mr. Dickson, who was admittedly hunting for a TCPA lawsuit and cannot recall any inconvenience or harm from the RVM—facts that deprive him of standing and defeat a showing of typicality or adequacy.

At most, the JDI/Magnify data and Plaintiff's expert purport to only show that RVMs were sent. They do not address whether people consented to receive them. If they consented, there can be no TCPA violation.[1] Here, Plaintiff fails to provide common proof showing lack of consent. Instead, he tries to shift his burden, arguing that Direct Energy has not produced any

---

[1] To be clear, Direct Energy does not concede RVMs are subject to the TCPA and reserves the right to argue they are not.

consent evidence. But that is not true. Direct Energy's contract with Total Marketing Concepts ("TMC") required TMC to procure TCPA-compliant consents, and emails with TMC show Direct Energy did not stray from that requirement. Further, TMC invoiced and Direct Energy paid nearly $530,000 for opt-in consents during the RVM campaign. TMC procured opt-ins from vendors DMI and Silverman, and hired another (Active Prospect) to maintain TrustedForm certificates to verify consents. And, TMC employee Larry Correia gave uncontradicted testimony that "the RVM campaigns that TMC did for Direct Energy all used opt-ins," and he "saw the TrustedForms" himself. This is not speculation—it is documentary and testimonial evidence of consents from multiple sources that will require individualized consideration. Plaintiff has no common proof to rebut it and sustain his burden on predominance.

Moreover, this is far from a run-of-the-mill TCPA case. As discussed in its crossclaim against TMC, Direct Energy's efforts recently uncovered that TMC breached its contract and defrauded Direct Energy by failing to retain records of the consents Direct Energy paid for, continuing to send RVMs long after Direct Energy ordered it to stop, and manufacturing a consent for Plaintiff when he filed suit. But contrary to Plaintiff's suggestion, TMC fabricating one opt-in is not common proof about consent—it highlights its individualized nature.[2] And importantly, Direct Energy cannot be vicariously liable for TMC's conduct taken *against* Direct Energy's express orders and payments to comply with the TCPA. This is precisely why Plaintiff derides Direct Energy's crossclaim as an effort to play "the victim": these facts defeat his claim.

To be clear, Direct Energy is not asking for sympathy—it is asking that Plaintiff be held to his Rule 23 evidentiary burden. For the reasons discussed below, Plaintiff cannot carry that burden and his motion for class certification should be denied.

---

[2] Plaintiff's suggestion that Direct Energy's crossclaim about his manufactured opt-in is an admission that *all* RVMs lacked consent misstates Direct Energy's pleading. The crossclaim's allegation that TMC faked the opt-in is specific to the one opt-in TMC provided for Plaintiff after this lawsuit was filed. *See* Dkt. 106.

## II.  BACKGROUND

**A. The Teleservices Agreement: Direct Energy Hires TMC as an Independent Contractor.**

Direct Energy is an energy supplier that hired TMC to provide telemarketing services like identifying, calling, and enrolling customers. Ex. 1, Moran Aff. ¶¶ 1-4. TMC performed such services for many other energy companies,[3] Verizon, AAA, SiriusXM, Starz, and Showtime. Ex. 2, Correia Dep. 92:12-93:22. Direct Energy and TMC signed a Teleservices Agreement in 2015, defining their relationship as independent and disclaiming any agency:

> 13.1 <u>Relationship of the Parties.</u> This Agreement is not intended to create, and does not create any partnership, joint venture, fiduciary, employment, or other relationship between the parties, beyond **the relationship of independent parties to a commercial contract. Neither party is, nor will either party hold itself out to be, vested with any authority to bind the other party contractually, or to act on behalf of the other party as a broker, agent, or otherwise.**

Ex. 1-A, Teleservices Agreement ¶ 13.1 (emphasis added). TMC employee Larry Correia confirmed in his deposition that the parties conducted themselves according to this provision and that TMC acted as an independent contractor.[4]

Under the Agreement, TMC promised to "compl[y] with all federal, state, and local laws, rules, regulations and ordinances[.]" *Id.* ¶ 9.2. In accompanying Statements of Work ("SOW") covering all outbound telesales, TMC similarly warranted to "provide all services in accordance with all applicable laws, regulations and rules, including, without limitation, the Telephone Consumer Protection Act of 1991, as amended, and all accompanying regulations and rules . . . ." Ex. 1-B, SOW (Outbound) ¶ 1.u; Ex. 1-C, SOW #1 (Outbound) ¶ 1.u. Another SOW for "Opt-in Leads" allowed TMC to place such outbound calls to a wireless number only if the recipient first

---

[3] "It's probably a shorter list of the [energy] companies [that TMC] ha[s]n't worked with over the past 15 years." Correia Dep. 93:11-12.

[4] Mr. Correia confirmed at his deposition that there is no joint ownership between the companies or loan agreements; TMC owned the key technology; maintained its own facility that Direct Energy could not access without TMC approval; TMC procured its own requisite telemarketing licenses; and TMC exclusively hired, managed, and paid its own agents. Correia Dep. 102:9-17, 103:12-106:11, 107:23-114:13, 114:25-115:13.

provided written consent. Ex. 1-D, SOW (Opt-In) at Direct Energy 000047. TMC agreed to obtain these consents from "potential customers who have opted-in through an online advertisement to receive a call regarding the specific offers determined by Direct Energy[.]" *Id.* The Opt-in SOW attached six pages of examples showing what the content and style of the opt-in websites should be and look like. *Id.*, Exs. A & B at Direct Energy 000052-57. It also specified that TMC's subcontractor for procuring opt-in leads would be DMI Partners, and the Agreement prohibited TMC from delegating work "without Direct Energy's express written consent." *Id.* at Direct Energy 000047; Teleservs. Agmt. ¶ 5.1.

Direct Energy paid a premium for these opt-ins, which TMC was required to retain and provide upon request.[5] Moran Aff. ¶ 10; SOW (Opt-in) at Direct Energy 000049; Correia Dep. 135:1-3. To further ensure compliance, TMC was also required to buy (at Direct Energy's expense) TrustedForm certificates to "provide independent proof of consent of the opt-in by the consumer . . . ." SOW (Opt-in) at Direct Energy 000047. TrustedForms, through an independent third party called Active Prospect, record all information about how the consumer filled out an online consent, including timestamps, data entry, and mouse movement and clicks. Moran Aff. ¶ 5; Correia Dep. 16:8-16, 36:6-20, 124:25-125:14. Their purpose is to remove any uncertainty about whether the called party opted in. Moran Aff. ¶ 5; *see also* Correia Dep. 133:3-19. Direct Energy only permitted TMC telemarketing under these express conditions. Moran Aff. ¶¶ 5-6, 8.

**B. The RVM Campaign: Direct Energy Authorizes RVMs to Opt-Ins Only.**

In 2017, TMC encouraged Direct Energy to supplement its traditional outbound calling

---

[5] "Records of such 'opt-in' consumers will be maintained and retained by TMC . . . . Such records will be made available to Direct Energy upon request." SOW (Opt-in) at DE 000049-50. Pursuant to the Outbound SOW, TMC warranted that it would "retain on record during the Term of the SOW or Agreement (whichever is longer) plus an additional five (5) years all information related to leads, sources, leads identities . . . and any third-party consents . . . . [TMC] shall make such information available to Direct Energy within one (1) business day of Direct Energy's request." Ex. 1-B, SOW (Outbound) ¶ 5.

4

with an RVM campaign. *Id.* ¶ 7. RVM technology deposits a message into a recipient's cellular voicemail box, without ringing or placing a call. Ex. 3, Kostyun Report ¶ 15 n.1. Direct Energy agreed to an RVM campaign limited to individuals who opted in to receive its marketing messages. Moran Aff. ¶ 7. As described in its crossclaim, *see* Dkt. 106, Direct Energy was unequivocal and consistent that TMC could only send RVMs to opt-in leads:

- **April 4, 2017**: Before the RVM campaign, Direct Energy's John Moran wrote TMC that ***Direct Energy would require "express permission from the customer"*** for any RVM. Ex. 1-E at Direct Energy 003139-003140 (emphasis added); *see also* Moran Aff. ¶ 8.

- **May 15, 2017**: Starting the campaign, Mr. Moran wrote: "We've been given the green light to go forward with the ringless voice message to ***opt lead leads only***." Ex. 1-F at Direct Energy 003493 (emphasis added); *see also* Moran Aff. ¶ 8.

- **August 2, 2017**: Mr. Moran wrote TMC to expand its opt-in lead generation: "I've greenlighted you to ***expand Opt in*** as high [and] as far as you can go." Ex. 1-G at Direct Energy 004295 (emphasis added); *see also* Moran Aff. ¶ 8.

- **August 16, 2017**: Mr. Moran emailed TMC reiterating "***that we only use ringless voicemail for potential customers who have provided consent to receive calls***." Ex. 1-H at Direct Energy 009085, 009087 (emphasis added); *see also* Moran Aff. ¶ 8.

Direct Energy's insistence never wavered. And during the campaign, it paid TMC $527,133.60 for Direct Energy opt-ins backed by TrustedForms. Moran Aff. ¶ 12. Then, in late November 2017, Direct Energy told TMC to stop all RVMs, and TMC confirmed that it did. *Id.* ¶ 14.

**C.  The Lawsuit: Direct Energy Uncovers that TMC Breached its Agreements.**

  *1.  TMC fabricates Plaintiff's opt-in and misrepresents its authenticity.*

Plaintiff filed suit in 2018 based on an RVM he received about Direct Energy on November 3, 2017. Direct Energy asked TMC for the opt-in proof required in its contracts. TMC responded with a website screenshot and a file of personal data it said Plaintiff entered on the website. Ex. A to Crocker Aff., Dkt. 65-3 at 6-7. Direct Energy asked for more information and records from TMC, including a TrustedForm, but TMC did not provide it. Crossclaim ¶ 32.

5

Instead, TMC delayed, deflected, and then stopped responding (including to this Court's orders), and entered into receivership in Florida. *Id.* ¶¶ 36-39. To get whatever information TMC had, Direct Energy forced its way into TMC's offices in January 2020 by filing a motion for preliminary injunction.[6]

A limited review of internal emails collected from TMC revealed that TMC created the "Dickson Opt In Record" and circulated it to ensure the "date lines up with the call date(s) before sending [to Direct Energy]" because of TMC's "concerns" about it (Ex. 4-A, TMC Email):

| | |
|---|---|
| | [FYDIBOHF23SPDLT)/Recipients/TOTALMARKETING.onmicrosoft.com-5419T-tyson> |
| **Subject:** | Dickson Opt In Record |
| **Attachments:** | DicksonOpt-InRecord.xlsx |
| | |
| Just need to make sure the opt in date lines up with the call date(s) before sending – Rob has concerns. | |

2. <u>*TMC Disregards Orders to Stop RVMs and Defaults on TrustedForms.*</u>

In the last two months, Direct Energy learned that TMC misled it and breached its contracts in other ways. For example, TMC's internal emails show it continued to drop RVMs in 2018 without Direct Energy's knowledge, long after TMC represented it had discontinued RVMs altogether. *See* Ex. 4-B, TMC Email (TMC discussing audio recordings for Direct Energy services in 2018); Ex. 4-C, TMC Email (same); Moran Aff. ¶ 14. As for the TrustedForms Direct Energy paid TMC for, Active Prospect deleted them because TMC stopped passing along payment, another breach (Ex. 4-C, Active Prospect Response):

> Request No. 4: Not applicable. TrustedForm certificates are only stored for customers with a TrustedForm Account. Total Marketing Concepts does not have a TrustedForm Account (they haven't paid us anything since 2018, and which time their account was deleted). See our End User License Agreement and Terms of Service for details. https://activeprospect.com/trustedform-eula/, https://activeprospect.com/terms-of-service/.

---

[6] Direct Energy filed a motion for preliminary injunction on December 27, 2019 in *Burk v. Direct Energy*, No. 4:19-CV-663, in the Southern District of Texas (another case involving TMC). The court's comments in the motion hearing caused TMC to agree that Direct Energy's counsel could visit its offices in Sanford, Florida to collect relevant records. Direct Energy had been demanding that chance since at least October 2019. Direct Energy's counsel flew to Florida the day after TMC consented and collected records on January 10 and 11, 2020.

**D.  Vicarious Liability: Direct Energy Did Not Approve or Ratify RVMs Without Opt-ins.**

Contrary to Plaintiff's suggestion, a "call" that mentions a seller's product or service does not automatically create vicarious liability for a seller who did not place the call. *See In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 527 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Am. Corp., Inc.*, 885 F.3d 243 (4th Cir. 2018). A TCPA claimant must ***prove*** the existence of actual authority, apparent authority, or ratification[7] to impute a telemarketer's liability to a seller like Direct Energy. *See Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 450 (9th Cir. 2018) (plaintiff must prove federal common law agency relationship between defendant and caller). Here, Plaintiff's lack of proof prevents him from carrying his Rule 23 burden. *See Kahler v. Fid. Mut. Life, Inc.*, 5:16CV287, 2018 WL 1365836, at *2 (N.D. Ohio Mar. 16, 2018) (Adams, J.) (discussing necessary proof for vicarious TCPA liability), appeal dismissed, No. 18-3349, 2018 WL 3494640 (6th Cir. June 18, 2018).

*1.  Direct Energy never authorized non-TCPA compliant leads.*

Plaintiff incorrectly states that Direct Energy authorized TMC to procure non-compliant opt-ins from Silverman during the RVM campaign. Mot. at 10. He is confused at best. The Agreement was clear that TMC was required to procure all Direct Energy opt-ins through DMI, SOW at Direct Energy 000047, which was "very well-respected for their opt-in traffic," Correia Dep. 16:1-2, and that any other subcontractor must be approved in writing, Teleservs. Agmt. ¶ 5.1. Direct Energy never authorized TMC—in writing or otherwise—to procure leads from Silverman or any other subcontractor for the RVM campaign. Moran Aff. ¶¶ 9-10. Indeed, Direct Energy's John Moran affirms that Silverman was not discussed as an RVM lead source. *Id.* ¶ 10.

---

[7] Plaintiff's motion never says which vicarious liability theory he proceeds under—whether actual authority, apparent authority, or ratification. For the reasons discussed herein, he cannot meet his burden as to any.

It was not until March **2018**[8] that Direct Energy entered into SOW "No. 3" authorizing Silverman to procure opt-ins for outbound calls **unrelated to RVMs**. Ex. 1-J, SOW No. 3, at TMC 000003; Moran Aff. ¶ 10. And Direct Energy never permitted Silverman—or any lead vendor—to procure non-TCPA compliant opt-ins.[9] Moran Aff. ¶ 6.

Plaintiff also misreads an affidavit from Silverman's Krista Crocker, which states: "Silverman purchased lists of cell phone numbers where the owner of the cell phone had previously granted **written consent** to be contacted with various offers for the sales of goods or services." Crocker Aff. Dkt. 65-3 ¶ 3 (emphasis added). Her affidavit does not suggest Direct Energy authorized Silverman to buy those opt-ins, much less non-TCPA compliant ones.[10]

 2. _Plaintiff has no evidence that TMC acted with apparent authority._

Plaintiff has no evidence of apparent authority either. Apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." _Jones v. All Am. Auto Prot., Inc._, 314CV00199LRHWGC, 2015 WL 7566685, at *4 (D. Nev. Nov. 24, 2015) (citation omitted). In other words, Plaintiff must submit "'proof of something said or done by [Direct Energy], on which [he could have] reasonably relied'" to believe the alleged agent was operating on its behalf—in this case to send RVM's allegedly without consent. _See id._ He fails to do so. Indeed, Plaintiff fails to even allege that JDI and/or Magnify, the vendors that sent the RVMs at issue, were Direct Energy's agents. Mot. at 4-5; Ex. 5, Walker Aff. ¶¶ 1-2. Nor could he. Direct Energy did not know of those vendors at the time, so Direct Energy certainly could not have said

---

[8] The unsigned 2017 SOW that Plaintiff cites only addresses Silverman placing RVMs, it does not authorize Silverman to procure opt-ins. _See_ Moran Aff. ¶¶ 9-10.

[9] Mr. Correia's testimony also does not support the false narrative that Direct Energy authorized Silverman to provide non-TCPA compliant leads. He consistently reaffirmed the contracts controlled the relationships with the vendors, like DMI and Silverman. Correia Dep. 25:16-26:14, 150:4-10, 174:4-175:2; _see also id._ at 164:18-22.

[10] Ms. Crocker's affidavit does not say that Direct Energy was not one of the companies listed on the opt-in as an "offer[] for the sale of goods and services." Crocker Aff. Dkt. 65-3 ¶ 3.

anything to Plaintiff about them. Moran Aff. ¶ 5. Because "the improper acts that [Plaintiff] seeks to impute to [Direct Energy] through [its] business relationship with [TMC] w[as] not performed by [TMC] at all," any apparent authority argument fails. *See Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 372 (6th Cir. 2015).[11]

### 3. *Plaintiff has no evidence that Direct Energy ratified TMC misconduct.*

Plaintiff's ratification evidence is no better. "Liability based on ratification arises when a seller ratifies the unlawful acts by knowingly accepting their benefits—for example, through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *Kahler*, 2018 WL 1365836, at *5. Plaintiff wrongly contends that four things suggest Direct Energy had knowledge of TMC misconduct. First, he cites an inadmissible settlement agreement that disclaimed liability between the Indiana Attorney General and a Direct Energy affiliate: the Assurance of Voluntary Compliance ("AVC"). The AVC did not even arise from telemarketing for energy (much less RVMs). Ex. 6, Carter Aff. ¶¶ 1-3, 5. It concerned One Hour Heating and Air Conditioning, a Direct Energy sister company that contracted with TMC to schedule pre-paid air conditioning maintenance services. *Id.* ¶¶ 1-3. The dispute arose over which company, One Hour or TMC, was responsible for scrubbing the customer list against the Indiana Do-Not-Call ("DNC") list. *Id.* ¶ 3. Importantly, nothing in the AVC or the events giving rise to it suggest TMC telemarketed without consent, and regardless, the AVC was "entered into without the adjudication of any issue of fact or law" and did "not constitute an admission." *Id.* ¶ 4; Ex. 10 to Pl.'s Mot., AVC, Dkt. 107-12 ¶ 15. Second,

---

[11] Evidence of use of a trade name is insufficient to create apparent authority. *In re: Monitronics*, 223 F. Supp. 3d at 527 ("[T]he mere fact that a dealer uses a supplier's name does not render it an agent of the supplier, just as every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise."). And even if Direct Energy authorized TMC to use its trade name, it is not an "outward" manifestation from Direct Energy that caused Dickson or any other individual to reasonably believe that TMC had apparent authority to engage in improper conduct. *See Kahler*, 2018 WL 1365836, at *5.

Plaintiff's "red flag" email about listening to enrollment calls is a red herring. Direct Energy not only listened to the calls, it then paid TMC approximately $530,000 for opt-ins and TrustedForms. Moran Aff. ¶¶ 12-13. Third, Plaintiff's allegation about people who previously made a DNC request misses the mark because Direct Energy only authorized TMC to contact individuals who opted in (overriding any previous DNC request). *See id.* ¶¶ 5-8. Fourth, as for "notice" provided by this lawsuit, Direct Energy ordered TMC to stop all RVMs two months ***before*** its filing. *Id.* ¶ 14. The lawsuit was not notice of any ongoing conduct. Indeed, Direct Energy only learned of TMC's fraud and breaches through its own aggressive discovery efforts. It also terminated TMC and filed crossclaims, repudiating any TMC conduct at issue.

Plaintiff's lack of evidence (individual or class-wide) supporting vicarious liability is another reason he fails to carry his Rule 23 burden and his motion should be denied.

### III.    PLAINTIFF'S RULE 23 BURDEN OF PROOF

Certification of a TCPA class action should be far from "automatic." *See Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 473 (6th Cir. 2017) (certification in a TCPA case is not "automatic"). "It is the party seeking class certification—here, [Plaintiff]—that bears the burden of 'affirmatively demonstrate[ing]' compliance with Rule 23." *See Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 418 (6th Cir. 2012). Rule 23's requirements for certification "must be proven by a preponderance of the evidence." *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 337 (E.D. Mich. 2012) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079–80 (6th Cir.1996)). And to demonstrate that certification is warranted, "[t]he Sixth Circuit uses the 'rigorous analysis' requirement" as to each Rule 23 factor. *Gooch*, 672 F.3d at 418. A "'limited factual inquiry' assuming plaintiff's allegations to be true does not constitute the required 'rigorous analysis' [the Sixth Circuit has] repeatedly emphasized." *Id.* Plaintiff cannot rely on allegations; he must produce evidence to satisfy all Rule 23 factors. *Id.*

10

## IV.    A<span style="font-variant:small-caps">RGUMENT</span>

### A. Ascertainability: The Class Is Not Identifiable from JDI's RVM Records.

"Though not an express requirement of Rule 23, ascertainability goes to whether the class has been defined such as it encompasses an identifiable group" of ***persons***—not just phone numbers. *Stuart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008).[12] Contrary to Plaintiff's argument, the Court cannot certify a class based solely on a list of numbers (again, the JDI/Magnify list does not identify people). Rather, the Sixth Circuit's *American Copper & Brass* decision declined to address ascertainability, saying the defendant "failed to make this argument in its opposition to class certification … so the argument has been forfeited." 757 F.3d 540, 545 (6th Cir. 2014).[13] Plaintiff's retained expert witness, Anya Verkhovskaya, cannot identify the class either. She wrongly claims she will be able to identify class members from the JDI/Magnify records with a "reverse append" process, where she uses a patchwork of inconsistent public records and data vendors to try to match phone numbers with people. As discussed below, numerous courts have harshly criticized this process and denied class certification ***in similar cases involving Ms. Verkhovskaya***. Critically here, Ms. Verkhovskaya's identification plan fails before her process can even begin because the JDI/Magnify records on which she depends cannot be trusted. As stated in Jan Kostyun's Expert Report, Ms. Verkhovskaya cannot identify class members for three independent reasons:

> (1) The JDI/Magnify records that are the foundation of her analysis are unreliable, showing successful RVMs that were not possible (RVMs to landlines, RVMs before campaigns began, and an RVM to Plaintiff that he says he did not receive).

---

[12] "[A]scertainability goes to whether the class has been defined such that it encompasses and identifiable group." *Cerdant, Inc. v. DHL Express (USA), Inc.*, 2:08CV186, 2010 WL 3397501, at *5 (S.D. Ohio Aug. 25, 2010) (quotations omitted). "The touchstone of ascertainability is whether the class is objectively defined, so that it does not implicate the merits of the case or call for individualized assessments to determine class membership." *Id.*

[13] *Innovative Acct. Sols., Inc. v. Credit Process Advisors, Inc.* is also distinguishable because the records included the list of entities contacted. *See* 2020 WL 1465981, at *5 (W.D. Mich. Mar. 26, 2020).

(2) Even if those records were reliable, she cannot accurately identify the wireless telephone numbers that received RVMs about Direct Energy. At least 16% of the telephone numbers her report references (470,869 of 2,867,388) were demonstrably not contacted about Direct Energy—some were contacted by its competitors.

(3) And, even if she could accurately identify the telephone numbers, her proposal for matching numbers with their users/owners as of the RVM date (and then determining their addresses) is unreliable has been criticized by courts in similar cases.

Kostyun Report ¶¶ 15-17. Direct Energy addresses each in turn below.

### 1. *Plaintiff (and the Court) cannot rely on the JDI/Magnify list to identify the class.*

First, the JDI/Magnify data contain indisputable errors that make it an unreliable starting point for class identification. Ms. Verkhovskaya's class list (Exhibit B to her report) is a set of phone numbers that the JDI/Magnify data says successfully received Direct Energy RVMs (noted "OK" in the data). Verkhovskaya Report ¶¶ 12 & n.1, 59-60. And while it is undisputed that RVMs can only be placed to **cell** phones, *see id.* ¶ 62; Crocker Aff. ¶ 3; Kostyun Report ¶¶ 19-21, some class numbers that JDI/Magnify say received Direct Energy RVMs were, in fact, "**landlines** on the dates that ALL RVMs were sent." Kostyun Report, ¶¶ 22-31(emphasis added). It is impossible for landlines to receive RVMs. *Id.* ¶¶ 19-21. And these errors are not limited to Direct Energy RVMs. The JDI/Magnify list wrongly shows successful RVMs to landlines in other companies' campaigns too. *Id.* ¶¶ 32-40.[14] In addition, it indicates that a non-Direct Energy RVM was successfully delivered to Plaintiff's cell phone on August 6, 2017—but Mr. Dickson testified he did not receive it. *See id.* ¶¶ 47-49; Ex. 7, Dickson Dep. 43:12–44:3, 99:6-17, 109:25-110:11. In other words, the JDI/Magnify list indicates that RVMs connected to landlines and wireless lines when they did not. Mr. Kostyun states that such errors commonly exist in RVM records. Kostyun Report ¶ 50. For all of these reasons, the JDI/Magnify data is an unreliable

---

[14] Another flaw in the JDI/Magnify data is that the timestamps of the campaigns and RVMs do not match, showing that RVMs were sent *before* the associated campaign was initiated—another impossibility. Kostyun Report, ¶¶ 41-45. At least five non-Direct Energy RVMs that Plaintiff received "were reported as having been delivered to Plaintiff's telephone number either 1 or 2 days prior to the start of their respective campaign." *Id.* at ¶ 45.

foundation for identifying class members. *See id.* ¶¶ 18-51.

    2.  *Ms. Verkhovskaya inaccurately identified the telephone numbers at issue.*

      Further, even if JDI/Magnify data was reliable, Ms. Verkhovskaya's Report shows that she is unable to accurately identify the wireless telephone numbers that supposedly received RVMs about Direct Energy. *Id.* ¶ 52. Her report claims that 3.2 million RVMs about Direct Energy were sent to 2.8 million wireless numbers. *Id.* ¶ 53 (citing Verkhovskaya Report ¶ 12). But *16.4%* of the numbers she identifies (470,869 of 2,867,388) never received a single RVM related to Direct Energy—according to her own interpretation of what constitutes a Direct Energy RVM. *See* Kostyun Report ¶¶ 53, 63-81. Instead, many seem to have received RVMs about Direct Energy competitors like Spark Energy, Life Energy, and Verde Energy. *See id.* ¶¶ 64-78, Figures 13-20. Whatever methodology Ms. Verkovskaya used was unsuccessful and unreliable by a wide margin. Similar deficiencies in her analysis have contributed to class certification being denied in other TCPA cases. *See, e.g.*, *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457 (M.D. Fla. 2018) (denying certification in part because "defense expert, Jan Kostyun" concluded "the number of relevant calls is significantly lower than" Ms. Verkhovskaya calculated); *see* Kostyun Report ¶¶ 91-94 (collecting cases).

    3.  *Courts regularly reject Ms. Verkhovskaya's "reverse append" methodology.*

      Finally, even if the JDI/Magnify data was reliable (it is not) and Ms. Verkhovskaya had the ability to reliably identify wireless numbers that received RVMs (she cannot) a third problem would remain: Ms. Verkhovskaya's proposed methodology for matching telephone numbers with their users/owners and addresses is wildly inaccurate and unreliable. *See* Kostyun Report ¶¶ 99-160. Numerous courts have criticized it, and those criticisms have contributed to denial of class certification in multiple instances.

Ms. Verkhovskaya's "reverse append" methodology involves sending phone numbers to "Data Vendors" such as "LexisNexis, TransUnion, Experian, and others,"' and relying on their hodgepodge of "public and proprietary information" to produce a list of class members. Verkhovskaya Report ¶¶ 73-84. "Notably, this is not the first-time … Ms. Verkhovskaya, has faced criticism that her reverse-append process fail[s] to identify the [class] in a putative class action under the TCPA." *Sandoe v. Boston Sci. Corp.*, 333 F.R.D. 4, 8 (D. Mass. 2019) (denying class certification, citing failures in Ms. Verkhovskaya's reverse append methodology). Reliance on such data vendors to "reverse append" the telephone number to any specific individual is not so simple because "[t]here is no public database of cell phone subscribers, and ***private services are often inaccurate and incomplete." Jacobs v. Quicken Loans, Inc.***, 2017 WL 4838567, at *3 (S.D. Fla. Oct. 19, 2017) (citations omitted) (emphasis added) (rejecting "reverse append" process to identify class members); *Sandoe*, 333 F.R.D. at 8 ("[T]here is no centralized database linking individual subscribers to phone numbers and that the private databases used by [Ms. Verkhovskaya] are inaccurate and unreliable."); *Wilson*, 329 F.R.D. at 457 (denying certification in part because "there is no public database of cell phone subscribers and private services are often inaccurate and incomplete"); Kostyun Report ¶¶ 109 (stating the same problems exist here). Courts are also reluctant to adopt her methodology because the "proprietary 'black box' techniques of LexisNexis" cannot be verified. *See id.* ¶ 117; *Wilson*, 329 F.R.D. at 458.[15]

Even LexisNexis disclaims its own "data's capacity to fulfill this purpose." *Hunter v. Time Warner Cable Inc*., 2019 WL 3812063, at *11 (S.D.N.Y. Aug. 14, 2019) (denying reverse append methodology relying on LexisNexis); *see also* Kostyun Report, ¶¶ 113-125, 131-137.

---

[15]  "[E]ven if a carrier-by-carrier investigation was undertaken," as Ms. Verkhovskaya proposes here (Verkhovskaya Report ¶¶ 85-86), "it still would not ensure accuracy." *Jacobs*, 2017 WL 4838567, at *3. This is because "historical subscriber records (assuming they still exist) do not always accurately identify historical cell phone subscribers" for many reasons. Kostyun Report ¶¶ 138-156. Moreover, subpoenaing carriers is an "impractical" and "laborious" task (*id.*), which will "require an individualized inquiry." *Wilson*, 329 F.R.D. at 458.

"[O]ne LexisNexis representative averred that [its data] 'cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was 'reassigned' from one person to another, or when the 'customary user' of a phone number changed.'" *Id.* In other words, LexisNexis expressly disavows the very reliance Plaintiff advocates for here.[16] These flaws are illustrated by Plaintiff's data. Plaintiff confirmed that several numbers associated with him on LexisNexis and Westlaw—the exact type of sources that Ms. Verkhovskaya intends to rely on— were not his (belonged to his mother), were work phones, were not recognizable, and one of them was "an incorrect number." Dickson Dep. 59:19-61:12; *see* Kostyun Report, ¶ 154.[17]

Even cases that Ms. Verkhovskaya's Report highlights as wins because the court accepted her "reverse append" methodology should give this Court pause:

| | |
|---|---|
| *Shamblin v. Obama for Am.*, 2015 WL 1909765, at *7 & n.2 (M.D. Fla. Apr. 27, 2015). | The Court **denied class certification**, stating that "[w]hile [it] declines to exclude the expert reports of Verkhovskaya and Biggerstaff, **the Court disagrees with any of their conclusions** tending to suggest that class-wide proof is available on these specific issues." |
| *Reyes v. BCA Fin. Servs. Inc.*, No. 1:16-cv-24077, Dkts. 208-209 (S.D. Fla. Mar. 18, 2020) | The Court **decertified the class** at the request of the parties. |
| *Krakauer v. Dish Network LLC*, No. 1:14-cv-333, Dkts. 581, 562, 567 (M.D.N.C. May 4, 2020) | Using the same reverse-append methodology, Ms. Verkhovskaya **could not identify 4,869 class members** from a 18,066-member class—on top of a potential 14% error rate in the rest. Dish recently appealed her methodology. |

---

[16] While Ms. Verkhovskaya asserts that class members' identities can be "validated" through affidavit, (Verkhovskaya Report, ¶¶ 85-86, 88-95.), courts widely criticize the use of affidavits because it "ignores the very purpose of ascertainment and will, in any event, require an individualized inquiry." *Wilson*, 329 F.R.D. at 458. And importantly, "while an affidavit certifying inclusion in a class might be appropriate in some cases where damages for an individual claimant are negligible," here Plaintiff alleges that Direct Energy "could face up to $1,500 per call," creating "an incentive for individuals to improperly enter the class" and implicates "due process protections." *Id.* "As a result . . . each of the thousands of putative class members would be subject to cross-examination at trial." *Id.* "Such a procedure has been expressly rejected . . . as a means for identifying class members." *Id.*

[17] Recently, a woman made national news because she received calls and texts for Elon Musk because "[p]ublic records show that [her] number was once associated with a condo Musk bought and sold years ago." https://www.npr.org/2020/05/21/858155045/she-gets-calls-and-texts-meant-for-elon-musk-some-are-pretty-weird.

For all of these reasons, Plaintiff fails to show a viable method to identify class members. *Sandusky*, 863 F.3d at 466 (affirming denial of class certification based on concerns of identifying class members under ascertainability and predominance).

## B.  Numerosity: Plaintiff offers no reliable evidence about class members.

Plaintiff's only evidence of numerosity is the JDI/Magnify data and his expert's opinion that it shows 3.2 million RVMs received by 2.8 million cellular numbers. Of course, numerosity would be satisfied by evidence showing that 2.8 million people match Plaintiff's definition of "*persons*. . .who *received* telemarketing calls from Direct Energy, *acting through TMC*. . . on their *cellular* telephone numbers."[18] Mot. at 17 (emphasis added). As discussed, however, there is no such evidence. Plaintiff does not even have reliable evidence that a single wireless number on the list—other than his own—actually received an RVM about Direct Energy. Nor does he have a way to reliably pair the numbers with people.

Likewise, Plaintiff has no evidence about (or way to determine) how many of those people are Ohio residents, as he must. Instead, his numerosity argument assumes an impermissible nationwide class. Because Direct Energy is not subject to general jurisdiction in Ohio, Plaintiff relies on the Court's exercise of specific personal jurisdiction. *See* Dkt. 34, Second Amended Complaint ("SAC") ¶ 10. In such circumstances, "[t]he Court lacks jurisdiction over [defendants] as to the claims of the nonresident, proposed class members." *Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc*., No. 16 C 9281, 2018 WL 3474444, at *4 (N.D. Ill. July 19, 2018) (citing *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty*., 137 S. Ct. 1773, 1783 (2017)); *Chavez v. Church & Dwight Co., Inc.*, No. 17 C 1948, 2018 WL

---

[18] "'[N]umerosity . . . is inextricably bound up in the question of class definition.'" *Cochran v. Oxy Vinyls LP*, CIV. A. 306CV-364-H, 2008 WL 4146383, at *8 (W.D. Ky. Sept. 2, 2008) (citation omitted). Plaintiff must define the class to include only those that were actually harmed. *See Castellanos v. Worldwide Distribution Sys. USA, LLC*, 14-CV-12609, 2015 WL 13862060, at *3 (E.D. Mich. Aug. 19, 2015) ("Reference to the total number of individuals conceivably harmed is insufficient to prove numerosity.").

2238191 (N.D. Ill. May 16, 2018) (plaintiff may not represent "nationwide and multistate class comprising non-Illinois residents in this suit").[19] Because the Court lacks general jurisdiction as to Direct Energy, Plaintiff cannot seek to certify a class that includes non-Ohio residents.[20] Here, he submits no evidence about any Ohio resident other than himself.

In addition, to the extent Plaintiff's claim is based on a ratification theory, the class must be limited to individuals who received an RVM from which Direct Energy obtained a benefit. *See Kahler*, 2018 WL 1365836, at *5 ("Liability based on ratification arises when a seller ratifies the unlawful acts by knowingly accepting their benefits[.]"). Here, Direct Energy received no benefit from the RVM sent to Plaintiff, who explained the RVM did not prompt him to enroll and in fact hurt his opinion of Direct Energy to the point that he would never do business with it. Dickson Dep. 62:4-63:1, 63:17-21. There is no evidence suggesting other people had a different reaction. And despite Plaintiff's allegation that Direct Energy used RVMs to "fuel 'its impressive growth,'" he submits no evidence of any sales made from the RVM campaign. *See Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 745–46 (N.D. Ill. 2014) (TCPA action in which plaintiff's ratification theory failed because she did not allege she did business with defendants because of their calls); *Jones*, 2015 WL 7566685, at *5 (plaintiff failed to allege defendant received any benefit from calls). To be clear, Plaintiff cannot identify one person who enrolled with Direct Energy because of an RVM they received.[21]

For these reasons, Plaintiff fails to carry his burden to establish numerosity.

---

[19] Plaintiff may note that the Supreme Court has only ruled on this issue in the context of mass actions. *See Bristol-Myers*, 137 S. Ct. at 1783. As discussed in *Promologics* and *Chavez*, the same due process concerns addressed in *Bristol-Myers* equally apply to class actions.

[20] Direct Energy timely raised its personal jurisdiction as to absent class members by raising it in this opposition to Plaintiff's attempt to certify a class. *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 249 (5th Cir. 2020) (defendant did not waive personal jurisdiction defense as to nationwide class by not raising it in a Rule 12 motion because unnamed class members are not before the district court until class certification).

[21] Plaintiff may argue that Direct Energy received name recognition. But Plaintiff has no evidence on this topic, and as Plaintiff's experience indicates, such a theory defies common sense.

**C.  Typicality and Adequacy: Dickson is not an appropriate class representative.**

To satisfy Rule 23(a)(3) typicality, Plaintiff must show that he "has been injured by the same kind of conduct alleged against the defendant as other members of the proposed class[,]" *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 185 (S.D. Ohio 2012), and that the unique defenses applicable to him will not "usurp a significant portion of [his] time and energy" at the class's expense. *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 484 (S.D. Ohio 2004). Adequacy under Rule 23(a)(4) similarly requires Plaintiff to "'have common interests with unnamed members of the class,'" and it therefore "'overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members.'" *In re Am. Med. Sys.*, 75 F.3d at 1083 (citation omitted).

Here, Plaintiff says he is an appropriate class representative simply because he and the putative class received an RVM promoting Direct Energy's services, but that is not enough. Conclusory assertions of typicality and adequacy do not satisfy his evidentiary burden. *In re Am. Med. Sys.*, 75 F.3d at 1082-83. Looking past the pleadings as the Court must, the evidence proves that Plaintiff is far from a typical or adequate class representative.

For example, Plaintiff testified that he was ***seeking out*** a TCPA claim when he received the RVM at issue. Dickson Dep. at 87:16–88:6, 110:4–11. Having previously served as the plaintiff in another TCPA lawsuit that settled, he was in the process of collecting evidence for his next TCPA case. *Id.* at 11:15–13:5, 76:3–6, 86:12–25, 99:4–17. Plaintiff first received RVMs in July 2017 (marketing other energy companies without identifying them by name) and, rather than call back and ask that they stop, he forwarded them to his lawyers. *See id*. By August 2017, Plaintiff and his lawyers had decided they would file a TCPA lawsuit; they just did not know who to sue. *Id.* at 87:16–88:6, 110:4–11. So, when Plaintiff received the November 2017 RVM

from "Nancy Brown with Direct Energy," it was the long-awaited key to a lawsuit—an RVM that enabled him to identify a defendant. *Id.* at 88:12–23. He sent a demand letter and filed this case shortly thereafter. *See* Dkt. 1. However, Plaintiff cannot recall ***any*** relevant facts about the RVM. He does not know where he was, what he was doing, or even what time it was when he received the RVM. *See id.* at 49:18–50:25, 52:6–53:1. Plaintiff has no evidence of injury, and his months-long litigation hunt shows he was not harmed at all.

Plaintiff's testimony and personal experience mean that he cannot satisfy Rule 23(a)'s typicality or adequacy requirements for three fundamental reasons. Specifically, he: (1) cannot establish Article III standing, (2) will be consumed by unique defenses and credibility attacks at the expense of the class, and (3) lacks a viable vicarious liability theory.

### 1. *Plaintiff lacks a concrete injury sufficient for Article III standing.*

"Threshold individual standing is a prerequisite for all actions, including class actions." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). Here, Plaintiff cannot establish an injury-in-fact to confer Article III standing. Direct Energy's forthcoming motion for judgment on the pleadings will explain more fully why Plaintiff lacks standing to bring his claim in any capacity. Relevant to this motion, however, his lack of standing means the Court cannot certify any class. *See Courtney v. Smith*, 297 F.3d 455, 467 (6th Cir. 2002) (plaintiff's lack of standing prevents class claims in full) (citing *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1287 (11th Cir. 2001) ("[A]s a prerequisite to certification, it must be established that the proposed class representatives have standing[.]")). It also means that Plaintiff cannot satisfy Rule 23(a)'s typicality or adequacy requirements because he was not "injured by the same kind of conduct," that he says injured the class. *Swigart*, 288 F.R.D. at 185; *see Oron 2015 LLC v. City of Southfield*, 2019 WL 2502739, at *6 (E.D. Mich. June 17, 2019) ("[T]here cannot be

19

adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class.").

Again, Plaintiff sued Direct Energy based on **one RVM**. *See* Mot. at 4. However, one ringless communication to a cell phone is insufficient on its own to show an injury-in-fact. *See Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019) (the "chirp, buzz, or blink of a cell phone receiving a single text message" is "not a basis for invoking the jurisdiction of the federal courts").[22] Nor can Plaintiff rely on RVMs allegedly sent to the putative class to satisfy his burden to establish standing for himself. *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1089 (D. Colo. 2018) ("[T]he named plaintiffs must allege an actual injury, not an 'injury [that] has been suffered by other, unidentified members . . . .").

Even if one RVM could be enough to confer Article III standing (it is not), Plaintiff must also prove he suffered some concrete harm from the RVM beyond a "bare procedural violation" of the TCPA. *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1549 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation."). While Plaintiff's pleadings make generic allegations of annoyance, *see* SAC ¶¶ 31–32, his sworn testimony is that he cannot recall any of the circumstances surrounding his receipt of the RVM. *See Zemel v. CSC Holdings LLC*, 2017 WL 1503995, at *5 (D.N.J. Apr. 26, 2017) ("Because Plaintiff has failed to allege why or how the small number of text messages caused him aggravation or nuisance, this Court cannot and will not infer such harm."). Nor can Plaintiff point to annoyance from other companies' RVMs to claim standing for the one RVM about Direct Energy. *See LaVigne v. First*

---

[22] *See also Drazen v. GoDaddy.com, LLC*, CV 1:19-00563-KD-B, 2020 WL 2494624, at *4 (S.D. Ala. May 14, 2020) ("receipt of a single text message is insufficient to establish an injury in fact"); *Cranor v. 5 Star Nutrition, LLC*, 1-19-CV-908-LY, 2019 WL 8331601, at *4 (W.D. Tex. Nov. 27, 2019) ("[I]solated, single text message is not an invasion of 'the privacy rights [the Act] is intended to protect.'"); *Shuckett v. DialAmerica Mktg., Inc.*, No. 17CV2072-LAB (KSC), 2019 WL 3429184, at * (S.D. Cal. July 30, 2019) (one unanswered phone call about which plaintiff could not recall any details cannot confer standing); *Smith v. Aitima Med. Equip., Inc.*, No. EDCV1600339ABDTBX, 2016 WL 4618780, at *4 (C.D. Cal. July 29, 2016) (no standing from one phone call).

*Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1141 (D.N.M. 2016) ("Each alleged violation . . . is considered a separate claim, meaning that a plaintiff must establish standing (an injury-in-fact) for each individual call."). At most, Plaintiff has **allegations** of "a brief, inconsequential annoyance [] categorically distinct from those kinds of real but intangible harms" necessary for standing. *See Salcedo*, 936 F.3d at 1168. But he has no **evidence** of any harm whatsoever. In fact, Plaintiff was hunting for a TCPA lawsuit, undermining any Article III injury.

  2.  *Unique defenses undermine Plaintiff's ability to represent the class.*

  Typicality and adequacy are destroyed where a proposed class representative is subject to "defense[s] peculiar to [him.]" *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc*., 332 F.R.D. 556, 567 (M.D. Tenn.), *leave to appeal denied sub nom.*, *In re Cmty. Health Sys., Inc*., No. 19-0509, 2019 WL 5549319 (6th Cir. Oct. 23, 2019). To defeat class certification a defendant need not "*prove* a unique defense," but rather "[i]t is problem enough that the proposed representative [is] subject to such defenses[.]" *Id.* at 568 (quotations omitted). So, at this stage, "the court has to make only a preliminary determination of whether the [proposed representative] would be subject to unique defenses, not whether such defenses will ultimately be successful." *Id.* Here, Plaintiff is atypical and inadequate, as he is uniquely subject to a number of attacks that will distract from the litigation as the class's expense.

  First, Plaintiff's prior experiences as a TCPA litigant and admitted desire to file another TCPA lawsuit mean he is outside the zone of interests that Congress meant to protect. As discussed, he testified he was collecting RVMs for months for the sole purpose of bringing a lawsuit. This alone defeats his bid to serve as a class representative. *See, e.g.*, *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 378 (C.D. Cal. 2016) (plaintiff who sought out TCPA violation is inadequate and atypical because "the typical member of the class . . . hope[d] and

expect[ed] that [their] privacy would be respected and not invaded by unwanted text messages from [defendant].").[23] Otherwise, "if [Plaintiff] is the class representative, he and his counsel will have to devote most of their time and resources trying to refute [Direct Energy's] attacks on his character and his motivations for filing and litigating this lawsuit[.]" *Id.* at 383.

Second, Plaintiff's choice to voluntarily dispose of his cell phone during the pendency of the lawsuit, *see* Dickson Dep. 89:4-90:2, raises potential spoliation issues unique to him. Plaintiff never alerted Defendants that he intended to—and ultimately did—dispose of his cell phone. Although his interrogatory answers indicated the cell phone was in his possession, *see* Ex. 8, Pl.'s Resp. to TMC's Interrog. at 4, Plaintiff recently testified that he traded in his cell phone in late 2018, shortly after providing that answer. *See* Dickson Dep. 89:4-90:2. This violated his ongoing duty to maintain evidence at the center of his lawsuit. *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008) ("As a general matter, it is beyond question that a party to civil litigation has a duty to preserve relevant information including [Electronically Storied Information]."). Of course, Plaintiff's cell phone is relevant to the standing issues discussed above, which arise in part from his inability to say where he was, what he was doing, or how he was alerted to the RVM, as well as to ascertainability if Plaintiff attempts to change his deposition testimony to claim he did receive an August 6, 2017 RVM, as the JDI/Magnify data shows. Thus, there are "possible defenses against him that would not apply to the class as a whole," making him atypical. *Mooradian v. FCA US, LLC*, 286 F. Supp. 3d 865, 870 (N.D. Ohio 2017) (plaintiff who serviced car engine during engine defect case could not be class representative).

Third, Plaintiff's beliefs about his case are at odds with his counsel's and his expert's

---

[23] *See also Telephone Science Corp. v. Asset Recovery Sols., LLC*, 15-CV-5182, 2016 WL 4179150, at *15–16 (N.D. Ill. Aug. 8, 2016) (plaintiff "did not suffer the injury contemplated by the TCPA—that is, invasion of privacy and/or general nuisance" as it welcomed the calls); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 323 (3d Cir. 2015) ("[A] generalized interest in punishing telemarketers [] would not qualify on that basis alone.").

position that his lawsuit is based solely on the one RVM mentioning Direct Energy. *Compare* Dickson Dep. 39:12-40:11, *with* Mot. at 4, *and* Verkhovskaya Report ¶ 99. Despite being pressed on the issue in his deposition, Plaintiff insisted that he is suing based on the ten other RVMs that do not mention Direct Energy and, in fact, are attributable to Direct Energy's competitors. *See* Dickson Dep. 37:16-23, 39:12-40:11; Verkhovskaya Report ¶ 99; Kostyun Report ¶ 49. Plaintiff's insistence that Direct Energy is responsible for the other ten RVMs (a fact his counsel and expert dispute) undermines his ability to fairly and adequately represent the class at trial because it indicates he does not understand his case and contradicts the theory his attorneys are pursuing on behalf of the class. *See San Pedro-Salcedo v. Haagen-Dazs Shoppe Co., Inc*., 5:17-CV-03504-EJD, 2019 WL 6493978, at *5 (N.D. Cal. Dec. 3, 2019) (plaintiff's testimony that lawsuit was about twelve phone calls when in fact it was about one text message, "indicate[d] [a] distressing lack of understanding of or familiarity with her claim").

For all of these reasons, "[t]he major focus of this litigation will be on these issues and defenses unique to [Plaintiff], not on the claims of the class," rendering Plaintiff an atypical and inadequate representative under Rule 23(a). *Nghiem*, 318 F.R.D. at 382–83.

3. *Plaintiff lacks a viable vicarious liability theory against Direct Energy.*

Plaintiff is an atypical and inadequate representative for the additional reason that he has no viable vicarious liability claim himself, which precludes him from representing a class seeking to hold Direct Energy vicariously liable. *See Donaca v. Dish Network, LLC.*, 303 F.R.D. 390, 399 (D. Colo. 2014) (plaintiff with no viable vicarious liability theory not typical of persons who pursue vicarious liability claim under TCPA). As a threshold matter, for vicarious liability to attach under any theory, Plaintiff must prove that TMC was its agent. *Keating*, 615 F. App'x at 372 ("no principal-agent relationship was established" when acting "only pursuant to

23

contractual obligations"). He cannot. No principal-agent relationship existed between Direct Energy and TMC because the Teleservices Agreement provided that TMC was an independent contractor, and it expressly limited any authorized actions. *See Kahler*, 2018 WL 1365836, at *3-4; *see also Keating*, 615 F. App'x at 372 (operating "pursuant to contractual obligations" means alleged agent not authorized to act on alleged principal's behalf where contract provides they are "independent contractors").[24] "Because [TMC] was never authorized to act on [Direct Energy's] behalf, but rather only pursuant to contractual obligations, no principal-agent relationship was established." *Id*. This alone dooms Plaintiff's attempt to hold Direct Energy vicariously liable as to him or the class. Beyond this threshold (and dispositive) failure, Plaintiff also fails to say whether he seeks to hold Direct Energy liable under a theory of actual authority, apparent authority, or ratification. This is unsurprising as he cannot sustain his burden under any one of the three available theories.

   *a.  Direct Energy did not give TMC actual authority to drop RVMs without consent.*

   As discussed, Direct Energy's agreements and communications with TMC expressly instructed that RVMs could only be sent with opt-in consent. *Supra* at 5; Moran Aff. ¶¶ 4, 5, 8, 12. Plainly then, TMC and Silverman did not have actual authority to do the opposite. *See Jones*, 887 F.3d at 449 (actual authority covers actions specifically requested or consistent with what agent is supposed to do). As for JDI and Magnify, Direct Energy did not know of their existence, much less authorize their actions. Moran Aff.  ¶ 11. No actual authority existed for TMC, Silverman, JDI, or Magnify to send RVMs without consent.

   *b.  TMC did not act with any apparent authority from Direct Energy.*

   "'[T]he apparent power of an agent is to be determined by the act of the principal and not

---

[24] *See Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 588 (S.D. Ohio 2016) (where seller's contract with a third-party 'specifically noted that [the third party] had to comply with all state and federal laws,' . . . the plaintiff "fail[ed] to allege a plausible basis to hold [the seller] liable under a ratification theory") (citation omitted).

by the acts of the agent[.]'" *Keating*, 615 F. App'x at 374. Here, Dickson's evidence falls far

short because Direct Energy did not make *any* representations to him (or the class), so apparent

authority fails on its face.[25] Moreover, Plaintiff's reliance on the fact that the RVMs mention

Direct Energy is insufficient as a matter of law because use of a trade name cannot establish

vicarious TCPA liability,[26] and those representations were made by JDI and/or Magnify *not*

Direct Energy.[27] There is no evidence to sustain apparent authority, if Plaintiff relies on it.

    *c.  The record contradicts any claim of ratification.*

"[R]atification is the affirmance of a prior act done by another," but such affirmance

cannot bind the party if it is "made without knowledge of material facts involved in the original

act when the [party] was unaware of such lack of knowledge." *Hodgin v. UTC Fire & Sec.

Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). Here, Plaintiff has no proof that either (i)

Direct Energy had knowledge of any material facts, or (ii) it affirmed any TMC misconduct.

    i.  Direct Energy could not have known any relevant material facts.

Plaintiff points to *no* evidence that TMC and its vendors were placing RVMs without

prior express written consent, much less evidence that Direct Energy knew it, which is fatal to a

---

[25] *Jones*, 2015 WL 7566685, at \*4 ("Royal did not make (or cause to make) any direct communications to end-users such that they might think a vendor or dealer was acting on Royal's behalf."); *see also N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997) ("Apparent authority cannot be established merely by showing that [the agent] claimed authority or purported to exercise it, but must be established by proof of something said or done by the [principal] on which [a third party] reasonably relied.").

[26] Again, the use of a trade name is insufficient for apparent authority. *In re: Monitronics*, 223 F. Supp. 3d at 527. And even if Direct Energy authorized TMC to use its name, this was a representation to TMC and not an "'outward' manifestation" to the putative class. *See Kahler*, 2018 WL 1365836, at \*5; *see also Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253, at \*8 (C.D. Cal. May 18, 2015) ("Here, the only arguable 'manifestation' UTCFSA made was to SOAS and its other authorized dealers-giving these dealers a limited license to declare themselves authorized dealers of GE Security and/or Interlogix. . .UTCFSA did not make (or cause to make) any *direct* communications to end-users [that] a reseller or dealer was acting on UTCFSA's behalf.").

[27] "[T]he improper acts that Keating seeks to impute to CUnet through that defendant's business relationship with CornerBlue were not performed by CornerBlue at all." *Keating*, 615 F. App'x at 372 (CornerBlue, like TMC, hired a text vendor, like JDI/Magnify, that the principal, like Direct Energy, did not know about); *Keating v. Peterson's Nelnet, LLC*, 2014 WL 1891369, at \*6 (N.D. Ohio May 12, 2014) ("In short, Plaintiff has failed to provide any evidence . . . that any Defendant . . . ever authorized River City to send the text messages at issue. Further there is no evidence that River City was an agent of CUnet . . . the only entity authorized by CUnet to engage in mobile media marketing on its behalf.").

ratification theory. *See Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1015 (9th Cir. 2018) ("[Plaintiff] presented no evidence that [defendant] had actual knowledge that [its vendor] was sending text messages in violation of TCPA.").[28] In fact, the record shows that Direct Energy repeatedly told TMC to contact only persons who provided consent, paid TMC for consents, and believed TMC had obtained them. *Kahler,* 2018 WL 1365836, at *5 ("[T]here is no evidence . . . that Fidelity was ever aware of Admen violating the TCPA in any capacity. As such, Kahler's ratification argument has no merit.").

As discussed, Plaintiff says four things suggest ratification, but none provides evidence to carry his burden. First, the AVC was "entered into without the adjudication of any issue of fact or law" and "d[id] not constitute an admission . . . of any Deceptive Act" or any other violation of Indiana law. Dkt. 107-12 ¶ 15; Carter Aff. ¶ 4.[29] It was also limited to alleged violations of state DNC laws, and thus completely unrelated to RVMs or even sales as here.[30] Second is an internal email that shows Direct Energy took "reasonable steps to ensure that the leads it purchased were not tainted by illegal telemarketing activity."[31] *See Johansen*, 218 F. Supp. 3d at 588. Likewise, DNC requests (fact three) are simply a request to no longer be contacted; they do not amount to "complaints" or notice to Direct Energy of any TCPA violation. And fourth,

---

[28] *See also Kern v. VIP Travel Servs.*, No. 1:16-CV-8, 2017 WL 1905868, at *8 (W.D. Mich. May 10, 2017) ("An acceptance is not effective to ratify unless it is accompanied by "actual knowledge of material facts[.] . . . Ratifying a reservation . . . is not the same as knowingly ratifying the conduct leading up to that reservation."); *Petri v. Mercy Health*, 4:15 CV 1296 CDP, 2016 WL 7048893, at *3 (E.D. Mo. Dec. 5, 2016) ("Mercy could not have ratified Valarity's conduct because there is no evidence Mercy knew Valarity's activities violated the TCPA.").

[29] Indiana law confirms that "[t]he assurance of voluntary compliance shall not be considered an admission of a deceptive act for any purpose[.]" IND. CODE § 24-5-0.5-7(b). At most, the Assurance is an inadmissible settlement agreement. *See* FED. R. EVID. 408(a); *see also Eldridge v. Cardif Life Ins. Co.*, 266 F.R.D. 173, 178 (N.D. Ohio 2010) (noting that AVCs "are essentially settlement agreements").

[30] *See Hodgin*, 885 F.3d at 253 n.5 ("Although Plaintiffs cited evidence demonstrating that Honeywell received complaints about ISI's aggressive telemarketing practices . . . , those complaints did not allege that ISI was using prerecorded messages or calling numbers on the Do–Not–Call Registry.").

[31] The decrease in opt-in price did not put Direct Energy "on notice" that TMC was contacting non-opt-in leads because Direct Energy was still paying a premium ($0.45) for Direct Energy specific opt-ins, which was significantly higher than prices for non-company specific opt-ins (frequently $0.05). Moran Aff. ¶¶ 5, 10; *see also* Correia Dep. 139:14-25.

26

Dickson points to this lawsuit but, likewise, allegations are not notice—and, anyway, Direct Energy ordered a halt to all RVMs before the case was filed.[32]

Moreover, even if Direct Energy had reason to know that TMC was violating the TCPA (it did not), such knowledge cannot be imputed as to Plaintiff's individual claim because TMC acted adversely to Direct Energy with respect to Plaintiff. This "adverse interest exception" holds that a supposed agent's "knowledge or conduct . . . will not be imputed to a principal if its agent 'is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act.'" *In re Fair Fin. Co.*, 834 F.3d 651, 676–77 (6th Cir. 2016) (citing RESTATEMENT (THIRD) OF AGENCY § 5.04 (2006)).[33] "For example, where the communication of a fact would 'necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating,' the agent's knowledge is not imputed to the principal." *BancInsure, Inc. v. U.K. Bancorporation Inc.*, 830 F. Supp. 2d 294, 302 (E.D. Ky. 2011) (citation omitted). That is precisely the case here. TMC deceived Direct Energy by manufacturing an opt-in to hide that it lacked any record of Plaintiff's consent, all so that it could continue to receive Direct Energy's business. As a matter of law Direct Energy could not have ratified TMC's fraudulent actions related to Plaintiff. *Id.*

> ii.  Direct Energy did not gain any benefit from the RVM to Plaintiff's phone.

"A party 'may ratify an act by failing to object to it or to repudiate it,' . . . **or** by 'receiving or retaining [the] benefits it generates[.]'" *Hodgin*, 885 F.3d at 252 (citation omitted) (emphasis added). As discussed, Direct Energy had no reason to believe until recently that TMC manufactured the Dickson opt-in it produced in this case. But, as soon as Direct Energy

---

[32] *See Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1049 (S.D. Cal. 2015) ("A complaint is an allegation of an illegal act, not notice of an illegal act.").

[33] "In TCPA cases, the Sixth Circuit looks to the Restatement of Agency to determine whether vicarious liability should be imposed." *Johansen*, 218 F. Supp. 3d at 586.

discovered that fact, it immediately repudiated by filing a crossclaim detailing TMC's fraud. *See* Dkt. 106. Nor did Direct Energy receive any benefit from the RVM to Plaintiff. He did not enroll with Direct Energy, was "completely uninterested" in it, had a negative impression of the company, and said he would never "do business with Direct Energy" as a result of the RVM. Dickson Dep. 61:23-63:21. So, Direct Energy plainly received no benefit. *See Toney*, 75 F. Supp. 3d at 745–46 ("Plaintiff's ratification theory fails because plaintiff does not allege that [defendant] accepted any benefit that stemmed from [the] telemarketing calls to plaintiff.").[34]

### D.  Commonality & Predominance: Individualized issues overwhelm any common ones.

Commonality under Rule 23(a)(2) requires that the claims of the class "depend upon a common contention … of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Predominance under Rule 23(b)(3) likewise "require[s] that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *Am. Med. Sys.*, 75 F.3d at 1084; *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (the "predominance criterion is even more demanding" than commonality).

Plaintiff identifies only two disputed issues he says are common and will predominate over individualized ones: whether class members gave TCPA-compliant consent to be contacted, and whether Direct Energy is vicariously liable for the RVMs. Neither can satisfy commonality because there is no evidence showing they can be resolved on a class basis. Quite the contrary, the record shows that both raise individualized issues that will dominate the proceedings. And

---

[34] *Petri*, 2016 WL 7048893, at *3 ("Petri has neither alleged in his complaint nor submitted evidence to show that he paid any money to Valarity or Mercy."); *Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 779 (N.D. Ill. 2014) (ratification theory rejected because "Plaintiffs do not allege that Variable provided any leads to Farmers . . . stemming from [the] telemarketing calls to Plaintiffs").

regardless, issues of standing and of determining whether the RVMs were played (a prerequisite for TCPA liability) will require individualized inquiries that will consume the litigation. Plaintiff has not met his burden to establish Rule 23(a) commonality or Rule 23(b) predominance.

1. *Plaintiff submits no common evidence to resolve the issue of consent class-wide.*

Plaintiff says that (lack of) consent is a common issue because Direct Energy has not produced evidence of a single TCPA-compliant consent. He is wrong as a matter of law and fact. Legally, his argument is nonsensical in this Rule 23 posture. As the proponent of class certification, it is Plaintiff—not Direct Energy—who bears the burden to affirmatively show that consent is a common question that will predominate over individualized issues. *See Sandusky*, 863 F.3d at 466 (plaintiff must "affirmatively demonstrate" compliance with all Rule 23 provisions, including predominance in the context of TCPA consent); *Sawyer v. KRS Biotechnology, Inc.*, 1:16-CV-550, 2018 WL 2425780, at *9 (S.D. Ohio May 30, 2018), *report and recommendation adopted sub nom. Sawyer v. KRS Glob. Biotechnology, Inc.*, 2018 WL 4214386 (S.D. Ohio Sept. 5, 2018) (same).[35] Plaintiff does not even attempt to meet his burden.

Instead, Plaintiff tries to dodge his evidentiary burden by pointing to the supposed absence of consent evidence. But, as mentioned, that position is factually incorrect as well. The record unquestionably contains evidence that TCPA-compliant consents exist for some class members: Direct Energy's agreements with TMC required it to procure TCPA-compliant

---

[35] *See also Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) ("predominance of individual issues necessary to decide an affirmative defense may preclude class certification"); *Tomeo v. CitiGroup, Inc.*, 13 C 4046, 2018 WL 4627386, at *8 (N.D. Ill. Sept. 27, 2018) (collecting cases for proposition that "[t]he need for individualized inquiries with respect to an affirmative defense may still defeat the predominance requirement"); *Newhart v. Quicken Loans Inc.*, 9:15-CV-81250, 2016 WL 7118998, at *4 (S.D. Fla. Oct. 12, 2016) ("Plaintiff has failed to … demonstrate that the prior express written consent issue can be resolved for all class members by common evidence."); *Selby v. LVNV Funding, LLC*, 13-CV-01383-BAS(BLM), 2016 WL 6677928, at *4 (S.D. Cal. June 22, 2016) ("'[F]or purposes of class certification, [plaintiff] must prove that consent, or the lack thereof, can be resolved 'on evidence and theories applicable to the entire class.'") (quoting *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) (same)) (citing *Blair v. CBE Group, Inc.*, 309 F.R.D. 621, 628–29 (S.D. Cal. 2015) (same)); *Balthazor v. Cent. Credit Services, Inc.*, 10-62435-CIV, 2012 WL 6725872, at *4 (S.D. Fla. Dec. 27, 2012) ("[W]hile it is true that CCS will ultimately bear the burden of establishing prior express consent, at the class certification stage, the burden is on the Plaintiff to establish the Rule 23 factors.").

consents, and even included examples of how the opt-in websites must look, SOW (Opt-In) at Direct Energy 000047-57; Direct Energy's emails with TMC show that Direct Energy never wavered in that requirement, *see supra* Part II.B; Direct Energy paid TMC nearly $530,000 for opt-ins during the RVM campaign, Moran Aff. ¶ 12; TMC contracted with Active Prospect to maintain TrustedForm to verify the consents, and there is evidence that Active Prospect maintained at least 70,877 consents specific to Direct Energy, Ex. 4-E, Active Prospect Receipts; DMI supplied TMC with Direct Energy opt-ins, Correia Dep. 126:10-16; and TMC procured opt-ins from Silverman for the Direct Energy RVM campaign,  Crocker Aff. ¶ 3. Perhaps most important, TMC's Larry Correia unequivocally testified that "the RVM campaigns that TMC did for Direct Energy all used opt-ins," and he even "**saw the TrustedForms**" with his own eyes. Correia Dep. 24:6-8, 36:6-24, 125:15-21, 137:3-25, 152:24-153:3 (emphasis added).

Direct Energy's evidence of consent is a far cry from the "speculation and surmise" discussed in *Bridging Communities* (relied on by Plaintiff). *Bridging Cmtys. Inc. v. Top Flite* Fin. Inc., 843 F.3d 1119, 1125–26 (6th Cir. 2016). Unlike in *Bridging Communities*, Direct Energy has offered admissible evidence, including sworn testimony, that some class members consented. The record here is in accord with the facts of *Sawyer*, which distinguished *Bridging Communities* to rightly deny class certification for lack of predominance. 2018 WL 2425780, at *6–13. In *Sawyer*, as here, the plaintiff "repeatedly insist[ed] that Defendant ha[d] 'produced no evidence of consent whatsoever,'" but, like here, that was "not a correct statement." *Id.* at 11. And just like Direct Energy, the *Sawyer* defendant "offered testimony . . .  that . . . [certain] 'recipients had consented[.]'" *Id.* On such facts, having to determine who in the class "provided consent would be no hypothetical scenario but would instead predominate this case, requiring myriad mini-trials

and a painstaking sorting process[.]" *Id.* at *12 (quotations omitted).[36] Just as in *Sawyer*, Direct Energy's evidence of consent means that class certification should be denied.

By contrast, Plaintiff has not presented a ***single fact*** common to the class that could resolve consent class-wide. He has therefore failed to establish commonality or predominance.

2. <u>*There is no evidence (common or otherwise) to establish vicarious liability.*</u>

Plaintiff's supposed common proof of vicarious liability fares no better. *See Dukes,* 564 U.S. at 350 ("What matters to class certification ... is ... the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation.") (quotations omitted). As discussed, the evidence affirmatively disproves actual authority, and so Plaintiff will likely rely on apparent authority or ratification theories. Because he has no common proof for either, individualized issues will predominate as to vicarious liability as well.

a. *Apparent authority will raise individualized issues of reliance.*

To prevail on apparent authority, Plaintiff "must present evidence that each class member knew about [any Direct Energy] representations, each class member relied upon those representations, and then each class member changed his or her position based upon such individual reliance on [Direct Energy's] representations." *Bouton v. Ocean Props., Ltd*, 322 F.R.D. 683, 701 (S.D. Fla. 2017). Plaintiff "does not address this issue or otherwise explain how he intends to prove his theory of apparent agency against [Direct Energy] without resorting to individualized proof." *Id.* Thus, because Plaintiff has no common evidence, individualized inquiries into reliance will predominate the apparent authority analysis. *Id.* (collecting cases).

---

[36] *See also See Smith v. Cash Am. Int'l, Inc.*, 1:15-CV-00760-MRB, 2019 WL 2352921, at *4 (S.D. Ohio June 4, 2019) ("The existence of various manners in which consent may be obtained, imperfectly obtained, or not obtained at all is precisely the reason why consent [] cannot be determined on a classwide basis"); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 543  n.9 (D. Minn. 2017) ("[E]ven if [plaintiff] is correct that [defendant] lacked consent as a general matter, other evidence in the record, such as [] deposition testimony, suggests that at least some references nevertheless expressly consented to be called. Thus, [defendant] would be entitled to offer such evidence with respect to each particular class member.").

31

*b.  Plaintiff has no common proof of ratification.*

To turn ratification into a common issue, Plaintiff would need class proof that Direct Energy either failed to object to TMC's unauthorized vendors' placement of RVMs without consents in violation of the parties' Agreements **or** that it retained the benefits of that wrongdoing. *See BancInsure*, 830 F. Supp. at 302. Plaintiff has common proof of neither.

First, as to a failure-to-object theory, Plaintiff makes the conclusory assertion that Direct Energy was "on notice"[37] that TMC was violating the TCPA. His argument is self-defeating. It cuts against class certification because whether Direct Energy knew about, but failed to object to, TMC's actions will involve different proof depending on when an RVM was placed. For example, class members who received RVMs in 2018 cannot rely on the same proof as those who received them earlier—because 2018 RVMs came **after** Direct Energy expressly told TMC to stop. Moran Aff. ¶ 13. In other words, even if Plaintiff proved ratification for the RVM he received on November 3, 2017, that would be proof of nothing for later RVMs. *See Glob. Towing, L.L.C. v. Marine Tech. Services, Inc.*, 244 F.3d 138, at *4 (5th Cir. 2000) (Table) ("An earlier ratification . . . does not necessarily ratify all future unauthorized acts."). Indeed, Plaintiff has no evidence of ratification for RVMs post-dating Direct Energy's late November 2017 instruction to stop all RVMs. Conversely, class members who received an RVM at the start of the campaign in May 2017 will be hard-pressed to show Direct Energy had knowledge of the material facts (TMC's alleged TCPA violations) at the outset—as required for ratification.

Next, as to an acceptance-of-benefit theory, Plaintiff likewise relies on a conclusory assertion: that Direct Energy "accepted the profits of TMC's conduct." Mot. at 30. Importantly, however, he has not provided **any** proof that Direct Energy successfully made sales to class

---

[37] Direct Energy disputes that "on notice"—essentially a negligence standard—is the proper standard for ratification. Plaintiff must prove that Direct Energy had knowledge of all material facts relevant to the act it supposedly ratified. *See Hodgin*, 885 F.3d at 252.

members. *See Petri*, 2016 WL 7048893, at *3 (ratification theory failed for TCPA claim absent of "evidence to show that he paid any money" as a result of call). And even if Plaintiff identified who in the class signed up for Direct Energy, he would further have to prove that the sales were the result of the RVM—i.e., that the class member did not enroll for some other reason (such as another marketing effort). *See Smith*, 30 F. Supp. 3d at 779 (ratification failed where no plaintiff alleged "that they spoke to or did business with [defendant] as a result of [the] calls"). Indeed, Plaintiff's negative reaction highlights that not all class members people would be inclined to enroll because of an RVM. The Court will have to engage in individualized inquiries to determine which class members enrolled with Direct Energy because of an RVM. *See id.*

Furthermore, individualized questions of repudiation will inevitably complicate the ratification analysis. As discussed, an alleged principal has a "reasonable time" after learning that an agent acted improperly to repudiate the benefits of improper conduct. *See Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 677 (7th Cir. 2004). With respect to Plaintiff, Direct Energy clearly did so by terminating TMC and by filing its crossclaim shortly after learning that his opt-in was manufactured. But each class member will be subject to their own analysis as well. For example, depending on when they received the RVM—whether in mid-2017, late 2017, or 2018—class members have varying incentives to argue when Direct Energy learned of the misconduct and had to repudiate. Plaintiff unsurprisingly offers no reason why those individualized determinations will not predominate.[38]

3. *Standing will entail an individualized inquiry for each class member.*

Even if consent or vicarious liability were common questions with common answers (they are not), Plaintiff would still fail to satisfy Rule 23(b)(3) predominance due to

---

[38] Treble damages, which can be recovered only upon a showing of a "willing or knowing violation," will implicate similar individualized issues for the same reasons.

individualized standing issues. Where, as here, "it appears that a large portion of the class does not have standing," then a "district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case . . . ." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019). Applying simple math to Ms. Verkhovskaya's allegation that 3,295,028 RVMs were sent to "2,867,388 unique telephone numbers," the vast majority of class members, like Plaintiff, received only one RVM and so may have no legal injury at all. Verkhovskaya Report ¶ 72. This Court will therefore "have to make individualized inquiries to determine whether [class members] have standing," or if they lack evidence of a concrete injury-in-fact. *Gawry v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 942, 956 (N.D. Ohio 2009), *aff'd*, 395 Fed. App'x 152 (6th Cir. 2010).[39] Plaintiff's deposition highlights the individualized nature of the inquiry: he testified that he received only a single RVM referencing Direct Energy about which he has no recollection of any inconvenience, annoyance, or other harm. *See* Dickson Dep. 49:18–50:25, 52:6–53:1. Of course, such a detailed inquiry into each class member's standing would predominate over any common issues.

    4.   <u>There is no common evidence that class members played the RVMs.</u>

        Finally, Plaintiff's contention that TCPA liability can be determined class-wide ignores a key element of the underlying claim: "[t]o be liable under the 'artificial or prerecorded voice' section of the TCPA . . . a defendant must make a call and an artificial or prerecorded voice must actually play." *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635, 640 (5th Cir. 2015) ("We hold that making a call in which a prerecorded voice might, but does not, play is not a violation of the

---

[39] Although it is generally the case that "the standing of the individual class members need not be determined at a Rule 23 class certification inquiry," it is also true that "the Court must look beyond the pleadings and anticipate how the case would play out at trial." *Gawry*, 640 F. Supp. 2d at 955. That is especially true where, as here, "at some time in the course of the litigation the district court will have to determine whether *each* of the absent class members has standing before they could be granted any relief." *Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*, 18-CV-00649-LJV-JJM, 2020 WL 2395919, at *1 (W.D.N.Y. May 12, 2020) (citation omitted).

TCPA."). Thus, "determining whether a PRV [a prerecorded voice message] played would require an individualized inquiry as to each PRV class member." *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 280 n.21 (M.D. Fla. 2019). Because there is no class-wide proof that each class member's RVM successfully played, the factfinder would require testimony from each of the millions of class members as to whether this happened.[40] This individualized inquiry requires denial of class certification as well.

### E.  Superiority: Plaintiff Cannot Show that Class is a Superior Form of Adjudication.

For similar reasons, Plaintiff has not shown that a class action is "superior to other available methods for fairly and efficiently adjudicating this controversy." FED. R. CIV. P. 23(b)(3). Individualized issues regarding consent, vicarious liability, and standing will inevitably "result in the exact 'myriad mini-trials' that Rule 23(b)(3) seeks to prevent." *Sandusky*, 863 F.3d at 470 (quoting *Gene & Gene*, 541 F.3d at 329). A class proceeding would become unwieldy with respect to consent as there is evidence of opt-ins for at least some of the class. Mini-trials on vicarious liability will also be necessary because Plaintiff has no common proof. And finally, it would be impossible to consider facts relevant to standing for millions of class members. As such, Plaintiff's proposed class is not a feasible—much less superior—method for resolution.

### V.   CONCLUSION & PRAYER

Based on the foregoing, Direct Energy respectfully requests that Plaintiff's motion for class certification be denied in full.

---

[40] Plaintiff may say JDI's notation of "OK" indicates an RVM was "received by the recipient" and should have played. Verkhovskaya Report, ¶ 59. But this is not enough. "[W]hether a PRV 'should have played' does not establish that it did in fact play." *Sliwa*, 333 F.R.D. at 280 n.1 (citing *Ybarra*, 807 F.3d at 640); *see also Morris v. Unitedhealthcare Ins. Co.*, 415CV00638ALMCAN, 2016 WL 7115973, at *7 (E.D. Tex. Nov. 9, 2016), report and recommendation adopted, 4:15-CV-638, 2016 WL 7104091 (E.D. Tex. Dec. 6, 2016) ("Plaintiff's mere speculation that an artificial or prerecorded voice may have played had he answered the calls is insufficient.").

DATE: June 4, 2020                  MCDOWELL HETHERINGTON LLP

By: */s/ Michael D. Matthews, Jr.*

       Michael D. Matthews, Jr.*
       Texas Bar No. 24051009
       William B. Thomas*
       Texas Bar No. 24083965
       David L. Villarreal**
       Texas Bar No. 24095434
       1001 Fannin Street, Suite 2700
       Houston, Texas 77002
       T:  (713) 337-5580
       F:  (713) 337-8850
       matt.matthews@mhllp.com
       william.thomas@mhllp.com
       david.villarreal@mhllp.com

       Ashley L. Oliker (0085628)
       FROST BROWN TODD LLC
       10 W. Broad Street, Suite 2300
       Columbus, Ohio 43215
       T: (614) 559-7227
       F: (614) 464 1737
       aoliker@fbtlaw.com

       *Admitted Pro Hac Vice
       ** Pro Hac Vice Application Forthcoming

       *Counsel for Direct Energy, LP*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on the 4th day of June 2020 via CM/ECF on all counsel of record.

       */s/ William B. Thomas*
       William B. Thomas