# EXHIBIT 2

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2
                      CASE NO.  5:18-cv-182
 3

     MATTHEW DICKSON, on behalf of
 4   himself and others similarly
     situated,
 5
          Plaintiffs,
 6
     vs.
 7
     DIRECT ENERGY, LP, et al.,
 8
          Defendants.
 9   _____/
10
11
                         Veritext Reporting
12                       37 N. Orange Avenue
                         Suite 500
13                       Orlando, Florida
                         Friday, 10:12 a.m.-2:35 p.m.
14                       October 25, 2019
15
16        VIDEOTAPED DEPOSITION OF LARRY CORREIA
17
18        Taken on Behalf of the Plaintiffs before
19     Lisa Gerlach, Court Reporter, Notary Public
20     in and for the State of Florida at Large,
21     pursuant to Plaintiffs' Notice of Taking
22     Deposition in the above cause.
23
24
25
```

Page 2

```
 1    Appearances:
 2       Counsel for the Plaintiffs:
 3       MATTHEW P. McCUE, ESQUIRE
         Law Office of Matthew P. McCue
 4       1 South Avenue
         Third Floor
 5       Natick, MA 01760
         508-655-1415
 6       mmccue@massattorneys.net
 7       JONATHAN P. MISNY, ESQUIRE
         Murray Murphy Moul + Basil, LLP
 8       1114 Dublin Road
         Columbus, OH 43215
 9       614-488-0400
         misny@mmmb.com
10
11       Counsel for the Defendants:
12       WILLIAM B. THOMAS, ESQUIRE
         MICHAEL D. MATTHEWS, JR., ESQUIRE
13       McDowell Hetherington, LLP
         1001 Fannin Street
14       Suite 2700
         Houston, TX 77002
15       713-337-5580
         william.thomas@mhllp.com
16       matt.matthews@mhllp.com
17       CHRISTINA DILLARD, ESQUIRE
         (by speakerphone)
18       In-House Counsel, Direct Energy
19
20
21
22
23
24
25
```

Page 4

```
 1    Exhibit 10   Direct Energy 000001 through
                    000035            140
 2
      Exhibit 11   TMC 000086        143
 3
      Exhibit 12   Direct Energy 006932 through
 4                  006933            158
 5    Exhibit 13   Direct Energy 001641 through
                    001643            159
 6
      Exhibit 14   Direct Energy 002491 through
 7                  002494            160
 8    Exhibit 15   Direct Energy 001533 through
                    001537            173
 9
      Exhibit 16   SE 000002 through 000014     175
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                   INDEX
 2    WITNESS      EXAMINATION         PAGE
 3    Larry Correia
 4       Direct by Mr. McCue         6
 5       Cross by Mr. Thomas        87
 6       Redirect by Mr. McCue     163
 7       Recross by Mr. Thomas     173
 8       Further Redirect by Mr. McCue   175
 9    Certificate of Oath           179
10    Certificate of Reporter       180
11    Witness Review Letter         181
12    Errata Sheet                  182
13                 EXHIBITS
14    Exhibit 1   Subpoena and Notice      29
15    Exhibit 2   Direct Energy 001978     29
16    Exhibit 3   Direct Energy 001376 and 001379  31
17    Exhibit 4   Direct Energy 003493 through
                    003498            51
18
      Exhibit 5   Direct Energy 001016 through
19                  001027            69
20    Exhibit 6   Direct Energy 001872 through
                    001881            72
21
      Exhibit 7   Direct Energy 009021 through
22                  009025            76
23    Exhibit 8   Direct Energy 000047 through
                    000057            84
24
      Exhibit 9   TMC 000064 through 000085    116
25
```

Page 5

```
 1       THE VIDEOGRAPHER:  Good morning.  We are
 2    going on the record at 10:12 a.m. on
 3    October 25th, 2019.  Please note that the
 4    microphones are sensitive and may pick up
 5    whispering, private conversations, and
 6    cellular interference.  Please turn off all
 7    cell phones or place them away from the
 8    microphones, as they can interfere with the
 9    deposition audio.  Audio and video recording
10    will continue to take place unless all
11    parties agree to go off the record.
12       This is media unit one of the
13    video-recorded deposition of Larry Correia,
14    taken by counsel for the plaintiff, in the
15    matter of Matthew Dickson vs. Direct Energy,
16    LP, et al, filed in the United States
17    District Court, Northern District of Ohio.
18       This deposition is being held at Veritext
19    Orlando, located at 37 North Orange Avenue,
20    Orlando, Florida.  My name is Bailey Gerlach,
21    from the firm Veritext Legal Solutions, and
22    I'm the videographer.  The court reporter is
23    Lisa Gerlach, from the firm Veritext
24    Reporting.
25       Counsel and all present in the room and
```

Page 6

1  everyone attending remotely will now state
2  their appearance and affiliation for the
3  record, beginning with the noticing attorney.
4      MR. McCUE:  Matthew McCue for the
5  plaintiffs.
6      MR. THOMAS:  Will Thomas and Matt
7  Matthews from McDowell Hetherington,
8  representing Direct Energy.  Participating by
9  phone today is Christina Dillard.
10     MR. MISNY:  And also, Jonathan Misny, for
11 the plaintiff.
12     THE VIDEOGRAPHER:  Will the court
13 reporter, please, swear in the witness?
14 THEREUPON,
15         LARRY CORREIA,
16     A Witness herein, acknowledged after having
17 been duly sworn and testified upon his oath as
18 follows:
19     THE WITNESS:  Yes.
20         DIRECT EXAMINATION
21 BY MR. McCUE:
22 Q.  Mr. Correia, my name is Matthew McCue.  I
23 represent the plaintiffs in this case.  I'll be taking
24 your deposition today.  Mr. Thomas, who represents
25 Direct Energy, will also be asking you some questions.

Page 7

1      If, at any time during the course of the day,
2  you need to take a break, please let us know.  We'll
3  be happy to do that.
4      Can you confirm you're not going to be
5  represented today by counsel; is that correct?
6  A.  That's correct.
7  Q.  So then I will kind of advise you just a tiny
8  bit about your rights to read and sign the deposition.
9  So what the rule essentially provides is, a witness
10 has an opportunity to read the transcript that the
11 court reporter is putting down and make any
12 typographical corrections or any corrections that you
13 need to make on it, and you have 30 days to do that.
14 Or you can waive that.  It's called waiving the
15 signature.
16     So you don't need to make a decision right
17 now, unless you're ready.  But, at the end of the day,
18 I'll be asking you how you want to handle
19 post-deposition logistics -- do you want to waive or
20 do you want to read and sign?
21     If you want to read and sign, we will send
22 you a copy of the transcript.  You can make
23 corrections and send it back to us.  But if you don't
24 get it back to us within 30 days, it's deemed waived.
25     Okay?  Is that fair?

Page 8

1  A.  (Nods head.)
2  Q.  So one thing about depositions -- and I
3  notice how we're communicating -- everything is on the
4  record.  So you need to respond verbally.  The court
5  reporter can't take down head nods.
6      Okay?
7  A.  Okay.
8  Q.  If it's a no, say "no."  If it's a yes, say
9  "yes."  We try to avoid methods of communication that
10 kind of are neutral when it's on a transcript.  We
11 also have a videographer here today.  Okay?
12     During the course of a deposition, counsel
13 might object to the way I ask a question.  That's kind
14 of part -- they're preserving the record for the
15 trial, so that's fine.
16     But if, at any point, you don't understand my
17 question, I would just ask you to just stop and say,
18 "I don't understand."  I'll try to clarify.  All
19 right?
20     The idea of today is, this is really an
21 interview.  We're trying to figure out facts.  It's a
22 fact-gathering process, so we want to make sure we're
23 communicating clearly.
24     Is that fair?
25 A.  Yes.

Page 9

1  Q.  Can you tell me a little bit about yourself,
2  where you went to high school or college, and a little
3  bit about your employment background?
4  A.  I went to college at UCF.  I was in the
5  military.  I've been working for Total Marketing
6  Concepts now for 13 years.
7  Q.  Okay.  Where did you serve in the military?
8  A.  I was in the Army and I was stationed in
9  Hawaii.
10 Q.  For how long were you in the service for?
11 A.  I was in the service for about three years.
12 Q.  I think I forgot to even ask you to state
13 your full name for the record.
14 A.  It's Lawrence Leslie Correia.
15 Q.  Where do you work currently?
16 A.  Total Marketing Concepts.
17 Q.  What is their business address?
18 A.  1043 Upsala Drive or Road -- I always get
19 that mixed up -- Sanford, Florida 32771.
20 Q.  How many years now have you worked for TMC?
21 A.  This is now my 13th year.
22 Q.  Could you walk us through your different jobs
23 generally beginning 13 years ago?  Essentially, your
24 career progression at TMC, if you can summarize that
25 for us?

3 (Pages 6 - 9)

Page 10

1    A.  Sure.  I joined TMC as a telecommunications
2  manager.  I was brought in to manage an AT&T campaign.
3  Prior to my tenure there, they didn't really do a lot
4  of energy campaigns, and that was my specialty.
5        I joined as a manager, bringing in a
6  campaign, and grew from just a manager of that single
7  campaign to bringing in other telecommunications
8  programs.  Ended up growing that entire division and
9  just worked my way through the company to general
10  manager, operations manager.  As of right now, I'm the
11  business development manager, or director of business
12  development.
13    Q.  For how long have you had the title of
14  director of business development?
15    A.  It's about three months now.
16    Q.  What was your title before that time?
17    A.  I was a senior franchise manager for the past
18  few years.
19    Q.  Let's kind of put a cabin on it.  This case
20  is really about telemarketing that happened within the
21  last three or four years.
22        So focusing on that timeframe, what was your
23  job title during those years?
24    A.  I was a senior manager.  At one point, I was
25  an operations manager, but the day-to-day running of

Page 11

1  all the sales campaigns and things of that nature,
2  that really fell to Robert Svendsen over the past, you
3  know, five, six years or so, since I left Longwood.
4        In Longwood, I was the general manager and
5  had autonomy over everything.  When I moved to
6  Sanford, I was rolled up under the existing executive
7  structure there.  That was -- Robert Svendsen was my
8  direct report, and then George Lonabaugh.
9    Q.  So this case is about ringless voicemail
10  telemarketing.
11        Are you aware of that generally?
12    A.  Yes, I am.
13    Q.  Okay.  During the time that TMC did ringless
14  voicemail telemarketing for Direct Energy, who was
15  your immediate supervisor?
16    A.  That was Robert Svendsen.
17    Q.  And who would be above Robert Svendsen?
18    A.  That would be Tyson Chavarie -- I think was
19  the vice-president.  People wore a lot of different
20  hats at the time.  But, ultimately, it would be Robert
21  Svendsen, Tyson Chavarie, and George Lonabaugh who
22  were the upline for me.
23    Q.  During the same timeframe, who reported to
24  you as a direct report?
25    A.  The people that reported directly to me were

Page 12

1  Angela Preston, Amara Williams, Marissa Weed.
2        I was responsible for the home services
3  portion of the Direct Energy portfolio.  And my -- as
4  a senior manager, I initially launched the Direct
5  Energy program with home services.  The energy stuff
6  was really Robert Svendsen and his downline.
7    Q.  What category would you place ringless
8  voicemail telemarketing?  Does that fall into the home
9  service area?
10    A.  That falls completely under energy --
11  deregulated energy sales.  We didn't do any ringless
12  voicemail for home services.  Home services is an
13  inbound campaign where we receive calls.
14    Q.  Okay.  What was your role with ringless
15  voicemail telemarketing at Direct Energy?
16    A.  I negotiated the contract with Direct Energy
17  on behalf of TMC when we launched the campaign.  I was
18  responsible for launching a lot of campaigns, so that
19  was pretty normal where I would deal with the Direct
20  Energy procurement team, Lauren -- and I can't
21  remember everyone from over there -- Brian Cain
22  originally.  Unfortunately, he passed away.
23    Q.  Okay.  We'll get into some more detail later.
24  Just keeping it general for now.
25        What is your understanding of this lawsuit,

Page 13

1  of what it's about?
2    A.  My understanding of the lawsuit, from what I
3  gathered, is that someone received calls that they
4  didn't authorize, or they may have been on the DNC
5  list and they were marketed.  I think that's the
6  extent of my knowledge of the particulars of this
7  case.  I know it's a class action lawsuit now.
8    Q.  Sure.  What is your general understanding of
9  what is the Telephone Consumer Protection Act?
10    A.  The TCPA Act protects consumers' rights and
11  it stipulates how a call center should be conducting
12  itself in the way of how it procures leads, how it
13  handles those leads; and, you know, it's basically
14  everything -- the laws that govern contact centers.
15    Q.  Did you have some personal training or
16  education in the TCPA or in telemarketing rules in
17  general?
18    A.  We had some general training.  I think most
19  of that was handled by legal counsel.  That's all
20  stuff that fell under Patrick Crocker and senior
21  management.  At my level, I was not responsible for
22  compliance or procurement of leads or anything of that
23  nature.
24    Q.  Okay.  There's been some confusion about --
25  who does Patrick Crocker represent?  Did he represent

Page 14

1 TMC or did he represent Silverman?
2     A. I'm not quite sure of the particulars of him
3 and Silverman. I know Silverman was part of the
4 contract for the procurement of leads. Somehow -- I
5 don't know what his involvement with that was. But my
6 understanding of Silverman is, they were the lead
7 provider at one time. Patrick, from my understanding,
8 was our legal counsel -- was TMC's legal counsel.
9     Q. Okay. I understand.
10     What is TMC? How would you describe what
11 your company does?
12     A. TMC is a technology-driven contact center.
13 We specialize in market research, sales, customer
14 service.
15     Q. Telemarketing?
16     A. Yes; telemarketing is one component.
17     Q. What is ringless voicemail marketing?
18     A. Ringless voicemail -- I'm not an IT guy, so I
19 can't speak to the particulars of it. But my
20 understanding of the technology is that it allows you
21 to deliver a message to a customer without ringing
22 their phone, without actually having them -- from
23 hearing their phone ring. So they would just get a
24 message, I guess.
25     Q. Do you know how TMC first learned about

Page 15

1 ringless voicemail marketing?
2     A. That's something that's been a part of the
3 industry. It was introduced to us by -- wow -- I
4 can't remember the gentleman's name. I would have to
5 think about that. But it's a gentleman out of Texas.
6 I can't remember the name of the company. But he
7 introduced us to the concept of it.
8     Q. Do you understand from your experience that
9 there's controversy about this -- this ringless
10 voicemail is subject to the TCPA? Are you generally
11 familiar with that question?
12     A. Sitting here, yes, I'm aware of it now.
13     Q. Even not sitting here, but over the years,
14 between TMC and Direct Energy, there was a lot of back
15 and forth about the technology and is it subject to
16 the TCP or not.
17     Do you recall that general discussion going
18 back and forth between TMC and Direct Energy?
19     A. Yes. Direct Energy wanted to make sure that
20 we were fully compliant with the TCPA rules. And the
21 way that we structured the deal with Lauren is based
22 on opt-in data, where customers were opting in to
23 being marketed, versus just random leads.
24     So the system that I negotiated with Lauren
25 was that we would procure the leads from a company

Page 16

1 named DMI. DMI is very well-respected for their
2 opt-in traffic. And we went a second layer to provide
3 TrustedForm data.
4     So the contract that I helped put together
5 was, I believed at that time, a solid contract. And
6 we shot it past Direct Energy's legal team, and it
7 satisfied all of the requirements at the time.
8     So we had leads where customers were opting
9 in, and we had Verisign data or TrustedForm -- I can't
10 remember -- it's a lot of stuff. I think it's
11 TrustedForm.
12     TrustedForm would capture whatever -- this is
13 all stuff that was being told to me by our IT team
14 that these are things that we could do and were doing.
15 And that's how I negotiated the contract with Direct
16 Energy.
17     Q. Sure. So the first -- I think the earliest
18 -- one of the earlier contracts between TMC and Direct
19 Energy specifically refers to DMI, opt-in leads, and
20 exactly what they should look like?
21     A. Correct.
22     Q. Is it your understanding that, at any time
23 when TMC did ringless voicemail telemarketing for
24 Direct Energy -- at all times, were opt-in leads used?
25     A. That's outside of my knowledge. I negotiated

Page 17

1 the contract, but I was not responsible for the
2 day-to-day operations of that campaign.
3     Q. Okay.
4     A. So, once again, that fell to Robert Svendsen
5 and his team of managers -- Daniel Bettis and Teddy
6 Smith and whomever else was managing that team.
7     Like I said, I was responsible for home
8 services, and I learned about things, like, at
9 quarterly business reviews, where I would sit next to
10 John Moran and other guys from Direct Energy, and
11 that's how I kind of learned about things. But I
12 wasn't privy to a lot of things that were going on at
13 TMC.
14     Q. Okay. Do you realize you're on a lot of
15 e-mails between you and John Moran over the years,
16 talking about RVM -- ringless voicemail -- do you
17 recall that happening generally?
18     A. Yeah.
19     Q. Do you have knowledge that at some point --
20 let's cabin a few things.
21     When did TMC start doing ringless voicemail
22 telemarketing for Direct Energy?
23     A. I can't remember the date off the top of my
24 head. I would have to think probably somewhere around
25 2017, maybe.

5 (Pages 14 - 17)

Page 18

1    Q.  I promise only to take you through a document
2  when we have to.
3    A.  Sure.
4    Q.  Sometimes we need to refresh memory and
5  things like that, so that's fine.
6        So we're at Document 12.  Mr. Correia, if you
7  would just take a moment and look through that e-mail.
8  But, for the record, I'm referring to a document
9  produced by Direct Energy and it's at Bates 001978,
10  and it's an e-mail correspondence from Mr. Correia to
11  Mr. Moran, regarding ringless SOW.
12        Let me know when you've had a chance to look
13  at that.
14    A.  Yeah, I'm looking at this e-mail.
15    Q.  So this e-mail, halfway down, we're trying to
16  get a -- cabin the date on when the ringless voicemail
17  telemarketing began.  There's a discussion here where
18  you're referring to the program starting back in
19  September of 2016 -- would be the context from the
20  e-mail.
21        Do you agree with that?
22    A.  This e-mail is dated March 2017.
23    Q.  Sure.  And then the language of the e-mail,
24  Mr. Moran is asking you -- to Mr. Correia -- "Did you
25  submit an amendment to the SOW," and the subject is

Page 19

1  "ringless SOW" -- "for this program back in September
2  when it first launched?"
3        Do you see that?
4    A.  Yeah.
5    Q.  That's what I'm referring to.
6    A.  So, I guess, it was 2016 when it launched,
7  instead of 2017.
8    Q.  And when did it stop?
9    A.  I have no idea.
10    Q.  Do you know what dialing company TMC used for
11  ringless voicemail technology, say, back in September
12  of 2016?
13    A.  I heard a couple names.  I can't -- like I
14  said, I was not involved with anything with those
15  customers.  I heard the name JDI.
16    Q.  Okay.
17    A.  I don't know -- that's the only one I can
18  think of.
19    Q.  Sure.  Let me try to help refresh your
20  memory.  So we have call records from JDI that seem to
21  tie to Silverman that go from June, roughly, in 2017
22  through June of 2018.  So we have those records from
23  that period of time.
24        What I'm trying to figure out is, who was the
25  dial-in before that period of time.  Would you know?

Page 20

1    A.  Who did the RVM?
2    Q.  Right.  Who actually did the physical
3  transmission of the RVM telemarketing calls?
4    A.  Wow.  I think the gentleman's name is Alan
5  or -- that's the name we know, or I know.  I can't
6  remember the gentleman that referred him to us.  David
7  Hjorth -- H-J-O-R-T-H -- David Hjorth was the
8  gentleman that originally provided the RVM, I believe.
9    Q.  The original RVM kind of dialing platform?
10    A.  Yeah.
11    Q.  I understand.  Thank you.
12        Who in your memory would be the person with
13  the most knowledge from TMC about the relationship
14  with Direct Energy specific to RVM telemarketing?
15    A.  That would probably be Robert Svendsen.
16    Q.  And what was his title?  I apologize if I
17  already asked you.
18    A.  He was the director of operations.
19    Q.  Is he still the director of operations?
20    A.  No.  He's no longer employed at TMC.
21    Q.  Do you know roughly where he currently
22  resides?
23    A.  He resides in Polk County, I believe, or Lake
24  County, but he works for a company in Fort Lauderdale
25  now.

Page 21

1    Q.  Do you know who that company is if I was
2  trying to find them?
3    A.  I know it's called -- it's ECCO -- is the
4  acronym for the company.  ECCO.
5    Q.  When TMC was doing ringless voicemail
6  telemarketing for Direct Energy, did it do ringless
7  voicemail telemarketing for any other clients?
8    A.  I believe they also did energy for Spark.  I
9  don't know if they did ringless voicemail for Spark,
10  but I know they marketed for Spark Energy as well.
11    Q.  Okay.  So, internally, when TMC is
12  telemarketing for two different clients that are in
13  the energy space, how do they keep the records
14  separate?
15    A.  I have no idea.  I do know, on the front-end,
16  that, when we're negotiating contracts, that is
17  something that most clients are sensitive to -- you
18  know -- the overlap in markets.  That's something
19  that -- you know -- we, to my knowledge, never did,
20  where we were in the same market at the same time.
21        But, once again, the day-to-day management of
22  energy did not fall under me.
23    Q.  Okay.  I noticed in the contract -- and I can
24  show you if we need -- there's a reference -- or it
25  says -- a "do not compete" clause that says, "If TMC

6 (Pages 18 - 21)

Page 22

1  is telemarketing for Direct Energy, they can't use the
2  same lists for any other client in the same space."
3       Does that make sense to you?  Are you
4  familiar with that type of --
5       A.  I'm familiar with that type of clause.
6       Q.  If TMC is doing telemarketing for Direct
7  Energy and Spark at the same time, Direct Energy would
8  use -- if they had a list -- they would only use that
9  list for Direct Energy, and they would not use that
10  list for Spark.
11       Does that make sense?
12       A.  Yeah, that makes sense.
13       Q.  Is that consistent with your experience about
14  how things actually happen?
15       A.  Yes, that's consistent.
16       Q.  What is Silverman?  What do they do?
17       A.  Silverman was introduced to me by George and
18  Robert as a lead vendor or a lead broker.  So they
19  became, in essence -- instead of using David Hjorth
20  and JDI, they started using Silverman.
21       Q.  Okay.
22       A.  That's how, I believe -- once again, you
23  know, I'm just trying to piece together things.
24       Q.  All you can do is tell us your perspective on
25  this.

Page 23

1       Was there any type of ownership overlap
2  between TMC and Silverman?
3       A.  Not that I'm aware of, other than the
4  relationship with Patrick Crocker.
5       Q.  His wife works at Silverman?
6       A.  I believe so.  I believe his wife is somehow
7  tied to Silverman.
8       Q.  I notice from the documents that Silverman
9  was both kind of doing the ringless voicemail and was
10  also sourcing opt-in leads.
11       Is that consistent with your memory?
12       A.  Once again, that is not something that I was
13  involved in.  I was client-facing.
14       But you'd have to understand the way that TMC
15  was structured at the time.  There wasn't a lot of
16  transparency and there wasn't a lot of -- there wasn't
17  a lot of meetings with the guys that ran stuff.  So...
18       Q.  Sure.  Okay.  What other vendors did TMC use
19  to get opt-in leads besides DMI?
20       A.  I believe they used Brightbox.
21       Q.  Anybody else?
22       A.  We've used a lot of vendors for leads, so I
23  don't know which lead vendors they used specifically
24  for RVM leads.  But I can tell you vendors that we've
25  used for leads in the past that I know of.

Page 24

1       Q.  When you say "leads," are they all opt-in
2  leads?
3       A.  They're -- some are opt-in leads and some are
4  just cold-call leads that need to be ran through TMC
5  scrubs and stuff like that.
6       Q.  But the RVM campaigns that TMC did for Direct
7  Energy all used opt-ins; is that correct?
8       A.  Correct.
9       Q.  So who would be the different vendors for
10  opt-in leads that were used for the ringless voicemail
11  campaigns?
12       A.  When I negotiated it, it was DMI.  DMI was
13  the vendor that I negotiated, and DMI was the company
14  that we were using while I was involved in the
15  campaign.
16       Q.  At some point, did TMC stop using DMI for
17  opt-in leads and use somebody else?
18       A.  Yes, I believe so.  They ended up using
19  Silverman, as you said.
20       Q.  Okay.  Was there a transition during those
21  times?  Like, I've seen Fluent mentioned.  You
22  mentioned Brightbox.
23       But focusing specifically on opt-in leads,
24  what were the other vendors that were used?
25       A.  I have no idea.  That's a question that's for

Page 25

1  Tyson Chavarie.  Tyson Chavarie became the point for
2  all of that -- Tyson Chavarie and Joe Yates.  Those
3  guys in IT really control the leads, the purchasing of
4  the leads, the vendors.  Like, they took control of
5  it, and I was off doing something else.
6       Q.  I understand.
7       A.  That was not within my purview.
8       Q.  Sure.  So I see in the contracts that there
9  is a specific opt-in contract regarding DMI.
10       Are you familiar with that contract?
11       A.  Yes.  That's the contract that I negotiated.
12       Q.  But I don't see contracts specific to
13  Brightbox or Fluent or any other opt-in leads that you
14  mentioned.
15       A.  I was not responsible for that at that time.
16       Q.  Do you know, was TMC required to get specific
17  contractual authority or permission from Direct Energy
18  to use specific opt-in vendors or did they have
19  discretion?
20       A.  When I was dealing with Direct Energy, it was
21  my understanding that everything needed to be approved
22  by DE.  So any vendor that I brought on, I received
23  approval from John Moran or whomever it was for that
24  on-boarding process.  So it was my understanding that,
25  if any changes were being made to the campaign, they

7 (Pages 22 - 25)

Page 26

1 had to be vetted.

2    Q.  Okay.  So if they're using Fluent, there

3 should be a specific contract where Direct Energy is

4 allowing Fluent to do opt-ins?

5    MR. THOMAS:  Object.  It's vague as to

6    "they."

7 BY MR. McCUE:

8    Q.  Sorry.  If TMC is using Fluent opt-in leads,

9 then it's your testimony that there should be a

10 specific contract where Direct Energy is approving

11 Fluent as an opt-in vendor?

12    A.  Based on my experience dealing with Direct

13 Energy and how they structure their business, I would

14 say yes.

15    Q.  At some point, Silverman was approved for

16 opt-in leads; is that right?

17    A.  Correct.

18    Q.  Were you involved in that at all?

19    A.  I believe I was involved in the paperwork,

20 yes.

21    Q.  Okay.  Did Direct Energy ever specifically

22 authorize TMC to engage in ringless voicemail

23 telemarketing?

24    A.  Yes.  You know, it's my understanding that --

25 you know -- based on that contract that we negotiated

Page 27

1 with Lauren, that they gave us approval for conducting

2 RVM based on how I outlined it in that contract.

3    Q.  And this is what I'm trying to understand.

4 There's a lot of e-mails -- I can show you the

5 documents -- where you're sending over to Moran an

6 SOW -- a statement of work -- specific for ringless

7 voicemail, and it starts in March of 2017.  You're

8 sending over a specific contract.  And over and over

9 again, you're sending the contract that TMC has

10 signed, but Direct Energy never signs it, until

11 roughly December of 2017.

12    Does that refresh your memory about that

13 going back and forth?  If not, I can show you some

14 documents.

15    MR. THOMAS:  I object.  I think that

16    assumes some facts not in evidence.  It may

17    be more beneficial to show him the documents.

18    A.  Yeah.  You would have to refresh my memory.

19 This is a long time ago.

20 BY MR. McCUE:

21    Q.  Understood.  Do you recall when Direct Energy

22 signed a contract authorizing ringless voicemail

23 technology through Silverman?

24    A.  No, I don't.  I don't recall the specific

25 date, but there should be e-mails where Lauren, you

Page 28

1 know, sends that back and says, "Hey, there's the

2 thing."

3    And we did not do any ringless voicemail for

4 Direct Energy prior -- or anyone else -- prior to that

5 approval.  Like, we didn't -- to my knowledge, we were

6 not RVM-ing anyone until that contract came back from

7 DE saying that we could.  That was my understanding.

8    Q.  All right.  Do you recall getting e-mails

9 from John Moran where he's saying, "Ringless voicemail

10 is a green light"?  Do you recall those types of

11 e-mails?

12    A.  Yes.

13    Q.  Just bear with me one second.

14    MR. THOMAS:  Matt, do we want to mark the

15    1978 as an exhibit -- the last document you

16    showed him?

17    MR. McCUE:  I prefer to just have it in

18    the record by the Bates.  Is there a reason

19    why you want to mark it?  I'm happy to hear

20    that.  I just think, if we do it by the

21    Bates, you'll know what it is.

22    MR. THOMAS:  Can we just mark it by the

23    exhibit?

24    MR. McCUE:  Okay.  Why don't we mark the

25    first document -- well, first, let's mark the

Page 29

1 depo notice as Exhibit 1, and we'll mark

2 1978, which is binder document 12 -- we'll

3 mark that as Exhibit 2.

4    (Exhibits 1 and 2 were marked for

5    identification.)

6 BY MR. McCUE:

7    Q.  If you could turn to binder document 13?

8 Just take a moment to look at this document, the first

9 page and the second page.

10    A.  Okay.

11    Q.  So referencing the document Bates-stamped

12 Direct Energy 001376, and the next one is Direct

13 Energy 001379, it looks like an e-mail to you from

14 George, dated March 23, 2017.

15    Is that correct at the top here?

16    A.  This is an e-mail, actually, from George to

17 me.  So this is a document where George is forwarding

18 the signed -- I guess this is an addendum --

19    Q.  Yeah.

20    A.  -- to me.  Yes.

21    Q.  Okay.  But it's not signed by George; right?

22 It's signed by -- when you say George -- I'm sorry --

23 is that George Lonabaugh?

24    A.  That's George Lonabaugh.

25    Q.  So Bates 001379, this is a statement of work

8 (Pages 26 - 29)

Page 30

1 addendum for ringless voicemail telemarketing?
2   A. Correct. Signed by George Lonabaugh,
3 forwarded to me on the 23rd, which I sent to John
4 Moran later that day.
5   Q. Okay. Was it your understanding that this
6 program was approved right around that time or was it
7 approved at some later time?
8   A. I believe that it was approved somewhere
9 around this time for this addendum. I think this
10 addendum is just changing it to Silverman.
11   Q. Okay.
12   A. But prior to that, we had approval to do RVM
13 with DMI.
14   Q. Okay. Referring back to Bates 1379, is this
15 an accurate summation of your understanding of the
16 terms of the agreement between TMC and Direct Energy
17 about ringless voicemail telemarketing?
18   A. At that time, yeah, I believe so. This, I
19 believe, was, like, the last interaction that I really
20 had with this sort of paperwork.
21     You have to understand that, you know, prior
22 to that, I had more of an interaction with Direct
23 Energy. I was kind of pulled away from a lot of
24 things.
25     During this time, I was in charge of

Page 31

1 launching another Direct Energy campaign. They were
2 in the process of downsizing their home services in
3 Phoenix and migrating all of their work over to me.
4     This is the kind of stuff that I was doing on
5 the side, but my main focus was onboarding over 300
6 agents in 2017 for Direct Energy. So you'll have to
7 forgive me.
8   Q. Sure. So if the actual physical signature of
9 Direct Energy didn't come in around that date, that
10 might not have been something that was in your
11 wheelhouse. That was somebody else?
12   A. Right.
13     (Exhibit 3 was marked for
14     identification.)
15 BY MR. McCUE:
16   Q. For the record, Exhibit 3 refers to Bates
17 1376 and 1379. If I could turn you to Tab 31?
18     If I could turn you to Tab 31?
19   A. 31.
20   Q. Take a moment to review that e-mail. Just
21 let me know when you're ready.
22   A. All of these?
23   Q. I'm just going to refer you to Bates 003493.
24     Have you had time to look at that?
25   A. Yes.

Page 32

1   Q. Would you agree with me that this is an
2 e-mail from John Moran to the team, and the team
3 copies yourself and George Lonabaugh, and it refers to
4 the ringless voicemail campaign and is giving TMC the
5 green light to go forward with the ringless voice
6 message program to opt-in leads only?
7   A. Correct.
8   Q. So if the contract wasn't physically signed
9 for sometime after March, as of May 15, 2017, TMC has
10 the green light to go forward with this program; is
11 that correct?
12   A. Yeah, I assume so.
13   Q. Okay. So it seems that, at all times, TMC
14 acted with Direct Energy's specific authorization.
15     Would you agree with that?
16   A. Yes.
17     MR. THOMAS: Object. I think that may
18 call for a legal conclusion; vague,
19 ambiguous.
20     MR. McCUE: That's fine.
21 BY MR. McCUE:
22   Q. In your understanding, working for TMC, did
23 you authorize TMC to do anything that was outside the
24 scope of the authority of Direct Energy?
25   A. While I was working on this campaign,

Page 33

1 everything that was done was done, you know, with the
2 authorization of Direct Energy, yes.
3   Q. Sure. So we referred to opt-in leads.
4     What is your understanding of what is an
5 opt-in lead?
6   A. An opt-in lead is a lead where the customer
7 has provided consent to be contacted either
8 electronically or through the telephone, e-mails,
9 whatever it may be. Those leads are usually -- I
10 guess that's it.
11   Q. Consent to be called by who?
12   A. By whoever is listed in the opt-in language.
13   Q. Was Direct Energy required to be listed in
14 the opt-in language?
15   A. I believe, when we negotiated -- when I
16 negotiated the DMI contract -- I believe Direct Energy
17 was listed as part of the language. So when the
18 customer reads the fine print, it would say, "AT&T,
19 Walmart, Direct Energy" --
20   Q. Sure.
21   A. -- whatever. Or any third party or whatever.
22   Q. And the DMI contract, to refresh your memory,
23 that was back in 2016, roughly? Is that your memory?
24 I can show you the document.
25   A. Yeah, yeah, 2016.

9 (Pages 30 - 33)

Page 34

1    Q.  All right.  Was that before the ringless
2  voice message telemarketing began or after?
3    A.  The DMI was the beginning of it.
4    Q.  Okay.  In terms of the opt-in vendors that
5  were subsequently used, you don't have firsthand
6  knowledge of who exactly you used?
7    A.  No, sir.
8    Q.  If TMC continued to use DMI, you would assume
9  there's an invoice paper trail showing that they're
10 purchasing opt-in leads from DMI?
11   A.  I would assume so, but I wasn't privy to that
12 sort of stuff.
13   Q.  That would be Tev -- what is his name --
14 Tevron?
15   A.  Tyson.
16   Q.  Tyson.  Sorry.
17   A.  Things were controlled at TMC for a long time
18 by George, Tyson, and Robert.  They had autonomy to do
19 whatever they wanted, and they didn't ask for my
20 permission and they didn't clue in the rest of the
21 organization about anything.  So, you know...
22   Q.  Okay.  So then focusing on DMI -- after you
23 negotiated the contract with DMI, do you specifically
24 reach out to DMI and say, "We can only buy opt-ins
25 that are specific to Direct Energy"?

Page 35

1    A.  That was not my job.  That is IT.  That falls
2  under IT to procure leads.  They're given the contract
3  and the agreement, and quality assurance knows what
4  compliance things they have to look for.  Accounting
5  gets what they need from the contract.  But every
6  department is responsible for adhering to the
7  contract, and that's managed by Tyson, Robert and
8  George.
9    Q.  Okay.
10   A.  So, yeah -- I was not involved in anything
11 with -- communicating with any of those vendors.
12   Q.  Okay.  Does TMC still work with Direct
13 Energy?
14   A.  No, we do not.
15   Q.  Do you know why that relationship ended?
16   A.  Because of this case.
17   Q.  Okay.  Did Direct Energy terminate TMC while
18 still owing it outstanding funds?
19   A.  I have no idea.
20   Q.  Do you think that Direct Energy has treated
21 TMC fairly?
22   A.  I have no idea.
23      MR. THOMAS:  Objection; calls for
24   speculation.
25 BY MR. McCUE:

Page 36

1    Q.  Your personal observations.
2    A.  That they have treated -- all my interactions
3  with Direct Energy have been very professional, and I
4  have nothing disparaging to say about Direct Energy or
5  any of their employees or my interactions with them.
6    Q.  At any time, focusing on DMI, did you take
7  any steps to ensure that DMI was providing opt-in
8  leads in accordance with the contract?
9    A.  Yes.  I followed up with Tyson to make sure
10 that we were getting the information and that was
11 being provided to the client.
12   Q.  What do you mean, the information that was
13 provided to the client?
14   A.  We were supposed to be getting TrustedForms.
15 So every time the customer actually goes online and
16 fills out the opt-in with DMI, we were capturing that
17 information.  We were actually capturing the mouse
18 movement, the IP address, all of that IOT information
19 that can be traced back to a location.  Not
20 necessarily a specific person, but...
21   Q.  Okay.  So for every opt-in lead that was used
22 to do a ringless voicemail call for Direct Energy,
23 there should be this consent paper trail?
24   A.  Under the DMI contract, correct.
25   Q.  Is TMC in possession of this evidence?

Page 37

1    A.  I have no idea.
2    Q.  In your understanding --
3    A.  I believe that was stuff that was provided.
4  What happened after Silverman and those contracts and
5  stuff like that, I don't know.
6    Q.  Okay.
7    A.  But that information is typically information
8  that would be submitted along with invoices and stuff
9  like that.
10   Q.  Can you describe kind of the cultural
11 environment at TMC over the course between -- between,
12 say, March of 2016 through 2018, in terms of the
13 pressure to generate sales for Direct Energy?
14   A.  It's a company that's built on
15 pay-for-performance.  So that pressure-cooker culture
16 is always there in the telemarketing environment.  So
17 I wouldn't say there was any more pressure to perform
18 for Direct Energy over any other client.
19   Q.  Do you recall e-mail conversations you had
20 with Mr. Moran where you were saying, "We can increase
21 sales if we get more opt-in data"?
22   A.  Yes.
23   Q.  What did you mean by that?
24   A.  It costs a lot of money to generate opt-in
25 data to procure a customer that is interested in your

10 (Pages 34 - 37)

Page 38

1  offer and wants to be contacted, it costs money.  So
2  we were spending a lot of money to generate those
3  leads and it was making the program unprofitable.
4      Q.  So what happened next?  After you realized
5  that opt-ins you were paying for were unprofitable,
6  was there some type of adjustment made?
7      A.  Yeah.  There were numerous adjustments that
8  were made on the campaign where we were given
9  additional bonuses on per-sales and adjustments to
10  incentivize sales.
11      Q.  And different vendors were used as well;
12  right?
13      A.  Yes.  You told me about a few.  Like I said,
14  that was outside of my scope.
15      Q.  I don't want to tell you about a few.  You
16  had testified that there were other opt-in vendors
17  that you recalled specifically; correct?
18      A.  I know of Brightbox being used, yes.
19      Q.  Okay.  Are you aware of any contract between
20  TMC and Direct Energy in regards to Brightbox?
21      A.  Not my area of expertise at that time.
22      Q.  Do you have any knowledge if Brightbox was
23  subject to the same quality-control requirements about
24  opt-ins that DMI was?
25      A.  Unfortunately, I have no idea.

Page 39

1      Q.  Do you know if Silverman was subject to the
2  same type of opt-in quality controls that DMI was?
3      A.  I have no idea.
4      Q.  If we wanted to figure out how long the
5  relationship with DMI lasted for, that would be in
6  invoices?
7      A.  Probably.
8      Q.  Do you have any knowledge if, today, TMC has
9  this consent evidence stored anywhere?
10      A.  I have no idea, sir.  The people that were in
11  charge of those programs no longer work for TMC.
12      Q.  Who is in charge of TMC currently?  I heard
13  they're in receivership.
14      A.  Correct.  The company is in receivership.  It
15  is currently -- I guess, who's in charge now would be
16  Kelly McKenna.  He is the chief receiving officer, the
17  CRO, I believe, if that's the correct acronym.
18      Q.  Is he with, like, a firm?
19      A.  Capstone -- Capstone Leadership.
20      Q.  Has anybody asked you in this case to try to
21  either find evidence or produce evidence to TMC to
22  produce during the course of this litigation?
23      A.  Not at all.  This came as a surprise to me.
24  I received a letter notifying me of a deposition after
25  the original deposition.  Then I was served at work

Page 40

1  probably about a week or two later.
2      Q.  Okay.  So the first knowledge you had of the
3  case was our efforts trying to interview you as a
4  witness?
5      A.  Yeah.
6      Q.  Is Patrick Crocker your attorney?
7      A.  No, sir.
8      Q.  What conversations have you had with
9  Mr. Crocker about this case?
10      A.  When I was notified of this, it was basically
11  an e-mail that was sent with a copy of a notification
12  that was e-mailed to the company or mailed to the
13  company or something like that.
14          You'll have to understand that I wasn't with
15  the company for a bit.  They've gone through some
16  economic turmoil, and there were times where we
17  weren't being compensated and stuff like that.
18      Q.  Right.
19      A.  So I wasn't there for a couple months, and I
20  just recently returned to the company.
21      Q.  Okay.  Have you had other conversations --
22  substantive conversations -- with Patrick Crocker
23  about this case?
24      A.  I asked if I was -- if they were going to
25  provide representation in conjunction with this, and I

Page 41

1  was told, "No," and here I am.
2      Q.  We appreciate it.
3          Focusing on telemarketing in general, can you
4  describe for us how a telemarketing campaign is
5  initiated?
6      A.  Sure.  Depending on the type of campaign,
7  usually we negotiate the contract, the contract is
8  signed, it is disseminated to all the departments,
9  there is a launch meeting.  This is how things are
10  done today.
11          So we have a launch meeting with human
12  resources, with IT, everyone -- stakeholders meeting,
13  if you will -- everyone knows what deliverables they
14  need to take action on and the timelines, and we just
15  execute based on the contract.
16      Q.  Okay.  Focusing more specifically on -- let's
17  focus on ringless voicemail telemarketing back when
18  you were familiar with the campaign, how did you
19  physically initiate a ringless voicemail campaign?
20      A.  Wow.  So, once again, we started with a
21  contract and, you know -- can we do this?  Do we have
22  permission to do it?
23          Once the contract was negotiated, that was
24  turned over to Robert and George and Tyson.  Tyson was
25  our CIO.  He was the director of IT, became our CIO,

11 (Pages 38 - 41)

Page 42

1  became our VP; at one point, became the president.
2  So, you know, everything kind of ran through those
3  guys to create campaigns.
4      Leads were procured through IT.  IT would
5  request leads from the vendors, get approval for
6  payment from accounting, and, you know, away we went.
7      Q.  That's what I'm trying to get to -- away we
8  went.
9      Would, essentially, the numbers that have
10  been kind of vetted and approved then be put into some
11  type of Excel spreadsheet or some type of data list
12  and loaded into a computer?
13      A.  The numbers for vetting the campaign?
14      Q.  The numbers that are actually being called.
15      A.  Yeah.  The numbers that are being called,
16  they're put into some dialing -- an RVM platform, is
17  what I understand.  The platform then initiates the
18  contact and delivers the messages.
19      Q.  Okay.  And it's an automated process; right?
20  There's no one physically dialing telephone numbers?
21      A.  Correct, I believe.  Yes, to the best of my
22  understanding, it's a fully automated process.
23      Q.  Are you familiar with the term "predictive
24  dialer"?
25      A.  Yes.

Page 43

1      Q.  Are you familiar with what an automatic
2  telephone dialing system is, ATDS?
3      A.  Basically, yes.
4      Q.  Generally, what is your working knowledge of
5  what an ATDS is?
6      A.  Auto dialer is just a piece of equipment that
7  will dial a list of numbers at different pacing
8  settings.  It's just a contact software or platform to
9  dial customers.
10      Q.  And with RVM technology, you can also
11  physically attach a recording to the call, is that
12  correct, and then drop it into an answering machine?
13      A.  I can't speak to the science of RVM.  That's
14  something that, you know, guys like Tyson would be
15  better equipped to answer.
16      My understanding is that you were able to
17  leave a message on someone's phone without actually
18  ringing their phone, so no call was being initiated.
19      Q.  That was all done through the automated
20  dialer?
21      A.  It was not done through our dialer.  It was
22  done through an RVM platform.  So we had a separate
23  dialer where agents were logged into our dialer and we
24  received calls, but the RVM platform was separate from
25  our dialer.

Page 44

1      Q.  I'm trying to understand how the RVM platform
2  works, and I understand it's your working knowledge.
3  It sounds like a list is taken with a recording and is
4  somehow communicated to the RVM platform.
5      A.  Correct.
6      Q.  What's your working understanding of what
7  happens next?
8      A.  That platform contacts the customer, delivers
9  the message, and then the customer would initiate an
10  inbound call to the contact center.
11      Q.  All right.  The RVM platform, that's an
12  automated process; right?  There's no one physically
13  hand-dialing numbers and sending an RVM into someone's
14  answering machine; is that correct?
15      A.  That's correct.  It was a separate automated
16  process.  I know because we were delivering, with DMI,
17  thousands of leads at a time.  No one is dialing
18  thousands of leads at a time.
19      Q.  Focusing on what you testified, then the next
20  step -- calls are initiated by the RVM platform.  And
21  if a consumer wanted them to respond, they would call
22  you back; is that correct?
23      A.  Yes, sir.
24      Q.  Then TMC had essentially a call center set up
25  to handle those calls; is that correct?

Page 45

1      A.  Yes, sir.
2      Q.  The RVM message, did it say, "It's TMC
3  calling," or did it say, "Are you interested in Direct
4  Energy?"
5      A.  It said -- I believe the original message
6  actually said "Direct Energy" and referenced the Nest
7  offer, I believe, which was a product that they were
8  selling at the time.
9      Q.  To your knowledge, at all times, was Direct
10  Energy specifically mentioned?
11      A.  Yes.
12      Q.  In other words, TMC had the authority to
13  specifically market using Direct Energy's trade name?
14      A.  We did not have the authority to
15  specifically -- to use their trade name whenever we
16  wanted.  We had a certain mockup that was approved,
17  and it was my understanding that we had to get
18  approval for any changes.
19      Q.  Sure.  Direct Energy approved the use of the
20  prerecorded message used with the RVM campaign; is
21  that correct?
22      A.  Correct.
23      Q.  That message specifically mentioned Direct
24  Energy; correct?
25      A.  Yes.  When I was involved, yes, absolutely.

12 (Pages 42 - 45)

1    Q. So then people start calling back into the
2  TMC call center.
3        Do you have, essentially, a software that can
4  handle those -- I notice we have a manual here called
5  "Disposition code training."
6        Are you familiar with what that is,
7  generally?
8    A. Uh-huh.
9    Q. What does that mean?
10    A. Disposition codes, that speaks to the quality
11  of your leads.  So dispositioning is just accurately
12  coding the call for what it was.
13    Q. So an RVM message goes out to however many
14  people, a call is made into TMC.
15        What happens next?
16    A. The call would be connected to a waiting
17  agent, and the agent would go over the offer with the
18  client on the phone and take them through the sales
19  process.  That call would then be dispositioned at the
20  end of the call.
21    Q. Okay.  If someone called back and actually
22  complained about getting the call, was there a
23  disposition to evidence that?
24    A. Yes.  If someone was irate or unhappy or they
25  requested to be removed from the calling list, there

1  were dispositions for those too.
2    Q. Would DNC be one of those dispositions?
3    A. Correct.
4    Q. What would the other dispositions be for that
5  type of situation?
6    A. I would have to look at the dialer.  I
7  haven't had view of that in quite some time.
8    Q. Sure.  In your experience, did that happen?
9  Did people call back irate or upset about getting
10  ringless voicemail calls?
11    A. We had some people that did call and did not
12  remember how they opted in.  We were able to educate
13  most people about how we got their lead, and they're
14  like, "Oh, yeah.  Okay."
15        But some people, yes, absolutely did not want
16  to be contacted or they didn't read the fine print,
17  and we're more than happy to remove people from our
18  calling list.
19    Q. Did some people say, "I never opted in"?
20    A. Yeah, we've had people that have stated that.
21  Like I said, sometimes people forget and they don't
22  always read the fine print of how they opted in.
23    Q. Okay.  That's certainly one explanation.
24        Did TMC ever do any due diligence to
25  double-check to make sure its opt-ins that it was

1  calling -- opt-in leads -- really, truly were people
2  who wanted to receive Direct Energy calls?
3    A. I have no idea.  Once again, that sort of
4  stuff would fall under IT and the compliance
5  department.
6    Q. Sure.  What would the software be called that
7  had all the disposition codes in it?  Did it have a
8  certain name?
9    A. We use -- our dialing platform is VICI.
10  That's the software that we use on the agent side to
11  do all of our call tracking and disposition.
12    Q. Is that software hosted by TMC or hosted by
13  VICI?
14    A. That's a good question.  I think some of it
15  is in-house and some of it is hosted by different
16  vendors.
17    Q. If you wanted to -- say you did an RVM
18  campaign and you wanted to see how many DNC
19  dispositions there were, is that a fairly easy
20  analysis?
21    A. Yeah, it should be.
22    Q. Did TMC send over to Direct Energy DNC
23  dispositions?
24    A. I believe so.  I believe that was one of the
25  things that was being sent over almost weekly, I

1  believe.
2    Q. Do you have any sense as to the volume of
3  calls that were being made via ringless voicemail?
4    A. No.  I know it was significant, but I
5  couldn't speak to the number.
6    Q. Can you help us understand what is
7  significant?  Is it more than 10,000 a day, more than
8  100,000 a day?
9    A. I think it was more than -- at the time that
10  I was doing it, it was more than 2, 3,000 a day.
11    Q. Okay.  And it's your understanding that each
12  one of those persons specifically asked to receive a
13  Direct Energy telemarketing call?
14    A. Correct, yeah.  I mean, there was a lot of
15  sizzle to the offer.  You can get a free Nest
16  thermostat.  And DMI had a great network of publishers
17  all across the web.
18        So, yeah, I was very confident in the leads,
19  the way that it was structured.
20    Q. But your knowledge of the leads and the
21  quality of the leads kind of begins and ends with DMI?
22    A. Yeah -- DMI and Silverman.  At that time, I
23  was being transitioned out and handling other things.
24    Q. All right.  I'm trying to get a handle as --
25  today -- trying to figure out this consent issue.  I

1 think you've already said that you have no knowledge
2 as to whether this consent evidence currently exists.
3 Is that your understanding?
4      A. Yes.
5      Q. Do you know who would -- would it be Tyson
6 who would have the most knowledge about where that
7 evidence exists?
8      A. Yes, sir. Tyson was the lead data person, IT
9 guy, VP, ended up -- I mean, like -- you would have to
10 understand, TMC is in receivership for a reason.
11 Right?
12     Q. Sure.
13     A. The people that were in charge, thankfully,
14 they're no longer there. But there was a lot of
15 things that were made -- a lot of just -- most
16 decisions were made without, you know, asking anyone's
17 permission below them. There wasn't any general,
18 like, "Hey, guys. Let's have a meeting and let's talk
19 about this." That's not how things were run at TMC.
20     Q. Okay. Would you be surprised, explaining
21 that culture, that, at some point during the ringless
22 voicemail telemarketing campaign, TMC started using
23 opt-in leads that were not subject to the same level
24 of quality control as DMI?
25     A. I can't speak to that.

1      MR. THOMAS: Matt, we've been going about
2 an hour --
3      MR. McCUE: Let's take a break.
4 Ten-minute break?
5      MR. THOMAS: Sure.
6      THE VIDEOGRAPHER: We are going off the
7 record. This is the end of media unit one.
8 The time is 11:11.
9      (Brief recess.)
10     THE VIDEOGRAPHER: We are back on the
11 record. This is the beginning of media unit
12 two. The time is 11:20.
13     MR. McCUE: I just want to clean up -- we
14 had referred to Bates stamp 493 -- Direct
15 Energy 493 -- if we can just mark that as an
16 exhibit?
17     (Exhibit 4 was marked for
18 identification.)
19 BY MR. McCUE:
20     Q. Mr. Correia, let me ask you about
21 telemarketing complaints over the next category. We
22 talked about DNC dispositions and how, if people
23 complained, it would be noted in the records; right?
24     A. (Nods head.)
25     Q. Direct Energy would be shared -- you would

1 share that list with Direct Energy; correct?
2      A. (Nods head.)
3      Q. You have to respond verbally.
4      A. Yeah, that's my understanding.
5      Q. Did Direct Energy, to your knowledge, ever
6 voice concerns about -- as to the number of DNC
7 dispositions?
8      A. Not to my knowledge.
9      Q. Do you have any knowledge of other types of
10 ways in which consumers complained to TMC about
11 telemarketing calls?
12     A. No, sir.
13     Q. So, like, lawsuits or formal letters or
14 anything like that?
15     A. I'm not privy to any of that, sir.
16     Q. Do you have any knowledge of an AG, an
17 attorney general, action being initiated against TMC
18 for alleged illegal telemarketing?
19     A. No, sir.
20     Q. Do you have any knowledge of TMC ever being
21 sued before for violating the Telephone Consumer
22 Protection Act?
23     A. No, sir.
24     Q. Who would have knowledge about something like
25 that?

1      A. That's all e-level stuff. That's George,
2 Tyson, Andrew, the owner.
3      Q. And e-level, meaning executive level?
4      A. Yes, sir.
5      Q. Were you aware that Direct Energy had the
6 contractual right to audit TMC to make sure it was
7 compliant with its instructions?
8      A. Yes, sir. I was part of a DE audit.
9      Q. Okay. Did Direct Energy ever exercise its
10 right to audit TMC to make sure it was compliant with
11 its instructions?
12     A. Yes, I believe so.
13     Q. In regards to which topics?
14     A. In regards to their contracts. We conducted
15 a three-month audit in 2017 with Direct Energy.
16     Q. Okay. Did anything relating to that audit
17 have to do with telemarketing compliance?
18     A. I don't know the scope of their -- of their
19 investigation, but we were asked to justify pretty
20 much everything in all of our contracts.
21     Q. But focusing specifically on the contracts,
22 not on pattern and practice, course of performance,
23 different things like that?
24     A. Right, right. So, yeah.
25     Q. To your knowledge, did Direct Energy ever ask

14 (Pages 50 - 53)

1 for an audit of the opt-in vendors that TMC was using
2 for leads that it used for the ringless voicemail
3 campaigns?
4     A. Not to my knowledge.
5     Q. Did TMC ever audit, say, DMI to ensure that
6 its opt-ins were compliant with the contract?
7     A. I have no idea, sir.
8     Q. Did TMC have the authority to do that?
9     A. I would assume so, yes.
10     Q. Are you aware that, under the contract,
11 Direct Energy had the authority to audit
12 subcontractors used by TMC?
13     A. Yes, sir.
14     Q. It did have that authority?
15     A. I believe so.
16     Q. Did it exercise that authority?
17     A. They -- we had to vet the vendors; so, in
18 that regard, yes.
19     Q. What does that mean "vet the vendors"? What
20 would they do?
21     A. Any time we brought up any sort of vendor, we
22 would have to get them approved. For example,
23 Silverman -- we had to get an addendum for Silverman.
24 DMI -- we had to get an addendum for DMI.
25     We had brought on some third-party vendors to

1 call on our behalf as well, and that was also approved
2 by DE.
3     Q. Okay. What is the big picture? What are
4 they vetting? Do you have an understanding of what
5 kind of data they're asking for?
6     A. Typically, they want the name of the company,
7 ownership, history, basic financial information. I
8 think there was a one-pager that we had to fill out
9 and submit it to procurement, along with the request
10 to have them vetted.
11     Q. Okay. Did you ever have conversations with
12 anyone at Direct Energy where they were essentially
13 asking, "Were these opt-ins legitimate?"
14     A. No, no.
15     Q. No conversations with John Moran or anyone --
16     A. No, sir.
17     Q. -- in that regard?
18     A. No, sir.
19     Q. Who is John Moran's supervisor?
20     A. John Moran's supervisor, at the time, was
21 David Schotz.
22     Q. No memory of David Schotz ever expressing
23 concerns about the legitimacy of opt-ins?
24     A. No, sir; not in the context that they thought
25 what we were doing was outside of the scope of the

1 contract. But there were discussions in the beginning
2 about whether they could get this approved, you know,
3 number one. So there were discussions about the
4 process, but not specifically what you're asking.
5     Q. Okay. And I'm assuming that, if all -- if
6 all these opt-ins were legitimate in that there truly
7 was consent for each unique phone number, there should
8 be a consent paper trail for each number that was
9 called via ringless voicemail message; is that
10 correct?
11     A. Yes, sir. To the best of my understanding,
12 yes.
13     Q. So if two and a half million people were
14 called between June of 2017 and June of 2018 by
15 Silverman, on behalf of TMC, on behalf of Direct
16 Energy, there should be two and a half million consent
17 records?
18     MR. THOMAS: Objection; assumes facts not
19     in evidence.
20 BY MR. McCUE:
21     Q. You can still answer. He's objecting for the
22 record.
23     A. I would assume so.
24     Q. If everyone is doing their job --
25     A. If everyone's doing their job --

1     Q. -- and it's truly consented to, there should
2 be two and a half million opt-in records that show
3 specific consent to receive Direct Energy calls?
4     A. Yes.
5     Q. To your knowledge, does that exist?
6     A. I have no idea. I didn't pick the vendors; I
7 didn't pick the platforms; I didn't pick the leads. I
8 didn't pay for them. I mean...
9     Q. All you can do is testify to what you're
10 aware of.
11     A. Yeah. This is one of those times where I'm
12 glad I wasn't at the big boys' table.
13     Q. How would you describe the payment
14 relationship between Direct Energy and TMC? In other
15 words, was Direct Energy frequently behind in its
16 payments?
17     A. Was Direct Energy behind in its payments to
18 TMC?
19     Q. Right.
20     A. I have no idea.
21     Q. So you weren't involved in e-mails back and
22 forth saying, "Half a million dollars is due. This is
23 a crisis. We need to pay our vendors"? You weren't
24 involved in those discussions --
25     A. There were several times I was asked to reach

15 (Pages 54 - 57)

1  out to the client about where invoices were, but those
2  were typically issues where the invoice wasn't
3  submitted properly and there was missing data.  And
4  those were typically -- I just dealt with home
5  services.
6       So, yes, in home services, there were times
7  where Ashley Carter didn't approve invoices on time,
8  and we would have to reach out to her to nudge her and
9  figure out what was going on.  On the energy side, I
10  have no clue.
11    Q.  Do you have a sense as to how big of a client
12  Direct Energy was for TMC in terms of revenue --
13  per-year revenue?
14    A.  I would say they were pretty big.  For the
15  campaign that I was running, home services, it was on
16  par of about 6,000,000 a year.
17    Q.  That's just one campaign?
18    A.  That was just the campaign I was in charge
19  of.
20    Q.  And is that a telemarketing campaign?
21    A.  In the sense that we're using the phone.
22  It's an inbound appointment-setting campaign.  I guess
23  it's how you categorize the telemarketing.
24    Q.  Well, did it use ringless voicemail message?
25    A.  No, sir.  It's in the contract that we could

1  have, but it's not something that's feasible in the
2  home services.  We're taking calls for people that
3  have problems with their electrical, their plumbing,
4  or their HVAC.
5       So these are people that are calling us in an
6  emergency and we're just booking a call.  The only
7  outbound call we would make is to, like, confirm an
8  appointment, a follow-up.
9    Q.  How do they learn about Direct Energy's
10  services?
11    A.  That's a good question.  That's the first
12  question we ask in our script after their ZIP code.
13      MR. THOMAS:  We're going to sign you up,
14  Matt.
15    A.  Yeah.  You can be an agent.
16      So, typically, they're previous customers, so
17  they have a magnet or something in their home.  DE
18  does a lot of advertising.  There's the trucks --
19  advertising on the trucks, billboards, radio ads, TV
20  ads.  Right?  For us, that's easy.
21    Q.  On a Direct Energy truck would be a TMC phone
22  number?
23    A.  No, no, no.  It's the Direct Energy number
24  that gets routed to us.
25    Q.  I see.  I understand.

1    A.  Yeah.
2    Q.  Focusing back on opt-in data -- after TMC
3  purchased opt-in data, did it send it to Direct Energy
4  to do some type of scrubbing?  Are you aware of that?
5    A.  I have no idea.  I believe we were
6  responsible for the data.
7    Q.  Okay.  Do you recall Direct Energy saying, "I
8  don't want to pay for data we already have, so I want
9  you to send it to me so we can remove existing data"?
10    A.  I believe there may have been conversations
11  like that.  I think that's conversations we ended up
12  having with lots of clients.
13    Q.  Okay.  If Direct Energy wanted to test that
14  data to make sure that people were actually consenting
15  to receive calls, they could do a sampling of it and
16  call these people and say, "Did you really opt in to
17  receive Direct Energy calls?"  They could do that?
18    A.  Yes.
19      MR. THOMAS:  Objection; calls for
20  speculation.
21  BY MR. McCUE:
22    Q.  Let's turn now to training as a general
23  topic.
24      Could you explain for me how Direct Energy
25  was involved in the training of TMC employees?  Let's

1  cabin it specifically to ringless voicemail
2  telemarketing campaigns.
3    A.  How Direct Energy was involved with the
4  training of --
5    Q.  Right, right.
6    A.  They did not provide any of the training for
7  the ringless voicemail campaign.  I don't understand
8  the question.
9    Q.  Maybe we'll have to go more general.  There's
10  references throughout the documents to TMC employees
11  logging onto Direct Energy websites, and, it's my
12  understanding, going through certain training.
13      I'm trying to understand from your
14  perspective, how did that work -- what was that about?
15    A.  Ringless voicemail doesn't impact the
16  training.  So ringless voicemail, to my understanding,
17  is just a technology that delivers the calls.
18      So for the training of the employee, we
19  wouldn't have to train the employee on ringless
20  voicemail.
21    Q.  Okay.  So let's broaden it.  Training in
22  general.
23    A.  Right.
24    Q.  So how would Direct Energy be involved in
25  training -- generally training -- a TMC employee,

1 let's say, who's going to be involved in telemarketing
2 in general?
3     A.  They provided the training material for the
4 campaigns, you know.  They provided information about
5 the Nest product, about the rates, service
6 territories.  They provided a lot of guidance in how
7 the program should be structured and monitored.
8     Q.  Okay.  Did TMC provide, say, cloud-based or
9 internet hookup -- different mechanisms where TMC
10 could log onto different systems and get training?
11     A.  Training was in-house.  I think some of it
12 may be cloud-based, but I don't think agents could
13 access training outside of the company.
14     Q.  Okay.  Did Direct Energy provide the trainers
15 themselves to come and train?
16     A.  Often.
17     Q.  So Direct Energy paid for those trainers to
18 come and train TMC employees?
19     A.  Typically, it was on home services, not on
20 energy.  Energy -- we had existing energy campaigns
21 and there wasn't really a requirement for training
22 from Direct Energy.  They provided training material.
23 But I don't recall any hands-on trainer coming from DE
24 for energy.
25         On the other lines of business, like the ones

1 I manage, we had constant support for home services.
2 There was someone there all the time.
3     Q.  And there may be constant support for, say,
4 the telemarketing side, but that's not in your silo?
5     A.  Right.
6     Q.  Who would be most knowledgeable about that?
7     A.  That's Robert Svendsen.  He was in charge of
8 energy.
9     Q.  Did Direct Energy provide equipment for TMC
10 to use when telemarketing?
11     A.  Yes.  We've had campaigns -- once again, home
12 services -- where, in 2017, we were not only going
13 through a Direct Energy audit for home services, but
14 we were also onboarding, like, 30O agents when their
15 Phoenix call center closed down.  But we also made a
16 hardware migration in 2017 onto their Avaya platform.
17 So, specifically hardware, yes.
18     Q.  I'm referencing specific e-mails where Direct
19 Energy is saying, "The Avaya phones are on the way."
20         Is that consistent with your memory?
21     A.  Correct.  That's for the home services
22 campaigns.  So the Avaya phone system, we took
23 delivery of -- I can't remember -- probably, like, 80
24 Avaya phones from Direct Energy, got set up on their
25 switch and everything like that for home services.

1     2017 was a fun year for me.
2     Q.  But in terms of the telemarketing side, do
3 you have any knowledge of that type of support being
4 given to TMC?
5     A.  No, because we were doing outbound dialing
6 for them.  So there was no talk of being placed on
7 their Avaya system or anything like that.  Not to my
8 knowledge.
9     Q.  What computer system did Direct Energy make
10 available to TMC so that TMC could actually close
11 sales?
12     A.  Oh, wow.  That would be the TPV portal.
13     Q.  Does that stand for something specifically?
14     A.  The third-party vendor portal.
15     Q.  TPV?
16     A.  Right.
17     Q.  Generally, how would that work?  Someone
18 calls in -- let's say leaving voicemail -- somebody
19 calls in, "Yes, I'm interested in a Nest."
20         What happens next?
21     A.  We would transfer you to a third-party
22 company -- I can't remember the name of the company --
23 there's been so many over the years -- where the call
24 would be recorded and vetted for the customer's
25 protection and the client's protection.  And we go

1 through the basic information -- customer's name,
2 account information, and consent and understanding
3 that they're making a change to their supplier today.
4     Q.  Can you turn to Tab 76?  If you can take a
5 look at the document that's at page 76, there's no
6 Bates reference to it, but, for the record, this was
7 an Excel document produced by TMC, evidencing the
8 purported consent of our client to receive Direct
9 Energy telemarketing calls.
10         Once you've taken a look at that, let me
11 know.
12     A.  I've never seen this before, so...
13     Q.  Okay.  Were you involved at all in
14 investigating the telemarketing calls received by
15 Matthew Dickson, who's the plaintiff in this case?
16     A.  I received e-mails about them, but I
17 forwarded those on to Robert.
18     Q.  Okay.  What did those e-mails say?
19     A.  I believe, initially, John Moran or Madeline
20 had inquired about, you know, "Do you have the opt-in
21 record?"  I wasn't managing, so I forwarded it over to
22 the manager, which was Robert, and...
23     Q.  Okay.  I guess, what I'm trying to figure
24 out -- do you know where this came from?
25     A.  I have no idea.

Page 66

1    Q.  That would be Robert --
2    A.  Svendsen.
3    Q.  -- Svendsen, who, to the best of your
4  knowledge, would know where this came from?
5    A.  Correct.  Him and Tyson Chavarie.  This looks
6  like an IT kind of thing.  It has IP addresses and
7  stuff on it.
8    Q.  Could you help me understand -- I've seen
9  documents referencing daily RVM reports going back and
10  forth between TMC and Direct Energy.
11    Do you have knowledge of what those are?
12    A.  No.
13    Q.  Do you have any knowledge as to, under the
14  contract you negotiated, what was the reporting
15  requirements for TMC?
16    A.  I don't recall.
17    Q.  There's often references to USHS.  Can you
18  help me understand what that means?
19    A.  Sure.  That's United States Home Services.
20  That's what I do.  I can talk about that.  I know lots
21  of stuff there.
22    Q.  OBTM, what does that mean?
23    A.  Outbound telemarketing.  We started out doing
24  outbound telemarketing for USHS back in, like, I
25  think, 2015, 2016.  My dates are kind of off.

Page 67

1    But, yeah -- I mean, we started off calling
2  their non-club and cold-call customers and earned the
3  inbound work after that, so -- yeah.
4    Q.  Help me understand what the Discovery system
5  is.
6    A.  I have no idea what the Discovery system is.
7    Q.  How about Pogo and DX Access?
8    A.  Oh, okay, okay.  I know what you're talking
9  about now.
10    Discovery, Pogo, all that stuff is on the
11  energy side.  I think that's the platform that they
12  used to do credit checks for Texas, I believe.  I
13  believe that's what Pogo is.
14    Q.  How about DX Access, any idea?
15    A.  Oh, DXC -- I think that's probably DXC.  That
16  was the TPV company, the third-party company.  That
17  makes sense now.
18    Q.  Do you recall if, during the summer of 2017,
19  there was a request -- TMC made a request to do what
20  they call expanded RVM?  In other words, they
21  wanted --
22    A.  No, sir.
23    Q.  Okay.
24    A.  Sorry.
25    Q.  All right.

Page 68

1    A.  Go back to USHS.
2    Q.  Do you recall getting opinion letters from
3  Patrick Crocker about the legality of ringless
4  voicemail?
5    A.  I believe I saw an e-mail come through from
6  Patrick Crocker about that, yes.
7    Q.  Do you recall an internal debate as to
8  whether or not RVM can be done without opt-ins?
9    A.  That was outside of my scope.
10    MR. McCUE:  Why don't we take five
11  minutes, rather than me look at my notes
12  while you look at me, and I will see what
13  else I have.
14    THE VIDEOGRAPHER:  We are going off the
15  record.  The time is 11:43.
16    (Brief recess.)
17    THE VIDEOGRAPHER:  We are back on the
18  record.  The time is 11:51.
19  BY MR. McCUE:
20    Q.  If you could turn to page 67 of the binder --
21  Tab 67.  Is this -- if you could take a look at this
22  e-mail?
23    A.  Yes, sir.
24    Q.  Let me know when you're ready.
25    A.  I'm ready.

Page 69

1    Q.  Does this e-mail refresh your recollection as
2  to whether or not you were involved in talking about
3  opt-in leads with John Moran back in November of 2017?
4    A.  They requested the information from 2016 and
5  I forwarded it to them.  That was the extent of the
6  discussion.
7    Q.  Do you know what context that was in?  What
8  did they want that information for?
9    A.  In response to, I believe, this case, I
10  guess.  And I provided what I did, which was the DMI
11  contract.
12    Q.  Turn to Tab 21 --
13    MR. THOMAS:  Do you want to mark this?
14    MR. McCUE:  I'm sorry.  We can mark
15  Tab 67 as the next exhibit.
16    (Exhibit 5 was marked for
17    identification.)
18  BY MR. McCUE:
19    Q.  Take a look through that e-mail and let me
20  know when you're ready.
21    A.  I think I'm ready.
22    Q.  All right.  I'm showing you an e-mail --
23  there's an e-mail above your e-mail from David Schotz
24  to John Moran.  And if you could take a look at that
25  first e-mail, I'll ask you a question.

18 (Pages 66 - 69)

Page 70

1    A. I'm sorry.
2    Q. Let me know when you're ready and I'll just
3 ask you a general question.
4    A. Sure.
5    Q. We're looking at Bates 1872; correct?
6    A. 1872, yes, sir.
7    Q. First, I'm looking at an e-mail from you to
8 John Moran, dated March 30, 2017.
9       Do you see where I am?
10   A. Yes.
11   Q. Having read that e-mail, what is the context
12 and substance of this e-mail discussion between you
13 and Mr. Moran?
14   A. I believe this was renegotiating the price
15 for the leads on the DMI contract.
16   Q. Okay. Are you certain that this was DMI that
17 you're negotiating with that you refer to as the lead
18 partner?
19   A. I can't -- I don't know.
20   Q. Above that, there's a conversation between
21 Mr. Schotz and Mr. Moran that's referring to your
22 below about leads. It says, "This is good to
23 see. Please inspect here that these are all true
24 opt-ins."
25       Do you see that?

Page 71

1    A. Yes, sir.
2    Q. "We should listen to these calls and see
3 where they are opting in from, et cetera. Just really
4 make sure this is solid."
5       Do you see that?
6    A. Yes, sir.
7    Q. Are you aware of any follow-up conversation
8 from Mr. Schotz or Mr. Moran in response to that
9 discussion?
10   A. No, sir. Like I said, I wasn't in charge of
11 the day-to-day of this campaign, you know. I was the
12 face for the client and sending things back and forth,
13 but that was the extent of it.
14   Q. Would you agree that you were a primary point
15 of contact at least with Mr. Moran?
16   A. Yes, I was for a period of time. But Robert
17 Svendsen became the point of contact, instead of me.
18   Q. Okay. What general timeframe would that have
19 been?
20   A. That was 2016 -- end of 2016 -- when we
21 learned about the franchise work coming to us. I was
22 moved over to home services, and Robert took control
23 of everything. He was my senior anyway. And, at that
24 point, Robert was controlling all of energy and I was
25 completely outside of it.

Page 72

1       But I did have that client relationship prior
2 to that, so I was expected to continue to maintain
3 that sort of relationship -- sending e-mails here and
4 there and just...
5    Q. So, for example, this e-mail that we're
6 talking about at Bates 1872 is from March of 2017;
7 correct?
8    A. Right.
9    Q. This was during the time when you were --
10   A. Focused on home services.
11   Q. Right. But you were still in the e-mail
12 chain with Mr. Moran because of your relationship with
13 him?
14   A. Yes, sir.
15      MR. McCUE: If we can mark this as the
16   next exhibit?
17      (Exhibit 6 was marked for
18   identification.)
19 BY MR. McCUE:
20   Q. I'm going to take you to Tab 86.
21   A. 86.
22   Q. I'll ask you to look through the first three
23 pages, Bates 9021 through 9023. Let me know when
24 you're ready.
25   A. I'm ready.

Page 73

1    Q. Does this e-mail chain refresh your
2 recollection of whether or not you were involved in a
3 discussion with John Moran back in August of 2017
4 about ringless voicemail and the TCPA and Mr. Crocker?
5    A. Yes, sir.
6    Q. Tell me your current memory of the context of
7 this e-mail. What happened?
8    A. I believe John Moran had asked us these
9 questions, and this was the formal response that I was
10 asked to give at the time.
11   Q. Was the context of this that Direct Energy
12 was kind of vetting whether or not to do ringless
13 voicemail telemarketing without opt-ins?
14   A. I have no idea. I don't know what was going
15 on at that time in 2017. I have no idea.
16   Q. Okay.
17   A. Or I can't remember, right? I mean...
18   Q. Sure. If I can reference you to page 9022?
19   A. Okay.
20   Q. Towards the bottom of the page.
21   A. Right.
22   Q. The question is, "Does Direct Energy have
23 prior written consent from the person we hope to
24 contact via RVM?" The response is, "No."
25      Is that correct?

19 (Pages 70 - 73)

Page 74

1    A. Yes, sir.
2    Q. Was this your e-mail that you're filling out
3  and sending over to Direct Energy?
4    A. I believe this was the -- the questions were
5  asked by John Moran and I was just responding to them.
6    Q. Okay. Were you responding with your personal
7  knowledge or were you getting answers from other
8  people?
9    A. I was getting answers from other people. I
10  believe this was -- I believe the answers came from
11  Tyson.
12    Q. Okay. And the context of this on page 9022
13  is, you're discussing Silverman; correct?
14    A. I believe so, right. The questions are about
15  Crocker & Crocker and Silverman, I believe.
16    Q. And using Silverman to do ringless voicemail
17  telemarketing; correct?
18    A. Yes, sir.
19    Q. And the question is, "Does Silverman have
20  prior express written consent to send RVM calls to
21  consumers?" And your answer is, "No."
22      Is that correct?
23    A. Where is that, sir?
24    Q. Towards the bottom of the page -- the top of
25  the page, we're talking about Silverman; correct?

Page 75

1    A. Yes. "Who is Silverman?"
2    Q. Right. And we're also talking about ringless
3  voicemail delivery; correct? If we go back to
4  page 9021, the subject matter of the e-mail --
5    A. Right.
6    Q. So I'm just trying to put the three together.
7  The subject matter is about ringless voicemail
8  delivery. They're asking about Silverman, and can we
9  use Silverman to deliver these ringless voicemail
10  calls; correct?
11    A. Correct.
12    Q. And then the question is, "Does Silverman
13  have prior express consent to contact via RVM?" And
14  the answer is, "No."
15    A. I don't --
16      MR. THOMAS: I'm going to object. I
17  think that mischaracterizes --
18    A. I don't see that question --
19      MR. THOMAS: She can't write twice --
20  over each other. One of us can only talk at
21  a time.
22      I'm going to object. I think that
23  mischaracterizes this document.
24  BY MR. McCUE:
25    Q. Let me read it verbatim. The second to last

Page 76

1  bullet point on page 9022 -- are you with me?
2    A. Correct.
3    Q. "Does DE" -- does DE mean Direct Energy?
4    A. Yes.
5    Q. -- "have prior written consent from the
6  person we hope to contact via RVM?"
7      Did I read that correctly?
8    A. Correct.
9    Q. And the answer is, "No"?
10    A. Correct.
11    Q. I know you negotiated the DMI contract.
12      Were you also familiar with the underlying
13  teleservices agreement between Direct Energy and TMC
14  that was negotiated about a year earlier in 2015?
15    A. I believe that was the one that was started
16  with Brian Cain.
17      MR. THOMAS: Matt, before we go on, did
18  we mark Tab 86?
19      MR. McCUE: Let's do that. For the
20  record, Tab 86 refers to Direct Energy
21  009021.
22      (Exhibit 7 was marked for
23  identification.)
24      THE WITNESS: And to answer your
25  question, it's my understanding of -- when

Page 77

1    this was answered -- that, you know, we are
2    getting consent by the opt-in.
3      So does DE have prior written consent
4    from any of these people? No. But we're
5    getting consent in the opt-in.
6  BY MR. McCUE:
7    Q. From who?
8    A. From the customers.
9    Q. From who? Who are you getting the opt-ins
10  from?
11    A. From the customers themselves, by going
12  online or wherever they go to opt in for the lead.
13    Q. I understand that. But back in this
14  timeframe -- we're talking August of 2017 -- who was
15  TMC using to get opt-in leads?
16    A. I have no idea.
17    Q. So that exhibit refers to Bates 90 --
18    A. I believe it's Silverman, right?
19    Q. You've got to --
20    A. Sorry.
21    Q. -- refers to 9021 through 9025.
22      Back to your testimony. Is it your
23  understanding that, in August of 2017, TMC
24  purchasing opt-in leads from Silverman?
25    A. According to this document, yes.

20 (Pages 74 - 77)

1     Q.  Does that refresh your memory about when and
2  what timeframe TMC used Silverman to buy opt-in leads?
3     A.  Vaguely.  Like I said, I wasn't involved in
4  the day to day of what leads were being purchased, who
5  they were being purchased from, and that sort of
6  stuff.  It's several years ago.
7     Q.  Were you aware, when you were working with
8  Direct Energy, that they had the right to listen in on
9  sales calls?
10    A.  Yes, sir.
11    Q.  How would that work?
12    A.  Clients can dial in and monitor.  We also
13  provide recordings of calls.
14    Q.  How often did TMC provide recordings of calls
15  to Direct Energy?
16    A.  On my campaign, it wasn't very often because
17  they had access to the calls.  So, on the calling
18  platform that I managed, the calls were routed to us
19  through a system called Callcap, so they actually had
20  full recordings of the conversations and it didn't
21  really require too much for us to send to them.  They
22  had it all.
23    Q.  So, really anytime, Direct Energy could
24  listen in on a TMC sales call?
25    A.  On my campaign, correct.  And on energy,

1  theoretically, yes, they could.  They would have to
2  set up a monitoring session.  But, on my campaign,
3  they could listen any time they wanted because it was
4  their system.
5     Q.  So if Direct Energy wanted to know if people
6  were making "do not call" requests, they would get
7  both the "do not call" lists from TMC -- correct?
8     A.  Correct.
9     Q.  -- and they could listen in to as many sales
10  calls as they wanted --
11    A.  Yes, sir.
12    Q.  -- to see if people were complaining or not?
13    A.  Yes, sir.
14    Q.  To your knowledge, did Direct Energy ever do
15  that in regards to the ringless voicemail campaigns?
16    A.  I have no idea, sir.
17    Q.  Are you aware, under the contract, that TMC
18  was required to provide Direct Energy with what they
19  called call quality monitoring evaluations?
20    A.  Yes, sir.
21    Q.  What is that?
22    A.  We had -- we had regular calibrations with
23  their quality team, where we would actually listen to
24  calls, score them, and calibrate to make sure that
25  our quality teams were in line with their

1  expectations.
2     Q.  Okay.  The contract refers to TMC
3  facilitating focus groups at Direct Energy's request.
4       Are you familiar with that?
5     A.  Yes, sir.
6     Q.  Did that actually happen?
7     A.  Yes.  We did a lot of focus groups.  Once
8  again, I can't speak about the energy side.  But on
9  the home services side, we did a lot of breakout
10  sessions, focus groups.  And those were scheduled by
11  workforce management over at Direct Energy.
12    Q.  Okay.  Did Direct Energy dictate to TMC,
13  like, the time of day they could send out
14  telemarketing calls?
15    A.  I don't believe so.  I think all of that sort
16  of stuff is governed by the TCPA, the rules for
17  individual states.
18    Q.  But, other than that, so could Direct Energy
19  say, "Look, we only want calls to start at noon and
20  end at 3:00"?  Did they have the power to do that?
21    A.  Oh, absolutely, yes.
22    Q.  Similarly, did they have the authority to
23  tell TMC how many telemarketing reps they want on a
24  certain shift?
25    A.  Certainly, yes, sir.

1     Q.  Did that actually happen?
2     A.  I would assume so, yes.  They controlled
3  their cost to acquire and manage it by adjusting
4  staffing, so, yeah.
5     Q.  Direct Energy had the power to adjust
6  staffing at TMC?
7       MR. THOMAS:  Objection; mischaracterizes
8     testimony.
9  BY MR. McCUE:
10    Q.  TMC had the -- Direct Energy had the
11  authority to direct staffing at TMC?
12      MR. THOMAS:  Same objection.
13    A.  They could make requests for staffing
14  changes.  Ultimately, they're the client and they're
15  paying the bill.  So, you know, if they want five
16  employees, we'd put five employees.  If they want ten
17  employees, we'd put ten employees.  It's based on the
18  goal that's set by the client.
19      So I guess the answer is, yes, ultimately.
20  BY MR. McCUE:
21    Q.  Was TMC required to tell Direct Energy if
22  they received, say, an AG complaint about
23  telemarketing?
24    A.  I don't know.  I'm not familiar with all the
25  terms in the contract.

21 (Pages 78 - 81)

Page 82

1    Q. Sure. What was your understanding of the
2 power that Direct Energy had to discipline or
3 terminate TMC?
4    A. I think most of those energy contracts are
5 written that way, where, you know, the client can
6 terminate us for cause.
7    Q. Do you have an understanding of what cause
8 would be under the contract?
9    A. Violations of any terms in the contract.
10    Q. Would violating telemarketing law or
11 allegedly violating telemarketing law be a cause for
12 discipline?
13    A. I would assume so.
14    Q. Did that ever happen?
15    A. Yes. We had issues in Connecticut, where our
16 tele-salespeople were being too aggressive, and we
17 were reprimanded for that and removed from dialing.
18    Q. When you say, "too aggressive," do you mean
19 more like an unfair representation versus an illegal
20 violation of the TCPA?
21    A. I would have to -- I don't think it was
22 TCPA-related -- it was not TCPA-related.
23    Q. Okay. But, in that instance, Direct Energy
24 came in and said, "We're going to make some changes,"
25 and issued some discipline?

Page 83

1    A. Yes, sir.
2    Q. It had the authority and ability to do that?
3    A. Yes, sir.
4    Q. And your understanding is that the
5 relationship between TMC and Direct Energy was
6 terminated specifically because of this lawsuit?
7    A. That's my guess. I was not part of the
8 company when all of this went down. I came back to
9 the company recently and learned that we were no
10 longer doing Direct Energy work. Because, when I
11 left, I think we were still doing it. I'm not quite
12 sure.
13    Like I said, in my department, we are still
14 doing some work, which is not -- it's complicated. It
15 used to be Direct Energy. It's now Authority Brands.
16 Direct Energy divested themselves of the campaign that
17 I was responsible for.
18    So I really haven't had much to do with
19 Direct Energy. I've been more focused on Authority
20 Brands and their franchise work. So, you know, I'm
21 sorry that there's gaps in my memory and...
22    Q. Sure. Just do the best you can.
23    A. Yeah.
24    Q. Just a few more questions for you.
25    A. Sure.

Page 84

1    Q. Turn to page 4 -- binder page 4. Let me know
2 when you're ready.
3    MR. McCUE: Mark, this is the next
4 exhibit.
5    A. I believe I'm ready.
6    (Exhibit 8 was marked for
7 identification.)
8 BY MR. McCUE:
9    Q. We've referenced a bunch of times today a
10 contract that you negotiated with DMI for opt-in
11 leads; is that correct?
12    A. Yes, sir.
13    Q. Is this the contract that you're referring
14 to?
15    A. I believe so. This looks like it.
16    Q. For the record, we're talking about Bates 47
17 through 57.
18    A. There is no 47 -- oh, I'm sorry -- yeah. 47
19 through 57.
20    Q. Take your time.
21    A. Yes. I believe this is -- this looks like
22 it, to my recollection.
23    Q. So is it your testimony that the opt-in leads
24 that Direct Energy used for the ringless voicemail
25 campaigns, at least at the beginning, began with

Page 85

1 opt-in leads purchased from DMI? Is that correct?
2    A. That's what I set up; yes, sir.
3    Q. And then, this contract then specifies
4 exactly what that opt-in is supposed to look like?
5    A. Correct.
6    Q. If I can turn your attention to paragraph 1,
7 it says "term."
8    Do you see where I am?
9    A. Yes.
10    Q. I'll just read this to you and you let me
11 know if I read it correctly.
12    "The parties agree to a 30-day calendar trial
13 period beginning on the date upon which services
14 commence, as mutually determined by the parties, trial
15 period. During the trial period, either may terminate
16 this SOW for any reason upon 48 hours written notice
17 to the other party."
18    "The parties will negotiate in good faith and
19 determine if the services will continue past the trial
20 period upon execution of a written agreement between
21 the parties reflecting mutually agreeable commercial
22 terms for performance of the services. If this SOW
23 continues in effect beyond the trial period, either
24 party may terminate this SOW upon 30 days written
25 notice without penalty."

22 (Pages 82 - 85)

Page 86

1    Did I read that correctly?
2    A. Yes, sir.
3    Q. Is it your understanding -- is there a
4    document that extends the DMI opt-in contract beyond
5    the 30-day trial period?
6    A. Not to my recollection. I believe it just
7    continued under the terms of this agreement.
8    Q. What language are you relying upon that this
9    automatically continues beyond 30 days?
10   A. "If this SOW continues in effect beyond the
11   trial period."
12   Q. That's it? That's what you're referring to?
13   A. Yes, sir.
14   Q. Are you aware of the parties negotiating in
15   good faith after the termination of the 30-day
16   calendar trial period?
17   A. I don't understand your question.
18   Q. So it looks like this contract is for
19   30 days; right? And you negotiated it. It basically
20   is saying, if we're going to continue it, we're going
21   to negotiate in good faith and we're going to agree to
22   the continuation of the contract.
23   My question to you is, do you have a memory
24   of that actually happening?
25   A. I don't understand the contract that way.

Page 87

1    But, after the trial, yes, we did speak with John
2    Moran and it did continue.
3    Q. And you were involved with that?
4    A. Yes, sir.
5    Q. And was there an e-mail conversation about
6    that?
7    A. I believe so.
8    Q. Was a new contract signed?
9    A. No, sir. It just continued under this,
10   because -- from my understanding of it, if this SOW
11   continues in effect, either party may terminate -- if
12   it continues in effect beyond the trial period --
13   which it did.
14   Q. Okay.
15   A. That's how I understand it.
16   MR. McCUE: Sure. I have no further
17   questions for now.
18   MR. THOMAS: Can we take a break?
19   MR. McCUE: Sure.
20   THE VIDEOGRAPHER: We are going off the
21   record. The time is 12:16.
22   (Brief recess.)
23   THE VIDEOGRAPHER: We are back on the
24   record. The time is 12:24.
25   CROSS-EXAMINATION

Page 88

1    BY MR. THOMAS:
2    Q. Mr. Correia, my name is Will Thomas. I
3    represent Direct Energy.
4    We've never met before today; correct?
5    A. I don't believe so.
6    Q. Okay. You said you were stationed in Hawaii
7    in the military?
8    A. Yes, sir.
9    Q. 25th Infantry Division?
10   A. Yes.
11   Q. What did you do in the 25th ID?
12   A. I was 71 Lima. I was stationed with the 4th
13   Battalion, 22nd Infantry.
14   Q. And what is that 71 Lima?
15   A. Admin finance specialist.
16   Q. Excellent. Anywhere else that you were
17   stationed in --
18   A. Out of Fort Jackson.
19   Q. Fort Jackson. Was that --
20   A. For my basic --
21   THE REPORTER: Hang on. Can you give him
22   one more rule?
23   MR. THOMAS: I will.
24   BY MR. THOMAS:
25   Q. This is a very unnatural process. I'm just

Page 89

1    as bad about it as every witness that I've ever
2    deposed.
3    The court reporter can't take down two people
4    talking at once. So I'm going to try to do the best I
5    can to not talk over you, and then, if you can, just
6    let me finish my question before you answer.
7    Is that okay?
8    A. Yes.
9    Q. Excellent. How long has TMC been in
10   existence?
11   A. I believe about 15 years or so. I'm not
12   quite sure. I think there were some things that were
13   done -- honestly, I don't know. I've been working for
14   this company for 13 years. My paychecks have said
15   "TMC." I don't know if that's TMC I, TMC II.
16   So, behind the scenes, I couldn't answer
17   specifically how long the company's been in existence.
18   Q. So you worked there for 13 years?
19   A. Correct.
20   Q. And you have an understanding that the
21   company existed for some time before you were
22   employed?
23   A. Correct.
24   Q. Okay. And how many employees does TMC have
25   today?

23 (Pages 86 - 89)

Page 90

1    A. I believe we have somewhere around 300
2  employees.
3    Q. And in 2018?
4    A. 2017, 2018, we probably had closer to 600 or
5  700 employees.
6    Q. During your time at TMC, what is the most
7  number of employees that were employed there?
8    A. Probably over a thousand.
9    Q. When was that?
10   A. I would have to think -- every four-year
11 election cycle, a lot of the work that we do is
12 political in nature -- a lot of market research. So
13 in the presidential cycles, we will bring on a lot of
14 agents for that work. It's seasonal, but it has
15 gotten as high as a thousand employees.
16   Q. And understanding that it's seasonal, how
17 much does the political work that TMC does make up of
18 its overall business?
19   A. A majority of it. That's what I've been led
20 to believe. Political accounts for the majority of
21 our revenue.
22   Q. Okay. And the non-political work, about what
23 percentage does that make up as far as TMC's business?
24   A. I have no idea.
25   Q. Is there any way you can ballpark --

Page 91

1  20 percent, 30 percent, 1 percent?
2    A. I can tell you about headcount. I can't tell
3  you about numbers. I don't know the financials for a
4  lot of the programs, so I can't tell you what the
5  revenue mix is and what percentage of the business it
6  accounts for.
7    But it is one of three primary lines of
8  businesses that we have. The other two being
9  telecommunications and the home services appointment
10 setting that we do -- or market research, really.
11   Q. So three lines of business. Political;
12 correct?
13   A. (Nods head.)
14   Q. Is that a yes?
15   A. Yes.
16   Q. That's the other oddity about this. She
17 can't actually take down a head nod.
18   The other one is telecommunications?
19   A. Correct.
20   Q. Okay. And this Direct Energy campaign would
21 have fallen within the telecommunications; correct?
22   A. It would have fallen under deregulated -- it
23 would've fallen under sales, because our
24 telecommunications campaigns are more inbound-centric.
25 We're calling existing customers.

Page 92

1    Q. I just want to understand. You said it's
2  inbound-centric and you're calling existing customers?
3    A. There's two campaigns. One is inbound; one
4  is outbound. But the mix of the work is -- most of
5  the work we're doing now is inbound in nature. We're
6  not outbound dialing.
7    Q. I understand that. Out of the
8  telecommunications, energy services is just one
9  component of all the telecommunications work that you
10 do; correct?
11   A. Sure, yes.
12   Q. What are some of the other areas that TMC
13 services?
14   A. We service satellite radio, subscription
15 services. So we will do a lot of subscription
16 services for AAA membership. We do subscription
17 services for SiriusXM. We do a lot of work for Starz
18 and Showtime. We do work for Verizon -- Verizon
19 Wireless -- we've done a lot of work for them.
20   Q. Anybody else on the phone side?
21   A. I mean, over the past 13 years, we've had
22 lots of clients.
23   Q. What about on the energy side of the
24 telecommunications?
25   A. On the energy side, we've worked with

Page 93

1  numerous clients over the past 13 years, to my
2  knowledge. When I first came on with TMC, we worked
3  with MXenergy, Santanna.
4    Do you want a list of all the clients that I
5  know?
6    Q. Everyone that you can name.
7    A. Oh, wow. So Santanna, MXenergy -- wow --
8  Spark Energy, maybe Liberty, Clearview, Direct Energy,
9  of course, the Direct Energy sister companies, CLG and
10 all those other ones.
11   It's probably a shorter list of the companies
12 we haven't worked with over the past 15 years. We've
13 worked with PALMco. It's an extensive list. I can't
14 remember every one that we've worked with.
15   Q. Just Energy, is that another one?
16   A. I believe so, yeah.
17   Q. Smart Energy?
18   A. I don't remember Smart Energy, but, sure.
19 Like I said, I was just one of many managers there. I
20 was not the head energy guy.
21   Q. What about USG&E, is that another one?
22   A. US Gas & Electric, yes.
23   Q. Okay. Out of the telecommunication sales,
24 how much -- do you know what percentage that the
25 energy services makes up out of the telecommunications

24 (Pages 90 - 93)

1  tier of business?

2      A.  No clue.  It wasn't our major revenue driver

3  at TMC.  Most of our revenue came from other clients,

4  such as Kipany.

5      Q.  What do they do?

6      A.  Kipany is a broker.  And we have had most of

7  our eggs in the Kipany basket for over a decade.  So

8  much so that they have their own parking spaces.

9      But -- yeah -- the majority of the work has

10  not been deregulated energy in the past five,

11  six years, to my knowledge, and my focus -- my focus

12  has not been energy.

13      Q.  When TMC is doing this telemarketing sales

14  at any given time, they're doing this for multiple

15  clients at the same time.

16      Is that fair?

17      A.  Yeah, that's a fair assumption.  I would

18  assume so.

19      Q.  Okay.  If you walked into the TMC

20  headquarters, it's not just the Direct Energy people.

21  It's other agents that are servicing other clients as

22  well; correct?

23      A.  Yeah.  Space is a price commodity, and there

24  are campaigns that are running simultaneous on the

25  same floor.

1      Q.  Will an agent sometimes work on one campaign

2  and then, on another day, work on a different campaign

3  for a different client?

4      A.  Yeah, absolutely.

5      Q.  Does that happen frequently?

6      A.  That does happen frequently, especially on

7  the energy side, where the campaigns typically may not

8  have the hours you need on them.  Agents will get

9  their hours by working other campaigns.

10      And we encourage that across all of the

11  programs in our company.  We want our agents to hit

12  40 hours and, you know, make their paycheck and come

13  back the next week.  So we try to encourage them to

14  get those hours on other campaigns.

15      Q.  How is it that they go and get those hours on

16  the other campaigns?  Is it something the agent signs

17  up, that they're working on Direct Energy for these

18  days, or is that something that's provided to them?

19      A.  I think that's something that management

20  would provide to them.  The managers know the

21  availability from campaign to campaign.

22      For example, I use political campaigns as a

23  resting place for my agents, because I can't predict

24  when I'm going to get a call in home services.  I

25  don't know when someone's plumbing is going to go bad.

1      So we have a lot of agents that are just

2  sitting there idle.  And our occupancy is very low,

3  which costs money.  So, for my department, I'll use

4  political, for example, as a way to -- as a campaign

5  to put agents in there so we can generate revenue.

6      Q.  But that's a TMC-driven decision; correct?

7      A.  Yes, sir.  Yes, sir.

8      Q.  It's not a client-driven decision; correct?

9      A.  No, sir.  It can be to some point.  It

10  depends on the contractual limitations of clients.

11  Some clients want dedicated agents and they don't want

12  us to utilize those agents for other campaigns.

13      We do have campaigns that are set up in clean

14  rooms, for example, where they could not even if they

15  wanted to.

16      Q.  Okay.  But that's something the client would

17  actually have to ask TMC; correct?

18      A.  It's part of the contract, yes, sir.

19      Q.  Okay.  And then TMC would then have to agree,

20  "Hey, these agents are going to work exclusively with

21  you"?

22      A.  Yes, sir.

23      Q.  Okay.  So in terms of the assignments of the

24  agents to the client, it's a TMC decision that they

25  agree to do with the client?

1      A.  Correct.

2      Q.  Okay.  What are some of the services that TMC

3  provides its customers?

4      A.  Outbound, inbound, digital.  We're trying to

5  get into more big data analysis and sentiment analysis

6  and lead segmentation.  And as the business -- as

7  director of business development, I'm trying to steer

8  the company into a different horizon -- voices --

9  Adodo -- and we need to stay competitive with what's

10  out there in the market, so we're transforming into a

11  more digital play.

12      Q.  What's the digital business that you're

13  talking about?

14      A.  The digital business is advocacy.

15      Q.  What does that mean?

16      A.  Political advocacy.

17      Q.  Like --

18      A.  Political consulting.  Things like static

19  ads, video ads.  Getting people to change their mind

20  about topics and getting them to vote.

21      Q.  What's encompassed in, you said, outbound?

22      A.  Outbound would be any campaign where agents

23  are initiating the phone call.

24      Q.  What about lead generation?  How does that

25  play into outbound campaigns?

1    A.  Lead generation?  It depends on the client.
2   Typically, the client's either providing the data or
3   we're providing the data.
4    Q.  So that is a service that you offer the
5   client, is to go provide them data?
6    A.  Yes, sir.  That is one of the things that we
7   offer.  We can procure leads.
8    Q.  Is that something that TMC does organically,
9   or is that something that TMC exclusively outsources
10  or uses a vendor for?
11   A.  We typically vend that sort of stuff.  We
12  don't have the capacity to generate our own leads.
13      We've toyed with creating our own digital
14  platforms.  We have a web page that we tried to drive
15  traffic to to generate opt-in leads.  It hasn't worked
16  really well.  We can't scale it.  So we rely on
17  vendors.
18   Q.  And who goes and identifies those vendors
19  that you procure leads from?
20   A.  That's Tyson and George.  We used DMI because
21  DMI was a previous client and we had experience with
22  them and their leads.  DMI is -- you've seen them, but
23  you don't know who they are.  If you've ever seen an
24  ad pop up trying to get you to go back to school,
25  that's DMI.

1       They have the capacity of, as soon as you
2   respond to it, an agent is, like, calling you within a
3   minute to try to sign you up for Phoenix online or
4   whatever it may be.
5       So we were very educated about their ability
6   to provide leads for us.  That's why I felt
7   comfortable in going along with them initially.
8    Q.  And you're correct.  I've never heard of DMI
9   before this.
10      Are they a big player in this space?
11   A.  Uh-huh.
12   Q.  Are they the biggest player in this space?
13   A.  I don't know that, but I know they are a
14  player.  I was told that they were one of the bigger.
15   Q.  Do you know how many other bigger ones there
16  are?
17   A.  No clue.
18   Q.  Would you consider them one of the top-tier
19  lead generators?
20   A.  That's what I was told by Tyson.
21   Q.  Any other basis for that other than Tyson?
22   A.  Just previous work experience that we've had
23  with them.  They were one of our clients.  They were a
24  pretty good client, so we trusted them.
25   Q.  Have you ever spoken with anybody over at

1   DMI?
2    A.  Yes, but not in relationship to this.  I
3   spoke with DMI when they were clients and I was
4   testing out their campaign and stuff like that.  But
5   not in -- I never spoke with anyone at DMI about these
6   leads.
7    Q.  So in the case of Direct Energy, DMI,
8   Silverman -- what's the third one?  Bright -- the
9   other vendor?
10   A.  Brightbox.
11   Q.  Yeah.  Those were vendors --
12   A.  I assume that we use Brightbox for this.  I
13  don't know.
14   Q.  But those would all be vendors that TMC
15  selected; correct?
16   A.  Yes, sir.
17   Q.  And then they went to Direct Energy and said,
18  "We want to use these people"?
19   A.  Correct.  Those were vendors brought on by
20  Tyson, yes.
21   Q.  Do you have any understanding as to how lead
22  generation works?
23   A.  Yeah.  From what I understand -- I was on a
24  conference call with Tyson -- and I believe it was one
25  of the guys at Brightbox, where he was trying to

1   explain how they get the leads.
2       They basically go after people that are
3   trying to make money, save money, or win money online.
4   They target those three segments and offer them
5   something to get their information.  It's basically
6   buried in the terms and conditions, all of the people
7   that can be contacted on behalf...
8       So depending on the language of the lead, it
9   could be an exclusive opt-in to just Direct Energy,
10  and it's, like, hey, this is for Direct Energy.  Or it
11  could be a little looser, where it's, like, here's --
12  it's for Direct Energy and all of our partners.
13  Right?
14      So that's where I think it can get -- it can
15  get gray for the customer, because they don't remember
16  all of the other people that were listed on that
17  opt-in.
18   Q.  When you say "gray," you mean it's a matter
19  of recollection?
20   A.  Recollection.  Correct.
21   Q.  This is a service that TMC offers to clients
22  like Direct Energy, Verizon, USG&E -- "Hey, we can
23  provide you leads."  Correct?
24   A.  Typically, on the energy side, it's more --
25  it's more standard on energy than anywhere else.  Most

26 (Pages 98 - 101)

Page 102

1  of our other campaigns, clients provide us leads, but
2  it's a different type of campaign, so --
3      But on the energy side, it's not my
4  understanding that many clients will provide a call
5  list on an outbound campaign on energy.  I just
6  haven't seen too many of those.
7      Q.  On the energy side --
8      A.  Yeah.
9      Q.  -- TMC is not only procuring and providing
10  leads just for Direct Energy; correct?
11      A.  True.
12      Q.  It's doing it for the majority of its energy
13  service clients?
14      A.  Correct; yes, sir.
15      Q.  And that's another service that you guys
16  offer?
17      A.  Yes, sir.
18      Q.  I want to talk about your facility.  You said
19  there's a facility here in Florida.  It was at 1043 --
20      A.  Upsala.
21      Q.  -- Upsala.
22      Does TMC have any other facilities?
23      A.  Not any longer.  At the time, we had two
24  buildings, which was 4395 St. Johns Parkway, which was
25  our corporate building.  That has been -- I don't even

Page 103

1  know.  This is my guess.  From what I've heard, I
2  think that's been wrapped up as part of the bankruptcy
3  with the company.  We just -- one day, we saw people
4  moving stuff out of the building.
5      Q.  Larry, you're under oath today.  I don't want
6  you guessing.  I want to know your knowledge.  I want
7  you to be able to testify honestly and truthfully that
8  these are the things and these are the facts I know.
9      So that's just kind of an another instruction
10  moving forward.  I want to know what you know.
11      A.  Sure.
12      Q.  That structure -- TMC or its receiver owns
13  that structure; is that correct?
14      A.  The 1043?
15      Q.  Correct.
16      A.  Yes, I believe so.
17      Q.  Direct Energy has no ownership interest in
18  that?
19      A.  Not to my knowledge.
20      Q.  To your knowledge, Direct Energy doesn't have
21  a key to that facility; correct?
22      A.  Not to my knowledge.
23      Q.  Direct Energy doesn't have a security code to
24  that facility; correct?
25      A.  No.  You guys have to badge in.

Page 104

1      Q.  Have to badge in.  Where do they get their
2  badges?
3      A.  From our receptionist at the front desk, and
4  you need to be buzzed in to get in.
5      Q.  Right.  Basically, if Direct Energy is going
6  to visit the facility, they have to prearrange travel;
7  correct?
8      A.  Yes, sir.
9      Q.  And they have to ask you guys; correct?
10      A.  Yes, sir.
11      Q.  Say, "Hey, we're coming into town.  We'd like
12  to come see the facility."  Correct?
13      A.  Yes, sir.
14      Q.  They don't have a right to just drop in
15  unannounced and start walking through your facility;
16  correct?
17      A.  I think they could.  We had an open-door
18  policy with them, where they were always open, but
19  that was never -- that's not how the relationship was
20  structured.  Direct Energy always let us know what
21  their travel plans were ahead.
22      Q.  That's not how it was structured; correct?
23      A.  Correct.
24      Q.  And that's not what they did; correct?
25      A.  No.  We always knew when they were coming

Page 105

1  ahead of their arrival.
2      Q.  Direct Energy has no financial ownership
3  interest or ownership into TMC; correct?
4      A.  Not that I'm aware of.
5      Q.  No stock that's held; correct?
6      A.  No, sir.
7      Q.  There's no loans that Direct Energy has made
8  to TMC; correct?
9      A.  I have no idea.
10      Q.  Okay.  Does any customer have a financial
11  interest in TMC?
12      A.  Any customer?
13      Q.  Yeah.
14      A.  Not to my knowledge.
15      Q.  Right.  To your knowledge, it's TMC,
16  wholly-owned, going into receivership?
17      A.  Correct.
18      Q.  The technology that TMC employees -- for
19  example, the server -- that's something that belongs
20  to TMC; correct?
21      A.  Yes.  The server belongs to TMC, yes.
22      Q.  TMC owns that server?
23      A.  Once again, I'm speaking outside of my
24  knowledge.  I don't know what we own, what we lease,
25  what is on site, what's in the cloud.

27 (Pages 102 - 105)

1    Q. Right. That's fair. Direct Energy does not
2  own that server; correct?
3      A. No, no.
4      Q. The computers that TMC uses, those are TMC
5  computers; correct?
6      A. Correct.
7      Q. Those are not Direct Energy computers?
8      A. No.
9      Q. Direct Energy doesn't even have a say as to
10  what computer we prefer that you guys use?
11     A. No longer. They never had a say on energy.
12  But on home services, Direct Energy did dictate
13  headsets, monitors -- minimum spec requirements for
14  computers to meet the network requirements for the
15  ethernet connections we had with you guys.
16     Q. We've spoken a lot today about home services.
17  I just want to be -- I want to make sure I have a
18  complete understanding of this.
19         In your mind, that is something entirely
20  different than the telesales; correct?
21     A. Yes, sir.
22     Q. Physically, they're in a totally different
23  spot?
24     A. Different spot. Like, I'm in a different
25  building. Like, energy was run up front in 4395, with

1  Robert and George and that gang. I was in a
2  completely different building with home services. My
3  hands were full.
4         I mean, I am the face for a lot of this stuff
5  with e-mails just because I helped launch the
6  campaigns. But the day-to-day operation of energy, I
7  have no clue.
8      Q. And on the home services, you had a different
9  point of contact over there?
10     A. Absolutely, yeah. That was actually Carter
11  and Amie Spence. Those were my two primary contacts.
12  One for retail and one for franchise.
13     Q. Direct Energy, to your knowledge, doesn't
14  even own those home services anymore?
15     A. No longer. Those were divested to Authority
16  Brands, I believe, last year or the year before.
17     Q. And you have a completely different contact
18  now?
19     A. Yeah. I work with Amie Spence now. She was
20  brought -- she migrated over with the work to
21  Authority Brands -- her and Ashley Carter. I think
22  Ashley is still around.
23     Q. And you've never been a Direct Energy
24  employee; correct?
25     A. No, sir.

1      Q. Direct Energy never paid you directly?
2      A. No, sir.
3      Q. You don't get any type of 1099 or W-2 from
4  them?
5      A. No.
6      Q. No other kind of benefit? All of your
7  compensation comes from TMC?
8      A. Correct, sir.
9      Q. And that's true for, to your knowledge,
10  everybody else at TMC; correct?
11     A. To the best of my knowledge, yes.
12     Q. On the teleservices side, Direct Energy
13  doesn't tell TMC what computers to use; correct?
14     A. No.
15     Q. They don't tell them what phones to use;
16  correct?
17     A. No.
18     Q. They don't tell them what headsets to use;
19  correct?
20     A. No.
21     Q. The furniture that the agent is sitting on,
22  that's TMC furniture?
23     A. Yes, sir.
24     Q. That's not Direct Energy furniture?
25     A. No, sir. It's not Direct Energy furniture.

1      Q. Are you aware as to whether or not TMC has a
2  license to operate as a telemarketer in certain
3  states?
4      A. Yes. That information was provided to us by
5  Patrick Crocker, and he sent out a document which was
6  updated periodically that said, "Here's our
7  certifications. Here's the cert numbers."
8         So, yes -- yeah.
9      Q. When TMC goes to get those licenses, that's
10  something that TMC does on its own; correct?
11     A. Yes.
12     Q. Or with its lawyer; correct?
13     A. Yeah. That's done by Patrick Crocker.
14     Q. It's not anything that it has its customers
15  do; right?
16     A. No, no.
17     Q. They're the customer?
18     A. Correct.
19     Q. You're servicing the customer; correct?
20     A. Yeah. The only thing we require from the
21  customer is probably a SANs number.
22     Q. What's a SANs number?
23     A. That's just the number so we can do your DNC
24  checking.
25     Q. That makes sense.

28 (Pages 106 - 109)

Page 110

1    Direct Energy never participated in any type
2  of licensing for TMC; correct?
3      A. No, sir.
4      Q. There's no license that you have that's
5  specific to handling Direct Energy telemarketing
6  calls; correct?
7      A. We have nothing that's specific to the
8  client. It's all specific to the company.
9      Q. And the reason -- you say, it's not specific
10  to the clients -- specific to the company -- it's
11  because TMC is the telemarketer; right?
12      A. Yes.
13      Q. That's -- the value-add for all of your
14  customers is your ability to do telemarketing;
15  correct?
16      A. I guess so. That's the service that we
17  provide. I wouldn't necessarily say that's our
18  value-add, but, yeah.
19      Q. So what is your value-add?
20      A. The value-add that I feel that TMC brings is
21  that we -- we have a lot of experience that we can
22  leverage on behalf of our clients to meet their goals.
23  That's a value-add. How we go by doing that is
24  through these different services.
25      Q. What's that experience?

Page 111

1      A. Which experience?
2      Q. Well, you said that TMC has experience, and
3  that contributes towards its value-add.
4      A. Correct.
5      Q. So I want to understand. So what's the
6  experience that TMC has to have a value-add for its
7  customers?
8      A. I think it would be the experience of its
9  people -- the people that are working there in the
10  trenches, taking the phone calls, selling the
11  customers. They're the ones that the business is
12  built on. So we've got a strong group of people.
13      Q. Every year, how many campaigns do you think
14  TMC does?
15      A. Hundreds or more.
16      Q. Hundreds or more over more than a decade;
17  correct?
18      A. Oh, yeah. On political seasons, we will run
19  typically 50 or more independent campaigns a day on
20  political.
21      Q. So you would say that you guys are experts in
22  telemarketing; correct?
23      A. Yes.
24      Q. And you have that expert experience that your
25  customers don't; right?

Page 112

1      A. Yes.
2      Q. And your customers are relying upon your
3  experience and expertise in telemarketing to engage in
4  certain campaigns that you guys run; right?
5      A. Sure. Your business is energy and mine is
6  telemarketing.
7      Q. Fair enough. I want to talk about the agents
8  that you guys use.
9      A. Sure.
10      Q. How do they get hired?
11      A. They -- we place ads for internal or external
12  opportunities. They're vetted through human
13  resources. They go through training.
14      Q. That's all TMC; right?
15      A. Yes, sir.
16      Q. So looking at the applications; right?
17      A. (Nods head.)
18      Q. Is that a yes?
19      A. Correct.
20      Q. Identifying the people you want to bring and
21  interview, those are the types of TMC functions;
22  right?
23      A. Yes.
24      Q. Sitting and actually interviewing all of
25  these people, that's another TMC function; right?

Page 113

1      A. Yes.
2      Q. And then ultimately training those people is
3  another TMC function; right?
4      A. Yes.
5      Q. Okay. The customer has no responsibility in
6  your organization as to hiring your agents; correct?
7      A. No. Typically, they don't.
8      Q. You say "typically." Is there an atypical
9  example?
10      A. There are some customers that provide
11  criteria for the client -- for the candidates that
12  they want to be hired -- so they will provide minimum
13  requirements. Do they need a high school diploma? Do
14  they need a college degree? Do they need to be
15  background-checked? All these different things, so
16  the client does have some influence over that process,
17  yes.
18      Q. But those are still a very general criteria;
19  correct?
20      A. Yeah.
21      Q. Ultimately, TMC has the decision, I'm hiring
22  this person. I'm not hiring this person. Correct?
23      A. Yes, sir.
24      Q. This person can have all of the criteria that
25  the client wants, but I still may not hire them

29 (Pages 110 - 113)

Page 114

1  because I have my own independent reason; right?
2      A.  Hopefully that's not happening.
3      Q.  But it could?
4      A.  Yes.
5      Q.  That's how it works; right?
6      A.  Yes.
7      Q.  TMC is responsible for hiring, interviewing,
8  training up its own agents; right?
9      A.  Yes.
10     Q.  How are those agents paid?
11     A.  Typically, hourly plus bonus.
12     Q.  What's the bonus?
13     A.  It varies from campaign to campaign.
14        THE VIDEOGRAPHER:  Counsel, we have five
15  minutes remaining on this media.
16  BY MR. THOMAS:
17     Q.  I've got a couple questions.  Then we can
18  maybe take a break.  Is that fair?
19     A.  Sure.
20     Q.  Again, it's not a marathon or a race.  I just
21  need you to -- we can take a break when we need to.
22     A.  I'm okay with continuing through.
23     Q.  We'll finish with these couple questions.
24  Then we'll take a break.
25        Direct Energy didn't pay per head for each

Page 115

1  agent on its campaign; right?
2      A.  I don't believe so, no.
3      Q.  Okay.  Your understanding was, Direct Energy
4  paid for the sales that TMC closed; right?
5      A.  Correct.
6      Q.  So Direct Energy paid for the sales that TMC
7  closed; is that right?
8      A.  Yes, yes.
9      Q.  If there were five people working on that
10  campaign or 20 people working on that campaign, the
11  pay compensation was still the same; right?
12     A.  Yeah.  It's per sale.  It's typically per
13  sale on energy campaigns.
14        MR. McCUE:  Let's take a break.
15        THE VIDEOGRAPHER:  We are going off the
16  record.  This is the end of media unit two.
17  The time is 12:54.
18        (Brief recess.)
19        THE VIDEOGRAPHER:  We are back on the
20  record.  This is the beginning of media unit
21  three.  The time is 1:02.
22  BY MR. THOMAS:
23     Q.  Mr. Correia, when it came to promoting
24  agents, was that a TMC function?
25     A.  Yes.

Page 116

1      Q.  Customers didn't have a say in the promotion
2  of your agents; right?
3      A.  No, sir.
4      Q.  What about performing reviews of the agents?
5      A.  No.  That was in-house as well.
6      Q.  That's something that you guys did
7  periodically?
8      A.  Yes, sir.
9      Q.  On the training for the agents -- I'm going
10  to show you what's been produced by TMC.  This is
11  Exhibit 9.
12        MR. THOMAS:  Matt, this is the
13  disposition you guys handed us.
14        (Exhibit 9 was marked for
15  identification.)
16  BY MR. THOMAS:
17     Q.  So take that.  If you can just take a minute
18  to look through it?
19     A.  I'm familiar with this document.
20     Q.  And how is it that you're familiar with this
21  document?
22     A.  I helped create it.
23     Q.  Okay.  That training that you created, that's
24  about --
25     A.  I didn't create it.  I helped create it.

Page 117

1      Q.  You helped create it.  Who else helped create
2  it?
3      A.  This fell to Mary LaPorte.
4      Q.  Who is Mary LaPorte?
5      A.  She was the person that was heading up energy
6  most of the time, but she hasn't been with us for a
7  couple of years.
8        This disposition training, I believe, is very
9  dated.  This is -- wow -- it's at least 10-years-old.
10  I don't know.  The only reason I'm familiar with this
11  is because we have a new trainer that is responsible
12  for redesigning all of this stuff, and I just sat with
13  her yesterday and went over this specific document.
14     Q.  Good timing.
15     A.  Yeah.
16     Q.  Is that training -- is that the training that
17  your agents would have gone through?
18     A.  This is the training that our agents would go
19  through today.
20     Q.  And then you're in the process of --
21     A.  Of updating it.
22     Q.  What is disposition training?
23     A.  For me, it's like one of the most important
24  parts of the call.  It tells other departments how to
25  handle the call operationally.  It's how -- it's

30 (Pages 114 - 117)

1  ranking the call for what it was.
2      If it was an answering machine, we tell our
3  teams that it was an answering machine.  If it was a
4  "do not call," we let our internal teams know that it
5  was a "do not call."
6      However the agent dispositions the call
7  impacts how that lead is treated internally.
8      Q.  That's a critical function for the agent?
9      A.  Correct, correct.  That can cause a lot of
10  troubles if the agent does do their job correctly.
11      Q.  Right.  And that's a function that TMC takes
12  on to make sure their agents can perform; correct?
13      A.  Yes, sir.
14      Q.  That's not something that the customer does;
15  right?
16      A.  No.
17      Q.  Earlier, you talked a little bit about some
18  sort of, like, campaign or product-specific training
19  that wasn't necessarily TMC training.
20      What is that?
21      A.  There's certain -- all campaigns, when they
22  come on board, there's a script, there's rebuttals,
23  there's frequently asked questions.  So those types of
24  materials usually come from the client on how they
25  want to structure the sales call or the call flow.

1      So that type of information -- we will
2  facilitate the training -- but, a lot of times, the
3  training material is provided to us.
4      Q.  And the reason the client is providing that
5  material is because it's their product that you guys
6  are selling?
7      A.  Correct.
8      Q.  So your agents need to understand how, for
9  example, deregulated energy works; right?
10      A.  Yes, sir.
11      Q.  Or if they're selling Verizon cell phone
12  plans, they need to understand the different types of
13  Verizon cell phones plans that are out there; right?
14      A.  Correct.
15      Q.  So the training that your customers are
16  providing you guys is to better understand the product
17  that the agents are selling; right?
18      A.  It depends on the campaign.  We have other
19  campaigns where the training is conducted exclusively
20  by clients, so it could be either/or.
21      For example, with Direct Energy, we had a mix
22  of both.  On the home services side, typically,
23  Christina Thurik and other L&D trainers would come in
24  and provide training for us.  The first training was
25  done by Lance -- I think his last name is DePaula --

1  and Ashley Carter.
2      So there's a lot of times where -- or not a
3  lot of times -- there were times where training was
4  facilitated by the client.
5      Q.  What about energy services?
6      A.  Energy services, I can't recall.  Not with
7  Direct Energy.  I believe with some clients, like Just
8  Energy and a few others.  There are instances that I
9  can think of where the client did the training, but I
10  can't think of any with Direct Energy.
11      Q.  But the training that client is
12  providing, again, is still focused on their product;
13  correct?
14      A.  It's complete training, soup to nuts,
15  Sales 101 -- everything.
16      Q.  Okay.  But things like the disposition and
17  the compliance training, those are things that you're
18  responsible for; correct?
19      A.  Once again, it depends on the campaign.
20      Q.  Fair enough.  What about on the energy
21  services campaigns?
22      A.  On the energy services campaigns, it depends
23  on the client.  So we have had clients that have done
24  soup-to-nuts training for us and we're spectators in
25  the class.

1      There are other clients, such as Direct
2  Energy, where I don't recall DE providing any of
3  that -- that core energy training material.  There
4  were supplemental things that were provided --
5  territory sheets -- just other things -- other
6  additional training things were provided to us.
7      Q.  What do you recall in terms of any training
8  that Direct Energy provided?
9      A.  In regards to -- what are we speaking about?
10  Are we speaking about just energy or in general?
11      Q.  Just energy services.
12      A.  Okay.  Energy services?  Direct Energy
13  provided a landing page with all the forms, paperwork,
14  and processes that we needed to adhere to.  That was
15  pretty much the extent of what was provided to us from
16  Direct Energy.
17      Q.  But Direct Energy, for energy services, to
18  your recollection, it did not provide the compliance
19  or disposition-type training; correct?
20      A.  I can't recall.  Honestly, I can't recall.  I
21  don't believe so, but...
22      Q.  As we sit here today, you're not aware of
23  compliance training for energy services that my client
24  provided your agents?
25      A.  Off the top of my head, I can't think of

31 (Pages 118 - 121)

Page 122

1  anything.
2      Q. If you can, I want to go to Tab 4 in your
3  notebook.  This was Exhibit 8.
4      A. Tab 4?
5      Q. Yes.
6      A. I think we're already on --
7      Q. We actually may already be there.
8      A. Yeah.
9      Q. You said earlier that you're familiar with
10  this document?
11      A. Yeah.
12      Q. How is it that you're familiar with it?
13      A. I helped negotiate it with Lauren -- I can't
14  remember her last name -- from DE procurement.  It was
15  Isaac Matute and Lauren -- I can't -- McClendon, I
16  believe, was her last name.
17      Q. So under the services that -- tell me if I'm
18  wrong here -- the services that TMC was to offer was
19  to provide a test campaign with DMI Partners on
20  co-registration opt-in leads; is that correct?
21      A. Yes, sir.
22      Q. What are co-registration opt-in leads?
23      A. I believe, in this instance, co-registration
24  means that there were multiple names listed on the
25  lead.  So they were registering for a lead for Direct

Page 123

1  Energy, as well as ABC Company.
2      Q. Okay.
3      A. I believe.
4      Q. For example, there could be a marketing
5  partner, and then Direct Energy would be one of those
6  marketing partners?
7      A. Correct.
8      Q. If you can go to where it says, "Program
9  offering," I want to go to the second bullet.  "DMI
10  will provide co-registration leads for potential
11  customers who have opted in through an online
12  advertisement to receive a call regarding the specific
13  offers determined by Direct Energy for the market in
14  question."
15      Did I read that correctly?
16      A. Yes, sir.
17      Q. The "opt in through online advertisement,"
18  what is that?
19      A. That is the lead -- that is the
20  co-registration lead.
21      Q. Okay.  Is it just a lead or is there consent
22  language associated with that lead?
23      A. There is consent language associated with the
24  lead.  So DMI has a network of publishers or just
25  website partners.  And any time you go anywhere, they

Page 124

1  can pop up any message on any website through their
2  affiliates.
3      So you would be on the internet, browsing,
4  and you would have a popup that says, "Hey, do you
5  want to win the thing?  Enter your information here."
6  That's how they generate opt-in leads.  It could be on
7  a specific website that you're visiting.  It could be
8  just through web searches.  It could be anything.  It
9  depends on the network of providers that you're using
10  online.
11      Q. So, in your mind, in your understanding,
12  opt-in, it refers to the lead of the person that wants
13  to hear about Direct Energy's services or someone
14  else's services, as well as consent language that
15  would allow TMC or somebody else to contact them?
16      A. Yes, sir.
17      Q. Okay.
18      A. That's my understanding.
19      Q. On the third bullet, it says, "TrustedForm
20  certificates will provide independent proof of consent
21  of the opt-in by the consumer for compliance
22  purposes."
23      Did I read that correctly?
24      A. Yes, sir.
25      Q. What is a TrustedForm certificate?

Page 125

1      A. The way it was explained to me by Tyson
2  Chavarie is that TrustedForm captures a video snippet
3  of the actual mouse movement.  So when you're online,
4  everything is being captured that you do online, even
5  when you're pausing on a page or moving your mouse.
6      So we were able to capture the mouse movement
7  of people clicking on the consent form using
8  TrustedForm.
9      Q. And what's the TrustedForm certificate?
10      A. That is -- that's the certificate that
11  accompanies -- I'm guessing here -- I would assume
12  that the certificate is the proof provided by
13  TrustedForm that -- that interaction -- that thing
14  actually happened.  Whatever that was.
15      Q. For the RVM campaigns that TMC conducted for
16  Direct Energy, were the opt-ins supposed to be
17  provided pursuant to this agreement?
18      A. As far as I know, the agreement -- the DMI
19  agreement that I negotiated -- yes, that was
20  absolutely supposed to be part of it.  It was opt-in
21  leads with a TrustedForm, which is bullet 3.
22      Q. And then it also mentions compliance
23  purposes, that "the Trusted certificate will provide
24  independent proof of consent of the opt-in by the
25  consumer for compliance purposes."

32 (Pages 122 - 125)

Page 126

1    Do you have an understanding as to what those
2  compliance purposes are?
3    A. It was my understanding that if anyone wanted
4  proof of the opt-in, that would be the proof of the
5  opt-in. It would be -- once again, if someone didn't
6  remember opting in, we could provide -- you know --
7  "Here's the website that you visited to opt-in" or
8  "Here's your IP address that you opted in from," and
9  that would satisfy any compliance issues, if asked.
10    Q. Are you aware of TMC efforts to make sure
11  that DMI would be able to provide that Trusted
12  certificate?
13    A. I believe that I saw Trusted certificates
14  actually come through from TrustedForm. I believe
15  that we did have corroboration that, yeah, it worked
16  and we saw that.
17    Q. You understand that TMC has an agreement with
18  DMI to be able to provide the Trusted certificate for
19  these opt-ins?
20    A. No. TMC has an agreement with DMI to provide
21  the opt-in leads, and we have an agreement with
22  TrustedForm to provide the certificate.
23    Q. Okay.
24    A. Two different companies.
25    Q. I appreciate that clarification.

Page 127

1    Do you have any understanding as to how
2  TrustedForm goes about authenticating or verifying the
3  opt-ins that DMI provided?
4    A. I think they had an API set up.
5    Q. What's an API?
6    A. It's just a tunnel between computer systems
7  that allows them to share information.
8    So when DMI -- we engaged both DMI and
9  Trusted at the same time to engineer the solution. So
10  DMI and TrustedForm were connected at the IP level at
11  the internet level. So anything that DMI was doing
12  for us, Trusted had insight into it live.
13    Q. What's your understanding or basis for that?
14    A. That's how it was explained to me by Tyson.
15    Q. Do you recall when Tyson explained that to
16  you?
17    A. Prior to the negotiation of the contract.
18    Q. So --
19    A. Because we discussed, "How are we going to
20  engineer this?"
21    Q. So, in your mind, as you're negotiating this
22  contract with Direct Energy, you understood, hey, TMC
23  is going to get -- be able to provide opt-in leads for
24  Direct Energy and they're going to able to be verified
25  by this TrustedForm certificate?

Page 128

1    A. That's what I negotiated; yes, sir.
2    Q. If you can, turn to the next page with me.
3  It's Direct Energy 000048.
4    A. Yes.
5    Q. You see where it says, "Payment"? It's in
6  bold.
7    A. Yeah.
8    Q. And it says, "TMC will invoice Direct Energy
9  for the leads and will pay DMI Partners directly."
10    A. Correct.
11    Q. Did that happen?
12    A. To the best of my knowledge, yes.
13    Q. You said to the best of your knowledge. What
14  is your knowledge based on?
15    A. At the time when this went into place, I was
16  still involved in the day-to-day running. We were
17  invoicing Direct Energy for leads from DMI and
18  providing bill backup for it -- invoice backup for it.
19    Q. Were you involved in that invoice process?
20    A. No, sir.
21    Q. But did you submit those invoices to Direct
22  Energy?
23    A. I don't think I directly submitted those -- I
24  might have. I can't remember if I was the one who was
25  submitting the invoices. I typically -- I'm not very

Page 129

1  involved in invoices, other than to look at them
2  before they go out. I don't generate them, you know.
3  I don't...
4    Q. Fair enough. So you would have reviewed the
5  invoices --
6    A. I may have.
7    Q. You say you may have. Would it --
8    A. I just can't remember. This is four years
9  ago.
10    Q. And that's fair. That's completely fair.
11  This is my only time to talk to you before trial, so I
12  want to get your best recollection as we sit here
13  today.
14    A. Right.
15    Q. Would it have been your practice to review
16  the invoices before they got sent to Direct Energy?
17    A. No, that wasn't one of my practices. That
18  was typically something that was done by accounting.
19    And you have to understand. At a certain
20  point, most of the middle managers, like myself, we
21  were kind of -- we were kind of pushed out of the
22  day-to-day. Like, we didn't have P&L meetings, we
23  didn't have manager meetings, we didn't have a lot of,
24  you know, direction, you know, from our senior team
25  about what was going on with the business. Are there

33 (Pages 126 - 129)

Page 130

1  lawsuits?  Are there AG complaints?
2        We didn't even see the guys.  Right?  It's,
3  like, I'm in another building; they're in another
4  building.
5        For the invoice, I know that this is the way
6  that I structured it, and I do recall invoices being
7  sent to Direct Energy to be compensated for the leads.
8        Q.  Do you have any reason to believe those
9  invoices were at all inaccurate?
10       A.  I don't believe so.  We went through an audit
11  with an outside company that was ordered by Centrica,
12  which is Direct Energy's parent company.  So Centrica
13  did a huge six-to-eight-month audit of all of our
14  contracts, and there was no indication of any pay
15  anomalies associated with anything with RVM.
16       Q.  Are you aware -- strike that.  So let's get
17  back to this scope of work right here.
18       It says, "Leads are priced at 50 cents plus
19  the TrustedForm fee."
20       Do you see that?
21       A.  Yes, sir.
22       Q.  So what was -- what went into TMC's pricing
23  for these leads?
24       A.  How did we reach a price of 50 cents?
25       Q.  Correct.

Page 131

1        A.  I believe that, you know, Tyson went out
2  there and found the best rate.  I would assume that,
3  you know, they were looking at something that would
4  provide what is required at the most economical rate.
5  I would assume that's how they went by doing it.
6        Q.  Do you know if that 50 cents is the rate that
7  DMI charged?
8        A.  You want to know if there was something added
9  to the rate?  I don't know.
10       Q.  Okay.  You don't know if there was a markup?
11       A.  I don't know if there was a markup.  I don't
12  believe that there was a markup.
13       Q.  You may have already said this.  You don't
14  know what the DMI rate would've been?
15       A.  I didn't directly negotiate with DMI.  So the
16  DMI portion and the TrustedForm was brought on by
17  Tyson.
18       You have to remember, I'm just one guy.  So
19  I'm working with all these different departments to
20  get a contract put together.  So it's, like, "Hey, can
21  we do this?"  You go to IT.  IT says, "Yeah, we can do
22  it.  This is how we can do it."
23       Tyson came back with, "We can use DMI because
24  we know them.  We know the quality of their leads.
25  And we can do this TrustedForm," because John Moran

Page 132

1  was very interested in making sure that the leads were
2  solid leads.
3        We're, like, "Well, how do we prove that the
4  guy did the thing?"  Right?  So you get the
5  TrustedForm so you can see the guy actually doing the
6  thing.
7        So, hopefully, that answers your question.
8        Q.  I think it does.  I think it answers my
9  question.
10       But as you sit here today, you have no
11  recollection as to what the cost per lead would've
12  been from DMI?
13       A.  No.  I don't know what the exact -- I can't
14  recall that information, no.
15       Q.  You don't know if it was the exact same cost
16  that you charged Direct Energy or something less?
17       A.  I know it wouldn't be something less.
18       Q.  You know it would not be something less?
19       A.  Yeah.  We wouldn't have charged Direct Energy
20  less than what we were being charged for the lead.
21       Q.  Fair.  Would you charge Direct Energy more
22  than what you were being charged for the lead?
23       A.  We may, yeah.  I just don't know if we did
24  that specifically in this instance.
25       However, that's normal business -- yeah --

Page 133

1  you mark up stuff and make a profit.  Right?  So I
2  would assume -- I would hope they did that.
3        Q.  And you said that John Moran was interested
4  in this TrustedForm certificate?
5        A.  Yes, sir.
6        Q.  Is the TrustedForm certificate something you
7  approached John about?
8        A.  I believe that's something that we brought to
9  the table.  I believe that's something that Tyson
10  suggested to -- Direct Energy legal, at the time, they
11  were asking questions about, "How do we prove it's an
12  opt-in," and this is how we satisfied that ask.
13       Q.  So, in other words, it's another service that
14  TMC was able to provide to Direct Energy?
15       A.  Sure, yeah.
16       Q.  And it was your intention that John Moran
17  relied upon things like the TrustedForm certificate;
18  right?
19       A.  Yes.
20       Q.  At the time, what was -- at the time this was
21  executed, what was Tyson's position?
22       A.  CIO, I believe.  He's had a lot of titles,
23  but he's been the senior IT guy.
24       Q.  Okay.  If you can, I'm going to go ahead and
25  flip over to the next page, which is Direct Energy

34 (Pages 130 - 133)

1  000049.

2      A.  Yes, sir.

3      Q.  If you look at the second paragraph, it says,

4  "Records of such opt-in, consumers, will be maintained

5  and retained by TMC and/or its subcontractor, DMI

6  Partners."

7          Did I read that correctly?

8      A.  Yes, sir.

9      Q.  What was the arrangement -- or did TMC have

10  an arrangement for someone to be able to retain these

11  records?

12      A.  I believe that the standard practice that we

13  have with most of our contracts -- the way that

14  they're written -- is that we retain all data for at

15  least two years.  So that was my understanding of what

16  our best practices were at the time, that we retained

17  all of our data based on our contracts.

18      Q.  When you say "we," do you mean TMC?

19      A.  TMC.

20      Q.  So TMC would have a record of all of these

21  opt-ins?

22      A.  DMI should as well.

23      Q.  So it was for both entities to maintain those

24  records?

25      A.  Correct.

1      Q.  So the opt-in data should have been preserved

2  by TMC; correct?

3      A.  Correct.

4      Q.  And also preserved by DMI; correct?

5      A.  Correct.

6      Q.  And you said the standard practice was to do

7  it for two years?

8      A.  Yes.

9      Q.  Do you understand if Direct Energy had a much

10  longer requirement than the two years?

11      A.  I don't recall.

12      Q.  Are you aware of TMC directing the

13  destruction of any of its records?

14      A.  No, sir.

15      Q.  So the two-year period is the sort of just

16  cutoff that they're holding onto this info?

17      A.  Generally, based on my experience with seeing

18  other contracts.

19      Q.  And, certainly, Direct Energy never

20  instructed TMC to destroy any documents?

21      A.  No, no.  I'm not privy to any documents being

22  destroyed or anything like that, sir.

23      Q.  You have no knowledge of my client

24  instructing you or knowledge of anybody else at TMC to

25  direct the destruction --

1      A.  I have no knowledge of anything being

2  destroyed, period.

3      Q.  That's all I want to know.  I want to go to

4  the first, second, third, fourth paragraph down.  It

5  says, "No outbound sales calls will be made by TMC or

6  DMI Partners under this program to cellular phones, or

7  phones on the FCC wireless/wireline ported list, using

8  automated dialer equipment, or systems capable of

9  storing telephone numbers or dialing those numbers,

10  unless prior consent has been provided by a party who

11  is age 21 years or older."

12          Did I read that correctly?

13      A.  Yes, sir.

14      Q.  That's the term that you understand applied

15  to the RVM campaign; right?

16      A.  Yes, sir.

17      Q.  So these things -- these opt-ins -- there had

18  to be opt-ins for each call?

19      A.  Correct.  In order for us to make an outbound

20  call, we had to have an opted-in record to call.

21      Q.  You had to have prior written consent?

22      A.  Correct.  A caveat to this is, I don't

23  believe that we were making any outbound sales calls,

24  so they were using RVM to generate inbound calls.

25      Q.  The RVMs, though, had to be placed with

1  opt-ins?

2      A.  Right, absolutely.

3      Q.  The people who were contacted with RVMs, to

4  your understanding --

5      A.  Opt-in.

6      Q.  -- had to have an opt-in?

7      A.  Yes, sir.

8      Q.  And Direct Energy never wavered from that;

9  correct?

10      A.  Not to my understanding.

11      Q.  Direct Energy never modified this agreement

12  and said, "We're willing to do something less than

13  opt-ins," correct?

14      A.  I don't recall that happening.

15      Q.  You don't recall that happening?  You would

16  have been the point person for Direct Energy up until

17  what time?

18      A.  Technically, about 2016 is when I

19  disassociated from energy, but I was still on the

20  e-mails through 2017 probably.

21      Q.  But going through 2017, you're not aware of

22  an instance when John Moran, Madeline Nieves, or

23  anybody else at Direct Energy said, "We don't need

24  opt-ins for these RVMs anymore"?

25      A.  No, no.

Page 138

1    Q.  If you can, I want to go to the last
2  paragraph.  It says, "It is the opt-in permission that
3  permits a subsequent outbound telesales call that is
4  the essential service being provided by TMC or DMI
5  Partners to Direct Energy under this scope of work or
6  SOW."
7    A.  Yes.
8    Q.  Did I read that correctly?
9    A.  Yes.
10    Q.  And you would agree with me, that was the
11  essential service that you were providing Direct
12  Energy?
13    A.  That is what I negotiated with Direct Energy,
14  yes, sir.
15    Q.  Right.  That was the essential service?
16    A.  That is the service that we were providing.
17    Q.  Isn't it true that if you had non-opt-in
18  leads, let's just say, there are other types of leads
19  out there; correct?
20    A.  Yes.
21    Q.  What other kinds of leads are out there?
22    A.  There's just leads that you buy -- Experian
23  sells leads.  Everyone sales leads.  Everyone sells
24  their data.
25    Q.  But there are leads out there that are non --

Page 139

1    A.  That are non-opt-in.
2    Q.  Again, let me finish my question.  I'll give
3  you plenty of time to answer.
4    A.  Sure.
5    Q.  It's a very unnatural process.  I apologize
6  for that.
7        The opt-in lead, though, is going to be more
8  expensive than the non-opt-in lead; right?
9    A.  Yes.
10    Q.  Because you actually have to get -- it's a
11  smaller niche or grouping of people; right?
12    A.  Yes.  There's more effort that goes into
13  securing that lead.
14    Q.  Right.  That's why you would pay something
15  like 50 cents per lead; right?
16    A.  Correct.
17    Q.  What would be the cost of a non-opt-in lead?
18    A.  Depending on the volume of leads that you're
19  buying, maybe 2 cents.  It depends.  It really
20  depends, because there's -- in the digital side, if
21  we're talking about voice, as low as 2 cents.  Maybe
22  less.
23    Q.  You would agree with me that that's a pretty
24  significant difference on a per-lead basis; right?
25    A.  Yes.

Page 140

1    Q.  I'd like to go to what is Tab 1 in your
2  notebook.  I don't believe this is actually marked.
3  If you can, put this on the front, if you will.  Thank
4  you, sir.
5        (Exhibit 10 was marked for
6    identification.)
7    A.  Don't thank me until you get your bill.
8  BY MR. THOMAS:
9    Q.  You can send it to those guys.
10        Are you familiar with this document?
11    A.  I am not.  I'm familiar with the document.
12  I've seen it.  I am not -- I was not involved in the
13  negotiation of this document.  This was negotiated
14  between Brian Cain and George Lonabaugh.
15    Q.  Have you seen this document before?
16    A.  Yes, I have seen the document.  I have not
17  read it.
18    Q.  If you can, I want to go to Direct Energy
19  001392.
20    A.  Can you say that again?
21    Q.  001392.
22    A.  1392?
23    Q.  Correct.
24    A.  Is that under Section 1?
25    Q.  No.  It's on the bottom.  There's these Bates

Page 141

1  labels.  Just go to 1392.
2    A.  Oh --
3        MR. McCUE:  You're looking at a different
4    binder.
5  BY MR. THOMAS:
6    Q.  Oh, I'm sorry.  We have a different -- that's
7  why.  Too many binders.
8        It's going to be Direct Energy 4.
9    A.  Oh, okay.
10    Q.  Direct Energy 000004 is actually page 3 of
11  the contract, and it's section 1.14.
12    A.  So section 1?
13    Q.  Yeah.  Keep going.
14    A.  Page 3?
15    Q.  Yeah.  Keep going.  That's it.
16    A.  Page 4?
17    Q.  Page 4.  Page 3, that's also Direct Energy 4.
18    A.  Okay.
19    Q.  On the bottom, it says -- I'm looking at the
20  very first column, all the way under 1.14 -- all the
21  way to the end of that column -- the second to last
22  line, it says, "Vendor is solely responsible for the
23  work product of each such third-party vendors, if
24  any."  It goes on to the next page.
25        Did I read that correctly?

36 (Pages 138 - 141)

Page 142

1    A. Yes, you did.
2    Q. Are you aware of any other arrangement
3  whereby TMC, as the vendor, did not agree to be
4  responsible for its own third-party vendors?
5    A. Not to my knowledge.
6    Q. All right.  Again, the last sentence of that
7  section, it says, "Vendor shall inspect the work
8  product of such third parties and promptly correct any
9  deficiencies and maintain proper performance by such
10  parties."
11       Did I read that correctly?
12    A. Yes, you did.
13    Q. Are you aware of any other arrangement
14  whereby TMC did not agree to inspect and verify the
15  work and the work product and proper performance of
16  its sub-vendors?
17    A. You mean DE?
18    Q. No.  It says, "vendor shall inspect the
19  work."
20    A. Oh, okay.
21    Q. Are you aware -- and the implication -- TMC
22  agreed to inspect the work.  Correct?
23    A. Yeah.
24    Q. TMC was responsible for inspecting the work
25  of its own vendors; right?

Page 143

1    A. The way this is written, yes, absolutely.
2    Q. Right.  And the way the other agreements were
3  written.  Is that fair?
4    A. Yes.
5    Q. Okay.  Under this arrangement, TMC assumed
6  responsibility and agreed to correct and inspect and
7  maintain the work product of its own vendors; correct?
8    A. That's what the agreement says.
9    Q. And Direct Energy relied on that; right?
10    A. Yes.
11    Q. In your opinion, that's something reasonable
12  for a customer to be able to rely upon; right?
13    A. Yeah.
14    Q. You're the telemarketer; right?
15    A. Correct.
16    Q. I want to go to -- I'm going to show you what
17  I'm going to mark as Direct Energy -- it's just going
18  to be Exhibit 11.
19       (Exhibit 11 was marked for
20       identification.)
21  BY MR. THOMAS:
22    Q. This is a document that was produced by TMC
23  in this litigation.
24       Are you familiar with this document?
25    A. Yes, I believe so.

Page 144

1    Q. How is it that you're familiar with this
2  document?
3    A. I believe this is an example of what the
4  customer would see when they're opting in -- I
5  believe.
6    Q. Do you know if Mr. Dickson visited this
7  landing page?
8       MR. McCUE:  Objection.
9    A. I have no idea.
10       MR. THOMAS:  What's your basis?
11       MR. McCUE:  Speculation.
12  BY MR. THOMAS:
13    Q. You have no knowledge as to whether or not
14  Mr. Dickson visited this landing page?
15    A. No, sir.  I have no knowledge of any lead --
16  right?  That's not something that we checked in my
17  department.  Right?  The operations team wouldn't be
18  checking leads prior to calling them.
19    Q. Okay.  On this document -- this landing
20  page -- do you participate in the creation of landing
21  pages like this one?
22    A. No.  I provided information.  I acted as a
23  liaison between Direct Energy and TMC.  That's
24  basically my function.  So I didn't -- I wasn't
25  involved in the creation of anything, so much as the

Page 145

1  communication of things.
2       So any ad design or static design, that would
3  be done by Tyson and the IT team.
4    Q. Who was it that would create the landing
5  page?
6    A. DMI created the landing page.  So we got the
7  language approved by Direct Energy, and then that
8  language was given to DMI for their ads, whether it's
9  a static ad or a video ad or whatever it would be.
10    Q. So what's the language that you're referring
11  to?
12    A. That would be the approved language for the
13  offer, as well as the approved language for the
14  consent.  We don't want to put out an offer there that
15  says, "You can get the Nest for $5," when the actual
16  rate is 20 bucks or whatever.
17    Q. That's the product that Direct Energy is
18  offering?
19    A. Correct.
20    Q. And Direct Energy is responsible for the
21  product that they're offering?
22    A. Correct.
23    Q. Paid-for research, that's not anything
24  affiliated with Direct Energy; right?
25    A. I think that may be DMI.

37 (Pages 142 - 145)

Page 146

1    Q. That's not a -- to your knowledge, that's not
2  a Direct Energy landing page; right?
3    A. No.
4    Q. Paid-for research is not something that
5  Direct Energy does; right?
6    A. Not to my knowledge.
7    Q. And you guys went to DMI to come up with
8  these landing pages; right?
9    A. Yes. TMC engaged DMI.
10    Q. Okay. Do you recall, as the liaison, any
11  conversations going back between Direct Energy and TMC
12  and DMI about these landing pages?
13    A. No.
14    Q. That was something that TMC worked on
15  exclusively with DMI; right?
16    A. Correct. John Moran and Madeline Nieves
17  communicated what the client expectation was from
18  procurement and legal. Then Tyson did the direct
19  negotiation with DMI and TrustedForm. Then I
20  communicated what we did.
21    Q. Fair enough. But there were no drafts that
22  went back and forth; correct?
23    A. Not to my knowledge, no.
24    Q. Direct Energy wasn't marking up paid-for
25  research and saying, "Let's call it something else,"

Page 147

1  right?
2    A. You guys were not involved with any creative
3  ad designs or anything like that.
4    Q. Do you know, if someone fills out this
5  landing page, the data that's on that landing page --
6  for example, the phone, the address, the city, the
7  state, the ZIP code -- where does that go?
8    A. I would assume it goes into a database
9  somewhere. First, it would be DMI's database. If
10  there's an API, it would instantaneously enter our
11  database as well.
12    Q. I'm sorry. I think your answer is, API is --
13    A. It's just a way to tunnel systems together,
14  to connect different computers together.
15    Q. So this would go to a DMI database?
16    A. And, simultaneously, ours.
17    Q. And go simultaneously to DT?
18    A. Correct.
19    Q. Would that data then go to Direct Energy?
20    A. I believe in the form of, like, DNC reports
21  and things -- not directly.
22    Q. No. To your understanding, this data would
23  only go to Direct Energy if someone called and
24  complained; right?
25    A. Correct. Or it may have been included, like,

Page 148

1  in a DNC report that we sent weekly, or a flash or
2  something like that. I'm not quite sure what the
3  reporting is on the back end. But you either asked
4  for it or it was included in a DNC report.
5    Q. But that would have to be someone who
6  actually decided, hey, I would like to not receive
7  these calls?
8    A. Correct.
9    Q. As a matter of course, all of this lead
10  information is not getting transported API --
11    A. Not to my knowledge.
12    Q. Hold on one second -- API'd over to Direct
13  Energy. Right?
14    A. Correct.
15    Q. Direct Energy relied upon TMC to use this
16  data to place the telemarketing calls; correct?
17    A. Yes.
18    Q. The list that TMC used for the RVMs, that
19  data came from DMI; correct?
20    A. Yes, sir.
21    Q. And possibly, you think, Silverman, depending
22  upon the timing; right?
23    A. Yes, sir.
24    MR. McCUE: Objection.
25  BY MR. THOMAS:

Page 149

1    Q. During the period of the RVM campaign, TMC
2  was sourcing its opt-ins from one entity at a time; is
3  that right?
4    A. I have no idea, sir. When I was involved, it
5  was DMI.
6    Q. Fair enough. Direct Energy had no other
7  involvement in those lists; right?
8    A. When I was involved, no.
9    Q. When you were involved, Direct Energy didn't
10  get copies of the list in advance of any outbound
11  campaign or the RVM campaign; right?
12    A. No.
13    Q. To the best of your knowledge, that didn't
14  change after you took a different position?
15    A. I can't speak to the quality of the leads
16  once Silverman was involved. I don't know.
17    Q. Because you weren't involved with that?
18    A. I wasn't involved.
19    Q. Your participation ended with DMI?
20    A. Correct.
21    Q. Do you know when Silverman got involved?
22    A. Sometime around 2017.
23    Q. Any idea of the year when they got involved?
24    A. Excuse me?
25    Q. Do you have any idea when specifically in

38 (Pages 146 - 149)

Page 150

1 2017?
2     A.  From viewing the earlier document that we
3 covered, it was somewhere around March.
4     Q.  But that knowledge is based upon the document
5 that you saw today?
6     A.  Yeah.  It's just been three years.  You know,
7 I wasn't involved with Silverman and all that stuff.
8 I just forwarded the paperwork and that was it.  I
9 don't know what happened -- I know DMI.  I can speak
10 about DMI.
11     Q.  Did TMC approach Direct Energy about using
12 ringless voicemails?
13     A.  No.  I believe we did.
14     Q.  That's what I'm saying.  TMC approached
15 Direct Energy; right?
16     A.  Correct.
17     Q.  This was another service that TMC was
18 offering to provide to Direct Energy; right?
19     A.  Sure.
20     Q.  And it provided that same service to other
21 clients?
22     A.  Yes, I believe so.
23     Q.  Direct Energy was not the only person that
24 TMC was engaged in this -- in ringless voicemails --
25 correct?

Page 151

1     A.  I believe we had other clients, yes.
2     Q.  You had other energy service clients; right?
3     A.  I believe so.
4     Q.  Do you have any idea how many clients were
5 using RVMs?
6     A.  No, sir.
7     Q.  Did you use RVMs in the political tier of
8 business?
9     A.  I don't believe so, but -- I don't think it's
10 even covered under political.  Political has its own
11 laws.
12     Q.  I understand that.  But did you use RVMs on
13 any political campaign?
14     A.  Not to my knowledge.
15     Q.  Does TMC own the technology to place ringless
16 voicemails?
17     A.  Not to my knowledge.
18     Q.  Okay.  It has to go contract with somebody
19 else to use that technology?
20     A.  I believe so.
21     Q.  Do you know who they contracted with to use
22 the RVM technology?
23     A.  I recall JDI is one company.  There may have
24 been another.  I don't know the name.
25     Q.  Do you recall if Direct Energy approved JDI

Page 152

1 as a subcontractor?
2     A.  I have no idea.
3     Q.  Did TMC participate in the development of the
4 software to place ringless voicemails?
5     A.  I don't believe so.
6     Q.  To your knowledge, Direct Energy didn't
7 either; right?
8     A.  Not to my knowledge.
9     Q.  Right.  To your knowledge, that technology is
10 owned by JDI or whomever that vendor is; right?
11     A.  Yes, sir.
12     Q.  Does TMC place a -- have a license to use
13 that ringless voicemail technology?
14     A.  I have no idea.  I don't know if it's per
15 call, per minute, per -- I have no idea how that is
16 structured.
17     Q.  To your knowledge, Direct Energy doesn't have
18 a license to use that; right?
19     A.  I have no idea.  I would assume not.
20     Q.  Have you ever seen this technology?
21     A.  No, I haven't.
22     Q.  Do you know where it's at?
23     A.  I have no idea.
24     Q.  Certainly, at least when you were working
25 with DMI --

Page 153

1     A.  With DMI, I -- I was confident with DMI
2 because I could see it.  I saw the TrustedForms and
3 stuff like that.  After that, I have no idea.
4     Q.  Are you aware of anybody at Direct Energy
5 ever going and seeing that technology?
6     A.  No.
7     Q.  Are you aware of anybody at TMC ever going
8 and seeing that technology?
9     A.  Maybe Tyson and those guys.  I mean, it's --
10 I don't know if it's, like, a thing.  Right?  It's all
11 these different parts of the internet that are being
12 pulled together to do a thing.
13         So I don't know if there's, like, a place --
14 one place -- that you can go to to see what RVM is
15 because there's just so many different components to
16 it.  But that would be stuff that would be vetted by
17 our IT team.
18     Q.  Again, you're guessing on this; right?
19     A.  Yes, sir.
20     Q.  If we can, I want to go to Tab 85.  This is
21 Exhibit 7.  I'm sorry.  Tab 86.  I want to go to
22 Direct Energy 009022, which is going to be the next
23 page.
24         Do you see where it says, "Direct Energy
25 program"?

39 (Pages 150 - 153)

Page 154

1    A. Yes, sir.
2    Q. You see, below that, where it says,
3  "Regarding the program DE wants to roll out, I need to
4  understand the exact details of the proposed RVM
5  campaign, especially given the advice provided in my
6  e-mail of 30, June 2017 regarding RVM campaigns."
7        Did I read that correctly?
8    A. Yes, sir.
9    Q. Is it your understanding that the bullets
10  below this paragraph are about the proposed campaign?
11  Correct?
12    A. Yes.
13    Q. So where it says, "Does DE have prior written
14  consent from the person we hope to contact via RVM?"
15  "No" -- that's in regards to the proposed campaign?
16    A. Correct.  Because, at the time, we do not
17  have permission to contact.  We're trying to get a
18  campaign -- to build a campaign where we do have
19  permission.
20        So, at the time, yeah -- do we have written
21  consent from anyone to contact?  No.  We're proposing
22  a solution to that whereby, using opt-in leads, we
23  would.
24    Q. Because, on the outbound telemarketing, you
25  were using opt-ins at this time?

Page 155

1    A. On outbound?
2    Q. Correct.
3    A. We were not using --
4    Q. Let me rephrase that.  On the RVM campaign,
5  you were using opt-ins?
6    A. Yes.
7    Q. When you're involved and engaged in
8  contacting cellular phones, you're using opt-ins;
9  correct?
10    A. Yes, sir.
11    Q. This proposal, to your knowledge, Direct
12  Energy never agreed to go forward with this campaign;
13  correct?
14    A. I don't recall.  I don't know.
15    Q. You don't have a recollection as to Direct
16  Energy saying, "Let's do this campaign."  Right?
17    A. Which specific campaign are we talking about?
18    Q. The one that's referenced in this e-mail,
19  Exhibit 7.
20    A. I believe, if it's referencing Silverman, it
21  was my understanding that we did have permission to
22  use Silverman.
23    Q. To use Silverman; right?
24    A. Correct.
25    Q. But this is about the use of wireless leads.

Page 156

1    A. I don't know the answer to that.
2  Specifically to wireless leads, I don't know the
3  answer to that.
4    Q. You don't know if Direct Energy ever engaged
5  in a campaign with wireless leads; right?
6    A. To my recollection, no.
7    Q. You were not the point person at that time?
8    A. No, I was not.
9    Q. To the best of your knowledge, they never
10  did?
11    A. I don't believe so.  I don't know.  I'm not
12  comfortable answering that question.  I just don't
13  know.
14    Q. You don't know?
15    A. I don't know.
16    Q. TMC has employees that are dedicated to
17  compliance; correct?
18    A. Yes.
19    Q. So there's individuals within the TMC
20  organization that are responsible for compliance?
21    A. Yes.
22    Q. Compliance is something that's important to
23  TMC?
24    A. Yes.
25    Q. Compliance for all of the campaigns; correct?

Page 157

1    A. Correct.
2    Q. I mean, to the best of your knowledge, in
3  your interactions with Direct Energy, compliance was
4  important to Direct Energy as well; right?
5    A. Absolutely.  On all the campaigns that I've
6  managed, PCI compliance has been huge, so, you know, I
7  run my campaigns aboveboard.
8    Q. Right.  You're unaware -- you have no
9  knowledge of Direct Energy ever looking past any type
10  of TMC violation of the TCPA; right?
11    A. No.  We tracked errors and complaints on a
12  daily basis with DE.
13    MR. THOMAS:  Okay.  Let's go ahead and
14  take a five-minute break.  I just want to see
15  what else I've got and maybe try to organize
16  a little bit earlier.
17    THE VIDEOGRAPHER:  We are going off the
18  record.  The time is 1:52.
19    (Brief recess.)
20    THE VIDEOGRAPHER:  We are back on the
21  record.  The time is 1:59.
22  BY MR. THOMAS:
23    Q. All right, Mr. Correia.  I am showing you --
24  one second.
25    MR. THOMAS:  Matt, that green light

40 (Pages 154 - 157)

Page 158

1  e-mail you had that you marked as an exhibit,
2  I don't want to remark it.
3      MR. McCUE:  It's 31.
4  BY MR. THOMAS:
5      Q.  If you'll turn to Tab 31 -- this is
6  Exhibit 4 -- this is an e-mail from John Moran, and I
7  believe you're listed on the "to" line.  Correct?
8      A.  Yeah.  To George and myself.
9      Q.  It says, "Team, we've been given the green
10  light to go forward with ringless voice message
11  program to opt-in leads only."
12      Then we go to the second paragraph and it
13  says, "Essentially, this campaign will allow you to
14  drop a voice message to every opt-in lead currently in
15  your recent files."
16      Correct?
17      A.  Correct.
18      Q.  As of May -- May 15th of 2017 -- the campaign
19  and the RVM that Direct Energy green-lighted, this
20  concerned opt-ins; right?
21      A.  Correct.
22      (Exhibit 12 was marked for
23      identification.)
24  BY MR. THOMAS:
25      Q.  Mr. Correia, I'm showing you what's been

Page 159

1  marked as Exhibit 12.  This is Direct Energy 006932.
2  Again, this is an e-mail from John Moran to you,
3  May 22nd, 2017; correct?
4      A.  Correct.
5      Q.  He says, "Thank you."
6      Your e-mail to John was, "We're looking to
7  launch RVM this week.  We wanted to tie it to the
8  relaunch of opt-in data."
9      Did I read that correctly?
10      A.  Correct.
11      Q.  Again, the RVM was tied to the opt-in data
12  that TMC was getting through one of its vendors;
13  right?
14      A.  Correct.
15      Q.  During this time, do you recall if it was DMI
16  or Silverman?
17      A.  2017?  It may have been Silverman at that
18  time.
19      (Exhibit 13 was marked for
20      identification.)
21  BY MR. McCUE:
22      Q.  I'm showing you now what is Exhibit 13.  This
23  is Direct Energy 1641.
24      May 31st, 2017 --
25      A.  Right.

Page 160

1      Q.  -- you e-mail John Moran; is that correct?
2      A.  Correct.
3      Q.  I want to go to the third paragraph in this.
4  "Moving forward, customers who opt in between
5  9:00 a.m. and 9:00 p.m., their time zone, will be
6  contacted via RVM.  Any opt-in lead received after
7  hours will be contacted the following day at
8  9:00 a.m."
9      Did I read that correctly?
10      A.  Yes.
11      Q.  Again, the direction that TMC had was
12  dropping RVMs to opt-in customers; right?
13      A.  Yes, sir.
14      Q.  As of May 31st, 2017, still no change in that
15  direction; right?
16      A.  As far as I know, there was never any change
17  in that direction.
18      Q.  Fair.  That's what I want to understand.
19      A.  Yeah.
20      (Exhibit 14 was marked for
21      identification.)
22  BY MR. THOMAS:
23      Q.  I'm going to show you what was marked as
24  Exhibit 14.  This is Direct Energy 002491.  This is an
25  e-mail from you to John Moran in November of 2017 --

Page 161

1  November 15th, 2017.
2      You mention, "revamping and overhauling the
3  entire lead sourcing strategy to focus primarily on
4  the following:"  Bullet one, "HIVE and sweepstakes
5  targeted opt-in data for multiple lead vendors."
6  Bullet two, "SMS to drive inbound."  Three, "OB to opt
7  in."  Four, "RVM as a last effort pass on opt-in
8  data."
9      Did I read that correctly?
10      A.  Yes.
11      Q.  The RVM, that would still be -- the RVMs in
12  November were still being dropped on opt-in data as
13  far as you know; correct?
14      A.  Correct.  This was about the time that the
15  company was, I think, exploring drip platforms.  So
16  they were trying to play around with a strategy to
17  have an omnichannel approach to marketing, where we
18  would send the text, the text would generate an
19  inbound.  If that doesn't work, then we would -- the
20  second part of the drip marketing strategy would be an
21  outbound call.  And the third thing would be, as a
22  last-ditch effort, is to RVM blast as to the opt-in
23  leads.
24      Q.  So the drip is really sort of a three-phased
25  approach; is that fair?

41 (Pages 158 - 161)

Page 162

1    A.  It can be more than three, but it's a
2  multiphase approach to keeping your leads intact.
3  Because, as we all know, it's, like, very expensive,
4  so we don't want to turn our leads into DNCs.  So the
5  way that we strategize to do that is by not
6  over-penetrating the leads.  You don't want to call
7  the same customer a million times and upset them.
8        So this was a marketing strategy where we
9  could have multiple touches with the same customer
10  without upsetting them.
11    Q.  So the phrase "teledrip," that refers to the
12  strategy, not necessarily the technology; right?
13    A.  Correct.
14    Q.  Because I've seen references to teledrip.
15    A.  It's more of the strategy.  It's not a
16  platform.  You can use different platforms within the
17  teledrip.  You can use, like, constant contact for an
18  e-mail.  You can use something else for text.  So it's
19  just a strategy.
20    Q.  Based on your understanding of the agreements
21  for TMC to place ringless voicemails, we established
22  it was always supposed to be with opt-ins; correct?
23    A.  Yes, sir.
24    Q.  Your understanding would be, if it did it
25  without opt-ins, that would be contrary to Direct

Page 163

1  Energy's instructions; correct?
2    A.  And contrary to what I negotiated, yes, sir.
3        MR. THOMAS:  Fair enough.  Pass the
4  witness.
5        MR. McCUE:  Sure.  Just a few follow-ups.
6           REDIRECT EXAMINATION
7  BY MR. McCUE:
8    Q.  We talked a lot today about DMI.
9        When did your working relationship with DMI
10  end chronologically?
11    A.  Probably at the time that Silverman came up
12  or shortly before Silverman came up, I would believe.
13    Q.  What timeframe was that?
14    A.  I would have to think, somewhere around the
15  end of 2016, the beginning of 2017.
16    Q.  So, earlier, we talked about -- you can look
17  at Exhibit 13 in your binder -- let me rephrase it.
18  Tab 13.  Second page, Tab 13.  Earlier, we talked
19  about this draft statement of work.
20        Would you agree with me that this is from
21  March of 2017?
22    A.  Yes.
23    Q.  So the relationship with Silverman might have
24  actually been started earlier than that?
25    A.  It may have, yes.

Page 164

1    Q.  And Silverman is providing -- is essentially
2  the new provider of opt-in leads after DMI?
3    A.  Yes.  That's what I was saying.  We probably
4  engaged Silverman late 2016.  If this is dated March,
5  it makes sense that we were talking to them at the end
6  of 2016, the beginning of 2017.
7    Q.  So for calls taking place, say, the beginning
8  of 2017 going through 2018, DMI has really nothing to
9  do with any of those calls; right?
10    A.  For 2017 --
11    Q.  2017 through 2018.
12    A.  Based on this, yeah, anything from 2017,
13  looks like it's Silverman.
14    Q.  Okay.  Are you aware of when Direct Energy
15  entered into a contract approving Silverman to give
16  opt-in leads?  Are you aware of when that happened?
17    A.  I would assume it's sometime around March.
18    Q.  So the contract will speak for itself.  But,
19  essentially, you would be looking to these contracts
20  as giving Silverman or DMI specific guidance about
21  what an opt-in looks like; right?
22    A.  Yes, sir.
23    Q.  There is a lot of reference in the e-mails to
24  stopping the ringless voicemail campaign and
25  restarting it.

Page 165

1        Are you familiar with that general context?
2    A.  Yes.
3    Q.  What happened?  Why did it start?  Why did it
4  stop?  Why did it restart?
5    A.  I think it was around cost.
6    Q.  Okay.  Can you give me a little more detail?
7    A.  It costs a lot to produce an opt-in lead.
8  And based on the contact rate and the conversion of
9  those leads, it was driving up our cost to acquire it
10  above our burden rate.  So we went back to Direct
11  Energy to renegotiate.
12    Q.  Okay.  And the restart, is that --
13  chronologically -- is that somewhat consistent with
14  now turning to Silverman to run the program?
15    A.  I believe so.
16    Q.  Okay.  So Direct Energy authorized TMC to
17  restart their ringless voicemail campaign on new
18  negotiated terms with Silverman?
19    A.  Yeah.  I was not involved with the
20  negotiation of those Silverman terms.
21    Q.  But your general understanding is that they
22  were able to get the lead costs negotiated down
23  somewhat?
24    A.  It was my understanding that they were
25  providing the same quality of a lead for a cheaper

42 (Pages 162 - 165)

1 rate, yes.
2     Q.  Who would be the person with the lead
3 knowledge in terms of these dealings with Silverman?
4     A.  That would be Tyson, Robert, Joe Yates, and
5 George.  So leads are procured by IT.  Typically, in
6 this -- with this marketing initiative, that was all
7 handled specifically by Tyson Chavarie.
8     Q.  Okay.
9     A.  He had a director of IT, Joe Yates, that
10 would handle the day-to-day lead purchasing, lead
11 allocation, I guess you would -- whatever -- managing
12 the actual systems and the contacts and stuff like
13 that.  That was all done by that department.
14     Q.  You were asked some questions about other
15 energy clients for TMC.  I want to kind of direct your
16 attention to that.
17         When TMC does a campaign, is the campaign
18 exclusive per client?
19     A.  Yes, sir.
20     Q.  So any campaign that is done for Direct
21 Energy, every call in that campaign will be for Direct
22 Energy?
23     A.  Yes, sir.
24     Q.  We saw in the opt-in contract the specific
25 example of the Direct Energy language -- the Direct

1 Energy opt-in?
2     A.  Yes, sir.
3     Q.  But then there was also discussion about
4 co-reg leads.
5         So those exhibits to the opt-in contract
6 where they specifically refer to Direct Energy, are
7 those co-reg leads in your mind?
8     A.  Yeah, they're all co-reg leads.  They're all
9 opt-in leads, co-reg leads.  It's all the same thing
10 to me.  I don't know if anyone else has a definition
11 that would divide them.  But, in my mind, an opt-in
12 lead -- a co-reg opt-in lead -- it's all the same
13 thing.  It's a lead where the customer is giving us
14 permission to contact them for 90 days.
15     Q.  I thought you said earlier that a co-reg lead
16 is a lead that the consumer is purportedly giving
17 consent to receive calls from a whole host of people.
18     A.  They're both opt-in leads.  There's different
19 qualities to your opt-in lead.  There's an opt-in lead
20 where you're giving direct consent to one company,
21 which is not a co-reg.  It's an opt-in lead.  That's
22 And that's written in the terms and conditions, the
23 language of the opt-in.
24         Then you have a co-registration opt-in, which
25 is still an opt-in lead; however, the customer is

1 opting in to multiple parties instead of just one.
2     Q.  I understand.
3     A.  They're co-registering for multiple offers.
4     Q.  Can you tell me what co-registration means in
5 your mind?  What do those words --
6     A.  Co-registration, in my mind, means the
7 consumer -- if I'm going online -- when I'm opting in,
8 I'm opting in to be marketed by more than one person.
9     Q.  Okay.  Is the exhibit to the opt-in
10 contract -- is the consumer consenting to receive
11 calls from more than one client or just from Direct
12 Energy?
13     A.  I think it depends on the lead source, I
14 guess, but -- and the way that the agreement is
15 written -- the terms and conditions are written.
16         I believe, with DMI, it was specific to
17 Direct Energy.  I'm not quite sure how it was
18 structured with Silverman.  But when I negotiated the
19 contract, I had to get approval for the ad copy and
20 the picture that I was using and everything.
21     Q.  You were asked a few questions about kind of
22 the minutia of Direct Energy involved with TMC's
23 business.  Just want to follow up on a few of those.
24         You were asked -- we talked about dedicated
25 agents.

1         Did Direct Energy ever request for dedicated
2 agents from TMC?
3     A.  Not on energy, but on other campaigns, yes.
4     Q.  Do you have knowledge about specifics for
5 energy or is that not your space?
6     A.  While I was working on the energy campaign, I
7 don't recall any requirements for dedicated agents.  I
8 mean, how are you defining dedicated agents?
9     Q.  I'm really just following up on your
10 testimony.  It seemed to me that you were saying that
11 a dedicated agent will only work for one campaign,
12 even if the phone is not ringing.
13     A.  Yeah.  So we have that with Direct Energy or
14 what is now Authority Brands.  It's just -- it's
15 difficult to talk about something -- we have such a
16 mix of campaigns that we do.
17         So, yeah, for Direct Energy, we had campaigns
18 where agents were not dedicated to them.  Then we did
19 have campaigns where agents were dedicated to Direct
20 Energy.
21     Q.  Okay.  Then, also, there's also some general
22 question about hiring and Direct Energy's involvement.
23         Did Direct Energy give TMC specific
24 instructions about who they wanted hired for Direct
25 Energy campaigns?

43 (Pages 166 - 169)

Page 170

1    A. Not specifically who, but, you know, basic
2  hiring guidelines.
3    Q. What were those guidelines? What are some
4  examples?
5    A. Wow -- I can't recall off the top of my head.
6  But some of the standard things that we hear from our
7  clients are typing a certain amount of words per
8  minute, being able to multitask, being able to speak
9  effectively and communicate effectively, accent
10  neutrality. Things of that nature.
11    Q. And your memory is that Direct Energy did
12  provide those types of hiring guidelines to TMC?
13    A. I don't know. I don't know. Once again, you
14  have to understand that, if we're talking about
15  energy -- I'm not sure if we're talking about home
16  services -- the answer is yes. When I launched Direct
17  Energy, I launched home services.
18    I kind of was doing energy to help out. And
19  whenever the company needed something, I would jump in
20  and do whatever was asked of me.
21    But on the home services side, yeah, Direct
22  Energy definitely set out the criteria for people that
23  are being hired.
24    Q. Does TMC still work with Silverman?
25    A. I have no idea. I would say no. TMC, today,

Page 171

1  as I know it, does not work with Silverman at all.
2    Q. Do you know why?
3    A. Because of this type of litigation, as well
4  as the fact that we no longer are in the energy space
5  as of right now.
6    Q. Sure. Do you have any factual basis to think
7  that Silverman did not provide truthful opt-in leads
8  to TMC?
9    A. I have nothing factual.
10    Q. Turning back to Tab 5, which we can say which
11  exhibit it is for the record. I guess we never marked
12  it.
13    MR. McCUE: Tab 5, could we mark it as
14  the next exhibit? We have already marked it.
15  BY MR. McCUE:
16    Q. If you can go back to Tab 4? We talked a lot
17  earlier about the contract between DMI and TMC.
18    Do you recall that testimony?
19    A. Yes, sir.
20    Q. I believe your testimony was -- the term
21  refers to a 30-day calendar day trial period.
22    Right? Do you see that?
23    A. Yes, sir.
24    Q. It's your testimony that you think this
25  contract extended past that; is that right?

Page 172

1    A. I believe so. That's the way I interpret
2  that language.
3    Q. Okay. What I'm trying to understand --
4  there's language in it that says, "if the services
5  will continue past the trial period upon execution of
6  a written agreement between the parties."
7    Do you see that language?
8    A. Where are you --
9    Q. About two-thirds down under "term."
10    A. Under "term"? Yes.
11    Q. I'll just read the language again. "The
12  parties will negotiate in good faith and determine if
13  the services will continue past the trial period upon
14  execution of a written agreement."
15    Did I read that properly?
16    A. Yes.
17    Q. I just want to make sure -- from your
18  perspective, you're not aware of any other written
19  agreement between TMC and DMI, other than what we've
20  been talking about?
21    A. Correct.
22    Q. All right. Was Silverman always involved in
23  ringless voicemail?
24    A. I don't know where Silverman came from. I
25  never worked with Silverman before. I've never worked

Page 173

1  with Silverman. I wouldn't work with Silverman.
2    Q. How come?
3    A. Simply because of what's going on right now.
4  I mean, I've learned through this process that
5  Silverman may not have been providing what we were
6  looking for. This is what I hear.
7    Q. Aside from the actual lawsuit, has anyone
8  else given you information that Silverman wasn't
9  giving you the leads you thought you were getting?
10    A. No.
11    MR. McCUE: Nothing further.
12    RECROSS-EXAMINATION
13  BY MR. THOMAS:
14    Q. I have a follow-up. If you can turn with me
15  to Tab 70? I'm going to mark this as 15.
16    (Exhibit 15 was marked for
17    identification.)
18  BY MR. THOMAS
19    Q. It's an e-mail from you to John Moran. This
20  is December 12th, 2017. The subject matter of this
21  is, "New proposed SOW, Silverman lead sourcing."
22    Did I read that correctly?
23    A. Yeah.
24    Q. In it you tell John, "Thank you for the
25  follow-up on this. This is huge for us. We will

44 (Pages 170 - 173)

Page 174

1  start flowing new leads into the campaign this week
2  and will work with the vendor to target the leads for
3  better performance."
4      Would this have been the new lead scope of
5  work or referencing the new lead scope of work with
6  Silverman?  If you can, take a minute and look through
7  the e-mail.  I know there's a long chain.
8      A.  Yeah.
9      Q.  This would've been the new scope of work for
10 Silverman?
11     A.  Yeah, I believe so.
12     Q.  Okay.
13     A.  It looks that way.
14     Q.  If I can, I want to go flip to --
15     A.  My dates may be off.  Maybe it wasn't in
16 March.  Maybe that's when we were negotiating it.
17 Honestly, I can't recall when the cutover date was
18 from one vendor to another one.
19     Q.  If you can, I want to flip back to Tab 13.  I
20 think this was marked as Exhibit 3.
21     A.  Statement of work addendum?
22     Q.  Yes.  Direct Energy 001379.
23      Is it possible that this statement of work
24 was contracting with Silverman to provide the RVM
25 technology and not necessarily the leads?

Page 175

1      A.  Possibly, possibly.  I'd have to defer to,
2  like, Tyson and those guys.  It's possible.
3      MR. THOMAS:  That's fair.  Pass the
4  witness.
5         FURTHER REDIRECT EXAMINATION
6  BY MR. McCUE:
7      Q.  Let me refer you to Tab 79 of the binder.
8  We'll mark this as the next exhibit.
9      (Exhibit 16 was marked for
10     identification.)
11     A.  Is this an invoice?
12 BY MR. McCUE:
13     Q.  A series of invoices.  Take a spin through
14 that tab.  For the record, it starts at SE 000002.  SE
15 is Silverman.
16     THE VIDEOGRAPHER:  Counsel, we have five
17 minutes remaining on this media.
18     MR. McCUE:  Okay.
19 BY MR. McCUE:
20     Q.  I'm just going to ask you some general
21 questions.  Let me know when you're ready.
22     A.  Yeah.
23     Q.  Do you agree with me in general that these
24 are invoices between Silverman and TMC that begin
25 June 5th, 2017 and go through September 11th, 2017?

Page 176

1      A.  It appears so.
2      Q.  There's 14 pages of invoices from SE 02
3  through SE 016, generally?
4      A.  Yes, sir.
5      Q.  What is your understanding of what these
6  invoices depict?
7      A.  I've never seen these invoices before.  They
8  appear to depict leads -- purchasing of leads.
9      Q.  Okay.  And this is in June of 2017 -- would
10 be the first one; correct?
11     A.  Correct.
12     Q.  It says, "Wholesale pricing tier, 1,250,000
13 RVM drop package."
14      What do you think that means?
15     A.  It means they probably dropped 1,250,000
16 messages.
17     Q.  So, at this point, we're in June of 2017.
18 Silverman would be doing both the ringless calling and
19 using their own leads.
20      Would that be your understanding?
21     MR. THOMAS:  Objection.  I think that
22 mischaracterizes his testimony.
23     A.  I have no idea.
24 BY MR. McCUE:
25     Q.  Having looked at this document?

Page 177

1      A.  Looking at this document, I don't even know
2  if these were leads that were procured for Direct
3  Energy or someone else.  Like I said, I wasn't
4  involved in Silverman Enterprises, and I have no idea
5  how many leads were being purchased, where leads were
6  being purchased from.
7  BY MR. McCUE:
8      Q.  In your mind, when TMC starts working with
9  Silverman, are they using Silverman both for leads and
10 for ringless voicemail, to do both the dial and get
11 the opt-ins?
12     A.  I believe it was for leads and the platform.
13 I believe it was both.
14     MR. McCUE:  Thank you.  Nothing further.
15     MR. THOMAS:  Nothing further.
16     MR. McCUE:  All right.  Thank you.
17     THE VIDEOGRAPHER:  We're off the record
18 at 2:27 p.m., and this concludes today's
19 testimony given by Larry Correia.  The total
20 number of media units used was three.
21     THE REPORTER:  The transcript was
22 ordered.  Do you want a copy?
23     MR. THOMAS:  Yes.  We don't need hard
24 copies.  Just an e-tran.
25     MR. McCUE:  Same for us.  We'll handle

45 (Pages 174 - 177)

Page 178

the read and sign.
THE REPORTER: Okay. Do you want the exhibits on the portal only?
(Response in the positive.)
THE REPORTER: Thank you.
(The reading and signing of the transcript were not waived, and these proceedings concluded at 2:27 p.m.)

Page 179

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

I, Lisa Gerlach, the undersigned Notary Public, in and for the State of Florida, hereby certify that Larry Correia personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 25th day of October, 2019.

Lisa Gerlach, Court Reporter
Commission #GG023652
Expires 9/8/2020

Page 180

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

I, Lisa Gerlach, Court Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 25th day of October, 2019.

Lisa Gerlach, Court Reporter

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or discretion of the certifying reporter.

Page 181

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

November 8, 2019

To: Mr. Matthew P. McCue

Case Name: Dickson, Matthew v. Direct Energy, LP, et al.

Veritext Reference Number: 3532360

Witness: Larry Correia Deposition Date: 10/25/2019

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA

Page 182

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3532360
 3 CASE NAME: Dickson, Matthew v. Direct Energy, LP, et al.
      DATE OF DEPOSITION: 10/25/2019
 4 WITNESS' NAME: Larry Correia
 5     In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7     I have made no changes to the testimony
      as transcribed by the court reporter.
 8
      _____
 9 Date           Larry Correia
10     Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11 the referenced witness did personally appear
      and acknowledge that:
12
          They have read the transcript;
13     They signed the foregoing Sworn
              Statement; and
14     Their execution of this Statement is of
              their free act and deed.
15
      I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
              _____
18     Notary Public
19
              _____
      Commission Expiration Date
20
21
22
23
24
25
```

Page 184

```
 1         ERRATA SHEET
          VERITEXT LEGAL SOLUTIONS MIDWEST
 2         ASSIGNMENT NO: 3532360
 3 PAGE/LINE(S) /        CHANGE      /REASON
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____     _____
20 Date           Larry Correia
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23
          Notary Public
24
          _____
25     Commission Expiration Date
```

Page 183

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 3532360
 3 CASE NAME: Dickson, Matthew v. Direct Energy, LP, et al.
      DATE OF DEPOSITION: 10/25/2019
 4 WITNESS' NAME: Larry Correia
 5     In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6 my testimony or it has been read to me.
 7     I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8 well as the reason(s) for the change(s).
 9     I request that these changes be entered
      as part of the record of my testimony.
10
      I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
      that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____
   Date           Larry Correia
14
      Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
      the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
          They have listed all of their corrections
18          in the appended Errata Sheet;
          They signed the foregoing Sworn
19          Statement; and
          Their execution of this Statement is of
20          their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of_____, 20____.
23
          _____
      Notary Public
24
          _____
25     Commission Expiration Date
```

47 (Pages 182 - 184)