# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

MATTHEW DICKSON, on behalf of          :       Case No. 5:18-cv-182-GJL
himself and others similarly situated,  :
                                        :       Magistrate Judge Limbert
       Plaintiff,                       :
                                        :
v.                                      :
                                        :
DIRECT ENERGY, LP, et al.,              :
                                        :
       Defendants.                      :

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ ii

I.      INTRODUCTION ...............................................................1

II.     ARGUMENT ......................................................................3

        A.    Whether Direct Energy Is Vicariously Liable Is a Merits and Fact-Intensive
              Inquiry that Will Turn on Evidence Common to the Class. ...................................3

        B.    The Class Is Ascertainable........................................................4

              1.    The Methodology Ms. Verkhovskaya Offered to Identify Class Members Has
                    Been Repeatedly Accepted as Reliable ...........................................4

              2.    The JDI Call Records Are Reliable ................................................6

              3.    Direct Energy's Claim That the Class List Is Over-Inclusive Does Not
                    Preclude Class Certification ........................................................7

        C.    The Class Is Overwhelmingly Numerous. ..............................................8

        D.    Mr. Dickson's Claim Is Typical of the Class.............................................8

              1.    Mr. Dickson and All Class Members Suffered Injury-In-Fact.......................8

              2.    Mr. Dickson's Prior TCPA Advocacy Does Not Deprive Him of
                    Standing........................................................................12

        E.    Mr. Dickson's Transfer of His Data to a New Cell Phone Is Not Spoliation ........13

        F.    Direct Energy's Consent Defense Will Fail on a Class-Wide Basis ....................14

        G.    Direct Energy's Claim That Something Beyond Initiating an Illegal Call Is
              Required to Trigger the TCPA Is Wholly Unsupported .......................................19

        H.    The Resolution of This Dispute Via One Class Action Is Superior to Two Million
              Individual Claims...............................................................20

i

**TABLE OF AUTHORITIES**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* No. 15-cv-06314-YGR, 2018 U.S. Dist. LEXIS 132078 (N.D. Cal. Aug. 3, 2018)................................................................. 3

*Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.,* No. 15-CV-6314-YGR, 2017 U.S. Dist. LEXIS 69307 (N.D. Cal. May 5, 2017) ........................................................ 4

*Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*, 757 F.3d 540 (6th Cir. 2014) ................. 20

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).............................................. 3

*Aranda v. Caribbean Cruise Line, Inc.,* 179 F. Supp. 3d 817 (N.D. Ill. 2016) ....................... 3, 20

*Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*, No. 09-c-07299, 2014 WL 540250 (N.D. Ill. 2014)......................................................................... 20

*Birchmeier v. Caribbean Cruise Line, Inc.,* 302 F.R.D. 240 (N.D. Ill. 2014) ........................... 4, 7

*Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 U.S. Dist. LEXIS 40779 (W.D. Wash. Mar. 30, 2015)........................................................................................................... 5

*Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320 (W.D. Okla. 2018) ............................... 4

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017) ................................................... 4

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773 (2017)........... 8

*Buchholz v. Tanick*, 946 F.3d 855 (6th Cir. 2020)......................................................................... 9

*Burns v. First Am. Bank,* No. 04 C 7682, 2006 U.S. Dist. LEXIS 92159 (N.D. Ill. Dec. 19, 2006) ................................................................................................................................ 5

*Cordoba v. DirecTV, LLC*, 320 F.R.D. 582 (N.D. Ga. 2017)........................................................ 5

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019)..................................................... 10

*Creative Montessori Learning Ctr. v. Ashford Gear, LLC,* No. 09 C 3963, 2014 U.S. Dist. LEXIS 27758 (N.D. Ill. Mar. 3, 2014) ................................................................... 4

*Drake v. Firstkey Homes, LLC*, No. 1:19-CV-1746-LMM, 2020 U.S. Dist. LEXIS 61281 (N.D. Ga. Feb. 20, 2020) ............................................................................................ 10

*Drazen v. GoDaddy.com, LLC*, No. 1:19-00563-KD-B, 2020 U.S. Dist. LEXIS 84727 (S.D. Ala. May 14, 2020) ............................................................................................... 10

*Gadelhak v. AT&T Servs.*, 950 F.3d 458 (7th Cir. 2020) ........................................................... 10

*Grant v. Regal Auto. Grp., Inc.*, No. 8:19-cv-363-T-23JSS, 2020 U.S. Dist. LEXIS 91897 (M.D. Fla. May 27, 2020) ............................................................................................. 6

*Griffith v. ContextMedia, Inc.*, No. 16 C 2900, 2018 U.S. Dist. LEXIS 5436 (N.D. Ill. Jan. 11, 2018)........................................................................................................... 5

*Hand v. Beach Entm't Kc,* No. 4:18-cv-00668-NKL, 2020 U.S. Dist. LEXIS 80201 (W.D. Mo. Apr. 27, 2020) ..................................................................................................... 4

*Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015)........................................... 11

*In re Amedisys Holding, LLC*, No. 19-0510, 2020 U.S. App. LEXIS 6364 (6th Cir. Feb. 28, 2020) ................................................................................................................................ 11

*Ira Holtzman, C.P.A. & Assoc. Ltd.. v. Turza*, 728 F.3d 682 (7th Cir. 2013) ............................ 20

*Johansen v. One Planet Ops, Inc.*, No. 2:16-cv-00121, 2018 U.S. Dist. LEXIS 47776 (S.D. Ohio Mar. 5, 2018) ................................................................................................... 12, 16, 19

*Keim v. ADF MidAtlantic, Ltd. Liab. Co.*, 328 F.R.D. 668 (S.D. Fla. 2018) .............................. 5

*Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015)...................................... 3, 5

*Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019) .............................................. 4, 20

*Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292 (D. Nev. 2014) .................................. 4

*Legg v. Voice Media Grp., Inc.*, No. 13-62044-CIV-COHN/SELTZER, 2014 U.S. Dist. LEXIS 67623 (S.D. Fla. May 16, 2014)................................................................................ 4

*Martin v. Glob. Tel*Link Corp.*, No. 2:15-cv-02495-ODW(PLAx), 2017 U.S. Dist. LEXIS 53899 (C.D. Cal. Apr. 7, 2017).......................................................................................... 5

*McCabe v. Caribbean Cruise Line, Inc.*, No. 13-CV-6131, 2014 U.S. Dist. LEXIS 91116 (E.D.N.Y. July 3, 2014) ............................................................................................................ 3

*Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85 (2d Cir. 2019) ........................................ 10

*Meredith v. United Collection Bur., Inc.*, No. 1:16 CV 1102, 2018 U.S. Dist. LEXIS 62961 (N.D. Ohio Apr. 13, 2018) .................................................................................................... 11

*Moser v. Health Ins. Innovations, Inc.*, No. 17-cv-1127-WQH-KSC, 2019 U.S. Dist. LEXIS 132790 (S.D. Cal. Aug. 2, 2019)............................................................................ 4

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)...................................................... 4

*Mussat v. IQVIA, Inc.*, 953 F.3d 441 (7th Cir. 2020)...................................................................... 8

*Ngheim v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375 (C.D. Cal. 2016) ................................ 12

*Reyes v. BCA Fin. Servs.*, No. 16-24077-CIV-GOODMAN, 2018 U.S. Dist. LEXIS 106449 (S.D. Fla. June 26, 2018)......................................................................................... 5, 7

*Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015) ..................................................... 4

*Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) ................................................................. 9, 10

*Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mich. 2018)................................... 10

*Sawyer v. KRS Biotechnology, Inc.*, No. 1:16-cv-550, 2018 U.S. Dist. LEXIS 89595 (S.D. Ohio May 30, 2018) ................................................................................................... 18, 19

*Schaevitz v. Braman Hyundai, Inc.*, No. 1:17-cv-23890-KMM, 2019 U.S. Dist. LEXIS 48906 (S.D. Fla. Mar. 25, 2019) ................................................................................................ 5

*Shelton v. Direct Energy*, No. 1:19CV0081, 2019 U.S. Dist. LEXIS 150559 (N.D. Ohio Aug. 27, 2019)........................................................................................................................ 11, 12

*Silbaugh v. Censtar Energy Corp.*, No. 1:18 CV 161, 2018 U.S. Dist. LEXIS 162177 (N.D. Ohio Sept. 20, 2018) ................................................................................................................... 11

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................................ 9, 11, 12

*Susinno v. Work Out World Inc.*, 862 F.3d 346 (3d Cir. 2017) ............................................ 9, 10

*Susinno v. Work Out World, Inc.*, 333 F.R.D. 354 (D.N.J. 2019) ............................................... 13

*The Siding & Insulation Co. v. Combined Ins. Grp., Ltd*, No. 1:11CV1062, 2014 U.S. Dist. LEXIS 54056 (N.D. Ohio Apr. 17, 2014) ...................................................................... 4

*United States v. Copeland*, 321 F.3d 582 (6th Cir. 2003) ......................................................... 13

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017) .................................. 10

*Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635 (5th Cir. 2015) .................................................. 19

*Youngman v. A&B Ins. & Fin., Inc.*, No. 6:16-cv-1478, 2018 U.S. Dist. LEXIS 65271 (M.D. Fla. Mar. 22, 2018) ........................................................................................................... 5

*Zelma v. Penn LLC*, No. 19-8725, 2020 U.S. Dist. LEXIS 9615 (D.N.J. Jan. 17, 2020).............. 9

*Zemel v. CSC Holdings LLC*, No. 16-4064-BRM-DEA, 2017 U.S. Dist. LEXIS 63398 (DN.J. Apr. 26, 2017) ...................................................................................................................... 9

**Other Authorities**
7 FAQs About Ringless Voicemail Marketing, JUST DELIVER IT, https://justdeliverit.net/7-faqs-about-ringless-voicemail-marketing ..................................................................................... 6

**Rules**
Fed. R. Civ. P. 23 ...................................................................................................................... 8

Fed. R. Civ. P. 23(b)(3) ............................................................................................................ 3

**Regulations**
47 C.F.R. § 64.1200(a)(2) ........................................................................................................ 24

**Constitutional Provisions**
U.S. CONST. ART. III ................................................................................................................. 9

## I.  <u>INTRODUCTION</u>

Direct Energy's Opposition to Plaintiff's Motion for Class Certification (Doc. 111) makes four primary arguments, none of which preclude class certification.  First, contrary to the well-settled federal law of agency, Direct Energy claims that it could never be held vicariously liable under any theory of agency law for the illegal actions of its telemarketing vendor, TMC. Direct Energy ignores that whether it is vicariously liable for the illegal actions of TMC will turn on common evidence, a factor that supports class certification.  Moreover, even though full discovery has yet to be completed, Plaintiff has produced more than sufficient evidence to reach a jury as to Direct Energy's agency relationship with TMC.  (Doc. 107 at pp. 4-16, 22-26.)

Second, Direct Energy claims the class is not ascertainable by attacking Plaintiff's expert witness—whose testimony courts have relied upon to support certification in numerous cases—while ignoring the multiple additional means available to identify class members.  It also claims that its vendor's detailed electronic business records setting forth millions of illegal telemarketing calls (the "Call Records") are "unreliable," despite the fact that its own expert concedes these records demonstrate more than two million calls promoting Direct Energy. These arguments run contrary to the Sixth Circuit view that an "ascertainable" class is one that is defined by objective criteria—and a class defined by a list of telephone numbers could not be any more objective.

Third, Direct Energy claims that Mr. Dickson is not an adequate class representative for a laundry list of reasons.  It claims he lacks standing due to his prior TCPA advocacy—in contravention of overwhelming authority that a willingness to enforce the law does not deprive a litigant of standing.  It claims he cannot represent class members outside Ohio, relying on cases from the Northern District of Illinois in 2019 and prior that were expressly rejected by the

1

Seventh Circuit in March 2020.  And it claims, without any basis, that Mr. Dickson somehow "spoliated evidence" by doing what nearly every American does on a nearly annual basis—upgrading his cell phone and migrating over his data.  And fourth, Direct Energy contends individual issues of consent will predominate, although it has not come forward with any evidence of consent whatsoever from even a single class member, and the consent defense it pursued for several years as to Mr. Dickson was an admitted fraud.

This is a simple case.  Direct Energy authorized its marketing agent, TMC, to send prerecorded Ringless Voice Message ("RVM") telemarketing calls directly to the voicemail boxes of millions of cell phones.  It controlled TMC's activities and even instructed it to use Direct Energy's trade name when making such calls to make it look like it was Direct Energy calling.  At all times, Direct Energy had the power to train, manage, supervise, or discipline TMC.  It failed to do so.  Direct Energy knew, prior to the class calling period, that TMC was a telemarketing scofflaw.  It suspected, prior to the class calling period, that TMC's claim it had consent to call class members was false.  It did nothing.  During the class period, thousands of class members complained after their receipt of unconsented to RVM prerecorded telemarketing calls and ordered Direct Energy "Do Not Call."  Direct Energy did nothing.[1]

Direct Energy has now sued TMC, acknowledging that the company had not obtained consent for the millions of RVMs from anyone.  And while it belatedly claims that it thought every consumer who was sent an RVM had explicitly consented to receive such calls, Direct Energy must not be allowed to authorize millions of illegal telemarketing calls, ignore direct complaints that the calls were unsolicited, profit from the telemarketing by paying TMC when

---

[1] Direct Energy shrugs off the thousands of demands of class members to "Do Not Call," claiming the consumers who took the time to call Direct Energy to explicitly demand that future telemarketing calls cease were lodging "simply a request to no longer be contacted."  (*See* Doc. 111 at p. 26.)  However, these requests, which are of course complaints, are one of the series of events that placed Direct Energy on notice that TMC did not obtain the prior express written consent of these thousands of class members to receive calls from Direct Energy.

they successfully bring Direct Energy a new customer, and then plead willful ignorance as an

excuse.  As detailed below, the Motion for Class Certification should be granted, and this case

should be allowed to proceed to full[2] discovery and ultimately trial.

## II.     ARGUMENT

### A.     Whether Direct Energy Is Vicariously Liable Is a Merits and Fact-Intensive Inquiry that Will Turn on Evidence Common to the Class.

Direct Energy asserts (incorrectly) that it could never be held vicariously liable in this

case.  The assertion misses the mark entirely as an argument against class certification.  As the

Supreme Court has held, while Rule 23(b)(3) requires a showing that *questions* common to the

class predominate, it does not require proof that those questions will be answered, on the merits,

*in favor of* the class.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013).  "[T]he

office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select

the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'"  *Id.*

Plaintiff laid out compelling evidence in his opening brief that Direct Energy is

vicariously liable for the conduct of TMC and indeed directed that conduct.  A determination of

an agency relationship is a fact-intensive inquiry, properly resolved on summary judgment or

trial.[3]  The answer to whether Direct Energy is vicariously liable is common to every class

---

[2] At the outset of this litigation, Direct Energy claimed Mr. Dickson consented to be called.  On this basis, on October 16, 2018, Direct Energy filed its Motion to Strike Class Claims and to Stay All Discovery, to which Plaintiff replied.  (*See* Docs. 64-65, 68.)  All discovery other than consent was effectively stayed pending the Court's resolution of the Motion to Strike.  On March 18, 2019, the Court denied the Motion to Strike and Stay Discovery.  (*See* Doc. 75.)  Thereafter, discovery proceeded but still not in full, as the Court ruled that until the class was certified, the scope of discovery would be limited.  (*See* Doc. 92.)

[3] *See, e.g., Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* No. 15-cv-06314-YGR, 2018 U.S. Dist. LEXIS 132078, at *9-12 (N.D. Cal. Aug. 3, 2018) (denying defendants' class action motion for summary judgment on TCPA vicarious liability noting material facts in dispute); *Aranda v. Caribbean Cruise Line, Inc.,* 179 F. Supp. 3d 817 (N.D. Ill. 2016) (TCPA vicarious liability may be adjudicated summarily only where the evidence would not permit a reasonable jury to find for the nonmoving party); *Krakauer v. Dish Network L.L.C.,* 311 F.R.D. 384, 395-396 (M.D.N.C. 2015) (recognizing it as 'well established' that whether an agency relationship exists in context of a TCPA class action is a fact determination), *aff'd,* 925 F.3d 643 (4th Cir. 2019); *McCabe v. Caribbean Cruise Line, Inc.*, No. 13-CV-6131, 2014 U.S. Dist. LEXIS 91116 (E.D.N.Y. July 3, 2014) (defendant's motion to dismiss TCPA

3

member—a key factor in favor of class certification.[4]

**B.    The Class Is Ascertainable.**

   **1.    _The Methodology Ms. Verkhovskaya Offered to Identify Class Members Has Been Repeatedly Accepted as Reliable._**

Direct Energy contends class certification should be denied because the actual names of class members cannot be ascertained from phone numbers.  (Doc. 111 at p. 11.)  The Sixth Circuit and several sister circuits have all flatly rejected the contention that a plaintiff must demonstrate it is administratively feasible to identify every class member by their name at the class certification stage.  _See Rikos v. Procter & Gamble Co._, 799 F.3d 497, 525 (6th Cir. 2015); _see also Briseno v. ConAgra Foods, Inc._, 844 F.3d 1121, 1125 (9th Cir. 2017); _Mullins v. Direct Digital, LLC_, 795 F.3d 654, 672 (7th Cir. 2015).  In the context of a TCPA class action, courts regularly reject telemarketers' claims that the identity of class members cannot be ascertained from phone records.  _See, e.g., Moser,_ 2019 U.S. Dist. LEXIS 132790, at *34 (rejecting expert's claim it is "utterly impossible" to identify members from call records and certifying class).

Even though Plaintiff is not required to identify class members by name at the class

---

vicarious liability claims denied as fact intensive merits inquiry required); _Legg v. Voice Media Grp., Inc._, No. 13-62044-CIV-COHN/SELTZER, 2014 U.S. Dist. LEXIS 67623 (S.D. Fla. May 16, 2014) ("summary judgment on TCPA vicarious liability is appropriate only in cases where evidence of the relationship is clear and unequivocal"); _The Siding & Insulation Co. v. Combined Ins. Grp., Ltd_, No. 1:11CV1062, 2014 U.S. Dist. LEXIS 54056 (N.D. Ohio Apr. 17, 2014) (denying TCPA motion for summary judgment because "a disputed issue of material fact exists on the question of [defendant's] apparent authority"); _Creative Montessori Learning Ctr. v. Ashford Gear, LLC_**,** No. 09 C 3963, 2014 U.S. Dist. LEXIS 27758 (N.D. Ill. Mar. 3, 2014) (denying plaintiff's TCPA summary judgment motion "because a genuine issue remains as to what authorization defendant gave alleged agent).

[4] _See, e.g., Hand v. Beach Entm't Kc,_ No. 4:18-cv-00668-NKL, 2020 U.S. Dist. LEXIS 80201, at *55-58 (W.D. Mo. Apr. 27, 2020) (granting TCPA class certification and denying defendant's motion for summary judgment as to vicarious liability recognizing the existence or nonexistence of a principal-agent relationship is a fact question); _Krakauer v. Dish Network, LLC_, 925 F.3d 643 (4th Cir. 2019) (recognizing public policy import of enforcing the TCPA via Rule 23 via principles of vicarious liability); _Braver v. Northstar Alarm Servs., LLC_, 329 F.R.D. 320, 332 (W.D. Okla. 2018) (agency, including apparent authority and ratification theories, subject to class-wide proof); _Moser v. Health Ins. Innovations, Inc._, No. 17-cv-1127-WQH-KSC, 2019 U.S. Dist. LEXIS 132790, at *11, *20-21 (S.D. Cal. Aug. 2, 2019) (agency liability presents a common question that supports certification); _Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.,_ No. 15-CV-6314-YGR, 2017 U.S. Dist. LEXIS 69307, at *15-17 (N.D. Cal. May 5, 2017) (same); _Birchmeier v. Caribbean Cruise Line, Inc.,_ 302 F.R.D. 240, 251 (N.D. Ill. 2014) (same); _Kristensen v. Credit Payment Servs.,_ 12 F. Supp. 3d 1292, 1306 (D. Nev. 2014) (same).

certification stage, his expert witness, Ms. Verkhovskaya, has explained a court-approved methodology to do so using commercially available databases widely recognized as reliable. (*See generally* Doc. 107-1.[5])  In fact, in *Reyes v. BCA Fin. Servs.,* No. 16-24077-CIV-GOODMAN, 2018 U.S. Dist. LEXIS 106449, at *35-39 (S.D. Fla. June 26, 2018), the defendant—like Direct Energy here—retained Mr. Kostyun to offer an opinion critical of Ms. Verkhovskaya's methodology.  Identical to his attack in this case, in *Reyes,* Mr. Kostyun similarly claimed that the databases relied upon by Ms. Verkhovskaya were "unreliable."  *Id.* The *Reyes* court rejected Mr. Kostyun's attack and affirmed Ms. Verkhovskaya's methodology to identify the class as sufficient at the class certification stage.  *Id*.  This Court should do the same.

If this Court had issues with Ms. Verkhovskaya's methodology to ultimately provide notice to class members, the Plaintiff could issue subpoenas to telephone carriers, a methodology other courts have recognized as an appropriate way to independently identify class members in TCPA class actions without the need for an expert's analysis.[6]  In fact, a district court in Florida certified a TCPA class last month following a similar RVM prerecorded message telemarketing campaign, acknowledging the legitimacy of using subpoenas to identify putative class members.  *Grant v. Regal Auto. Grp., Inc*., No. 8:19-cv-363-T-23JSS, 2020 U.S.

---

[5] *See Youngman v. A&B Ins. & Fin., Inc.*, No. 6:16-cv-1478, 2018 U.S. Dist. LEXIS 65271, at *4 (M.D. Fla. Mar. 22, 2018), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 64339 (M.D. Fla. Apr. 17, 2018); *Cordoba v. DirecTV, LLC*, 320 F.R.D. 582, 599 (N.D. Ga. 2017); *Krakauer*, 311 F.R.D. at 391 n.3; *Burns v. First Am. Bank,* No. 04 C 7682, 2006 U.S. Dist. LEXIS 92159, at *11 (N.D. Ill. Dec. 19, 2006).

[6] *See, e.g., Keim v. ADF MidAtlantic, Ltd. Liab. Co.,* 328 F.R.D. 668, 678 (S.D. Fla. 2018) (Plaintiff's plan to subpoena the phone carriers as to the names and addresses of subscribers "is administratively feasible"); *Griffith v. ContextMedia, Inc.*, No. 16 C 2900, 2018 U.S. Dist. LEXIS 5436, at *2 (N.D. Ill. Jan. 11, 2018) (recognizing that class members could be identified via class administration resources of subpoenas to phone carriers); *Martin v. Glob. Tel*Link Corp.*, No. 2:15-cv-02495-ODW(PLAx), 2017 U.S. Dist. LEXIS 53899, at *8-9 (C.D. Cal. Apr. 7, 2017) (certifying TCPA class pursuant to proposal whereby "parties will subpoena wireless cell phone providers" to identify subscribers associated with numbers); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 U.S. Dist. LEXIS 40779, at *4 (W.D. Wash. Mar. 30, 2015) (approving of the use of telephone carrier records and reverse-lookup directories to identify class members).

Dist. LEXIS 91897, at *14 (M.D. Fla. May 27, 2020).

>    **2.**        ***The JDI Call Records Are Reliable.***

Direct Energy also claims the Calling Records evidencing the millions of RVM prerecorded telemarketing calls TMC made on its behalf are "unreliable" and cannot be used to identify the class.  (Doc. 111 at p. 12.)  In support, Direct Energy claims the Call Records evidence RVM telemarketing calls delivered to landlines and not just cell phones.  It then claims it is "*impossible*" to deliver an RVM telemarketing call to a landline and that such calls, purportedly, can only be delivered to cell phones.  (*Id.*)  Direct Energy apparently did not review the website of JDI, which was the source of the RVM campaign in this case.  The JDI site expressly contemplates RVM calls to landlines and notes the challenge, which is that RVM calls to landlines work "sometimes" but are subject to a "high failure rate" due to how the voicemail inboxes are hosted by many service providers.  *See* 7 FAQs About Ringless Voicemail Marketing, JUST DELIVER IT, https://justdeliverit.net/7-faqs-about-ringless-voicemail-marketing (last visited June 19, 2020).[7]

Direct Energy next argues the Call Records show an additional RVM call to Mr. Dickson that, prior to his deposition, he was unaware he had received.  Direct Energy claims that Mr. Dickson's failure to recollect receipt of this specific call is evidence that the Call Records themselves are not reliable.  (Doc. 111 at p. 12.)  This argument is absurd.  The Call Records evidence that Mr. Dickson received this call on August 6, 2017, ***almost three years ago.***  (*Id.*)  That he did not recall the specifics of this particular call at his deposition is of no consequence.

---

[7] Direct Energy also cites its own expert and claims that even Plaintiff's expert witness, Ms. Verkhovskaya, agrees that RVM calls can only be sent to cell phones.  (Doc. 111 at p. 12.)  Ms. Verkhovskaya's report, however, makes ***no such claim.***  (*See generally* Doc. 107-1.)  Ms. Verkhovskaya limited the Class List to cell phones simply because Mr. Dickson received his RVM prerecorded call on a cell phone.  Direct Energy's contention that the Call Records must be unreliable because they show some RVM calls to landlines—which they wrongly claim is an impossibility—is a self-serving fiction that Ms. Verkhovskaya in no way supports.

In its final attack on the reliability of the Call Records, Direct Energy notes what it claims are abnormalities in the date stamps on those records.  (*Id.* at p. 12 n.14.)  Direct Energy contends the failure of its own vendors to maintain accurate date stamps as to its telemarketing campaigns should preclude the grant of class certification so that consumers—who received illegal telemarketing calls from Direct Energy—cannot hold Direct Energy accountable.  But courts have held that a defendant should not benefit from limitations in its own record keeping.  *See, e.g., Reyes,* 2018 U.S. Dist. LEXIS 106449, at *38 (defendant cannot avoid TCPA certification by pointing to its own deficient records); *Birchmeier,* 302 F.R.D. at 250 ("if defendants could avoid TCPA class certification by keeping deficient records, such would create an incentive to violate the TCPA on a mass scale and keep no records of its activity knowing its failure to maintain records could avoid legal responsibility").

### 3. *Direct Energy's Claim That the Class List Is Over-Inclusive Does Not Preclude Class Certification.*

Direct Energy next notes that in her report, Ms. Verkhovskaya opines that 3.2 million RVM telemarketing calls promoting Direct Energy were sent to and received by 2.8 million wireless numbers.  (Doc. 111 at p. 13.)  Direct Energy's expert, Mr. Kostyun, has examined the same records and is of the opinion that Ms. Verkhovskaya's Class List is over-inclusive and that **only 2.396 million class members received RVM prerecorded telemarketing calls** promoting Direct Energy's goods or services.  (*Id.*)  The ultimate outcome of this total number of calls dispute is irrelevant to class certification.  Accepting Mr. Kostyun's analysis as true, a massive number of class members received illegal RVM calls promoting Direct Energy's goods or services.  Given that *both* experts agree that millions of class members received RVM prerecorded telemarketing calls promoting Direct Energy, the resolution of this specific dispute has no relevance to class certification.

**C.     The Class Is Overwhelmingly Numerous.**

Direct Energy claims that since the Call Records are unreliable, and since Ms. Verkhovskaya cannot reliably identify class members, Plaintiff has failed to satisfy the numerosity requirement of Rule 23.  (Doc. 111 at p. 16.)  This assertion is defied by Direct Energy's own expert who is of the opinion that the Call Records are sufficient to prove that RVM calls were "sent" to 2.396 million class members promoting Direct Energy's goods or services.[8]  (*Id.*)

**D.     Mr. Dickson's Claim Is Typical of the Class.**

**1.     *Mr. Dickson and All Class Members Suffered Injury-In-Fact.***

Direct Energy claims that Mr. Dickson was not injured by his receipt of one RVM prerecorded telemarketing call promoting Direct Energy and, therefore, does not have standing to represent the class.  (Doc. 111 at pp. 19-21.)  First, the argument is flawed factually.  Mr. Dickson alleges in his Complaint that he received multiple energy-related RVM prerecorded telemarketing calls.  (*See* Doc. 34 at ¶ 24 (attesting to receipt of multiple RVM energy-related telemarketing calls).)  He has conclusively tied one of the calls to Direct Energy, and that call is included in the Class List, attached to Ms. Verkhovskaya's expert report.  (*See* Docs. 107-2 and 107-3.)  Mr. Dickson intends to continue to pursue discovery to ascertain if any of his other energy-related RVM prerecorded calls also connect to Direct Energy—discovery he has yet to obtain.  Accordingly, the contention that he received only one Direct Energy telemarketing call is factually premature and, as detailed below, irrelevant.

---

[8] Further, Direct Energy insinuates, in passing, that Mr. Dickson, an Ohio resident, cannot represent consumers who do not reside in Ohio.  In reliance, Direct Energy cites to *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1783 (2017).  (Doc. 111 at pp. 16-17.)  In support, Direct Energy relies on two decisions from the Northern District of Illinois, the reasoning of which was recently expressly rejected by the Seventh Circuit in *Mussat v. IQVIA, Inc.,* 953 F.3d 441, 448 (7th Cir. 2020) (Supreme Court's decision in *Bristol Myers Squibb* does not extend to class actions).

Even if it ultimately turns out, following the conclusion of discovery, that Mr. Dickson only received one RVM telemarketing call from or on behalf of Direct Energy, his receipt of that one call is sufficient to give him standing to represent the class, and his claim would be typical of other class members' claims.

To have standing under Article III of the Constitution, a plaintiff must allege a "concrete" injury in fact. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). "Concrete" means only that the alleged injury must be "real" and "not abstract," i.e., "it must actually exist." *Id. Spokeo* confirmed that "intangible" injury, and even a "risk of harm," may be "concrete" and "real" for purposes of Article III. *Id.* at 1549. *Spokeo* instructs courts to "consider two factors to determine whether an intangible injury is cognizable": 1) "whether Congress conferred the procedural right in order to protect an individual's concrete interests"; and 2) whether the intangible harm is "analogous to a harm recognized at common law …." *Buchholz v. Tanick*, 946 F.3d 855, 868 (6th Cir. 2020) (citation omitted).

The Third Circuit has analyzed each of these factors with respect to the precise circumstances at issue here—receipt of a single unanswered prerecorded voicemail to a cellular phone in violation of the TCPA—and held that such receipt gave rise to a concrete injury in fact. *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351-352 (3d Cir. 2017).

Rather than address the pertinent case law as to prerecorded voicemails[9], Direct Energy bases its argument that Plaintiff lacks standing on the Eleventh Circuit's decision in *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019), a case involving a receipt of a single *text message.* All other circuit courts to have considered the issue disagree with *Salcedo's* holding that receipt of a

---

[9] Rather than addressing *Susinno*, Direct Energy cites to a case from the Third Circuit, *Zemel v. CSC Holdings LLC*, No. 16-4064-BRM-DEA, 2017 U.S. Dist. LEXIS 63398 (DN.J. Apr. 26, 2017), which is now bad law, as it relied heavily on the district court's decision that the Third Circuit would later reverse in *Susinno*. *See Zelma v. Penn LLC*, No. 19-8725, 2020 U.S. Dist. LEXIS 9615, at *13-15 (D.N.J. Jan. 17, 2020) (rejecting argument based on *Zemel* in light of Third Circuit's decision in *Susinno*).

single text message is insufficient to confer standing.[10]  But even under *Salcedo*'s reasoning,
Plaintiff has standing here.  Indeed, Direct Energy fails to inform the Court that less than three
months *after* deciding *Salcedo*, the Eleventh Circuit in *Cordoba v. DIRECTV, LLC*, 942 F.3d
1259 (11th Cir. 2019) clarified that *Salcedo*'s reasoning was limited to text messages.  The court
expressly agreed with the Third Circuit's analysis with respect to prerecorded voicemails to
cellular phones in *Susinno*, and then explained that *Salcedo* did not change its analysis because
"[i]n *Salcedo*, we focused heavily on the unique features of text messages."  *Id.* at 1270.  In that
regard, the court in *Salcedo* found that unlike phone calls, the judgment of Congress was
"ambivalent at best" as to text messaging[11], that it was the Federal Communications
Commission's ("FCC's") interpretation of the TCPA that was the source of the TCPA's
application to text messaging, and that the FCC's judgment was irrelevant because it was not
*Congress'* judgment.  *Salcedo*, 936 F.3d at 1169-1170.[12]

While the Sixth Circuit has not specifically addressed standing with respect to receipt of
prerecorded voicemails, this Court has held that they give rise to injuries in fact even when
"ringless."  *See Silbaugh v. Censtar Energy Corp.*, No. 1:18 CV 161, 2018 U.S. Dist. LEXIS

---

[10] *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 461-463 (7th Cir. 2020) (explaining that *Salcedo's* analysis was flawed because "when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in kind, not degree [as the court in *Salcedo* did].");  *Melito v. Experian Mktg. Solutions, Inc.*, 923 F.3d 85, 88, 92-94 (2d Cir. 2019); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042-43 (9th Cir. 2017).

[11] An RVM phone call is qualitatively far different than a text.  In *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 909-910 (W.D. Mich. 2018)—the case this Court previously relied upon in finding the RVMs at issue in this case are calls under the TCPA—the court found that "Courts have consistently held that voicemail messages are subject to the same TCPA restrictions as traditional calls" and that the "effect [of an RVM] on the plaintiff is the same" as a traditional call.  *Id.* at 909-912 (collecting cases).

[12] *See also Drake v. Firstkey Homes, LLC*, No. 1:19-CV-1746-LMM, 2020 U.S. Dist. LEXIS 61281, at *15-18 (N.D. Ga. Feb. 20, 2020) (under *Cordoba and Salcedo*, a single prerecorded voicemail to a cell phone left in violation of the TCPA, where there was no indication the plaintiff ever heard the phone ring, gave rise to injury in fact); *Drazen v. GoDaddy.com, LLC*, No. 1:19-00563-KD-B, 2020 U.S. Dist. LEXIS 84727, at *12 (S.D. Ala. May 14, 2020) (a case cited by Direct Energy, finding that under *Cordoba and Salcedo*, two named Plaintiffs that "received allegedly unauthorized *voice calls*" had standing while another named Plaintiff that only received a single text message did not (emphasis added)).

162177, at *4-10 (N.D. Ohio Sept. 20, 2018) (receipt of RVMs to cell phone); *Meredith v. United Collection Bur., Inc.*, No. 1:16 CV 1102, 2018 U.S. Dist. LEXIS 62961, at *7-8 (N.D. Ohio Apr. 13, 2018) (receipt of prerecorded voicemails to cell phone).  *See also Shelton v. Direct Energy*, No. 1:19CV0081, 2019 U.S. Dist. LEXIS 150559, at *8-14 (N.D. Ohio Aug. 27, 2019) (receipt of single robocall to cell phone).  This Court has looked to the Sixth Circuit's analysis of standing to bring a TCPA claim in *Imhoff Inv., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627 (6th Cir. 2015), noting that courts in the Sixth Circuit have consistently held *Imhoff* remains good law after *Spokeo*. *Shelton,* 2019 U.S. Dist. LEXIS 150559, at *10.  In *Imhoff*, the Sixth Circuit held that "viewing or printing a fax advertisement is not necessary to suffer a violation of the statutorily-created right to have one's phone line and fax machine free of the transmission of unsolicited advertisements." *Imhoff*, 792 F.3d at 633.  The Sixth Circuit itself recently affirmed the vitality of *Imhoff* in *In re Amedisys Holding, LLC*, No. 19-0510, 2020 U.S. App. LEXIS 6364 (6th Cir. Feb. 28, 2020), finding that appellate review was not necessary to assess the district court's application of *Imhoff* because "the upshot of *Spokeo* is that not *all* procedural violations open the door to federal court.  But *some do,* even when the procedural violation causes only an intangible injury.  Congress may choose to identify and elevate certain intangible, concrete harms by statute, as it has chosen to do with the TCPA."  *In re Amedisys Holding, LLC*, 2020 U.S. App. LEXIS 6364 at *2-3 (citation omitted).

Mr. Dickson experienced precisely the concrete harms Congress elevated via the TCPA—he received at least one RVM phone call that was placed on behalf of Direct Energy, which he listened to, which interrupted his life, which took away his attention from what he was doing at the time, which he found annoying, and which he felt invaded his privacy.  (*See* Dickson Dep., Doc. 111-23, at pp. 51-52, 86.)  Mr. Dickson "need not allege any *additional* harm beyond

the one Congress has identified."  *See Spokeo*, 136 S. Ct. at 1549.

         **2.**         ***Mr. Dickson's Prior TCPA Advocacy Does Not Deprive Him of Standing.***

         Direct Energy claims that Mr. Dickson is not an adequate class representative because

he is not worthy of the protection of the TCPA.  (Doc. 111 at p. 21.)  In this regard, Direct

Energy reasons that since Mr. Dickson previously filed a TCPA lawsuit, and testified that he

was in the process of gathering evidence in support of a second TCPA claim, "he is outside the

zone of interests that Congress meant to protect" when it enacted the TCPA.  (*Id.*)  In other

words, Direct Energy seeks to limit standing only to those individuals who are ignorant of their

rights under the TCPA, and who do not file TCPA claims.[13]  But this argument by Direct

Energy was recently rejected in this very Court with respect to a plaintiff that had filed 37

TCPA lawsuits in recent years.  *See Shelton*, 2019 U.S. Dist. LEXIS 150559, at *11-14.

Another Ohio federal court also recently disposed of the idea that prior litigation experience—

even to the extent of having filed 21 lawsuits in a three-year period—could be an impediment to

class certification and noted that prior experience can make a plaintiff a better class

representative.  *Johansen v. One Planet Ops, Inc.*, No. 2:16-cv-00121, 2018 U.S. Dist. LEXIS

47776, at *9 (S.D. Ohio Mar. 5, 2018) (citing *Ngheim v. Dick's Sporting Goods, Inc.*, 318

F.R.D. 375, 383 (C.D. Cal. 2016)).  In so doing, the Court rejected the notion that the *Ngheim*

case—the sole case cited by Direct Energy in support of its argument—renders a repeat TCPA

litigant unfit to be a class representative.  *Id.*  Indeed, unlike that case, there is no argument here

that Mr. Dickson did *anything* to attract the call at issue.  Having experienced precisely the

---

[13] In support of this argument, Direct Energy badly misconstrues the record.  Direct Energy claims Mr. Dickson was "admittedly hunting" for a TCPA lawsuit when he received the RVM at issue.  (Doc. 111 at pp. 1, 21.)  In fact, Mr. Dickson testified that in August 2017, he had received several illegal RVM telemarketing calls but the recordings did not identify the name of the entity calling, and he forwarded those recordings to counsel.  (*See* Dickson Dep., Doc. 111-23, at pp. 87-88, 110.)

concrete harms Congress sought to protect in enacting the TPCA (*see* Section II(D)(1), *supra*), Mr. Dickson is squarely within the TCPA's zone of interests.

**E.      Mr. Dickson's Transfer of His Data to a New Cell Phone Is Not Spoliation.**

Direct Energy alleges that Mr. Dickson is not an adequate class representative because he "potentially" spoliated evidence.  (Doc. 111 at p 22.)  In support, Direct Energy notes that Mr. Dickson testified at his deposition that he traded his old cell phone for a new one.  (*Id.*)  However, Mr. Dickson testified that when he did this, all of his voicemails transferred to the new phone.  (*See* Dickson Dep., Doc. 111-23, at p. 89.)  He further testified since all the voicemails transferred, it never occurred to him that his old phone could somehow be evidence in this case.  (*Id.*)

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction."  *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003).  Direct Energy's purported spoliation concerns are meritless because the voicemails at issue here were not destroyed.  *See Susinno v. Work Out World, Inc.*, 333 F.R.D. 354 (D.N.J. 2019) (defendant's objection that the plaintiff retained neither the phone nor the offending voicemail at issue did not impact adequacy because there was no bad faith and, because a third party produced the message that played, there was no spoliation).

Direct Energy asserts that Mr. Dickson's old telephone could reveal information related to standing.  However, as shown above (*see* Section II(D), *supra*), standing to bring a TCPA claim does not turn on where a plaintiff was or what they were doing when they received the call or were alerted to it.  Direct Energy has also failed to explain what relevant evidence it seeks from Mr. Dickson's old cell phone or why it would be expected to be unfavorable to him.  Direct Energy's half-baked spoliation argument does not render Mr. Dickson inadequate.

**F.      Direct Energy's Consent Defense Will Fail on a Class-Wide Basis.**

Direct Energy's consent defense will surely fail, as it cannot come forward with any evidence that a single class member consented.  But the defense will also fail as to the whole class all at once without any individualized inquiries.

Direct Energy argues that its consent defense is not speculative for five reasons: 1) it contractually required TMC to procure consent; 2) Active Prospect at some point in time maintained at least 70,877 consent forms specific to Direct Energy; 3) DMI Partners ("DMI") supplied TMC with Direct Energy-specific opt-ins; 4) Silverman supplied TMC with opt-ins; and 5) Larry Correia of TMC testified that "the RVM campaigns that TMC did for Direct Energy all used opt-ins" and he "saw the TrustedForms" with his own eyes.  (*See* Doc. 111 at p. 30.)  None of these arguments have any merit, but even if they did, they will all be readily disposed of on a class-wide basis.

First, Direct Energy's argument that it contractually required consent is in no way proof of consent.  Indeed, Direct Energy is suing TMC for fraud and for *breach* of that contract.  The argument is also not in any way individualized—Direct Energy is not arguing that sometimes it required consent but other times it may not have.  Its argument is that it "never wavered" in its requirement that TMC gather consent for the entire class.  (*See* Doc. 111 at p. 30.)

Direct Energy's second and third arguments can be disposed of together—the 70,877 "TrustedForms" maintained by Active Prospect were created in connection with DMI leads.[14] On the eve of class certification, in a last-ditch effort to manufacture and inject predominance issues despite the absence of any consent evidence, Direct Energy amended its Crossclaim

---

[14] The requirement to use TrustedForm certificates as independent proof of consent is only found in a "Statement of Work (Opt-In Leads)" between Direct Energy and TMC which names DMI Partners as the subcontractor providing the opt-in leads.  (*See* Doc. 107-5 at p. 48.)  In practice, a "tunnel between computer systems" needed to be set up for TrustedForms to operate, and no such tunnel was ever set up between Active Prospect and Silverman or any third parties Silverman purchased leads from.  (*See* Correia Dep., Doc. 107-7, at pp. 36, 127.)

against TMC to assert for the first time in this litigation—nearly two and a half years after the original Complaint was filed in January 2018—that these 70,877 TrustedForms might contain information that some class members consented, but that TMC failed to maintain the TrustedForms.  In this regard, Direct Energy has alleged that sometime in 2018, TMC stopped paying Active Prospect, and due to the nonpayment, TMC's account was deleted.  (*See* Doc. 106 at ¶¶ 53-54.)

As an initial matter, it appears these TrustedForms can still be accessed.  After TMC stopped paying in 2018, TMC re-subscribed to the TrustedForm service in May 2019.  (*See* Doc. 111-20 at p. 23; Active Prospect Service Proposal, attached as Ex. 1 to the Declaration of Jonathan P. Misny ("Misny Decl."), attached hereto as Exhibit A.)  At that point, and for the following three months, Active Prospect charged and invoiced TMC for storage of "70,877 Retained Certificates"—the exact number of certificates that were being maintained back when TMC was still paying in 2018.  (Doc. 111-20 at pp. 22-25.)  Active Prospect has never said it deleted the TrustedForms or that they could never be accessed again—it said TrustedForm certificates are only stored for customers with an account and that TMC's *account* was deleted in 2018.  (Doc. 111 at p. 6.)  If Direct Energy comes forward with the TrustedForms, it will be a simple exercise to determine exactly which class members, if any, consented.  If there are any TrustedForms for any class members[15], the question of whether the TrustedForms constitute valid consent will not require individual inquiries because DMI is a single source and all leads

---

[15] Even if *all* 70,877 TrustedForms represented opt-ins from class members, this only constitutes approximately 3 percent of the class using Direct Energy's expert's calculation.  However, all but 8,618 TrustedForms, or *0.3 percent* of the class, come from before May 2017, and the class period does not begin until May 15, 2017.  Accordingly, Direct Energy's TrustedForm argument, at best, might apply to a miniscule number of class members, and Direct Energy has not even shown that it could potentially apply to *any* class members.  As Mr. Dickson has explained, TMC was sending RVMs to DMI leads prior to the class period but then began using cheaper Silverman leads instead in the beginning of 2017.  (*See* Doc. 106 at pp. 14-16.)  Larry Correia testified that in essence Silverman was the new provider of opt-in leads after DMI and that DMI didn't have anything to do with the calls around the beginning of 2017 going forward.  (*See* Correia Dep., Doc. 107-7, at 164.)

from DMI were required to use the exact *same consent language* on each lead generating website. (*See* Doc. 107-5 at p. 49.) "Furthermore, if evidence later shows that a defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms. For example, it can place class members with potentially barred claims in a separate subclass, or exclude them from the class altogether." *Johansen*, 2018 U.S. Dist. LEXIS 47776, at *13 (citation omitted).

But regardless of whether or not the 70,877 TrustedForms were in fact destroyed, they do not create predominance issues. Simply put, if Direct Energy or TMC believed these forms would have demonstrated consent for any of the class members, they would have gathered them. TMC stopped paying Active Prospect in February 2018—almost immediately after this class action lawsuit was filed on January 24, 2018 and after Direct Energy had requested opt-in information for Mr. Dickson from TMC. (*See* Doc. 111-20 at pp. 22-23; Doc. 106 at ¶¶ 31-32.) To be clear, the cost to have Active Prospect store the TrustedForms was not prohibitive. It was one one-hundredth of a penny per certificate—here, a grand total of *seven dollars* per month. TMC engaged a sophisticated law firm to represent it in the litigation—it could have afforded to pay the seven dollars to maintain its only evidence of consent if it in fact believed the TrustedForms would evidence that some of the class members consented. It chose not to do so.

TMC then responded to Direct Energy not with a TrustedForm but with a row of data that we now know was fabricated by TMC employees. (*See* Doc. 106 at ¶¶ 32-33.) Direct Energy now complains that this data, *even if it weren't manufactured*, fell "far short" of TMC's contractual obligations to maintain TrustedForms. (*Id.*) Yet it either never asked to see the TrustedForms for the class[16], or asked but failed to follow up on TMC's inability to provide these forms until late *2019*. (*See id.* at ¶ 43.) Mr. Dickson issued discovery requests to Direct

---

[16] Direct Energy also does not claim it asked for a TrustedForm for Mr. Dickson.

Energy and TMC in June 2018 asking for any evidence of consent for the class, but neither Direct Energy nor TMC made any effort to obtain or produce these forms.  (*See* Plaintiff's First Set of Discovery Requests to Direct Energy, attached as Ex. 2 to Misny Decl., at Request for Production No. 12; Plaintiff's First Set of Discovery Requests to TMC, attached as Ex. 3 to Misny Decl., at Request for Production No. 16.)  In fact, Direct Energy *never* made any efforts to obtain the TrustedForms from their source, Active Prospect—it was Mr. Dickson that issued the subpoena to Active Prospect after Larry Correia's discussion of the TrustedForms for DMI leads at his deposition.[17]  Nonetheless, Direct Energy now attempts to pass its own failure to gather its own purported consent evidence onto TMC—a party which is no longer here to defend itself.  If the TrustedForms were truly destroyed forever during the course of this litigation, Direct Energy must not be rewarded by relieving it from massive TCPA liability for over two million unlawful calls—particularly where the evidence might have related to, on Direct Energy's best day, .3 percent of the class, and uncontroverted testimony suggests it should relate to none of the class.  (*See* n.15, *supra*.)  As Mr. Dickson previously explained, Direct Energy "must be prepared" to meet its affirmative burden to come forward with "clear and convincing" and "unambiguous" evidence of consent, and it has not been relieved of its burden simply because it failed to gather the evidence it now speculates might apply to a small fraction of a percentage of the class.  (*See* Doc. 107 at p. 28.)

Fourth, Direct Energy's defense that purported "opt-ins" procured by Silverman might have consented fails not only because none of the defendants have been able to come forward with any evidence of such opt-ins but because, as Mr. Dickson explained in his opening brief,

---

[17] Mr. Dickson also subpoenaed DMI for any evidence of consent they may have for any of the class members and DMI did not have any.  (*See* Subpoena to DMI, attached as Ex. 4 to Misny Decl.; DMI subpoena response, attached as Ex. 5 to Misny Decl.)

Silverman's owner, Krista Crocker, has admitted that even if those opt-ins occurred, they were not TCPA-compliant in that they were not specific to Direct Energy.[18]  (*See* Doc. 107 at pp. 10-11.)  In response to Mr. Dickson's assertions, Ms. Crocker amended her affidavit but *still* was unable to state that *any* of these purported opt-ins were specific to Direct Energy, confirming that lack of consent will be determined on a class-wide basis for Silverman leads.  (*See* Doc. 112-1 at ¶ 7.)

Fifth and finally, Direct Energy resorts to standing behind the testimony of Larry Correia, who it accuses in its Crossclaim of making false statements to Direct Energy about the existence of consent evidence.  (*See* Doc. 106 at pp. 7-8.)  However, even setting aside Mr. Correia's trustworthiness, he repeatedly testified that he did not have knowledge of the procurement of leads for the RVM campaign during the class period, and thus his conclusory testimony as to whether there should have been consent is not probative of anything.[19]  Mr. Correia's testimony is not evidence of consent, and even if it was, Mr. Correia's testimony at trial can be considered on a class-wide basis.

As such, Direct Energy's speculation there might be consent evidence here is nothing like the evidence in the case it relies upon, *Sawyer v. KRS Biotechnology, Inc.*, No. 1:16-cv-550, 2018 U.S. Dist. LEXIS 89595 (S.D. Ohio May 30, 2018), in which the court found the defendant came forward with evidence that, while non-documentary, was not speculative and

---

[18] Of course, however, it is more likely that those purported opt-ins, numbering in the millions, simply never happened.  To use Mr. Dickson as an example, despite numerous requests to identify the source of his lead, Silverman has only misidentified Mr. Dickson's information as coming from Magnify Telecom, which denied selling Silverman any consent data or telephone numbers whatsoever.  (*See* Doc. 107 at pp. 5-6.)

[19] Direct Energy claims that Mr. Correia testified that "the RVM campaigns that TMC did for Direct Energy all used opt-ins," but literally one question later, he explained that he did not have personal knowledge of all the campaigns, clarifying that "DMI was the company that we were using while I was involved in the campaign."  (*See* Correia Dep., Doc. 107-7, at p. 24.)  As to Silverman—the lead source Mr. Correia testified replaced DMI prior to the class period—Mr. Correia repeatedly clarified he had no knowledge of whether those leads had consented because he wasn't involved.  (*See id.* at 39, 149.)

created a bona fide issue of consent as to *all* of the faxes to the other class members such that the court was concerned that individualized consent issues would drive the litigation. *See id.* at *24. Unlike the prerecorded calls here, where "prior express written consent" is required, the court found that under FCC guidance for faxes, evidence of established business practices could suffice to prove consent, and such evidence did not have to be in writing. *See id.* at *28. That was precisely the type of evidence the defendant offered—uncontroverted testimony that the defendant's business practice was to gather consent *and* that based on a sample of the class members, all of the class members sampled had consented, rendering the plaintiff an aberration. *See id.* at *26-32.

In contrast, the circumstances here are like those in *Johansen,* 2018 U.S. Dist. LEXIS 47776, in which the issue of consent did not predominate because: "In order to demonstrate that individuals consented to the calls, Defendants must marshal *some* evidence of prior express consent, such as a screenshot of a completed consent form for an individual plaintiff or a list of IP addresses of individual plaintiffs who consented to the calls. They have not." *Id.* at *14.

G.      **Direct Energy's Claim That Something Beyond Initiating an Illegal Call Is Required to Trigger the TCPA Is Wholly Unsupported.**

In its final predominance challenge, Direct Energy reads into the TCPA a requirement that not only must Plaintiff prove that illegal RVM calls were initiated to and received by consumers, but that the prerecorded message was fully played. (Doc. 111 at pp. 34-35.) There is no such requirement under the TCPA, which merely requires that a plaintiff demonstrate that a prerecorded telemarketing call was "initiated" to the consumer's cell phone. *See* 47 C.F.R. § 64.1200(a)(2). Plaintiff has gone even further and only included in the Class List those calls to which the Call Records confirmed the prerecorded message was successfully delivered. *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635 (5th Cir. 2015) is not controlling, but in any

event, that case is distinguishable because there, a prerecorded message would not play except in response to a voice actually speaking on the receiving end of the call.  *See Aranda*, 179 F. Supp. 3d at 824-25.  Here, Plaintiff has come forth with class-wide evidence that every RVM call was initiated, sent to, and delivered to the voicemail boxes of the class members and included a prerecorded message.  *See also Schaevitz v. Braman Hyundai, Inc.*, No. 1:17-cv-23890-KMM, 2019 U.S. Dist. LEXIS 48906, at *14 (S.D. Fla. Mar. 25, 2019) (with respect to RVMs, "it is the mere act of placing the call that triggers the statute.") (citation omitted).

**H.**   **The Resolution of This Dispute Via One Class Action Is Superior to Two Million Individual Claims.**

Federal courts have repeatedly recognized that TCPA claims are appropriate for resolution via class action. *See, e.g., Am. Copper & Brass, Inc. v. Lake City Indus. Prods.*, 757 F.3d 540 (6th Cir. 2014); *Ira Holtzman, C.P.A. & Assoc. Ltd.. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("[c]lass certification is normal in litigation under [the TCPA]"); *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*, No. 09-c-07299, 2014 WL 540250, at *15 n.11 (N.D. Ill. 2014) (collecting cases).  The Fourth Circuit recently held:

> Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition.  In enacting the law, Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case.  Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications.

*Krakauer*, 925 F.3d at 656.

The resolution of the common question as to whether Direct Energy is vicariously liable for the millions of telemarketing violations made on its behalf by TMC, at Direct Energy's authorization, direction, and control, via class action is no question superior to millions of individual trials in small claims court nationwide.

Respectfully submitted,

**/s/ Brian K. Murphy**
Brian K. Murphy (0070654)
Jonathan P. Misny (0090673)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murphy@mmmb.com
        misny@mmmb.com

Edward A. Broderick (admitted *pro hac vice*)
Broderick Law P.C.
99 High Street, Suite 304
Boston, MA 02110
Telephone: 617.738.7080
Facsimile: 617.830.0327
E-mail: ted@broderick-law.com

Anthony I. Paronich (admitted *pro hac vice*)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: 508.221.1510
E-mail: anthony@paronichlaw.com

Matthew P. McCue (admitted *pro hac vice*)
The Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: 508.655.1415
Facsimile: 508.319.3077
E-mail: mmccue@massattorneys.net

Samuel J. Strauss (admitted *pro hac vice*)
Turke & Strauss LLP
936 N. 34th Street, Suite 300
Seattle, WA 98103
Telephone: 608.237.1774
Facsimile: 608.509.4423
E-mail: sam@turkestrauss.com

*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I, hereby certify that on June 22, 2020, I served the foregoing through the Court's

CM/ECF system, which sent notice to all counsel of record.

**/s/ Brian K. Murphy**
Brian K. Murphy