# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF OHIO

2

3    MATTHEW DICKSON, on behalf of )

     himself and others similarly  )

4    situated                      )

          Plaintiff                )    CAUSE No. 5:18-cv-182

5                                   )

     VS.                           )

6                                   )

     DIRECT ENERGY, LP, TOTAL      )

7    MARKETING CONCEPTS, LLC,      )

     and SILVERMAN ENTERPRISES, LLC)

8          Defendandts            )

9

10

11          ORAL VIDEOTAPED ZOOM DEPOSITION OF

12                    MATTHEW DICKSON

13                    MAY 14, 2020

14                      VOLUME 1

15       ORAL VIDEOTAPED ZOOM DEPOSITION OF MATTHEW DICKSON,

16   produced as a witness at the instance of the Defendant

17   and duly sworn, was taken in the above-styled and

18   numbered cause on MAY 14, 2020, from 1:11 p.m. to

19   5:11 p.m., before Jill M. Vaughan, Certified Shorthand

20   Reporter in and for the State of Texas, reported by

21   computerized stenotype machine.  The witness appeared

22   remotely at 273 Troubadour, Northfield, Ohio.  The

23   deposition was taken pursuant to the Federal Rules of

24   Civil Procedure and the provisions stated on the record

25   or attached hereto.

                                        Page 1

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Samuel Strauss    (Zoom)
    TURKE & STRAUSS, LLP
    613 Williamson Street
    Suite 201
    Madison, WI 53703
    608-237-1174
    sam@turkestrauss.com

FOR THE DEFENDANT DIRECT ENERGY:
    Mr. Michael D. "Matt" Matthews, Jr.   (Zoom)
    Mr. William Thomas          (Zoom)
    MCDOWELL HETHERINGTON
    1001 Fannin Street
    Suite 2700
    Houston, TX 77002
    713-337-5580
    matt.matthews@mhllp.com

FOR THE DEFENDANT:
    Mr. Thomas Yardley    (Zoom)
    Ms. Christine Walsh   (Zoom)
    ROBBINSON SALOMON & PATT, LLC
    180 North LaSalle Street
    Suite 3300
    Chicago, IL 60601
    312-456-0184
    tyardley@rsplaw.com

ALSO PRESENT:
    Erik Nelson, videographer  (Zoom)
    Christina Dillard, In-house Direct Energy (Zoom)

---

INDEX                    PAGE

Appearances ...........................     2

MATTHEW DICKSON
   Examination by Mr. Matthews .........     5
   Examination by Mr. Yardley ..........    78
   Further Examination by Mr. Matthews .   109
   Signature and changes .................   117
Reporter's Certificate .................   119

EXHIBIT INDEX

NO.    DESCRIPTION                  PAGE
EXHIBIT 1  Complaint .......................    31
EXHIBIT 2  Audio transcript of VM117 ........   35
EXHIBIT 3  Audio transcript of VM92 ........    35
EXHIBIT 4  Audio transcript of VM99  ........   35
EXHIBIT 5  Audio transcript of VM104 ........   35
EXHIBIT 6  Audio transcript of VM105 ........   35
EXHIBIT 7  Audio transcript of VM106 ........   35
EXHIBIT 8  Audio transcript of VM108 ........   35
EXHIBIT 9  Audio transcript of VM119 ........   35
EXHIBIT 10 Audio transcript of VM121 ........   35
EXHIBIT 11 Audio transcript of VM123 ........   35
EXHIBIT 12 Audio transcript of VM127 ........   35
EXHIBIT 13 "Paid to Research" website print .   65
EXHIBIT 14 Opt in info ......................   68

---

    THE VIDEOGRAPHER:  Good afternoon.  We are now going on the record at 1:11 p.m. on March [sic] 14, 2020.  This is Media Unit No. 1 of the remote video recorded deposition of Matthew Dickson taken by the counsel for the defendant in the matter of Matthew Dickson versus Direct Energy, LP, Total Marketing Concept, LLC and Silverman Enterprises, LLC, which is filed in the United States District Court for the Northern District of Ohio, Case No. 5:18-cv-182.  My name is Erik Nelson, and I am the videographer.  The court reporter is Jill Vaughan.  We both represent Veritext Legal Solutions.  Counsel and all present, please state your appearance for the record.

    MR. YARDLEY:  Tom Yardley for Silverman Enterprises.

    MS. WALSH:  Christine Walsh on behalf of Silverman Enterprises.

    MR. MATTHEWS:  My name is Matt Matthews with the firm McDowell Hetherington on behalf of Direct Energy.

    MR. THOMAS:  My name is Will Thomas also with McDowell Hetherington on behalf of Direct Energy.

    MR. STRAUSS:  My name is Samuel Strauss.  I'm at the law firm of Turke & Strauss, and I represent Matt Dickson and the plaintiff class.

---

    MR. MATTHEWS:  And also participating just by phone is Christina Dillard who is an in-house attorney for Direct Energy.

    MR. YARDLEY:  Mr. Videographer, I heard March 14th in that introduction.

    THE VIDEOGRAPHER:  Excuse me?

    MR. YARDLEY:  I heard March 14th was the date in that introduction.

    THE VIDEOGRAPHER:  Oh, it is May 14th, I apologize.  Sorry about that.  The court reporter will now swear in the witness.

    MATTHEW DICKSON
having been first duly sworn, testified as follows:

EXAMINATION

BY MR. MATTHEWS:

    Q.  Good afternoon, Mr. Dickson.  Thank you for being here with us today via Zoom.  As I said, my name is Matt Matthews and I represent Direct Energy in this lawsuit.  You understand that, right?

    A.  I do.

    Q.  Great.  This is a bit unusual for -- for me at least and I think for -- for a lot of us to be doing a deposition through this format.  So we're all going to do our best to -- to make it work as well as it would if we were there in person.  But to -- to

1 help with that, I'm sure there are going to be some
2 unexpected things that happen during this, which is
3 the -- as I mentioned, the first Zoom deposition that
4 I've taken, but I'll -- we'll all just have to be
5 patient with each other.
6          Have you ever been deposed before
7 in -- in any way?
8     A.   No.
9     Q.   As I said, I'll go over some basic ground
10 rules for depositions and then maybe some specifics
11 for how it may work through -- through Zoom.  But you
12 understand that the testimony that you're giving in
13 this deposition is under oath in the same way and with
14 the same force and consequences that it would be if
15 you were in a courtroom in front of a judge and jury,
16 correct?
17     A.   Yes.
18     Q.   Great.  Even though you're sitting -- are
19 you at home currently?
20     A.   I am, yes.
21     Q.   Me, too.  You're -- you're doing a good job
22 so far of giving verbal responses, which is important
23 so that our court reporter can take it down and -- and
24 have a clean record.  And, likewise, you're doing a
25 good job of allowing me to finish my question before

1 you start answering.  And I will do my best to allow
2 you to finish your answers before I start asking you
3 another question.  But the -- the reason that's
4 important is so our court reporter can take down a
5 clean record where we're not talking over each other.
6 And so even if you -- you know what I'm about to ask,
7 please let me finish it before you -- you start.
8 Okay?
9     A.   Okay.
10     Q.   If you don't hear me given the technology or
11 I'm just speaking too softly, please let me know and
12 I'm happy to speak up or repeat anything I said.
13     A.   Sounds good.
14     Q.   And if I ask a question that's unclear,
15 which I'll probably do at some point today, just ask
16 me to clarify it and I'll do my best to ask it in a
17 clearer way.  Okay?
18     A.   Okay.
19     Q.   And if you don't ask me to clarify, I'll
20 assume that you understood.  Is that fair enough?
21     A.   That is fair.
22     Q.   Okay.  If -- if you need a break at any
23 point in time or you get interrupted -- you know, I
24 can't guarantee that one of my children won't walk in
25 at some point.  If that happens to you and you need a

1 break, just let me know and we will take a break.
2 Okay?
3     A.   Sounds good.
4     Q.   The only qualification I would add to that
5 is if -- if I've asked you a question, please answer
6 the question and then we'll take a break.  Okay?
7     A.   Yep.
8     Q.   Okay.  Mr. Dickson, what did you do to
9 prepare for your deposition today?
10     A.   I spent roughly three to four hours via
11 phone call with Sam Strauss and Alex Phillips going
12 over some of the documents and just how this would
13 work.
14     Q.   Okay.  Who is Alex Phillips?
15     A.   Alex is another attorney that works with
16 Sam.
17     Q.   Got it.  That -- that's not a name I know,
18 but I don't mean any disrespect to Alex.
19          Did -- did you do anything else to --
20 or hang on.  Sorry.  When -- when did you do that?
21     A.   The prep work?
22     Q.   Yes.
23     A.   Over the last week.
24     Q.   Okay.  Three to four hours over the last
25 week on the phone with Sam and Alex?

1     A.   Right.
2     Q.   Did you review any documents in preparation
3 for the deposition?
4     A.   Yes.
5     Q.   And did any of them refresh your
6 recollection about certain things?
7     A.   Yes.
8     Q.   Okay.  What -- what were those, what
9 documents were those?
10     A.   The complaint and the voicemails.
11     Q.   Okay.
12     A.   And let's see.  I think that's all I can
13 recall at this -- at this moment.
14     Q.   Okay.  And in what way did those refresh
15 your recollection?
16     A.   Well, it's been three years since this
17 started, so I needed a refresher just to remember
18 what -- what actually took place during -- during that
19 time in terms of what -- the content of the voicemails
20 and so on and so forth.
21     Q.   Got it.  Okay.  Mr. Dickson, I'm going to
22 ask you some questions about your background; and I'm
23 not meaning to pry into your personal affairs but just
24 to get a little bit more of a sense about some
25 background details that -- from -- that may be

3 (Pages 6 - 9)

**Page 10**

1  relevant in this case or may not.
2      A.  Okay.
3      Q.  Have you ever been the plaintiff in another
4  lawsuit?
5      A.  I have, and I meant to bring this up
6  earlier.  On the complaint or on the -- what is it,
7  the discovery questions, I think I said that I hadn't;
8  but part of the reason was because I didn't really
9  think that a divorce and a bankruptcy proceeding were
10  considered lawsuits.  And I also had a settlement that
11  came through which I thought happened right before I
12  went to court, but apparently it was settled right
13  after it was filed.  So there are three different
14  instances where I have been a plaintiff.
15     Q.  Got it.
16     A.  So that's the -- that's -- it's incorrect in
17  the -- in the complaint I believe or the discovery
18  questions, whichever -- wherever that's listed that I
19  don't -- that I have not been, that's incorrect.
20     Q.  Got it.  Thank you for that clarification.
21         So there was -- one is the divorce,
22  right?
23     A.  Yes.
24     Q.  And two is a bankruptcy filing?
25     A.  Correct.

**Page 11**

1      Q.  That was a personal bankruptcy filing or a
2  business filing?
3      A.  Personal, yes.
4      Q.  And when was that?
5      A.  I believe it was filed in the end of 2011.
6      Q.  In Ohio?
7      A.  Yes.
8      Q.  And the divorce proceeding, when was that?
9      A.  April of 2010.
10     Q.  And what county are you in there?  Cuyahoga?
11     A.  I live in -- well, right now I live in
12  Summit; but the divorce would have taken place in --
13     Q.  In Cuyahoga?
14     A.  Yeah.  I lived in Cuyahoga at the time.
15     Q.  Okay.  And the -- the third you said was a
16  settlement of some kind that you received right after
17  filing a lawsuit?
18     A.  Yeah.  And I thought it was -- I thought it
19  had happened before it even went to trial.
20     Q.  Before it was even filed?
21     A.  Yes.
22     Q.  And what kind of case was that?
23     A.  It was similar to this.  It was a
24  unsolicited phone call harassment.
25     Q.  A TCPA case?

**Page 12**

1      A.  Yes.  That's what they're called, yes.
2      Q.  I didn't -- just being clear that it
3  wasn't -- it was a TCPA case as opposed to, like, a
4  fair debt collection case or something like that?
5      A.  Correct.
6      Q.  Okay.  And where was that case filed?
7      A.  In the same place this one is.  It's in
8  northeast Ohio.
9      Q.  In Federal court, do you know?
10     A.  I -- I don't know the answer to that.
11     Q.  Got you.  Do you know who the defendant was?
12     A.  The -- yes, TruGreen.
13     Q.  And when was that case filed?
14     A.  It was ongoing right around the time this
15  one actually started.  So summer of '17-ish.
16     Q.  And it was your contention in that case that
17  TruGreen had contacted you without your consent?
18     A.  Correct.
19     Q.  On your cell phone?
20     A.  Correct.
21     Q.  Were those calls voicemails or texts that
22  you're saying --
23     A.  No texts.  There were no texts or things,
24  but it was variety of calls that I picked up and
25  voicemails.

**Page 13**

1      Q.  About how many, if you recall?
2      A.  A lot.  Upwards of 30 I'm sure.
3      Q.  Okay.  And you said that case settled
4  shortly after it was filed, right?
5      A.  Yes.
6      Q.  And what did it settle for?
7          MR. STRAUSS:  Mr. Dickson, I'm going to --
8  the terms of that settlement are confidential and
9  you're not able to disclose them.
10     A.  I was just going to answer as such.  Yeah,
11  it -- they are confidential terms.
12     Q.  (By Mr. Matthews) Sure.  And, you know, we
13  have a protective order and confidentiality
14  agreement in place.  So if -- if you'd like to
15  designate that information as confidential in this
16  lawsuit, you are certainly welcome to.
17     A.  So I prefer not to.
18     Q.  Okay.
19         MR. MATTHEWS:  So, Sam, are you instructing
20  Mr. Dickson not to answer that question?
21         MR. STRAUSS:  Yeah, I'm instructing
22  Mr. Dickson not to answer that question.  I'm aware of
23  the protective order in place.
24         MR. MATTHEWS:  Okay.  Confidentiality has
25  not been a basis for Direct Energy to withhold

4 (Pages 10 - 13)

1 information in this lawsuit. So we'll take that up at
2 a different time.
3 MR. STRAUSS: (Audio distortion.)
4 MR. MATTHEWS: What's that?
5 MR. STRAUSS: I said that sounds reasonable.
6 Q. (By Mr. Matthews) Mr. Dickson, have you --
7 aside from lawsuits, have you ever sent any -- in
8 this case there's a letter that you say you sent to
9 Direct Energy about alleged telemarketing
10 violations, right?
11 A. Yeah, yes.
12 Q. Have you ever sent other letters like that
13 to other companies about alleged telemarketing
14 violations?
15 A. If I did, it would have been during the
16 TruGreen one; and I don't recall the -- the details of
17 that.
18 Q. Okay. Okay. So the -- only lawsuit or
19 demand that you have ever made that's resulted in a
20 payment of some kind to you is the TruGreen lawsuit?
21 MR. STRAUSS: Object to form. You may
22 answer the question, Mr. Dickson.
23 A. That is correct.
24 Q. (By Mr. Matthews) Okay. Mr. Dickson,
25 you're an Ohio resident and have been your whole

Page 14

1 rethink your selection of counsel? I'm kidding. I'm
2 kidding. I went to University of Texas as well, and
3 those games were a lot of fun or one of them at least.
4 Q. (By Mr. Matthews) The -- Mr. Dickson, you
5 currently live at 273 Troubadour Drive, right?
6 A. Yes.
7 Q. And is that in Northfield or Sagamore Hills
8 or is it both?
9 A. It's -- it -- it can be both. If you
10 address something to either one of those cities, it
11 will come to my address; but we're technically in
12 Sagamore Hills.
13 Q. Okay. And how long have you lived at that
14 address?
15 A. It will be four years this fall.
16 Q. So fall of 2016 you moved in?
17 A. Uh-huh, yes.
18 Q. And do you own or rent?
19 A. I own.
20 Q. Okay. And who lives there with you?
21 A. My wife, my daughter and my step-daughter
22 and many pets, too many.
23 Q. Mr. Dickson, do you own any other properties
24 currently?
25 A. No.

Page 16

1 life, right?
2 A. Yes.
3 Q. And what's the highest level of education
4 that you've obtained?
5 A. I have a bachelor's degree.
6 Q. From where?
7 A. From Bowling Green State University.
8 Q. And what's your degree in?
9 A. Education.
10 Q. And what year did you graduate from Bowling
11 Green?
12 A. 1998.
13 MR. MATTHEWS: You know, I've noted that
14 you're an Ohio state fan, though. What's the deal?
15 Bowling Green doesn't have a strong enough football
16 team?
17 THE WITNESS: How did you know that? Did
18 you see it on my arm? No, that's a -- something I
19 grew up with. My parents both went to Ohio State, and
20 they just live and breathe scarlet and gray.
21 MR. MATTHEWS: I understand. Mr. Dickson,
22 were you aware that your attorney, Mr. Strauss, went
23 to the University of Texas?
24 THE WITNESS: That I was not.
25 MR. MATTHEWS: Would -- would you like to

Page 15

1 Q. Before Troubadour Drive, you lived at
2 6677 -- is it Solon or "Solan" Boulevard?
3 A. It's Solon, but that was --
4 Q. Solon.
5 A. I had a couple of addresses in between those
6 two.
7 Q. Okay. Where did you live prior to moving
8 into 2737 Troubadour?
9 A. At 2832 Aaron Drive in Medina, Ohio.
10 Q. And how long did you live there?
11 A. Four years.
12 Q. So that would take us back to the fall of
13 2012?
14 A. Correct.
15 Q. And before 2832 Aaron Drive, where did you
16 live?
17 A. I don't recall the actual address. It was a
18 condo in Streetsboro, Ohio. I think it was Maple --
19 Maplewood Drive and I don't know -- I only lived there
20 for a year. I rented it from a friend. 16-something.
21 I don't recall.
22 Q. 16-something Maplewood Drive?
23 A. Yeah, I think it was 1645. I don't know,
24 but it was on Maplewood Drive or Maple View -- no. It
25 was Maple View Court. That's what it was.

Page 17

5 (Pages 14 - 17)

1    Q.   Maple View Court?
2    A.   Yes.
3    Q.   And what town was that in?
4    A.   Streetsboro, Ohio.
5    Q.   And what -- you say you rented that from a
6    friend?
7    A.   Uh-huh.
8    Q.   For about a year?
9    A.   Yes.
10   Q.   Okay.  And that takes us back to the fall of
11   2011?
12   A.   Correct.
13   Q.   And where did you live prior to the Maple
14   View Court address?
15   A.   This would -- I had moved in with my mother
16   for around a year and a half and then I'd be at the
17   6677 Solon Boulevard address, but the address during
18   that time would have been 33355 Linden Drive in Solon,
19   Ohio.
20   Q.   So that's from early 2010 until fall of
21   2011?
22   A.   Thereabouts, yes, yes.
23   Q.   And where did you live before moving in
24   temporarily with your mom?
25   A.   At the 6677 Solon Road -- or Solon Boulevard

Page 18

1    address.
2    Q.   How long did you live at that address?
3    A.   Six years.
4    Q.   Moved in there when you got married and
5    moved out when you -- you and your wife split up?
6    A.   Correct.
7    Q.   Your ex-wife?
8    A.   Correct.
9    Q.   So we talked about a few different
10   addresses.  Did you ever live at any of them at the
11   same time?  Was there ever any overlap?
12   A.   I'm not sure -- I'm not understanding the
13   question.
14   Q.   Sure.  In other words, did you -- I'll just
15   give you an example.  So with the 2832 Aaron address
16   before you lived -- before you moved into Troubadour,
17   was there any overlap between the two?  In other
18   words, you moved out of the 2832 Aaron address but you
19   still owned it for two months or three months before
20   you moved in to the Troubadour address?
21   A.   I don't believe so, but even so I didn't
22   own.  I wasn't even on the mortgage at 2832 Aaron
23   Drive.  That was my wife's -- my current wife's house.
24   Q.   Okay.  And then circling back to 6677 Solon
25   Boulevard, did you own that property?

Page 19

1    A.   I did.
2    Q.   Okay.  That and the 237 Troubadour would be
3    the properties you owned?
4    A.   Yes.
5    Q.   Got it.  So understanding that there may
6    have been, you know, some time necessary to complete a
7    move from one property to the next, your time in each
8    of those properties has been more or less separate?
9    A.   Yes.
10   Q.   You moved out of one, sold it, moved into
11   another?
12   A.   Correct.
13   Q.   Okay.  You've never maintained a residence
14   at two different places at the same time?
15   A.   No.
16   Q.   Okay.  Thank you.  Mr. Dickson, where do you
17   currently work?
18   A.   I work for Everstream Solutions.
19   Q.   And what does Everstream Solutions do?
20   A.   We are a business only fiber network
21   provider.  So we -- we sell to businesses in the
22   midwest.  It's fiber-based Internet for network
23   solutions.
24   Q.   How long have you worked there?
25   A.   I started in November.  So roughly six

Page 20

1    months.
2    Q.   And what's your job at Everstream?
3    A.   I'm a major account executive in sales.
4    Q.   Do you have to travel for work in -- in
5    normal times?
6    A.   Yeah.  Right now, no.  And travel-wise, no,
7    because it's -- all of my accounts are local; but if
8    we have some sort of training or, you know, sales
9    kickoff meeting in one of our other markets, I might
10   have to, but I have not yet.
11   Q.   And where did you work before taking the job
12   at Everstream Solutions?
13   A.   I was with Spectrum -- or Charter
14   Communications is what they're technically called.
15   Q.   Is Spectrum the d/b/a, or is it the other
16   way around?
17   A.   The other way around.
18   Q.   Charter Communications?
19   A.   Uh-huh, yes.
20   Q.   And how long did you work at Charter
21   Communications?
22   A.   I had two separate stints there.  I started
23   originally in February of 2011, and I worked there
24   until September of 2014 where I took a job with a
25   company called Century Link.  And I was at Century

Page 21

6 (Pages 18 - 21)

1  Link from 2014 in October through October of 2015 when
2  I took another job back with Spectrum/Charter
3  Communications.  And so November of 2015 through
4  November of 2019 I was back at Spectrum.
5      Q.  Thank you.  And Spectrum is an Internet
6  service provider?
7      A.  Yes.  And they can -- yes.
8      Q.  I'm sorry.  Was -- was there something else
9  that you were going to describe about what they do?
10     A.  Other than the fact that they -- they can
11  sell -- I didn't; but they have the ability to sell to
12  residential services, too.  Whereas Everstream is
13  different, we only do businesses.
14     I remember the name because I believe you
15  said they were your Internet service provider in your
16  discovery responses.  They still are, correct?
17     A.  They still are, yeah.
18     Q.  Okay.  So from 2017 up through now, they've
19  been your Internet service provider?
20     A.  Correct.
21     Q.  What did you -- what was your job at
22  Spectrum during the second stint, the November 2015 to
23  November 2019?
24     A.  Same title, major account executive.  I was
25  selling to government entities and schools.  So it was

Page 22

1  a gov/ed position.
2      Q.  Did that position require you to travel for
3  work?
4      A.  It depends on what you say travel.  I mean,
5  I had a territory that was in western Ohio.  So I
6  would have appointments that sometimes could be 2,
7  2 1/2 hours away, yes.
8      Q.  Okay.  But all within the state of Ohio?
9      A.  Correct.
10     Q.  And your travel was -- was limited to car
11  travel?
12     A.  Correct.
13     Q.  You're not getting on a plane and flying all
14  over the country for it.  You have a territory that's
15  Ohio, and that requires day trips to other parts of
16  the state from time to time?
17     A.  Yes.
18     Q.  Where -- where was your office?  Where was
19  your home base?
20     A.  For Spectrum?
21     Q.  Yes, during the second stint.
22     A.  I -- I worked out of the Akron, Ohio office.
23     Q.  Did you work from home at all?
24     A.  Occasionally, not -- wasn't a full-time
25  work-from-home job, though.

Page 23

1      Q.  Did you have a work-issued desk top computer
2  there at the office?
3      A.  No, not the second stint.
4      Q.  Okay.  A work-issued laptop?
5      A.  Correct, yes.
6      Q.  Is it something that more or less stayed at
7  the office, though, on a dock with your -- with your
8  monitors or did you bring it home?
9      A.  I would bring it home.
10     Q.  You both worked on it at the office during
11  the day and from time to time would bring it home if
12  you had work to do at home?
13     A.  Correct.
14     Q.  Did -- did you use that computer for -- for
15  personal use at the time also?
16     A.  I suppose occasionally but not really.  I
17  have my own computer.
18     Q.  And did you have a work-issued iPad or
19  tablet?
20     A.  No, no.  I had a phone.  That's it.
21     Q.  You had a work-issued cell phone?
22     A.  Correct.
23     Q.  And what was -- what kind of phone was it?
24  Was it a iPhone, Android?
25     A.  Spectrum gave us Androids.

Page 24

1      Q.  Do you remember the number of that phone?
2      A.  (216)903-0184.
3      Q.  And at that time you also had a personal
4  cell phone as well, right?
5      A.  Yes.
6      Q.  Did you have more than one personal cell
7  phone?
8      A.  No.
9      Q.  Just the one?
10     A.  Correct.
11     Q.  And the number on that was (440)409-2229,
12  correct?
13     A.  Yes.
14     Q.  How long have you had that number as your
15  cell phone number?
16     A.  I think 12 years.
17     Q.  Okay.  Mr. Dickson, can -- can you tell us
18  in your own words what you think this lawsuit is
19  about?
20     A.  I think it's about a company who repeatedly
21  made unsolicited phone calls to myself and millions of
22  others, and I would like to have that stop.
23     Q.  How many phone calls do you allege that
24  Direct Energy or someone acting on Direct Energy's
25  behalf made to you?

Page 25

7 (Pages 22 - 25)

1    A.  I believe upwards of 12 or more.
2    Q.  Okay.  Now, in -- in this lawsuit you've
3  alleged that -- at least in part that Direct Energy
4  sent you ringless voicemail, correct?
5    A.  I wouldn't necessarily call it ringless.
6  What would happen was -- is the phone would ring and
7  on occasion I would catch it and pick it up in time,
8  but as soon as I picked it up, it would hang up and
9  then I would still get a voicemail.  Other times it
10  would, you know, ring and I -- and then drop and then
11  go to voicemail without me touching the phone.
12    Q.  Okay.  And you say on some occasions it
13  would -- let me make sure I have that right.  It would
14  ring -- your phone would ring, this is your own
15  personal cell phone and you would answer and the
16  call would drop, but then a voicemail would appear on
17  your phone?
18    A.  Yes.
19    Q.  Okay.  And it's your contention that there
20  were other occasions where a voicemail would just
21  appear on your phone with no ring?
22    A.  I believe so.  I'm not -- I'm not
23  100 percent positive on that, but it definitely was an
24  odd occurrence in the fact that either my phone
25  wouldn't ring or my phone would ring and then the call
Page 26

1  would drop yet I would still get a voicemail.
2    Q.  Okay.  And there's -- at least one of those
3  calls you produced in this lawsuit says the name
4  Direct Energy, right?
5    A.  Yes.  November 3rd, 2017, I believe.
6    Q.  Right.  Were there any others that
7  specifically identified Direct Energy as the caller?
8    A.  In terms of voicemails, I do not believe I
9  have any that directly say Direct Energy besides that
10  one.
11    Q.  You've -- you've produced some other
12  voicemails in this lawsuit other than the three, I
13  believe, that don't identify who is calling you, who
14  left the voicemail, right?
15    A.  There is a name, but not -- not a company
16  name, no.
17    Q.  Good point.  Good point.  The -- the
18  voicemail says an individual's name and in all three
19  it's a female and -- but the company itself is not
20  identified, correct?
21    A.  Correct.
22    Q.  Okay.  Is it your contention that those
23  voicemails were left by Direct Energy?
24    A.  Yes.
25    Q.  Okay.  And why do you believe those were
Page 27

1  left by Direct Energy?
2    A.  Because the script that whoever was leaving
3  the voicemail was following was almost verbatim
4  without the terms "Direct Energy" to the one that did
5  say Direct Energy.
6    Q.  Got it.  Those other three voicemails,
7  they -- each one provides a phone number at the end
8  that if you're interested in hearing more about
9  whatever this person is offering, you can call to
10  learn more about it, right?
11    A.  Yes.
12    Q.  Did you ever call those numbers to see who
13  was leaving you these voicemails?
14    A.  I believe I -- I did call back one time,
15  yes.
16    Q.  Okay.  And what was the company that
17  responded to that phone call?
18    A.  I don't recall if they mentioned a name or
19  not.
20    Q.  Okay.  So your -- your belief that the other
21  three voicemails that you received and have produced
22  in this case came from Direct Energy is based on the
23  fact that the -- that the words that the -- that were
24  used in the voicemail, the script, as you said, is
25  similar to the script of the voicemail that was left
Page 28

1  by someone purporting to be from Direct Energy?
2    A.  Yes.
3    Q.  Is there any other reason you believe they
4  came from Direct Energy?
5    A.  You know, other than the content of them
6  saying we're calling about your energy bill,
7  yeah, I mean, that's -- it's just -- everything that
8  they would say in their voicemails appeared to be
9  going down the same lines as something from Direct
10  Energy.
11    Q.  Okay.  Did you ever receive any calls from
12  Direct Energy in which when you picked up, you heard a
13  voice?
14    A.  No.
15    Q.  Okay.  Every time you picked up on one of
16  these calls, the connection would drop, correct?
17    A.  Yes.
18    Q.  And every time that happened, did you
19  receive a voicemail or only some of the time?
20    A.  I -- I can't tell you for sure that it was
21  every time; but what I can say is that it was such an
22  odd occurrence that it seemed like every single time
23  that would happen, you know, three minutes later there
24  would be a voicemail sitting in my voice mailbox.
25    Q.  Okay.  And it's your testimony that that
Page 29

8 (Pages 26 - 29)

1 happened upwards of 12 times from what you believe to
2 be Direct Energy?
3    A.  Yes.
4    Q.  You may have received other telemarketing
5 calls during that time or other voicemails, but your
6 testimony is that you received approximately 12 from
7 Direct Energy?
8    A.  Yes.
9    Q.  Okay.  When -- when did you receive the
10 first one of those?
11    A.  Probably August of 2017.
12    Q.  And you mentioned the November 3rd, 2017,
13 call -- well, let me back up.
14       When was the -- so the first one that
15 you received of the approximately 12 is August of
16 2017.  When was the last one that you received from
17 Direct Energy?
18    A.  I would say whatever the last date -- the
19 latest date on the four that are in the complaint is,
20 I think that's going to -- that's probably where it
21 ended.
22    Q.  Got it.
23    A.  I don't know the date right off the top of
24 my head.  So...
25    Q.  Got it.  Okay.  Let me -- let's -- let's do
                                    Page 30

1    Q.  So your testimony is that the -- the last of
2 the messages that you received from what you believe
3 to be Direct Energy would have been December 21st of
4 2017?
5    A.  I would say yes, but I would have to take a
6 look at my voice mailbox to see if there were ones
7 that were after that.
8    Q.  Do you have voicemails that you have not
9 handed over to your attorney?
10    A.  No.  I sent him all of them.
11    Q.  Okay.  And did you save all 12 of the
12 voicemails that you say came from Direct Energy?
13    A.  Yes.
14    Q.  And did you send all 12 to your attorney?
15    A.  Yes.
16    MR. MATTHEWS:  Sam, I'm going to ask that
17 those be produced.  There's only been four voicemails
18 that have been produced in this case, and only one of
19 them identifies Direct Energy.  So if there are other
20 voicemails that Mr. Dickson claims were left on his
21 cell phone by Direct Energy, I think we're certainly
22 entitled to give them a listen.
23    MR. STRAUSS:  I -- I'll note that, and we'll
24 work on the production.
25    MR. MATTHEWS:  Okay.
                                    Page 32

1 this if for no other reason than to see if I can make
2 the exhibit share work because you're talking about
3 the reference in the complaint to four different
4 calls, correct?
5    A.  Yes.
6       (Exhibit 1 marked.)
7    Q.  (By Mr. Matthews) Okay.  So if we can take
8 a look at what I marked as Exhibit 1 to your
9 deposition.
10    MR. MATTHEWS:  Erik, I scrolled down to --
11 let me see if I can --
12    MR. STRAUSS:  Matt, I no longer see that.
13    MR. MATTHEWS:  Oh, because I opened it?
14    MR. STRAUSS:  Oh, no, I do.  Sorry.  I
15 apologize.
16    Q.  (By Mr. Matthews) So if we scroll down to
17 paragraph 24, which is on, let's see, page 5.  Do
18 you see that?
19    A.  I see it.
20    Q.  Paragraph 24 says that Direct Energy caused
21 multiple prerecorded messages/calls to be sent to
22 plaintiff's cellular telephone number in 2017
23 including September 19, November 3, December 1 and 21.
24 Do you see that?
25    A.  I see it.
                                    Page 31

1    Q.  (By Mr. Matthews) Mr. Dickson, how
2 recently did you give the other eight voicemails to
3 your attorney?
4    A.  So the original four would have most likely
5 been sent to him during the initial communication.
6 And I'm -- the other eight -- after having looked back
7 at my voicemail during our deposition prep, I sent
8 them over to him -- over to him at that point.  I
9 don't really understand why I wouldn't have sent them
10 in the first place, but I didn't.
11    MR. MATTHEWS:  Okay.  Let's -- let's go off
12 the record for a minute.
13    THE VIDEOGRAPHER:  We're going off the
14 record at 1:55.
15       (Discussion off the record.)
16       (Recess taken)
17    THE VIDEOGRAPHER:  We're back on the record
18 at 2:50.
19    MR. MATTHEWS:  Okay.  Mr. Dickson, thanks
20 for your patience during that break and everyone else.
21 We took a break because Mr. Dickson's counsel sent
22 over the additional voicemails that I believe
23 Mr. Dickson was referring to.  There are 11 of them
24 total that we received.
25    Q.  (By Mr. Matthews) And, Mr. Dickson, you
                                    Page 33

9 (Pages 30 - 33)

1  previously testified that you had sent over 12. Is
2  that still your testimony; or having, you know,
3  refreshed your recollection is it 11 voicemails you
4  sent?
5      A.  It's 11.
6      Q.  Okay.  Are -- is it your contention that
7  there are other voicemails that you received from
8  Direct Energy at any time?
9          MR. YARDLEY:  I'll object to the question on
10  the basis that these -- these 11 voicemails were not
11  produced in discovery.  And I would object that
12  they -- to the -- to the introduction of the
13  voicemails in this deposition on that basis.  You can
14  answer.
15      A.  I don't think there would be more.  I feel
16  like I would have saved them if there were more.
17      Q.  (By Mr. Matthews) You don't recall
18  deleting any voicemails that referred to Direct
19  Energy?
20      A.  No.
21      Q.  And, likewise, you don't recall deleting any
22  voicemails that referred to your electric supply or
23  your gas supply generally?
24      A.  No.
25      Q.  Okay.  The 11 that you sent to your lawyers

Page 34

1  which they sent over to us now are -- that's the
2  universe of voicemails that you allege you received
3  from Direct Energy or someone acting on Direct
4  Energy's behalf?
5          MR. STRAUSS:  Objection, again.  Sam, same
6  objection.
7      A.  Correct.
8          MR. MATTHEWS:  I'm going to enter those
9  voicemails as exhibits in this deposition, and we have
10  forwarded them over to our court reporter.  And just
11  for the record, I'll identify each voicemail with an
12  exhibit number.
13          MR. YARDLEY:  So for the record, we'd like
14  to have a continuing objection to the use of these
15  non-produced documents in this deposition on the basis
16  that they violate the -- the discovery orders of the
17  case.  You can proceed.
18          MR. MATTHEWS:  So Exhibit 1 was previously
19  marked.  That's the complaint that was filed in this
20  lawsuit.
21          (Exhibits 2 through 12 marked.)
22          MR. MATTHEWS:  Exhibit 2 is the Voicemail
23  117.  Exhibit 3 is Voicemail 92.  Exhibit 4 is
24  Voicemail 99.  Exhibit 5 is Voicemail 104.  Exhibit 6
25  is Voicemail 105.  Exhibit 7 is Voicemail 106.

Page 35

1  Exhibit 8 is Voicemail 108.  Exhibit 9 is Voicemail
2  119.  Exhibit 10 is Voicemail 121.  Exhibit 11 is
3  Voicemail 123, and Exhibit 12 is Voicemail 127.  And
4  let me make sure.  Okay.  Got it.  And I would request
5  that those voicemails be transcribed in connection
6  with this deposition.
7          MR. YARDLEY:  I have objected to the use of
8  Exhibits 2 through 12 based on the fact they were not
9  produced in discovery prior to today's date.
10      Q.  (By Mr. Matthews) Mr. Dickson, I believe
11  you previously testified that only one of those
12  voicemails that you received identified Direct
13  Energy by name, correct?
14      A.  Yes.
15      Q.  And that's the voicemail that you received
16  on November the 3rd of 2017?
17      A.  Yes.
18          MR. STRAUSS:  Can you tie that back to the
19  exhibit by any way?
20          MR. MATTHEWS:  It's No. 2.
21          MR. STRAUSS:  Thank you.
22      Q.  (By Mr. Matthews) So let me -- let me play
23  just that one for you.  See if this works.  If it
24  creates a horrible screech, we won't do it.  But
25  it's very short.  That may not work.  Bear with me

Page 36

1  one second.  Okay.  I'm going to play Exhibit 2,
2  Voicemail 178.
3          (Recording begins.)
4          MS. BROWN:  Hi.  This is Nancy Brown with
5  Direct Energy.  I have some great information
6  regarding the supply portion of your electric
7  account.  Please give me a call back at
8  (440)596-4052 and have a copy of your energy
9  statement with you to review to see if you qualify.
10          (Recording ends.)
11      Q.  (By Mr. Matthews) Okay.  Mr. Dickson, is
12  Exhibit 2, which we just listened to, the voicemail
13  that you allege that you received on November the
14  3rd, 2017?
15      A.  Yes.
16      Q.  Okay.  And the other ten voicemails that you
17  received, downloaded from your cell phone and produced
18  to your attorneys, which are Exhibits 3 through 12,
19  did not identify Direct Energy by name?
20      A.  I do not believe so.
21      Q.  And, likewise, they do not identify any
22  energy company by name?
23      A.  I do not believe so.
24      Q.  Okay.  If Exhibit 2 turns out to be the only
25  voicemail that Direct Energy ever sent you, would you

Page 37

10 (Pages 34 - 37)

**Page 38**

1 feel different about this lawsuit?
2    A.  No.
3    Q.  Just the same?
4    A.  Yes.
5    Q.  Why?
6    A.  Because all the voicemails' content was
7 virtually the same and had the same effect on me.
8    Q.  Right.  But if Direct Energy didn't send the
9 other ten --
10    A.  There are --
11    Q.  -- why would you blame them for that?
12    A.  There are also millions of others that
13 received the same voicemail.
14    Q.  How do you know that?
15    A.  Because they are part of the class.
16    Q.  There's no class yet, but that's your
17 contention in this lawsuit.  But if -- if you just
18 received that one voicemail from Direct Energy and the
19 other ten -- I understand that you said that the
20 impact on you was the same.  But if those other ten
21 weren't sent by Direct Energy, you wouldn't blame them
22 for those ten, right, obviously?
23      MR. STRAUSS:  I object to form.  You can
24 answer the question.
25    A.  I believe that some -- in some way Direct

**Page 39**

1 Energy has the fault for that.
2    Q.  (By Mr. Matthews) Okay.  Are you alleging
3 that Direct Energy sent you those ten other
4 voicemails?
5    A.  Yes.
6    Q.  Do you understand that your lawyers in the
7 motion class certification have not alleged that?
8    A.  Yes.
9    Q.  And do you disagree with the position
10 they've taken on that?
11    A.  No.
12    Q.  Help me square that.  You -- you allege that
13 Direct Energy sent you 11 voicemails, right?
14    A.  Correct.
15    Q.  But your lawyers only allege that Direct
16 Energy sent one, right?
17      MR. STRAUSS:  Object to the form of the
18 question.  You may answer it, Mr. Dickson.
19    A.  That is correct.
20    Q.  (By Mr. Matthews) Okay.  Are you electing
21 to waive any sort of damages that you might have
22 from those other 11 voicemails?
23    A.  No.
24    Q.  Okay.  Do you understand that the expert
25 that your lawyers have retained in this lawsuit is

**Page 40**

1 only alleging that you received one voicemail from
2 Direct Energy?
3      MR. STRAUSS:  Object to the form of the
4 question.  You may answer it, Mr. Dickson.
5    A.  Yes.
6    Q.  (By Mr. Matthews) But you allege you
7 received 11 from Direct Energy?
8    A.  I'm sorry?
9    Q.  You allege that you received 11 from Direct
10 Energy?
11    A.  Yes.
12    Q.  Okay.  Mr. Dickson, just to be sure we tie
13 that off and are on the same page about it, all 11 of
14 those voicemails were sent to your cell phone with the
15 number (440)409-2229, correct?
16    A.  Yes.
17    Q.  And that was an iPhone?
18    A.  Yes.
19    Q.  Do you still have the same iPhone, or have
20 you gotten a new one?
21    A.  I have upgraded since then, yes.
22    Q.  Do you still have the iPhone that you had in
23 2017?
24    A.  No.
25    Q.  Are the voicemails that you produced in this

**Page 41**

1 lawsuit, which are Exhibits 2 through 12, still on the
2 iPhone that you currently have?
3    A.  Yes.
4    Q.  And circling back to the line of questioning
5 I was on before we took our break, the -- the 11
6 voicemails that you received you say started in about
7 August of 2017, correct?
8    A.  Correct, yes.
9    Q.  And ended in December 2017, right?
10    A.  I believe so, but I have not had a chance to
11 look and see the dates on all of the voicemails that
12 you've just received and marked as exhibits.
13    Q.  Okay.  Do you have that on your phone right
14 now?
15    A.  Yes.  I can look at it.
16    Q.  Okay.
17      MR. YARDLEY:  I'm going to object to the
18 evidence -- the -- the admission of any evidence from
19 that phone.  And when I say that phone, I mean the one
20 that's now replaced the one that was improperly
21 disposed of during the pendency of this lawsuit.
22    A.  Let me just check a couple here.  Okay?
23 Okay.  It looks like actually December 1st is that
24 one.  December 12th -- yeah, it looks like, you know,
25 December 12th -- if you have one from the 21st, I

11 (Pages 38 - 41)

1   don't -- I don't know that I see that one on here
2   but --
3     Q. (By Mr. Matthews) Can you tell me which one
4   you received on December the 12th of 2017?
5     A. December the 12th. The transcript does say,
6   hello, this is Jane Walsh. I have some important
7   information regarding the supply portion of your
8   electric and gas account. Give me a call back at
9   whatever number and have a copy of your gas and
10  electric bill ready to review to see if you qualify.
11  Your reference number is 0H963632.
12     Q. Got it. On your phone, when you're looking
13  at it, does it tell you what the voicemail number is;
14  or is that just something that happens when you access
15  it?
16     A. No. On -- on the voicemail itself, the
17  individual voicemail, it does say unknown; but
18  in the -- in the messages, they give a phone number to
19  call back.
20     Q. Right.
21     A. It's probably not even the number that
22  showed calling, but I would have no idea to whether or
23  not that was what it showed.
24     Q. Sure. I think my question was probably
25  unclear. What -- what I was getting at it is:

1  on your phone that have been introduced as Exhibits 2
2  through 12 as I earlier stated?
3     A. July 13th, 2017.
4     Q. Okay. Great. Mr. Dickson, when did you get
5  your new iPhone? When did you upgrade?
6     A. Probably a year after that, I think in like
7  November or October of 2018.
8     Q. And when did you -- what happened to the old
9  phone?
10     A. It was a trade-in program. So I had to send
11  it back to AT&T.
12     Q. So you got rid of it at the same time,
13  November of 2018?
14     A. Correct.
15     Q. Okay. Mr. Dickson, you said in 2017 you had
16  a -- you had a work cell phone and you had a personal
17  cell phone, which is the -- the personal one being the
18  (440)409-2229 number, correct?
19     A. Yes.
20     Q. Did you ever use your personal cell phone
21  for work?
22     A. No.
23     Q. Did you in 2017 have any separate businesses
24  that you ran aside from your work at Spectrum?
25     A. No.

1  When -- when you emailed it to your lawyers and when
2  Mr. Strauss emailed it to me, the file that I received
3  says voicemail and then there's -- there's a number
4  next to it. So those were the numbers I was calling
5  off in connection with the exhibits. So, you know,
6  117 was the one you received on November the 3rd.
7  When you look at your phone, are you able to see those
8  numbers or it just says unknown?
9     A. Well, it says unknown; but when I go into
10  the info section, it does share a phone number on
11  there.
12     Q. Okay. Can you tell me, December the 12th is
13  the latest date on any of those voicemails, correct?
14     A. That are on my phone, yes.
15     Q. And -- and all 11 of those are on your
16  phone, correct?
17     A. Correct.
18     Q. And those are the only 11 you received, to
19  the best of your knowledge?
20     A. To the best of my knowledge, yes.
21     Q. Okay. It's your testimony you didn't delete
22  any?
23     A. Yes, that is my testimony.
24     Q. Okay. Can you also tell me what -- the
25  earliest date on those voicemails, those 11 that are

1     Q. Have you ever owned a business before?
2     A. My wife and I have an LLC together
3  currently.
4     Q. When did that start?
5     A. Oh, it would have been the end of 2017.
6     Q. And what is the name of that LLC?
7     A. North Coast Renaissance.
8     Q. What does North Coast Renaissance do?
9     A. We created the LLC so that we could renovate
10  homes.
11     Q. Is that something that you do yourself, or
12  do you have employees who work for North Coast
13  Renaissance?
14     A. It's just us, but we've only done one home.
15  So we haven't had the ability to get out much and
16  do -- do anything other than just the first home we
17  did, but it was a fun experience.
18     Q. Fair enough, yes. And when was that?
19     A. We -- the first home we purchased was the --
20  it closed right before the new year of 2018 and then
21  we sold it, near the end of 2018.
22     Q. What's the phone number for North Coast
23  Renaissance?
24     A. Oh, gosh. I -- I don't even know that we
25  have one.

1    Q.  If -- if you were going to do something for
2  North Coast Renaissance, it would just be through your
3  cell phone?
4        MR. STRAUSS:  Object.
5        THE WITNESS:  I'm sorry?
6        MR. STRAUSS:  I said I object to the form of
7  the question.  You may answer it.
8    A.  I think we have a number attached to it when
9  we have to get, like, a Home Depot over-the-counter
10  something, but I don't -- I don't know the number
11  offhand.  Never used it.
12    Q.  (By Mr. Matthews) It's never used.  If you
13  have to talk to somebody about North Coast
14  Renaissance, you use your cell phone?
15    A.  Yes.
16    Q.  Do you advertise for
17  North Coast Renaissance?
18    A.  No.
19    Q.  Does it have a website?
20    A.  I don't think so.
21    Q.  Is it just word of mouth?
22    A.  Yeah.  I mean, ultimately we created it for
23  a liability standpoint.  If -- if we were flipping a
24  house in our own names, we didn't want to be
25  personally liable for any damages if something went

Page 46

1  that, but I was a Beachbody coach, network marketing
2  for five, six months at one point in 2015.
3    Q.  What is -- what is that?  You said a
4  Beachbody?
5    A.  Yeah, it's -- it's -- you ever heard of P90X
6  or --
7    Q.  Like a workout --
8    A.  Like the workout videos, yeah.  It's -- I
9  mean -- and I'm sure you're familiar with multilevel
10  marketing.  I mean, when you sign up to be a coach
11  through Beachbody, the idea is you get other people
12  underneath you and that's how you generate a stream of
13  income.  But it was not something that I was any good
14  at and I just -- I went away from it almost
15  immediately.
16    Q.  You said you did it for a few months in
17  2015?
18    A.  Yes.
19    Q.  How did you market that?  How did you try to
20  get other people?
21    A.  Facebook.
22    Q.  Okay.  Okay.  Let's talk about Exhibit 2,
23  the voicemail that you received on November the 3rd,
24  2017, that -- that identified Direct Energy in the
25  message.  Do you -- do you remember when you received

Page 48

1  wrong.
2    Q.  Okay.  In 2017 -- do you sometimes -- what a
3  lot of folks do is sell things online, on Ebay or
4  Craigslist or things like that.  Is that something
5  you've ever done?
6    A.  Yeah, a handful of times.  I don't -- I -- I
7  don't even -- I mean, my wife does that stuff.  I
8  don't do it, but I -- sometimes I'll do something like
9  on a Facebook group or something, neighborhood group.
10    Q.  And -- and you put your cell phone down as
11  the contact for that?
12    A.  No.
13    Q.  How do people contact you about that if they
14  want to buy something you're selling?
15    A.  For me it's through the Facebook messenger.
16    Q.  Did you flip houses or renovate homes before
17  North Cost Renaissance?
18    A.  No.  It was a dream of my wife's and we
19  decided to do it and just hopefully eventually someday
20  we can get to do some more.  It was fun.
21    Q.  Aside from North Coast Renaissance --
22  whether you formed it as an LLC or a corporation or
23  didn't incorporate it at all, have you ever run your
24  own business aside from North Coast Renaissance?
25    A.  I don't even know if you want to call it

Page 47

1  that?  I'm probably asking that poorly.  I understand
2  that you -- your contention is that the voicemail
3  appeared on your phone on November the 3rd of 2017,
4  right?
5    A.  Yes.
6    Q.  I mean, did you realize it immediately; or
7  did it take a while before you realized that voicemail
8  was on your phone?
9    A.  A few minutes.
10    Q.  Okay.  That -- that's all I'm getting at.
11  Sometimes I get voicemails, and I don't see it for a
12  day or two.
13    A.  No, I mean, I'm -- I'm pretty picky about
14  having notifications on my phone.  I don't like it at
15  all.  So if I see something on there, I'm going to go
16  check it and make sure it goes away, the -- the
17  notification.  That's it.
18    Q.  Did -- is it -- do you recall -- you said
19  some of these voicemails that you received the phone
20  rang before the voicemail showed up.  With respect to
21  this November 3rd voicemail, did your phone ring
22  before that voicemail appeared on the phone?
23    A.  I couldn't tell you.  I don't -- I don't
24  recall.
25    Q.  Okay.  But in any event, you were aware it

Page 49

13 (Pages 46 - 49)

**Page 50**

```
 1   was on your phone within a few minutes of it being
 2   placed on your phone?
 3       A.   Correct.
 4       Q.   Do you remember what day of the week that
 5   was?
 6       A.   I can look in my phone.
 7       Q.   Yeah.  I'm just trying to figure out what --
 8   kind of what was going on in your world that day.  Do
 9   you remember what time it was?
10       A.   No, but I generally tend to remember a lot
11   of these calls happening, like, while I was driving.
12   So most likely during, you know, normal work travel
13   hours.
14       Q.   Okay.  But you don't know for sure -- I'm
15   just asking about this one at the moment.
16       A.   No, I don't -- I don't know for sure when
17   that -- when that call came in.
18       Q.   You don't know whether it came in during the
19   workday or later?
20       A.   Correct.
21       Q.   Or before?
22       A.   Correct.
23       Q.   And you don't recall what you were doing
24   when you received that November 3rd voicemail?
25       A.   No, I don't recall.
```

**Page 51**

```
 1       Q.   Do you recall when you received it and
 2   listened to it whether you listened to the whole
 3   thing?
 4       A.   I probably did, yeah; but I can't tell --
 5       Q.   What --
 6       A.   -- I can't say for certain.
 7       Q.   What -- what I'm getting at is sometimes
 8   when I get voicemails and, you know, within two
 9   seconds of listening to it I can tell it's not
10   something I want and I delete it.  Do you do that
11   sometimes?  Obviously you don't delete it, but do you
12   stop listening to it?
13       A.   Sometimes I would say, but I think on this
14   one I -- on this one and really all of those, to be
15   honest -- I know we're -- I know we're only talking
16   about November 3rd, but I would listen and -- and say
17   what -- what is this number and -- in my head I'm
18   thinking what is this number and why are they giving
19   me some sort of confirmation code to call back and
20   reference on.
21       Q.   Okay.  To be sure I've got it right, you
22   don't remember with certainty that you listened to the
23   whole thing, but that's your -- your general practice
24   was -- with respect to these voicemails that related
25   to electric supply was you listened to them more or
```

**Page 52**

```
 1   less all the way through?
 2       A.   Your statement is correct, yes.
 3       Q.   Okay.  You just can't say whether you did or
 4   you didn't with respect to November 3rd?
 5       A.   Correct.
 6       Q.   And since you don't remember what you were
 7   doing at the time you got the voicemail, I guess you
 8   agree with me you can't recall that it interrupted
 9   something that was going on in your life at the time?
10           MR. STRAUSS:  Object to form.  You may
11   answer the question.
12       A.   I'm sure it interrupted something.
13       Q.   (By Mr. Matthews)  In the sense that it took
14   your attention away from whatever it was you were
15   doing for a brief period while you listened to it,
16   right?
17       A.   Correct.
18       Q.   Okay.  What I'm getting at it is you weren't
19   in the middle of a work meeting and you recall running
20   outside because you needed to check it immediately or
21   you were at your daughter's dance recital and it, you
22   know, just -- nothing like that happened that you
23   recall, right?
24           MR. STRAUSS:  Object to form.  You may
25   answer the question.
```

**Page 53**

```
 1       A.   I don't recall.
 2       Q.   (By Mr. Matthews)  How -- just to understand
 3   it, with respect to that voicemail and the other ten
 4   that you produced in this lawsuit, how did you get
 5   it off your phone and to your attorneys?
 6       A.   There is an icon where you can share the
 7   voicemail and what -- you know, however, you need to
 8   do it, if you send it through a text or -- or email
 9   it.  And I selected that icon and emailed it over to
10   him in 11 separate emails.
11       Q.   Got it.  It's the -- the square that has
12   arrow on the top of it?
13       A.   That's the one.
14       Q.   Okay.  I have an iPhone, too.
15           Mr. Dickson, do you recall any other
16   notifications that were on your phone at the time
17   that the November 3rd voicemail came through?
18           MR. STRAUSS:  Object to form.  You may
19   answer the question.
20       A.   I have no idea.  It probably was something,
21   but I don't -- I couldn't tell you for sure.
22       Q.   (By Mr. Matthews)  Circling back on the --
23   the Beachbody endeavor, did you get any coaches
24   signed up on that?
25       A.   I think I got two.
```

14 (Pages 50 - 53)

**Page 54**

1    Q.   And for communicating with that, you said
2  you originally marketed that through Facebook.  For
3  working with them, once you signed them up, did you
4  use your cell phone for that?
5    A.   No.  Primarily -- I don't -- I don't think
6  we ever really did cell phone.  We just strictly
7  through Facebook.  It was Facebook marketing.
8    Q.   You don't think you ever talked to them on
9  the phone?
10    A.   I don't -- no.  I -- I think that we when we
11  did these kind of things, it was through Zoom.
12    Q.   Okay.  You were using Zoom back then?
13    A.   It was some form of it, yeah.  There was
14  some sort of teleconference system that the team that
15  I was under and the people that signed up underneath
16  me, we would get on a call once a week and kind of
17  talk about, you know, where we're going with the
18  business and -- yeah, it was teleconference.  I don't
19  recall if it was Zoom, but it was very similar.
20    Q.   Whether it was Zoom or FaceTime or whatever,
21  I was just -- I was impressed if you were -- had it
22  occurred on Zoom.  I had never used Zoom in my life
23  until today.
24    A.   I wish it had occurred on Zoom right before
25  COVID, I would be a very wealthy man.

**Page 55**

1    Q.   Mr. Dickson, with respect to your personal
2  cell phone, the (440)409-2229 number, in 2017 AT&T was
3  your service provider, correct?
4    A.   Yes.
5    Q.   And are you the subscriber on that account?
6    A.   Yes.
7    Q.   It's in your name?
8    A.   Yes.
9    Q.   Do you share the phone with anyone?
10    A.   The phone, no.
11    Q.   Do you pay the bill on that phone?
12    A.   I do.
13    Q.   Does your employer pay any portion of it?
14    A.   No, because they give us a work phone.  We
15  had the option, and I chose to have a work phone
16  because I don't like to mix -- I don't want my -- my
17  customers knowing my personal number and calling me at
18  all hours of the night.
19    Q.   Do you know what kind of plan you had in
20  2017?
21      MR. STRAUSS:  Object to form.  You may
22  answer the question.
23    A.   Oh, at the time -- I don't recall for sure,
24  but that was also at a time where we limited our
25  children's usage of their phones.  So it's possible it

**Page 56**

1  was a limited plan and not some sort of unlimited.
2    Q.   (By Mr. Matthews) You didn't have a
3  pay-as-you-go account?
4    A.   No.
5    Q.   Okay.  And you can't recall whether you had
6  unlimited minutes or whether there was some limit on
7  the number of minutes you had?
8    A.   Correct, I do not.
9    Q.   Is that right?
10    A.   I do not recall for sure.
11    Q.   And same -- a lot of plans have data as part
12  of it as well.  Do you recall whether you had
13  unlimited data usage or whether there was some limit
14  on that?
15    A.   Well, that's the unlimited part that I was
16  talking about.
17    Q.   Oh, I see.
18    A.   I don't recall.
19    Q.   Okay.  Let me back up, then.  With respect
20  to minutes --
21    A.   I'm sure --
22    Q.   -- when you were talking about --
23    A.   I'm sure we had -- I know we had unlimited
24  minutes.
25    Q.   I believe in your -- your interrogatory

**Page 57**

1  responses you said you had two iPads during 2017 also,
2  right?
3    A.   Yes.
4    Q.   Were they part -- did you have a data plan
5  associated with those or -- or no?
6    A.   No.
7    Q.   Besides the cell phone, the two iPads, in
8  2017 you also had a MacBook and iMac in your house,
9  right?
10    A.   Yes.
11    Q.   Did you have any other devices in 2017?
12    A.   That were mine?  No.
13    Q.   Yes.  Okay.  Your -- your wife had a cell
14  phone?
15    A.   Oh, yes, yeah.
16    Q.   And your kids, your daughter and your
17  step-daughter, each had a cell phone?
18    A.   Yes.
19      MR. MATTHEWS:  I'm sorry, Sam, you wanted to
20  say something?
21    Q.   (By Mr. Matthews) Were there any other
22  iPads in the home?
23    A.   No.
24    Q.   Any other computers, desktop or laptop in
25  the home?

15 (Pages 54 - 57)

1    A.  From time to time my work laptop would have
2  been there.
3    Q.  But your daughters didn't have their own
4  laptop in 2017?
5    A.  No.
6    Q.  Or your wife?
7    A.  My wife has a work laptop as well.
8    Q.  Do you still have all of these devices?
9    A.  The iMac, yes.  The MacBook did take a
10  kaput, so I have a new one.  And the same thing with
11  the iPads, they're both -- you know, died.
12    Q.  Do you still have the MacBook and the two
13  iPads?
14    A.  Not the MacBook.  The iPads I think so, yes.
15    Q.  When did you get rid of the MacBook?
16    A.  When I upgraded and got a new one.  I
17  just -- I asked them what do I do with it, and they
18  said, well, we can take it off your hands and --
19  refurb or recycle if we can get it to turn on.
20    Q.  And when was that?
21    A.  I don't know.  Maybe a year ago.
22    Q.  And the two iPads you say you think you
23  still have?
24    A.  Yes, I think so.
25    Q.  Mr. Dickson, in 2017 did you have a landline

Page 58

1  number at your house?
2    A.  No.
3    Q.  What is the number of your work cell?
4    A.  Right now or then?
5    Q.  In 2017, back in 2017.
6    A.  I believe I gave it already.  It was
7  (216)903-0184.
8    Q.  Thank you.  I apologize if I asked you that
9  already.
10         Do you remember what -- did you have
11  a landline at work, like a direct line at work in
12  2017?
13    A.  Yes.
14    Q.  Do you remember that number?
15    A.  I do not.  It was (330)457-2 something.  I
16  don't remember the last four.
17    Q.  Okay.  Are you on any do not call lists?
18    A.  Not that I'm aware of.
19    Q.  I'm going to run through some phone numbers
20  with you and just ask you if you recognize them and if
21  you do whether they belong to you or somebody else
22  that you know.
23    A.  Okay.
24    Q.  First is (440)248-0183.
25    A.  Yes, that is my -- I recognize that number.

Page 59

1    Q.  What is it?
2    A.  That is my mother's former home phone
3  number, which also would have been, I guess, my home
4  phone number during the time when I lived with her.
5    Q.  Next one is (440)666-1737.
6    A.  That was my cell phone number when I worked
7  for Verizon Wireless.
8    Q.  When did you work for Verizon Wireless?
9    A.  2002 through 2008.
10    Q.  The next one I'd like to ask you about is
11  (440)666-1700.
12    A.  That's my mother's cell phone.
13    Q.  The next one that I'd like to ask you about,
14  (330)461-8671.
15    A.  I believe that one is my step-daughter's
16  cell phone number.
17    Q.  The next one is (440)394-8067.
18    A.  That one doesn't ring a bell.
19    Q.  Okay.  Do you recognize (330)722-1817?
20    A.  That would be -- I mean, I don't recognize
21  it off the top of my head; but that sounds like a
22  Medina based number.  So perhaps something when I
23  lived in Medina.  I don't know.
24    Q.  The next one -- we're almost done.  The next
25  one is (440)995-4197.  Do you recognize that?

Page 60

1    A.  I rec- -- are you looking at -- you must be
2  looking at some sort of credit report or something
3  because that is -- that is an incorrect number for an
4  old home that I lived in in the early 2000s.  I lived
5  with some buddies, and it was (330)995-4197.
6    Q.  Got it.  And the next one is (440)248-4600.
7  Do you recognize that number?
8    A.  No, but it's a Solon exchange.  I don't know
9  what that number is, though.
10    Q.  It's a -- it's a what?
11    A.  Solon exchange.  It's -- that's the --
12  that's -- 248 signifies Solon, Ohio.
13    Q.  Got it.  I understand.
14         MR. MATTHEWS:  If -- if you don't mind, can
15  we take a brief bathroom break?
16         MR. STRAUSS:  Fine with me.
17         THE VIDEOGRAPHER:  We're going off the
18  record at 3:35, and this ends ended Media Unit No. 1.
19             (Recess taken)
20         THE VIDEOGRAPHER:  We're back on the record
21  at 3:48, and this begins Media Unit No. 2.
22    Q.  (By Mr. Matthews)  Okay.  Okay.
23  Mr. Dickson, so after you received these voicemails,
24  you didn't switch to Direct Energy, right?
25    A.  No.

Page 61

16 (Pages 58 - 61)

**Page 62**

1    Q.  No.  The -- the message didn't give you a
2  great impression of the company?
3    A.  No.
4    Q.  Safe to say you were completely uninterested
5  in signing up for their service after you received
6  this voicemail?
7    A.  That's a fair statement, yes.
8    Q.  It didn't make you investigate them and
9  think, well, that's -- that seems like a great
10  company, you know, I'm not interested right now but
11  I'll -- I'll sure keep them in mind?
12    MR. STRAUSS:  Object to form.  You may
13  answer the question.
14    A.  There was no interest, but I wouldn't
15  necessarily say I didn't look to see who this company
16  is that keeps calling me all the time.
17    Q.  (By Mr. Matthews)  Right.  I just -- what
18  I'm getting at is the net result of that wasn't that
19  it improved your impression of the company or your
20  interest in doing business with them in the future?
21    A.  Correct.
22    Q.  After receiving the voicemail, you weren't
23  ever going to do business with Direct Energy?
24    MR. STRAUSS:  Object to the form.  You may
25  answer the question.

**Page 63**

1    A.  I would agree.
2    Q.  (By Mr. Matthews)  Do you know who your
3  electric provider was in 2017?
4    A.  I'm sure it was Ohio Edison.
5    Q.  Have you ever used a retail energy supplier
6  for electricity or natural gas?
7    A.  No.
8    Q.  You've always been with the default option,
9  the utility?
10    A.  Yes.
11    Q.  Have you ever shopped around to look for
12  different retail options?
13    A.  No.
14    Q.  Never have considered switching from the
15  utility?
16    A.  No.
17    Q.  Would you say that receiving the voicemail
18  hurt your opinion of Direct Energy?
19    MR. STRAUSS:  Object to form.  You may
20  answer the question.
21    A.  I suppose, yeah.
22    Q.  (By Mr. Matthews)  Okay.  Mr. Dickson,
23  you're aware that one of the defendants in this
24  lawsuit who is not on this -- participating in this
25  deposition today and their counsel has since

**Page 64**

1  withdrawn is a company called Total Marketing
2  Concepts.  Have you heard that name before?
3    A.  I'm aware of them, yes.
4    Q.  Okay.  And do you know how they fit in?
5    MR. STRAUSS:  Object to form.
6    A.  I believe they're -- I believe they're a
7  third-party vendor that Direct Energy hired to make
8  calls on their behalf.
9    Q.  (By Mr. Matthews)  Okay.  And you
10  understand that TMC claims that you gave consent to
11  be contacted by filling out a form on a website?
12    A.  Can you state that again?
13    Q.  Sure.  I'm not saying that you did it; but
14  I'm saying you understand that in connection with this
15  lawsuit, TMC claimed that you did give consent to be
16  contacted because you filled out a form on a website
17  in which you opted in to receive calls from Direct
18  Energy?
19    A.  Yes, I'm aware that they -- they are
20  alleging that.
21    Q.  Got it.  Give me one second.  And have you
22  seen the website -- picture of the website that TMC
23  claims you visited?
24    A.  Yes.
25    Q.  Sorry.  Bear with me one second.  I'm trying

**Page 65**

1  to do this on my iPad.  It's not working.  Okay.  I'm
2  going to mark as Exhibit 13 a screenshot of Paid for
3  Research form.  You know what?  The technology tricked
4  me, and I marked it as Exhibit 2.  Just --
5    MR. MATTHEWS:  Can everyone see the document
6  now?
7    MR. STRAUSS:  I just don't see it, no.
8    MR. MATTHEWS:  Maybe I...
9    MR. STRAUSS:  Oh, I see it now.
10    MR. MATTHEWS:  Okay.  So I made an error and
11  marked this as Exhibit 2.  I would ask that that be
12  corrected before the transcript and exhibits are
13  finalized and make this Paid for Research form be
14  marked instead as Exhibit 13.
15    (Exhibit 13 marked.)
16    Q.  (By Mr. Matthews)  So, Mr. Dickson, can you
17  see that Paid for Research form on your screen?
18    A.  Yep.
19    Q.  And you understand that this is a form that
20  TMC claims that you filled out?
21    A.  That does look like what I was showed, yes.
22    Q.  Okay.  Have you ever filled out a form like
23  that --
24    A.  No.
25    Q.  -- on a site called Paid for Research?

17 (Pages 62 - 65)

1      A.  No.
2      Q.  Okay.  Do you ever recall visiting a website
3  called Paid for Research?
4      A.  No.
5      Q.  Do you remember visiting any website that
6  claimed to pay for your help with research?
7      A.  No.
8      Q.  Setting aside this particular form, the Paid
9  for Research, have you ever filled out any forms on
10  Facebook or on the Internet like this --
11      MR. STRAUSS:  Object to form.
12      Q.  (By Mr. Matthews) -- where you provided
13  your personal information?
14      A.  I don't -- probably.  I -- I don't know of
15  any specific ones; but, yeah, definitely not that one.
16      Q.  Got it.  But there -- you've completed
17  surveys online before?
18      A.  Sure.
19      Q.  Okay.  You've filled things out on Facebook
20  to participate in certain groups or things like that?
21      A.  Correct.
22      Q.  Have you maybe entered into a vacation
23  giveaway?
24      A.  Maybe.  I don't -- I don't recall the
25  content of them.

Page 66

1  before the -- what TMC claims to have been your --
2  your opt-in record, which is in the form of an Excel
3  spreadsheet?
4      A.  I don't recall.
5      Q.  Okay.  Pull it up.
6          (Exhibit 14 marked.)
7      Q.  (By Mr. Matthews) Okay.  I'm going to
8  introduce as Exhibit 14 an Excel spreadsheet that
9  TMC contends was a record of your opt in.  Can you
10  see that?
11      A.  I do.
12      Q.  Okay.  Great.  Have you -- does this refresh
13  your recollection as to whether you've ever seen this
14  record before?
15      A.  I think so because I believe I needed to
16  look for IP addresses that might match that, and I was
17  unsuccessful at doing so.
18      Q.  Got it.  Okay.  So the other information on
19  there looks -- let's put in the IT address for -- for
20  a moment.  The -- the ZIP code, city and state, your
21  name and phone number and address are all correct,
22  right?  That is correct personal information for you?
23      A.  Yes, it is.
24      Q.  Okay.  So now circling back to the IP
25  address, you said you were asked to check for IP

Page 68

1      Q.  Right.  Or -- or other -- some other kind of
2  sweepstakes where you might win something by filling
3  out forms in which you provided some of your personal
4  information, you've done that before?
5      A.  Yes.
6      Q.  Or filled out forms for gift cards, you ever
7  done that, or other free items?
8      A.  I can't -- I mean, I don't recall; but
9  typically if it involved -- you know, if I -- if I'm
10  filling something like that out, when it starts to ask
11  me crazy questions or asking me for a credit card or
12  something, then I just X out of it.
13      Q.  Fair enough.  I -- I don't enter my credit
14  card either.  But in terms of other personal
15  information -- well, I think your answers are clear.
16  You just can't recall any -- entering any information
17  for gift cards or free items?
18      A.  No.
19      Q.  Okay.  You filled out forms before online.
20  You just don't recall ever doing anything on Paid for
21  Research or a form that looked like the one that is
22  Exhibit 13?
23      A.  No, I have not seen that website other than
24  what I'm looking at.
25      Q.  Okay.  Terrific.  Let me -- have you seen

Page 67

1  addresses that matched this one, correct?
2      A.  Yes.
3      Q.  When were you asked to do it?
4      A.  No, I wasn't asked to check if it matched
5  it.
6      MR. STRAUSS:  Mr. Dickson, before you
7  provide any additional testimony, I would remind you
8  that any communication that you had with your counsel
9  regarding this case is privileged.  So you're welcome
10  to answer the question if you can, but you -- I'm
11  advising you not to disclose the content of any
12  communication you've had with counsel.
13      Q.  (By Mr. Matthews) That's a fair -- fair
14  warning.  I'm not trying to ask about what
15  specifically your counsel may have told you to do or
16  what you reported back, but let's -- let's try to go
17  at it this way:  At some point in time did you
18  endeavor to try to see if the IP address that we see
19  on Exhibit 14 was the same as an IP address that
20  relates to one of your devices?
21      A.  Yes.  And that's primarily what it was.  I
22  mean, this is a document that I believe I remember
23  being shown, in which case I took it upon myself to
24  look at my devices and, you know, go to my IP.com or
25  whatever that is.  And -- and none of my IP addresses

Page 69

18 (Pages 66 - 69)

1  ever matched up with that.
2      Q.  Okay.  Let's -- let's break that down a
3  little bit.  When did you do that?
4      A.  After I got this document.  I don't -- I
5  don't recall when I -- when I saw it for the first
6  time.
7      Q.  Okay.  I'm not trying to be difficult, but
8  do you remember if it was 2018 or 2019 or was it
9  within the last 30 days or so?
10     A.  Oh, no.  I would say it was probably --
11  probably summer of '18.
12     Q.  Okay.  So you said about trying to match
13  this IP address with some other ones.  And what --
14  what devices did you check?
15     A.  All the ones that are provided that you've
16  asked about, the two iPads, the MacBook and the --
17  the -- my phone.
18     Q.  The -- your personal cell phone is one?
19     A.  Yes.
20     Q.  Correct?  Your two iPads that you had in
21  2017, correct?
22     A.  Yes.
23     Q.  Your --
24     A.  Oh, and the iMac, too.
25     Q.  IMac that you had in 2017 --

Page 70

1      A.  That's connected to that device, yes.
2      Q.  Right.  Okay.  Did you remember taking any
3  vacations in July 2017 or anytime in 2017?
4      A.  Definitely in 2017.  Let me think here.  I
5  went to Hawaii in March of 2017 and Santa Barbara,
6  California, in April of 2017.  I don't recall -- I
7  don't think there was any other ones.  Maybe -- maybe
8  Vegas for a weekend in August, but not in July.
9      Q.  Those are pretty good trips.
10     A.  It was a good year.
11     Q.  Okay.  All right.  Mr. Dickson, Mr. Strauss
12  is on the phone.  And you mentioned that you helped --
13  that you prepped with Mr. Strauss and with -- the
14  other name escape me.  And Alex I believe at
15  Mr. Strauss' firm.  Can you tell me the names of any
16  of the other lawyers who are representing you in this
17  case?
18     A.  I cannot.
19     Q.  Okay.  Have you ever heard of Matthew McCue?
20     A.  Yes.
21     Q.  Okay.  And who is -- is he representing you?
22     A.  Well, as you say the names, I -- I remember
23  them from reading the complaint.  So, yes, that's one
24  of the lawyers on there.
25     Q.  Okay.  Have you ever met Mr. McCue or spoken

Page 72

1      A.  And still have.
2      Q.  And the MacBook that you had in 2017?
3      A.  Correct.
4      Q.  Do you know if you checked before you got
5  the new cell phone?
6      A.  Yes, definitely.
7      Q.  Okay.  Did you check any other devices or
8  just those five?
9      A.  I may have checked my work laptop just to be
10  safe and just to see if these different IP addresses
11  that were popping up were, you know, kind of par for
12  the course of any device; but I don't -- I don't
13  recall for sure.
14     Q.  You don't remember for sure whether you
15  checked your work laptop?
16     A.  Right.
17     Q.  Okay.  How did you go about checking the --
18  the other -- the five devices that you mentioned?  You
19  just went to a website to google "my IP address"?
20     A.  Yeah.  I don't know what the web address is,
21  like go to myIP.com or something like that, something
22  of that nature.
23     Q.  Okay.  But that -- that was the extent of
24  the search, was that you went to a website that
25  purports to identify an IP address and --

Page 71

1  to him?
2      A.  No, I have not.
3      Q.  Okay.  Do you recognize the name
4  Anthony Paroinch?
5      A.  Yes.
6      Q.  Okay.  Who is he?
7      A.  He's also on that -- the list of the
8  attorneys representing.
9      Q.  Have you met or spoken to him?
10     A.  No.
11     Q.  What about Edward Broderick?
12     A.  Yes.
13     Q.  And who is he?
14     A.  Same thing, he's representing.
15     Q.  Okay.  What about Brian Murphy?
16     A.  I would imagine he's also there, but I don't
17  recall that name.  The other two I did remember.
18     Q.  That's not a person you've spoken to or met?
19     A.  No.
20     Q.  What about Jonathan Misny?
21     A.  No, I have not spoken to or met him; but I
22  would imagine he is also on the -- the complaint.
23     Q.  Do you have agreements with these lawyers
24  about this lawsuit or Direct Energy?
25     A.  I -- personally, I do not believe so.

Page 73

19 (Pages 70 - 73)

1    Q.  Do you have agreements with any other
2  lawyers about this lawsuit or Direct Energy?
3    A.  Can you clarify what you mean by agreement?
4    Q.  I mean it broadly.  I mean if you have an
5  understanding all the way up to a formal written
6  agreement with any lawyer besides those I mentioned
7  about this lawsuit or Direct Energy?
8    A.  Sam is the only -- the only lawyer that I
9  have any type of agreement with really.
10    Q.  Okay.  Again, I don't want -- as Mr. Strauss
11  said, I'm not trying to get at the -- the content of
12  your discussions; but was Mr. Strauss the first lawyer
13  that you communicated with about this lawsuit?
14    A.  Yes.
15    Q.  And how did you find each other?
16    A.  Mr. Strauss, he -- he -- let me think here.
17  He reached out to me at some point about the TruGreen
18  situation.
19    Q.  About the TruGreen situation?
20    A.  Yes.
21    Q.  The lawsuit that you had on file with them?
22    A.  Yes, yes.
23    Q.  Was a different lawyer representing you in
24  connection with the TruGreen lawsuit?
25    A.  No.

Page 74

1    Q.  Did you file that yourself?
2    A.  I filed it with the help of counsel.
3    Q.  Okay.  Who was that counsel?
4    A.  Sam.
5    Q.  Okay.
6    A.  Maybe I misunderstood your question before
7  that.
8    Q.  It was probably a bad question.  So did --
9  help me understand how it came about.  Did you fill
10  out a form online about some interest in pursuing a
11  claim?
12    A.  As I recall, he sent me a letter regarding
13  TruGreen and I responded to him.
14    Q.  Okay.  And what I'm trying to get at is how
15  he knew of your existence.  Were you -- were you guys
16  friends?
17    A.  No.  I believe I had posted a review of some
18  sort on the TruGreen Facebook page and he saw it.
19    Q.  I see.  Okay.  And so when you received
20  the -- help me.  I'm sure I asked you earlier, and I
21  apologize because I can't remember right now.  But
22  when -- when would that have been, early 2017?
23    A.  I don't recall.  It could have been even
24  earlier than that.
25    Q.  Okay.  Was it before you started receiving

Page 75

1  the voicemails that we've been talking about today?
2    A.  Yes.
3    Q.  Okay.  So once you started receiving the
4  voicemails that we've been talking about today, you
5  already had this relationship with Mr. Strauss?
6    A.  Yes.
7    Q.  Right?  Okay.
8        Mr. Dickson, you -- obviously you
9  understand you're the plaintiff in this lawsuit.
10  You're the named plaintiff, correct?
11    A.  Yes.
12    Q.  And as you told me earlier, you're seeking
13  to represent a whole class of people who, like you,
14  claim to have been contacted by Direct Energy or
15  someone acting on its behalf with voicemail, correct?
16    A.  Yes.
17        MR. STRAUSS:  Object to form.  You can
18  answer the question.
19    Q.  (By Mr. Matthews) And you understand that
20  as the named plaintiff, you have a duty to represent
21  their interest adequately, correct?
22    A.  Yes.
23    Q.  Not just what you think is best for you, but
24  you are required to do what is best for the class.
25  You understand that, correct?

Page 76

1    A.  Yes.
2    Q.  Okay.  And you're willing to do that?
3    A.  Yes.
4    Q.  You understand that if this case goes to
5  trial, you'll have to attend and -- and be there for
6  the duration, correct?
7    A.  Yes.
8    Q.  Are you willing to do that?
9    A.  Yes.
10    Q.  And are you willing to assist your attorneys
11  through the end?
12    A.  Yes.
13    Q.  You understand that despite all that, you
14  may not be compensated any more than any of the other
15  class members, correct?
16    A.  Understood.
17    Q.  Okay.
18        MR. MATTHEWS:  Let's take a break real
19  quick.  I just want to look over some notes.  I think
20  I'm about done, and I just want to be sure I haven't
21  missed anything that is super important.
22        MR. STRAUSS:  That sounds great.  How would
23  a 10-minute break work for you?
24        MR. MATTHEWS:  I'm sorry?  I didn't hear.
25  How long did you say?

Page 77

20 (Pages 74 - 77)

1      MR. STRAUSS:  Would a 10-minute break --
2  does that sound like a good amount of time?
3      MR. MATTHEWS:  Yes, that's great.  If I can
4  get it done faster, I'll come back.
5      THE VIDEOGRAPHER:  We're going off the
6  record at 4:14.
7      (Recess taken)
8      THE VIDEOGRAPHER:  We're back on the record
9  at 4:24.
10      MR. MATTHEWS:  Mr. Dickson, thank you for
11  your time today and your patience with me.  And I will
12  pass the witness.
13      MR. YARDLEY:  I don't know if I'm up next.
14  You know, I don't want to assume that I'm allowed to
15  ask questions next; but I think I'm going to because
16  no one else is talking.
17          EXAMINATION
18  BY MR. YARDLEY:
19      Q.  Mr. Dickson, do you know who Silverman
20  Enterprises is?
21      A.  I believe they are also named in the
22  complaint as a third-party vendor that Direct Energy
23  hired.  I could be wrong.
24      Q.  And how do you know that?
25      A.  How do I know what?

Page 78

1      Q.  Who Silverman Enterprises is.
2      MR. STRAUSS:  Object to form.  You can
3  answer the question.
4      A.  Because it's named in the complaint.
5      Q.  (By Mr. Yardley) But if this is your
6  complaint, you don't learn from your own complaint
7  what's going on.  You're supposed to know who they
8  are before you file a complaint; is that correct?
9      MR. STRAUSS:  Object to form.  You may
10  answer the question.
11      A.  Yes, I -- I understand that.
12      Q.  (By Mr. Yardley) Do you know what role
13  Silverman Enterprises is alleged to have played in
14  this case?
15      A.  To my knowledge, they were hired by Direct
16  Energy to make the calls to people within this class.
17      Q.  So it's your understanding that Silverman
18  Enterprises is a call center?
19      MR. STRAUSS:  Object to form.  You may
20  answer the question.
21      A.  I don't know if it's a call center, but
22  it -- it's a company that will make calls on a
23  company's behalf.
24      Q.  (By Mr. Yardley) And is it your
25  understanding that Silverman Enterprises is the

Page 79

1  entity that called you?
2      A.  I do not know which one of those three named
3  in the complaint actually called, but they were all as
4  a result of Direct Energy.
5      Q.  Do you know what relationship Silverman
6  Enterprises has with Direct Energy?
7      MR. STRAUSS:  Object to the form.  You may
8  answer.
9      A.  I'm not privy to that information, no.
10      Q.  (By Mr. Yardley) So do you have any
11  firsthand knowledge of who Silverman Enterprises is
12  outside of what you've read in your own complaint?
13      A.  No.
14      Q.  Had you ever heard of Silverman Enterprises'
15  name before the complaint was filed originally?
16      A.  No.
17      Q.  How did you first learn of the name
18  Silverman Enterprises?
19      A.  I drafted the complaint with the assistance
20  of counsel, and that's when I learned of them.
21      Q.  Well, the original complaint didn't name
22  Silverman Enterprises, did it?
23      A.  No, it did not.
24      Q.  The first amended complaint didn't name
25  Silverman Enterprises, did it?

Page 80

1      A.  No, it did not.
2      Q.  And after the first amended complaint was
3  filed, when did you first hear about Silverman
4  Enterprises?
5      A.  On receiving the revised complaint, the
6  third one.
7      Q.  So your lawyers sent you a document which
8  explained what Silverman Enterprises was?
9      A.  No.  They sent me the revised complaint that
10  had more information included, which was Silverman
11  Enterprises.
12      Q.  When you say the revised complaint, do you
13  mean the first amended complaint or the second amended
14  complaint?
15      A.  The second one.
16      Q.  So the first time you ever heard the name
17  Silverman Enterprises was when you read it in the
18  second amended complaint; is that correct?
19      A.  Yes.
20      Q.  And was that filed at that time?
21      A.  I do not know.
22      Q.  You don't know whether the first amended
23  complaint was filed at the time when you first
24  reviewed the name Silverman Enterprises?
25      A.  I would -- I would venture to say that I

Page 81

21 (Pages 78 - 81)

1 received the complaint and then it was filed because I
2 believe I would have had to have signed it.
3     Q.  So at the time you signed -- or at least
4 signed off on the second amended complaint, the only
5 information you had about Silverman Enterprises came
6 from your attorney; is that correct?
7     A.  Correct.
8     Q.  Did you ever do any independent research
9 about Silverman Enterprises?
10     A.  No.
11     Q.  Do you have an independent knowledge of what
12 Silverman Enterprises does or what role it had with
13 respect to your case outside of what you've been told
14 by your attorneys?
15         MR. STRAUSS:  Object to form.  You may
16 answer.
17     A.  No, I do not.
18     Q.  (By Mr. Yardley) And I think, if I -- if I
19 characterize your testimony correct, you're saying
20 that Silverman Enterprises was the entity that left
21 a voicemail on your message machine; is that
22 correct?
23         MR. STRAUSS:  Object to form.  You may --
24     Q.  (By Mr. Yardley) By message machine, I
25 mean your phone.

Page 82

1 involvement is that they were the entity that left a
2 ringless voice -- voicemail on your phone?
3     A.  My understanding --
4         MR. STRAUSS:  Objection, form.  You may
5 answer.
6     A.  My understanding is that they are one of the
7 companies that Direct Energy hired to make these
8 calls.
9     Q.  (By Mr. Yardley) So it's your position
10 that Direct Energy hired Silverman Enterprises,
11 correct?
12     A.  Yes.
13     Q.  Okay.  At the time -- the 11 calls
14 mentioned -- referenced in your second amended
15 complaint run from July 2017 to December 2017; is that
16 correct?
17     A.  That sounds correct, yes.
18     Q.  In July of 2017 do you remember receiving
19 the first message on your machine that you've
20 identified in the complaint?
21     A.  On the phone?
22     Q.  Yes.
23     A.  Yes.  I mean, I -- do I remember receiving
24 it, like, explicitly, no; but I have record of it on
25 my phone.

Page 84

1         MR. STRAUSS:  Object -- same objection.  You
2 may answer.
3     A.  That is my understanding, yes.
4     Q.  (By Mr. Yardley) So you -- you've alleged
5 in your complaint that there was 11 instances in
6 which someone called you; is that correct?
7     A.  Yes.
8         MR. STRAUSS:  Objection, form.  You may
9 answer.
10     A.  Yes.
11     Q.  (By Mr. Yardley) You testified earlier
12 today that you believed that it was Direct Energy
13 who called you; is that correct?
14     A.  I believe Direct Energy is the -- main
15 source of these calls.
16     Q.  Do you have any knowledge of any contract or
17 arrangement between Silverman Enterprises and Direct
18 Energy?
19     A.  Independent knowledge, no; but they wouldn't
20 be named in this complaint if there wasn't some sort
21 of connection.
22     Q.  Well, you named them; isn't that correct?
23 You're the plaintiff, correct?
24     A.  Yes.
25     Q.  And the extent of your knowledge of their

Page 83

1     Q.  At the time you received it, did you have an
2 understanding of whether the leaving of that message
3 on your phone violated the TCPA?
4         MR. STRAUSS:  Object to form.  You may
5 answer the question.
6     Q.  (By Mr. Yardley) You know what the TCPA
7 is, don't you?
8     A.  Yes.
9     Q.  What is it?
10     A.  It's the -- I don't know the -- what the
11 acronym stands for, but it is the -- it's
12 telemarketing calls to people unsolicited.
13     Q.  You're referring to the Telephone Consumer
14 Protection Act of 1991, correct?
15     A.  Yes.
16     Q.  So when you left -- when that phone message
17 was left on your telephone in July of 2017, did you
18 have an opinion or a position as to whether that act
19 violated the TCPA?
20         MR. STRAUSS:  Object to form.  You may
21 answer the question.
22     A.  I would say yes, I had an opinion that it --
23 I don't know why -- why they were calling me.  I had
24 no reason for them to call me.
25     Q.  (By Mr. Yardley) At the time you received

Page 85

22 (Pages 82 - 85)

1 that first call, what was your knowledge of the
2 TCPA?
3    A.  Probably not much.  Nothing I would say.
4    Q.  So you don't know whether the TCPA, in fact,
5 prohibits placing a ringless voicemail on your phone?
6       MR. STRAUSS:  Object to form.  You may
7 answer the question.
8    A.  I would not have knowledge of that, no.
9    Q.  (By Mr. Yardley) And you never researched
10 that; is that correct?
11    A.  No.
12    Q.  Well, what caused you to -- to file a
13 lawsuit if you don't have any position as to whether
14 placing a ringless voicemail on a phone violates the
15 TCPA?
16    A.  So the reason I reached out in the first
17 place to Sam is because I had the first -- that prior
18 relationship.  But the main reason that I reached out
19 to him directly was because I had never had a
20 situation where, you know, a telephone marketer calls,
21 it rings and then you pick up and then it hangs up and
22 then it still leaves a voicemail.  I had never heard
23 of that, and I thought that that was -- you know,
24 it -- it was annoying and it was an invasion of my
25 privacy, to be honest.

Page 86

1    Q.  Did you feel at that point that it violated
2 the TCPA?
3       MR. STRAUSS:  Object to form.
4    Q.  (By Mr. Yardley) When I say "it," I mean
5 your ringless voice message.
6    A.  Because I had not much knowledge of the TCPA
7 at the time, I would say I didn't know if it violated
8 it; but I knew that it was -- it was odd and I needed
9 to investigate it legally.
10    Q.  Did you -- at the time you received the
11 first voicemail, did you consider filing a lawsuit
12 based on that?
13    A.  The very first call?
14    Q.  Yes.
15    A.  No, not on -- not on the first call.
16    Q.  When did you first -- when did the first
17 thought come to your mind that you might file a
18 lawsuit based on one of the 11 ringless voicemails --
19 ringless voicemails that you allege was placed on your
20 phone?
21    A.  Probably about three or four in.
22    Q.  And when would that have been, how far in
23 time?
24    A.  Most likely sometime in August.
25    Q.  And that would be August of what year?

Page 87

1    A.  2017, I'm sorry.
2    Q.  So in August of 2017 you believed you might
3 have a lawsuit against someone.  Did you know who?
4       MR. STRAUSS:  Object to form.  You may
5 answer the question.
6    A.  No, I did not at the time.
7    Q.  (By Mr. Yardley) When did you first learn
8 of the name Direct Energy?
9    A.  When I -- through counsel.
10    Q.  I just said when.
11    A.  Oh, when?
12    Q.  Yes.  Was it during the period in which the
13 ringless voicemails were being left on your phone?
14    A.  Well, definitely during that time because
15 November 3rd, the name showed up on the voicemail.
16 But I don't recall whether or not my -- my
17 conversations with counsel told me about that name
18 prior to that November 3rd date.
19    Q.  But you were having ongoing conversations
20 with counsel during the November -- or let's say
21 during the second half of 2017 about filing a possible
22 TCPA claim; is that correct?
23    A.  Yes.
24    Q.  Now, you said that you swapped out your
25 phone in 2018; is that correct?

Page 88

1    A.  I did.
2    Q.  What month would that have been?
3    A.  I would say October of 2018.
4    Q.  So approximately one year after you first
5 thought about filing a TCPA claim, you agreed to give
6 your cell phone to AT&T in exchange for a new cell
7 phone?
8    A.  I did.
9    Q.  Did it ever occur to you that that old cell
10 phone would be evidence in any TCPA case you might
11 file?
12    A.  No.
13    Q.  Never occurred to you at all?
14    A.  No, because the voicemails transfer to the
15 new phone.
16    Q.  Who transferred those voicemails to the new
17 phone?
18    A.  It automatically happens based on the phone
19 number and the voicemail account.
20    Q.  Are you saying that -- that the phone
21 that -- which is the subject of this lawsuit which you
22 no longer have was backed up to AT&T's cloud system?
23       MR. STRAUSS:  Object to form.  You may
24 answer the question.
25    A.  I'm not sure if it's in a cloud system or

Page 89

23 (Pages 86 - 89)

1   not. That would -- I'm not -- I'm not an expert when
2   it comes to that. But I do know that -- that as long
3   as that phone number is with AT&T, any voicemails that
4   are left on their visual voicemail system will
5   transfer to any new device that you upgrade to.
6     Q. (By Mr. Yardley) How do you know that?
7     A. Well, one, because I formerly worked for
8   AT&T; but, two, because it's happened every time I've
9   upgraded a phone.
10     Q. Do you have an iCloud account?
11     A. iCloud, yes.
12     Q. What's the -- what's the email address that
13   your iCloud account is tied to?
14     A. My regular email. If you don't have it,
15   it's my name 27@yahoo.com.
16     Q. Can you spell out that whole email address?
17     A. I can. It's
18   M-a-t-t-d-i-c-k-s-o-n-2-7@yahoo, y-a-h-o-o, .com.
19     Q. Is your real name Matthew?
20     A. It is, yes.
21     Q. So do you back up the -- did you back up the
22   phone you had in 2017 to the mattdickson27@yahoo.com
23   iCloud account?
24     A. I did.
25     Q. You automatically did that?

1   wanted to wait until everything was loaded on the
2   phone.
3     Q. And you didn't wait that long because it
4   takes hours to do that; is that correct?
5     A. Sometimes it does. So, yeah, I think I did
6   leave. I -- I left once my texts and my -- and my
7   emails accounts were set up and everything. The apps
8   took forever to download.
9     Q. So my point --
10     MR. STRAUSS: Try not to speak over counsel.
11   They're making a record. So please let counsel ask
12   his question in its entirety before you begin your
13   response.
14     THE WITNESS: Okay.
15     Q. (By Mr. Yardley) And you still maintain
16   that Apple -- that mattdickson27@yahoo.com iCloud
17   account; is that correct?
18     A. I do.
19     Q. How long have you had that iCloud account?
20     A. Ten or 11 years.
21     Q. I was going to say it's a Yahoo account,
22   that kind of tells you something.
23     A. Oh, the Yahoo. You -- well, yeah, but you
24   said iCloud.
25     Q. Okay. So it's a -- it originally started as

1     A. I had it set so that it would automatically
2   do it every night; and prior to doing the upgrade, I
3   made sure that it was done so that I could access
4   everything that I had on the previous phone.
5     Q. So you didn't rely on AT&T's server to do
6   that; is that correct?
7     MR. STRAUSS: Object to form. You may
8   answer the question.
9     A. I don't know what I relied on. I just
10   relied on the fact that I knew that if I did a backup,
11   all my information would still transfer to the new
12   phone.
13     Q. (By Mr. Yardley) Remember when you got
14   that new phone?
15     A. Uh-huh, yes.
16     Q. Did you go to the store to get it? When I
17   say the store, I mean the AT&T store.
18     A. No. I got that at the Apple store.
19     Q. So you bought it on the Apple store. Did
20   Apple transfer all of your old data to your new phone?
21     A. No, because it accesses it through the
22   cloud.
23     Q. So you did that yourself; is that correct?
24     A. They -- they initiated it. But once it was
25   initiated, then I was free to leave the store unless I

1   a Yahoo account, correct?
2     MR. STRAUSS: Object to form. You may
3   answer the question.
4     A. No. It's -- I mean, when you create an
5   iCloud account, you need to create a user ID with an
6   email or a user name. And when I created my iCloud
7   account 10 or 11 years ago, I used my personal email
8   address, mattdickson27@yahoo.com.
9     Q. (By Mr. Yardley) Okay. So there's
10   actually two different accounts. There's a
11   mattdickson27@yahoo.com account, correct, that
12   predated your iCloud account, correct?
13     A. Yes.
14     Q. And then there's an iCloud account with
15   mattdickson27@yahoo.com. It has nothing to do with
16   Yahoo. It just uses the Yahoo word in the name,
17   correct?
18     A. Yes.
19     Q. And that iCloud account probably has a
20   mattdickson27@icloud.com email address also, doesn't
21   it?
22     A. I don't know what the email address would
23   be, but it probably does have some iCloud email
24   address.
25     Q. In addition to the mattdickson27@yahoo.com

1  email address, do you have any other personal email
2  addresses?
3      A.  Yes.
4      Q.  What are they?
5      A.  The same user handle,
6  mattdickson27@gmail.com.
7      Q.  And is that the only other one you have?
8      A.  Yes.
9      Q.  To the extent that we can count them, you
10  have mattdickson27@gmail, mattdickson27@yahoo and
11  probably a mattdickson27@icloud; is that correct?
12      MR. STRAUSS:  Object to form.  You may
13  answer it.
14      A.  Most likely, yes, on the iCloud one; but the
15  other two for sure.
16      Q.  (By Mr. Yardley) Did you ever opt in to
17  allow any entity to contact you?
18      MR. STRAUSS:  Object to form.  You may
19  answer it.
20      A.  Not that I'm aware of.
21      Q.  (By Mr. Yardley) So you've never allowed
22  any entity to contact you that you regularly do
23  business with?
24      MR. STRAUSS:  Object to form.  You may
25  answer it.

Page 94

1      A.  I would say if I do -- I mean, no.  I mean,
2  I get emails from like Home Depot and Kohl's and
3  places like that.
4      Q.  (By Mr. Yardley) That's because you have an
5  account at Home Depot, correct?
6      A.  What's that?
7      Q.  That's because you have an account at Home
8  Depot, correct?
9      A.  Correct.
10      Q.  And when you applied for that account at
11  Home Depot, you opted in to have them send you emails,
12  correct?
13      MR. STRAUSS:  Object to form.  You may
14  answer.
15      A.  Probably, yes.
16      Q.  (By Mr. Yardley) So do you know what other
17  entities that you allowed to send you communications
18  other than Home Depot?
19      MR. STRAUSS:  Object to form.  You can
20  answer that.
21      A.  I'm sure there's a handful.  I don't know
22  all of them offhand.
23      Q.  (By Mr. Yardley) Do you know any of them
24  offhand?
25      A.  Home Depot, Kohl's, Best Buy.

Page 95

1      Q.  And when you allow somebody to do that and
2  you give them an email address, did you give them --
3  did you give them mattdickson27@yahoo.com or
4  mattdickson27@gmail.com?
5      A.  Generally speaking -- sorry.  Generally
6  speaking, I will give them the gmail one because I use
7  it less.
8      Q.  That would be your sort of junk email
9  account; is that correct?
10      A.  Correct.
11      Q.  And the mattdickson27 is reserved for
12  personal matters that don't involve junk email?
13      A.  Correct.
14      Q.  So if we went to the mattdickson27@gmail
15  account you could see everybody that you opted into
16  because they would have emailed you there; is that
17  correct?
18      MR. STRAUSS:  Object to the form.
19      A.  Probably -- probably, yes.
20      Q.  (By Mr. Yardley) And the ones you can
21  remember are Home Depot, Kohl's.  Any others?
22      A.  Best Buy, Groupon.  That's about it.  Those
23  are the ones that I generally tend to have to delete
24  every morning when I check my email.
25      Q.  Ohio State University wouldn't be one of

Page 96

1  those?
2      A.  Maybe.  I don't know.  Like the -- like
3  probably a fan site maybe offering goods.
4      Q.  Okay.  So I think we've -- we've covered the
5  email addresses.  Now, I think your -- you produced
6  ten new voicemails today; is that correct?
7      MR. STRAUSS:  Object to form.
8      Q.  (By Mr. Yardley) When I say you, your
9  counsel has done that, correct?
10      A.  I believe that we produced seven new ones
11  other than the four that were in the second amended
12  complaint.
13      Q.  Okay.  And when did you find those seven
14  voicemails?
15      A.  Through deposition prep when -- when
16  discussing and I saw -- and I rereviewed the
17  complaint.
18      MR. STRAUSS:  Mr. Dickson, I'm going to
19  remind you not to discuss anything that you discussed
20  with counsel.  You can certainly answer the question
21  as to when you found them, but I want to remind you
22  any conversations you had with counsel either by phone
23  or via email or in any other form is privileged and I
24  would advise you not to answer.
25      A.  Okay.  The -- just in reviewing the -- the

Page 97

25 (Pages 94 - 97)

1    complaint, I noticed that there was only four on
2    there; and I was, like, it didn't seem right because I
3    knew that there was more.  And I -- I went back into
4    my voicemail and found the seven, so I sent them over.
5        Q.   (By Mr. Yardley) Did you ever respond to
6    any discovery in this case?
7        A.   To what?
8        Q.   Any discovery.
9        A.   Like the discovery questions?
10       Q.   Yes.
11       A.   Yes.
12       Q.   And did they -- did any of those discovery
13   questions ask you whether there were any other
14   instances where voicemails had been placed on your
15   phone that might relate to this lawsuit?
16           MR. STRAUSS:  Objection.
17       A.   I don't recall.
18       Q.   (By Mr. Yardley) You don't recall?
19       A.   I don't recall if one -- if that was one of
20   the questions.
21       Q.   Do you ever recall searching your phone for
22   voicemails?
23       A.   Yes, I -- I looked at them over the last
24   week and a half or so.
25       Q.   All right.  So over the last week and a half

Page 98

1    you looked at your phone to see if there were
2    voicemails there; is that correct?
3        A.   Yes.
4        Q.   **When did you do that prior to a week and a**
5    **half ago, if ever?**
6        A.   **Well, certainly when -- when my initiated --**
7    **my initiated -- when I initiated the conversations**
8    **three years ago with counsel, anytime I would get one,**
9    **I would make sure that it saved.  So throughout the**
10   **course of a couple years.**
11       Q.   **Are you saying that you were forwarding**
12   **these ringless voicemails in real time to your**
13   **attorneys?**
14       A.   **Like not real time but within -- within a**
15   **couple of days I would say.**
16       Q.   **And who did you forward them to?**
17       A.   **Mr. Strauss.**
18       Q.   How would you do that?
19       A.   The same way I did it earlier last week,
20   which is clicking on the icon and sharing it by email.
21       Q.   Had you ever done that before with other
22   electronic medium?
23           MR. STRAUSS:  Object to form.  You may
24   answer the question.
25       A.   I'm not sure I understand the question.

Page 99

1        Q.   (By Mr. Yardley) You're forwarding an
2    electronic medium.  Do you understand that?
3        A.   Uh-huh.
4        Q.   How did you know how to do that?
5        A.   Because it's just something you learn when
6    you're utilizing the phone.
7        Q.   Well, that icon is not -- is that stored on
8    your phone when you swipe down from the upper right?
9            MR. STRAUSS:  Object to form.  You can
10   answer the question.
11       A.   No.  It shows up when you actually click on
12   the voicemail.
13       Q.   (By Mr. Yardley) It gives you a methodology
14   for sending it; is that correct?
15       A.   Correct.
16       Q.   Did you send it email or text message?
17       A.   Email.
18       Q.   And you were going through those voicemails
19   over the last ten days; is that correct?
20       A.   Reviewing them, yes.
21       Q.   And you found new ones, correct?
22       A.   Well, they weren't new; but, I mean, new to
23   the complaint, yes.
24       Q.   So how did you identify those as emails that
25   related to this complaint -- excuse me, voicemails

Page 100

1    that related to this complaint?
2        A.   Because they all utilized the same general
3    format in the message that they left.
4        Q.   Did the word "Silverman" come up in any of
5    those messages?
6        A.   Silverman?
7        Q.   Yes.
8        A.   No.
9        Q.   Do you recall responding yes to a text when
10   asked for your consent to be contacted?
11           MR. STRAUSS:  Object to form.  You may
12   answer.
13       A.   To be contacted, no.
14       Q.   (By Mr. Yardley) So Home -- you've never
15   given Home Depot the consent to contact you,
16   correct?
17       A.   Via text, no.
18           MR. STRAUSS:  Object to form.  You can
19   answer.
20       Q.   (By Mr. Yardley) Do you know if the
21   consent that you gave to Home Depot, that it didn't
22   include text message?
23       A.   I don't recall.
24       Q.   Do you know whether the consent you gave to
25   Kohl's included text messages?

Page 101

26 (Pages 98 - 101)

1      A.   I don't recall; and if they -- if they do,
2   I -- I immediately respond with an opt out.
3      Q.   Well, you certainly know about Best Buy
4   because they -- they text messages all the time, don't
5   they?
6      A.   Not to me.
7      Q.   You don't get text messages from Best Buy
8   that says flash sale or anything like that?
9      A.   No.
10      Q.   And you don't know whether you gave Best Buy
11   the authorization to contact you by text?
12      A.   If I did, then I -- like I said, I would
13   have opted out right away when I got it.
14      Q.   Have you ever looked at the language of the
15   TCPA?
16      A.   I have not.
17      Q.   Do you know if the word "ringless voicemail"
18   appears in the TCPA anywhere?
19      A.   I do not.
20      Q.   What's the basis for your belief that a
21   ringless voicemail constitutes a violation of TCPA?
22           MR. STRAUSS:   Object to form.  You may
23   answer it.
24      A.   Can you repeat the question, please?
25           MR. YARDLEY:   I cannot, but the court

Page 102

1   reporter can.
2           THECOURT REPORTER:  "What's the basis for
3   your belief that a ringless voicemail constitutes a
4   violation of TCPA?"
5           MR. YARDLEY:   Thank you very much, Ms. Court
6   Reporter.
7      A.   I guess I would say that it -- I believe
8   that it's a violation based on the fact that I didn't
9   ask for that to happen and when I tried to answer the
10   phone to tell them to stop calling me, it immediately
11   hung up.
12      Q.   (By Mr. Yardley) Those are all factual
13   statements.  Do you have any basis to believe that
14   the TCPA prohibits the leaving of ringless
15   voicemails on your phone?
16           MR. STRAUSS:  Again I'm going to object,
17   form.  You can answer the question.
18      A.   I -- I don't know the language in the TCPA
19   to be able to answer that.
20      Q.   (By Mr. Yardley) One second.  How many
21   calls did you ID in the second amended complaint?
22      A.   In the second amendment complaint there, I
23   believe, were four.
24      Q.   And when I say calls, you understand I mean
25   ringless voicemails, right?

Page 103

1      A.   Yes.
2      Q.   And you allege four in the original
3   complaint; is that correct?
4      A.   You asked about the second amended
5   complaint.
6      Q.   Excuse me, the second amended complaint.
7      A.   Yes.
8      Q.   Did any of those four calls name Direct
9   Energy?
10      A.   Yes.
11      Q.   Which ones?
12      A.   November 3rd, 2017.
13      Q.   Is it your position that the November 3rd,
14   2017, call came directly from Direct Energy?
15      A.   My perception would have been that, yes,
16   that came directly from Direct Energy.
17      Q.   And you don't have any perception that any
18   call came directly from Silverman Enterprises,
19   correct?
20      A.   There is -- there's really no way that I can
21   ascertain whether it came from Silverman or Direct
22   Energy or TC -- TMC, whatever the third one is called.
23      Q.   You don't have any basis for concluding that
24   Silverman Enterprises contacted you like you do for
25   Direct Energy, correct?

Page 104

1           MR. STRAUSS:   Object to form.  You may
2   answer the question.
3      A.   I mainly think that Direct Energy is
4   responsible for this.
5      Q.   (By Mr. Yardley) So you don't believe
6   Silverman Enterprises is responsible for this?
7           MR. STRAUSS:   Object to form.  You may
8   answer it.
9      A.   I believe they -- they carry some
10   responsibility, but Direct Energy is the one that
11   reached out to them to hire them to call the -- myself
12   and millions of others.
13      Q.   (By Mr. Yardley) And just to make it very
14   clear, you believe that there is a contract between
15   Silverman Enterprises and Direct Energy to leave
16   ringless voicemails on your phone; is that correct?
17      A.   That is my understanding.
18      Q.   You're familiar with Exhibit 14, correct?
19   That's the -- the list.
20           MR. STRAUSS:   I'm not familiar, Counsel,
21   with what you're referring to when you say Exhibit 14.
22           MR. YARDLEY:   The IP addresses.
23           MR. STRAUSS:   Okay.  So -- okay.
24      Q.   (By Mr. Yardley) So when did you check the
25   IP addresses listed on deposition Exhibit 14 against

Page 105

27 (Pages 102 - 105)

1  your devices?
2    A.  Exact date -- I can give you probably a
3  range.  Probably I would say sometime in the late
4  spring, summer of '18.
5    Q.  So you're -- you're testifying that you
6  obtained that document from your lawyers and you
7  actually went through it and matched it -- and tried
8  to match it up with the IP addresses for your devices?
9    A.  I looked at my devices to see if that IP
10  address even existed here, and it didn't.
11    Q.  How did you do that, electronically?  You
12  didn't actually look at all the entries on that
13  exhibit, did you?
14    A.  No.  The only entry I'm seeing on that
15  exhibit is mine.
16    Q.  And what IP address did you see -- did you
17  see, if any?
18    A.  When I checked?
19    MR. STRAUSS:  Object to form of the
20  question.  You can answer.
21    Q.  (By Mr. Yardley) You may answer.
22    A.  Are you talking -- are -- are you asking me
23  what IP address I saw when I checked?
24    Q.  No.  If you saw any of your devices on that
25  list?

Page 106

1    A.  Oh, no.
2    Q.  You know all your devices have an IP
3  address, correct?
4    A.  Yes, all of my devices had an IP address.
5    Q.  And you made a list of those IP addresses,
6  correct?
7    A.  Yes.
8    Q.  Do you have a -- do you have a copy of that
9  list?
10    A.  I -- I would imagine I sent it to counsel.
11    Q.  You imagine or you did?
12    A.  I don't believe I made a document that I
13  saved.
14    Q.  Is there an email where you put all the IP
15  addresses for all your devices in an email?
16    MR. STRAUSS:  I'm going to advise you,
17  Mr. Dickson, not to reveal the contents of any email
18  that you had with counsel or any communication you
19  had.  But -- so you can answer the question -- well,
20  actually no.  I'm going to advise you not to answer
21  this question based on attorney/client privilege.
22    Q.  (By Mr. Yardley) Does any email exist
23  outside of the emails to your counsel that has the
24  list of the IP addresses of every one of the devices
25  you had?

Page 107

1    A.  No.
2    Q.  Does an email exist with all your IP
3  addresses sent to your lawyer?
4    MR. STRAUSS:  I'm going to again advise you
5  not to disclose the content of any communication that
6  you've had via email or over the phone or in person
7  with any of your counsel.
8    A.  I'm going to choose not to answer that.
9    Q.  (By Mr. Yardley) Who made the decision to
10  add Silverman Enterprises to the second amendment
11  complaint?
12    A.  When -- when drawing up the complaint, I
13  relied on the advice of counsel to do that.
14    Q.  You never made a decision yourself
15  personally to add Silverman Enterprises to the
16  complaint?
17    MR. STRAUSS:  I'm going to object to the
18  form of the question.  You may answer it.
19    A.  I relied on counsel to do that when we were
20  drafting the complaint.
21    Q.  (By Mr. Yardley) Did you make any decision
22  personally as to whether to add Total Marketing
23  Concepts to the complaint?
24    MR. STRAUSS:  Objection.  You may answer
25  that.

Page 108

1    A.  That's another one where I relied on the
2  advice of counsel to -- to add that when drafting.
3    Q.  (By Mr. Yardley) It's your position that
4  Direct Energy is responsible for these ringless
5  voicemails being placed on your phone; is that
6  correct?
7    MR. YARDLEY:  I have no further questions.
8    MR. MATTHEWS:  Sam, do you have anything?
9    MR. YARDLEY:  Mr. Strauss.
10    MR. STRAUSS:  Oh, I'm so sorry, guys. I
11  thought I heard -- no, I have no -- thank you very
12  much, Mr. Dickson.
13    MR. MATTHEWS:  I have just a few follow-ups
14  after that.  Not a lot, but just to be sure I have
15  some of it right.
16    MR. YARDLEY:  Make sure nobody else is going
17  to ask any questions first.
18    MR. MATTHEWS:  There's no one else.
19    MR. YARDLEY:  Okay.  That's what I want to
20  know.  Go ahead.
21    FURTHER EXAMINATION
22  BY MR. MATTHEWS:
23    Q.  Okay.  Mr. Dickson, so I want to make sure
24  that I understood your answers to some of
25  Mr. Yardley's questions correctly.  You testified

Page 109

28 (Pages 106 - 109)

1  earlier you started receiving these voicemails in July
2  of 2017, correct?
3      A.  Yes.
4      Q.  And then you started talking to Mr. Strauss
5  about a potential suit about them in August of 2017?
6      A.  Most likely August, yes, because that would
7  have given it about three or four calls in.
8      Q.  And then you started forwarding the
9  voicemails to Mr. Strauss as they came in in September
10  of 2017?
11      A.  Yeah, yeah, that would make sense.
12      Q.  Okay.  And then you received one in
13  November, November the 3rd that mentions the name
14  Direct Energy, correct?
15      A.  Yes.
16      Q.  And then you send a letter to Direct
17  Energy's general address after that?
18      A.  I don't know whether or not -- I don't
19  recall whether or not we did that -- or I did that
20  before or after that November 3rd call.
21      Q.  Well, it's unlikely you would have done it
22  before, right?
23          MR. STRAUSS:  Object to form.  You may
24  answer.
25      A.  I guess it depends on what investigative

1  research was done after I retained counsel.
2      Q.  (By Mr. Matthews) Well, here's -- here's
3  what I'm getting at is until that -- you start
4  getting these voicemails; and until November the
5  3rd, you had never gotten one that mentioned the
6  name Direct Energy, right?
7      A.  Correct.
8      Q.  And you had never called back the number to
9  see who was calling you to tell them to stop, right?
10      A.  Correct.
11          MR. STRAUSS:  Object to form.  You may
12  answer.
13      A.  Okay.  Not at that point.
14      Q.  (By Mr. Matthews) Okay.  At that point you
15  were, instead, forwarding it to your counsel and
16  then on November the 3rd you get the voicemail that
17  says the name Direct Energy and then you send the
18  letter to Direct Energy; is that right?
19      A.  That timeline makes sense, yes.
20      Q.  Okay.  Part of the reason I ask that is that
21  the -- the letter that you produced in this lawsuit
22  to -- to Direct Energy has a date on it of April 11th
23  of 2017.  And I -- I mean, I make mistakes on the
24  dates on letters sometimes.  But I wanted to be sure
25  that you did send a letter to Direct Energy in April

1  of 2017, correct?
2      A.  No, it wouldn't have been -- it would have
3  been April.  That has to be a typo.
4      Q.  It would have been after you got the
5  November 3rd voicemail?
6      A.  Most likely that should have said '18.
7      Q.  I see.
8          MR. STRAUSS:  You mean April 2018, right?
9      A.  Correct.
10      Q.  (By Mr. Matthews) A couple of questions
11  about the IP address.  I believe I understood your
12  testimony to me to be that what you did to check the
13  IP address of your devices was that you pulled up an
14  Internet search, like Google or something like that
15  and you searched for IP address locate and a website
16  came up.  You can't remember the exact name of it,
17  but it's the sort of website that tells you what
18  your IP address is?
19      A.  Correct.
20      Q.  And the IP address that it showed you was
21  the same for each of those devices that you searched?
22      A.  No.
23      Q.  No?
24      A.  Different on every one.
25      Q.  Okay.  Did -- did you go into your phone to

1  check the IP address?
2      A.  I did.
3      Q.  Okay.  And how did you do that?
4      A.  Oh, go into the phone?  No.  I just did the
5  website thing --
6      Q.  Okay.
7      A.  -- where --
8      Q.  So you didn't --
9      A.  -- it goes to go my IP.com or something.
10      Q.  Got it.  You -- you did not go to your WiFi
11  settings on your phone and check the IP address that
12  shows up on your phone?
13      A.  No, I did not.
14      Q.  Okay.  Or on the desktop that you have?
15      A.  I did not, no.
16      Q.  Or -- or the laptop?
17      A.  No.
18      Q.  Or -- or the iMac?
19      A.  Correct.
20      Q.  Okay.
21          MR. MATTHEWS:  Thanks very much,
22  Mr. Dickson.  I'll pass the witness.
23          MR. STRAUSS:  I have no redirect.
24          MR. YARDLEY:  I have no further questions.
25          MR. MATTHEWS:  Thank you very much,

Veritext Legal Solutions
346-293-7000

1    Mr. Dickson.  We can go off the record.
2        MR. YARDLEY:  I do have one objection I'd
3    like to put on the record.  I object to the use of the
4    additional documents either in this -- the additional
5    documents produced today were ringless voicemails that
6    the witness testified that he found in the last ten
7    days.  And we would object to the use of those
8    ringless voicemails in this lawsuit.  And if those
9    ringless voicemails are allowed to be added to this
10   lawsuit, we would reserve the right to redepose the
11   deponent.
12       MR. STRAUSS:  And just to be clear on this
13   regard, you are -- you would want to hold the
14   deposition open to cross-examine the deponent
15   regarding those additional seven ringless voicemails.
16   That would be the topic that you wish to discuss?
17       MR. YARDLEY:  I'd be seeking to exclude them
18   from the lawsuit.
19       MR. STRAUSS:  Yeah, I understand.  But to
20   the extent that that does not take place, an
21   alternative would be asking to hold in the deposition
22   open to prep further about the contents or about the
23   seven voice -- ringless voicemails?
24       MR. YARDLEY:  Yes, because I don't intend to
25   ask any questions about those until a ruling is made

Page 114

1        MR. YARDLEY:  Well, my position is that
2    they're not relevant to this lawsuit; and if they are
3    deemed relevant and deemed to be additional instances
4    that plaintiff is going to rely on in seeking damages,
5    that we would be allowed to redepose the witness over
6    that.  But it's my position that they're not.
7        MR. STRAUSS:  Okay.  Thanks.  Understood.
8    Thank you, Mr. Dickson.
9        THE VIDEOGRAPHER:  This concludes the
10   deposition testimony given today by Matthew Dickson on
11   May 14th, 2020.  We're going off the record at
12   5:12 p.m.
13           (Deposition concluded 5:12 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 116

1    that those ringless voicemails related to this
2    complaint because they were not included in either the
3    complaint or any of the discovery.
4        MR. STRAUSS:  Understood.  But I just -- I
5    just want to confirm the need to hold the deposition
6    open for any other topic.
7        MR. YARDLEY:  Well, any -- anything that
8    those seven ringless voicemails may relate to
9    including the quality of that.
10       MR. STRAUSS:  Understood.  Thanks.
11       MR. MATTHEWS:  Yeah, I think -- I mean, my
12   thought on that is I wish they had been sent over
13   earlier.  I appreciate his promptness in sending them
14   over once we asked today.  We reviewed them very
15   quickly, but we haven't had a chance to review them
16   against all the other records that have been produced.
17   I don't know what path that would lead down.  So if
18   it -- if all the answers today were sufficient, then
19   terrific.  And if -- but if comparing those records to
20   others that have been produced in the lawsuit leads to
21   additional questions, we'll follow up with you.
22       MR. STRAUSS:  Okay.  And just to make sure,
23   Mr. Matthews, what you're saying is basically you wish
24   to hold this deposition open as it relates to those
25   seven ringless voicemails that were produced today?

Page 115

1            CHANGES AND SIGNATURE
2    WITNESS NAME: MATTHEW DICKSON
3    DATE OF DEPOSITION:  MAY 14, 2020
4    PAGE LINE  CHANGE              REASON
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

Page 117

30 (Pages 114 - 117)

**Page 118**

1
2      I,_____, do hereby certify that I
3   have read the foregoing pages, and that the same is a
4   correct transcription of the answers given by me to the
5   questions therein propounded, except for the corrections
6   or changes in form or substance, if any, noted in the
7   attached Errata Sheet.
8
9   _____
10     WITNESS SIGNATURE DATE
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 120**

1   related to, nor employed by any of the parties in the
2   action in which this proceeding was taken, and further
3   that I am not financially or otherwise interested in the
4   outcome of this action.
5      Certified to by me on this 18th day of
6   May, 2020.
7
       Jill M. Vaughan, CSR, RPR
8      CSR No.  6192
       Expiration date: 12-31-21
9      Veritext Legal Solutions
       Veritext Registration No. 571
10     300 Throckmorton Street, Suite 1600
       Fort Worth, TX 76102
11     (817) 336-3042 (800) 336-4000
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 119**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2
3   MATTHEW DICKSON, on behalf of  )
    himself and others similarly  )
4   situated                )
        Plaintiff    )  CAUSE No. 5:18-cv-182
5                    )
    VS.              )
6                    )
    DIRECT ENERGY, LP, TOTAL    )
7   MARKETING CONCEPTS, LLC,    )
    and SILVERMAN ENTERPRISES, LLC)
8       Defendandts        )
9
10     REPORTER'S CERTIFICATION FOR THE
11     ORAL VIDEO ZOOM DEPOSITION OF MATTHEW DICKSON
12        MAY 14, 2020
13     I, Jill M. Vaughan, Certified Shorthand Reporter in
14  and for the State of Texas, hereby certify pursuant to
15  the Federal Rules and/or agreement of the parties present
16  to the following:
17     That the witness, MATTHEW DICKSON, was duly sworn by
18  the officer and that the transcript of the oral
19  deposition is a true record of the testimony given by the
20  witness;
21     That the deposition transcript was duly submitted on
22  _____ to the witness or to the attorney for
23  the witness for examination, signature, and return to
24  Veritext by _____.
25     I further certify that I am neither counsel for,

**Page 121**

1   sam@turkestrauss.com
2        May 18, 2020
3   RE: Matthew Dickson v. Direct Energy Services, LLC
4   DEPOSITION OF: Matthew Dickson (# 4107075)
5      The above-referenced witness transcript is
6   available for read and sign.
7      Within the applicable timeframe, the witness
8   should read the testimony to verify its accuracy. If
9   there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18        Yours,
19        Veritext Legal Solutions
20
21
22
23
24
25

31 (Pages 118 - 121)

Veritext Legal Solutions
346-293-7000