# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| MATTHEW DICKSON, on behalf of himself and others similarly situated, | : : : | Case No. 5:18-cv-182-JRA |
| | : | Judge Adams |
| Plaintiff, | : : | Magistrate Judge Henderson |
| v. | : : | |
| DIRECT ENERGY, LP, et al., | : : | |
| Defendants. | : | |

**PLAINTIFF'S SUR-REPLY TO DIRECT ENERGY'S REPLY IN SUPPORT OF SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION**

**INTRODUCTION**

Plaintiff previously described Direct Energy's attempt to submit newly produced evidence in its Supplemental Memorandum in Support of Class Certification as a "last-second Hail Mary." Perhaps that description was a bit premature, as now that Plaintiff has fully addressed Direct Energy's new evidence with a simple modification of the class definition, Direct Energy has decided to attempt one final desperation play.

Ten minutes before filing its Reply, Direct Energy made *another* supplemental production of documents, this time consisting of nearly 2,000 documents relating to the lead vendors DMI, Britebox/Squeeze, and KB Synergy. Direct Energy obtained those documents from TMC over two years ago, yet only now, in Direct Energy's fourth brief opposing class certification, did Direct Energy deem these documents worthy of the Court's attention.

There is a reason Direct Energy didn't submit these documents in their prior briefs. They don't include *any* evidence that a single class member consented. But they also don't even have anything to do with the RVM campaign at issue in this case. Some don't even have anything to do with Direct Energy at all, or even energy or utilities more generally. For example, Direct

Energy would have the Court believe that it was able to identify DMI leads that consented to be called by Direct Energy that are still in the class. However, the leads Direct Energy refers to **all come from a DMI campaign *from 2012*—five years before the class period—promoting online education.** And, that is not to mention that Direct Energy found the vast majority of the "DMI leads" it identified on *Do Not Call lists*—meaning that those individuals had actually explicitly told DMI to stop calling back in 2012 when they were called about online education.

In all, Direct Energy has still not shown that there is a *single* Direct Energy-related lead from any other vendor besides Silverman in the class. And that is after obtaining full access to TMC's emails and other documents, requesting and receiving additional time from the Court to complete its discovery on its consent defense before it had to respond to Plaintiff's Motion for Class Certification back in June 2020, and identifying and subpoenaing all potentially relevant vendors.

Critically, however, even if Direct Energy *could* show that any individuals in the class appear in lead data from DMI, Britebox/Squeeze, KB Synergy, or some other vendor Direct Energy identifies in yet another motion for leave to file a sur-reply, it would not matter. Direct Energy has still not come up with any evidence of consent for a single member of the redefined class. Without any evidence of consent for a single class member, Direct Energy's consent defense will fail on a classwide basis, making this case perfectly suited for class certification.

## LAW AND ARGUMENT

**I.    Direct Energy has still not produced any evidence of consent for a single putative class member.**

Nothing in Direct Energy's new production of documents or *second supplemental* expert report changes anything because Direct Energy still has not come forward with any evidence of

2

consent for a single member of the redefined class. Direct Energy's consent defense will therefore fail on a classwide basis without individualized inquiries.

As Plaintiff previously explained, the prior express consent required by 47 U.S.C. § 227(b) for telemarketing via pre-recorded message to a residential or cellular telephone line is "prior express written consent." (*See* Doc. 138 at pp. 26-28.) Moreover, "prior express written consent" is an affirmative defense. (*See* Doc. 141 at p. 8.) Direct Energy has the burden to prove "prior express written consent" with clear and convincing evidence. (*See* Doc. 138 at p. 28.)

Direct Energy has come forward with nothing but speculation that class members might have consented, but speculation does not suffice to defeat predominance. This Court previously recognized in denying Defendants' Motion to Strike Class Allegations that "Defendants claim that the class would include all members who provided consent, but *has not produced any documents clearly showing that any individual that was sent a voicemail provided consent.*" (*See* Doc. 75 at p. 3 (emphasis added) (citing *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1121 (6th Cir. 2016) ("Speculation alone regarding individualized consent was insufficient to defeat plaintiff's showing of predominance under Rule 23(b)(3)."))). Nearly three years later, that remains the case.

Direct Energy's speculation that another lead source besides Silverman might have obtained consent from some class members is off-base (*see infra* Section II), but even if it wasn't, it would not matter because Direct Energy has no evidence of consent for any class member from any source. Direct Energy once again tries to liken the circumstances here to *Sawyer v. KRS Biotechnology, Inc.*, No. 1:16-cv-550, 2018 U.S. Dist. LEXIS 150586 (S.D. Ohio Sept. 5, 2018), but that case is no more applicable now than it was back when Direct Energy filed its original

3

opposition brief.  (*See* Doc. 116 at pp. 18-19.)  Contrary to Direct Energy's description of the case, the court in *Sawyer* did not deny class certification simply because the defendant obtained leads from multiple sources.  Critically, *Sawyer* involved faxes, not pre-recorded calls.  Under FCC guidance for faxes, evidence of established business practices sufficed to prove consent and the consent did not have to be in writing.  *Sawyer v. KRS Biotechnology, Inc.*, No. 1:16-cv-550, 2018 U.S. Dist. LEXIS 89595, at *28 (S.D. Ohio May 30, 2018).  So, the defendant's practice of slowly building a collection of fax numbers through its twenty individual sales representatives each obtaining oral permission in the course of attending trade shows, collecting business cards, arranging meetings, searching the internet for public information, and contacting customers directly created an extremely complicated trial.  *Id.* at *18-19, 30-31.  The court was therefore concerned that as to each of the 34,772 class members, "[l]itigating this matter would require testimony from various sales representatives and individual fax recipients to determine how each fax number landed on the list and whether fax permission had been received."  *Sawyer*, 2018 U.S. Dist. LEXIS 150586, at *10-11.  That is not the case here.  Documentary evidence of "prior express written consent" is required, and there is *none*.  *See Johansen v. One Planet Ops, Inc.*, No. 2:16-cv-00121, 2018 U.S. Dist. LEXIS 47776, at *14-15 (S.D. Ohio Mar. 5, 2018) (issue of consent did not predominate because: "In order to demonstrate that individuals consented to the calls, Defendants must marshal some evidence of prior express consent, such as a screenshot of a completed consent form for an individual plaintiff or a list of IP addresses of individual plaintiffs who consented to the calls.  They have not.").

  Additionally, as Plaintiff previously pointed out, in *Sawyer*, *all* of the class members in a sampling of the class *had* in fact consented.  *See Sawyer*, 2018 U.S. Dist. LEXIS 89595, at *26-27.  Here, the opposite is true.  There is not any evidence that a single class member consented.

4

Indeed, while testimonial evidence does not suffice in this case involving pre-recorded calls, there is not even any testimonial evidence that a single class member consented. The lack of any consent evidence here also distinguishes this case from *Burk v. Direct Energy, LP*, No. 4:19-CV-663, 2021 U.S. Dist. LEXIS 178408 (S.D. Tex. Sept. 20, 2021), where Direct Energy provided purported opt-in data evidencing that a sampling of class members had consented, which could only be rebutted by testimony and other individualized evidence from each class member as to whether or not the individual visited a particular webpage in the purported opt-in data. *Id.* at *11-17. Here, no purported opt-in data has been provided, so lack of consent will be determined on a classwide basis, making this case perfectly suited for class certification.

**II.     Direct Energy's speculation that class members consented is misplaced.**

Direct Energy's speculation as to consent does not suffice to defeat class certification, but the Court should understand that a closer look at Direct Energy's new evidence reveals that Direct Energy's speculation that some class members may have consented is off-base.

    A.     *Direct Energy has not shown that a single DMI lead is still in the redefined class.*

Direct Energy exclaims that the redefined class "***still contains DMI leads.***" As an initial matter, even if this were true, it wouldn't matter because without any evidence of consent for those leads, Direct Energy's consent defense will still fail on a classwide basis. (*See supra* Section I.) But the assertion that the class still contains DMI leads is highly misleading. To support this assertion, Direct Energy points to several emails **from 2012—*five years* before the class period, which begins in May 2017**—that contain telephone numbers. (*See* Doc. 142-1 at ¶ 13.) Five out of seven of those emails contain lists of telephone numbers **to add to a Do Not Call list**, meaning that the recipient of the call told the caller to stop calling, thereby revoking any previous consent that may have existed. (*See* Declaration of Brian K. Murphy ("Murphy

5

Decl."), attached hereto as Exhibit A, at ¶¶ 3-7 and Exs. 1-5.) *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255-56 (11th Cir. 2014) (consent may be revoked orally); *In re Rules and Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7996 ¶ 64 (2015) ("Consumers have a right to revoke consent, using any reasonable method including orally or in writing. Consumers generally may revoke, for example, by way of a consumer-initiated call, directly in response to a call initiated or made by a caller ...."). Obviously, these numbers previously being added to a Do Not Call List is not evidence of consent; it is evidence of not having consent. Perhaps more importantly, there is nothing suggesting that these leads had at any time consented to be called *by Direct Energy or that these leads were even generated in connection with a Direct Energy campaign.*[1] In fact, the other two emails that Direct Energy points to that aren't Do Not Call lists reveal that all of these emails from the summer of 2012 relate to a DMI calling campaign **promoting online education.** (*See* Murphy Decl. at ¶¶ 8-10 and Exs. 6-8.) One of those emails discusses 12 leads, and the notes for each of those leads specifically mention that the calls were about schools. (*Id.* at Ex. 6.) The other email[2] specifically refers to certain leads being rejected because they were outside a "4-hour window when they already went to the schools." (*Id.* at Exs. 7-8.) Evidence relating to purported consent to calls about a different entity does not equate to consent involving Direct Energy. Rather, the consent must be specific to Direct Energy solicitations. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (consent must be specific as to entity whose

---

[1] The mere fact that Direct Energy is producing these emails does not mean they have anything to do with Direct Energy. Around January 2020, Direct Energy obtained access to all of TMC's emails and other documents, whether they related to Direct Energy or not. (*See* Doc. 101 at p. 2.)

[2] The documents attached to the Murphy Decl. as Exhibits 7 and 8 are from the same email thread.

goods or services are being promoted).  Yet Direct Energy's so-called "expert"[3] tells the Court that these emails "contain telephone numbers representing consented leads that had been generated by DMi" and that they contain "leads, that are within Plaintiff's Redefined Class despite the efforts to exclude DMi."  (Doc. 142-1 at ¶ 13.)  To make matters worse, Direct Energy did not provide the Court these emails, necessitating this sur-reply to clear up Direct Energy's intentionally misleading assertions.

Then, Direct Energy and its "expert" attempt to confuse the Court even more by boasting that they were able to find "at least one" email discussing validation of leads being produced by DMI for Direct Energy.  (Doc. 142-1 at ¶ 14; Murphy Decl. at ¶ 11 and Ex. 9.)  Unlike the other emails Mr. Kostyun cites, that one email is from 2017, but the lead discussed in that email **was already excluded from the redefined class.**  There was no reason to discuss this lead other than to intentionally try to conflate the 2016-2017 campaign for Direct Energy with the 2012 campaign involving online education.

In summation, despite Direct Energy's efforts to muddy the waters, it is clear that each of the "DMI leads" that Direct Energy contends are still in the redefined class are from the 2012 online education campaign whereas the sole lead identified in connection with a Direct Energy campaign in 2017 was already excluded from the class.  It does not matter if there should happen

---

[3] Plaintiff does not believe Mr. Kostyun's report needs to be excluded or struck at this stage and welcomes the Court to consider it for what it is worth, but the Court should appreciate that there is nothing "expert" at all about Mr. Kostyun's Second Supplemental Report.  He is simply serving as Direct Energy's mouthpiece at this point in an attempt by Direct Energy to give its speculation more weight.  To type a few phone numbers into a search bar to check if they are in the class doesn't require any expertise, but checking leads against the class list is the only subject in Mr. Kostyun's latest report that he is qualified to opine on.  Mr. Kostyun's experience is in software development, database technology, enterprise architecture, and data analysis.  (*See* Doc. 111-14 at ¶¶ 4-6.)  He doesn't have any expertise that would allow him to look at an invoice for leads and opine that those leads were used in a particular telemarketing campaign.  Nor does he have any expertise that would allow him to opine that a particular vendor properly gathered consent under the TCPA, particularly not where no evidence of such consent exists.

7

to be a DMI lead that is still in the class because there would be no evidence of consent for that lead. However, the evidence Direct Energy has submitted on reply only confirms that its arguments regarding DMI leads precluding class certification have been eliminated.

      B.      *Invoices from Britebox/Squeeze and KB Energy do not change anything.*

In a final last-ditch effort to try to make up for the lack of consent evidence for any member of the class, Direct Energy submits invoices showing that TMC purchased leads from other vendors besides DMI and Silverman. Curiously, however, Direct Energy did not produce any lead lists or any purported consent data for any of these sources. Nor has Direct Energy shown that there is *a single Direct Energy related lead* from any of those sources that is in the class. Direct Energy merely speculates that since TMC purchased these leads, they *could* have been used in TMC and Silverman's RVM campaign at issue in this case.

If Direct Energy truly believed these leads were in the class, Direct Energy would have mentioned as much in its Memorandum in Opposition to Plaintiff's Motion For Class Certification, its Motion for Leave to File a Sur-Reply, or at the very least in its Supplemental Brief Opposing Class Certification. But Direct Energy only came forward with these invoices in its *fourth* opposition brief, filed over a year and a half after Plaintiff moved for class certification.

Direct Energy provides no explanation as to why these invoices weren't submitted before. That is because they have long been in Direct Energy's possession. Direct Energy explained in a prior filing in this case that it visited TMC's offices over *two years ago* on January 10-11, 2020 and had the opportunity to search through TMC's records in their entirety for any evidence that might be relevant to this case. (*See* Doc. 101 at p. 2.) Direct Energy represented to the Court, "that search allowed Direct Energy to identify many of the sub-vendors used by TMC, and Direct Energy promptly began requesting opt-in discovery from them—including through

8

subpoenas served in *Burk*." (*See id.*) Despite Direct Energy requesting "opt-in discovery" from these sub-vendors, *no responsive documents* from any of these sub-vendors were ever produced in this case.

It should also be noted that around this time in early 2020, Plaintiff was ready to file his motion for class certification. (*See id.*) Plaintiff had already waited for two years at that point for Defendants to come up with any consent evidence for the putative class. Plaintiff therefore desired to set a briefing schedule for the motion for class certification and to set a cutoff for the production of any consent evidence. (*See* Doc. 100.) Direct Energy pleaded that it needed more time to do discovery on consent and argued that it would be "prejudiced if it had to respond to Plaintiff's motion without being able to complete discovery on an issue that is essential to its defense." (*See* Doc. 101 at p. 2.) Direct Energy then requested that it be given until June 4, 2020 to complete its discovery on its consent defense before responding to Plaintiff's Motion for Class Certification. The Court granted Direct Energy's request to delay the briefing schedule so that it could complete that discovery. Direct Energy never at any point thereafter suggested there was any outstanding discovery it still needed to complete in the course of class certification briefing.[4] Given Direct Energy has long since identified and subpoenaed all potentially relevant sub-vendors, and given neither TMC itself nor any of the sub-vendors have any evidence of consent for any class members, Direct Energy's suggestion that there are other vendors that might have evidence of consent for the class must be rejected.

---

[4] It is for this reason that Plaintiff remarked in his opposition brief that "discovery is closed." Plaintiff did not mean all discovery in the case is closed. Plaintiff has argued that discovery is still open on issues such as vicarious liability that primarily relate to the merits of the case rather than class certification. (*See* Doc. 116 at p. 6.) With respect to the issue of consent, however, Direct Energy had already asked for and been granted additional time to do discovery on its consent defense in order to oppose class certification. Thus, Plaintiff submits that he understood the Court's expectation to be that Direct Energy should not be producing new evidence in support of its consent defense after filing its opposition brief absent a compelling explanation as to why the information was previously unavailable.

9

        1.      <u>Britebox/Squeeze leads were the subject of the *Burk* case, and none of those leads have been shown to be in the class.</u>

Direct Energy has long known that Britebox/Squeeze leads were used in Direct Energy campaigns conducted by TMC. Those leads were used in the campaign that was the subject of the *Burk* case, which involved phone calls and texts, not the RVMs sent through Silverman and JDI that are at issue here. Indeed, in the *Burk* case, Direct Energy informed the Court that Britebox was the vendor responsible for obtaining telephone numbers for the campaign at issue, which another vendor, Teledrip LLC, then placed calls and texts to. (*See* Joint Statement filed in *Burk*, attached hereto as Exhibit B.) Direct Energy further represented that it issued a subpoena to Britebox, and that the plaintiff also issued two more subpoenas to Britebox. (*Id.*) Direct Energy and the plaintiff received 73 pages in response to the subpoena, *none of which were produced in this case, because Direct Energy determined they weren't relevant here*. (*Id.*) Moreover, Direct Energy's status report in the *Burk* case shows that it has had those documents since at least June 10, 2020, yet has never so much as suggested Britebox leads were in the class until it filed its fourth brief opposing class certification in January 2022. (*Id.*) That status report also shows that Direct Energy apparently has a "list of Britebox opt-ins," yet Direct Energy has deliberely chosen to withhold that list here. (*Id.*) Without any evidence of consent, Britebox leads do not need to be excluded from the class, but if Direct Energy were to produce the "list of Britebox opt-ins" it claims to have, those leads could easily be excluded from the class if the Court believes that would make the case more suitable to be certified. Rather than produce that list, Direct Energy has chosen to try to defeat class certification with speculation and surmise. That gambit should be rejected.

Finally, it should be noted that Direct Energy has not shown that there is a single Britebox lead that was generated in connection with a Direct Energy campaign in the class.

10

Direct Energy points to a single newly produced email thread that lists several phone numbers that were apparently sent by Britebox to TMC for test purposes.  (*See* Doc. 142-1 at ¶¶ 28-31; Murphy Decl. at ¶ 12 and Ex. 10.)  That email makes no mention of Direct Energy and only refers to "energy opt-in leads" generically.  (Murphy Decl. at Ex. 10.)  The earliest invoice Direct Energy has submitted from Britebox (as purported evidence that leads were used in a Direct Energy campaign) is from November 2017, but *this email thread is from August 3, 2017, three months earlier*, so there is no indication that this email has anything to do with Direct Energy.  (*See* Doc. 142-1 at ¶ 33.)

        2.    <u>No KB Synergy leads have been shown to be in the class, and there is no evidence of consent for any leads purchased in the invoices.</u>

Likewise, Direct Energy has not shown that there is a single KB Synergy lead in the class, or that KB Synergy leads have anything to do with the campaign at issue of RVMs placed through Silverman and JDI.  Nor has Direct Energy provided any evidence that KB Synergy's lead generation efforts resulted in a single class member providing consent for any company to call them.

Direct Energy's "expert" speculates that KB Synergy must have gathered consent for all of the leads that were purchased in the invoices.  However, *no evidence of consent* for *any of those leads* has been produced.  Instead, Direct Energy directs the Court to two email threads discussing consent for leads *from April and May 2019*, nearly a year *after* the class period and over a year after this lawsuit was filed.  (*See* Doc. 142-1 at ¶¶ 37-39; Doc. 142-4; Murphy Decl. at ¶¶ 13-15 and Exs. 11-13.)  Again, Direct Energy visited TMC's offices in order to gather documents and has full access to all of TMC's emails.  It searched far and wide for any evidence that so much as suggests there could be consent for any leads in the class.  It identified and subpoenaed all potentially relevant vendors.  Yet it still has no evidence that there is a single KB

11

Synergy lead in the class and no evidence that KB Synergy properly gathered consent before or during the class period.

## CONCLUSION

For the foregoing reasons, Direct Energy's new evidence and second supplemental expert report do not change anything, and Plaintiffs' Motion for Class Certification should be GRANTED.

Respectfully submitted,

**/s/ Brian K. Murphy**
Brian K. Murphy (0070654)
Jonathan P. Misny (0090673)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murphy@mmmb.com
　　　　 misny@mmmb.com

Edward A. Broderick (admitted *pro hac vice*)
Broderick Law P.C.
99 High Street, Suite 304
Boston, MA 02110
Telephone: 617.738.7080
Facsimile: 617.830.0327
E-mail: ted@broderick-law.com

Anthony I. Paronich (admitted *pro hac vice*)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: 508.221.1510
E-mail: anthony@paronichlaw.com

        Matthew P. McCue (admitted *pro hac vice*)
        The Law Office of Matthew P. McCue
        1 South Avenue, Suite 3
        Natick, Massachusetts 01760
        Telephone: 508.655.1415
        Facsimile: 508.319.3077
        E-mail: mmccue@massattorneys.net

        Samuel J. Strauss (admitted *pro hac vice*)
        Turke & Strauss LLP
        936 N. 34th Street, Suite 300
        Seattle, WA 98103
        Telephone: 608.237.1774
        Facsimile: 608.509.4423
        E-mail: sam@turkestrauss.com

        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2022, I served the foregoing through the Court's CM/ECF system, which sent notice to all counsel of record.

        **/s/ Brian K. Murphy**
        Brian K. Murphy