**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MATTHEW DICKSON, ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED; | ) ) ) | CASE NO. 5:18-CV-00182-JRA |
| | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | CARMEN E. HENDERSON |
| | ) | |
| DIRECT ENERGY, LP, TOTAL MARKETING CONCEPTS, INC., SILVERMAN ENTERPRISES, LLC, | ) ) ) ) | **REPORT & RECOMMNEDATION** |
| | ) | |
| Defendants, | ) | |

This matter has been referred to the undersigned United States Magistrate Judge for preparation of a Report and Recommendation pursuant to 28 U.S.C. Section 636(b), Fed. R. Civ. P. 72, and LR. 72.1, and for general pretrial supervision pursuant to Local Rule 72.2(a).

Before the Court is Defendant Direct Energy, LP's ("Direct Energy") motion for summary judgment. (ECF No. 168). Plaintiff Matthew Dickson ("Dickson" or "Plaintiff") filed a memorandum in opposition (ECF No. 172). Defendant filed a reply in support of its motion on August 20, 2024. (ECF No. 174). For the reasons set forth herein, the Court recommends DENYING Direct Energy's motion for summary judgment.

I.    **Background**

The Sixth Circuit Court of Appeals set forth the following brief summary of the background of this case:

> This case arises from unauthorized prerecorded messages allegedly sent to Dickson by Direct Energy. Specifically, Dickson alleges that Direct Energy delivered multiple [ringless voicemails ("RVMs")] to his cell phone in 2017 advertising its services.

1

RVM technology makes it possible to "deposit[ ] voicemails directly into a recipient's voicemail box, without placing a traditional call to the recipient's wireless phone." One RVM placed on November 3, 2017, explicitly stated that the call was from "Nancy Brown with Direct Energy." Dickson never consented to receiving these communications. He thus filed suit individually and on behalf of all others similarly situated, alleging that Direct Energy violated the TCPA's automated calling prohibitions under 47 U.S.C. § 227(b)(1) by sending RVMs.[1] Dickson claims that he was harmed by these communications because they tied up his phone line, cost him money, and were generally a nuisance. He also maintains that the calls disturbed his solitude and invaded his privacy.

*Dickson v. Direct Energy, LP*, 69 F.4th 338, 341–42 (6th Cir. 2023) (footnote omitted).

### A. Defendants

Dickson's Second Amended Complaint names Direct Energy, Total Marketing Concepts ("TMC") and Silverman Enterprises ("Silverman") as defendants. (ECF No. 34). Direct Energy is a retail energy supplier and the primary defendant. TMC was contracted by Direct Energy for telemarking. Direct Energy filed a crossclaim against TMC in 2018. According to Direct Energy, TMC went out of business in 2019. TMC's counsel withdrew in 2019, and no new counsel has appeared on its behalf. TMC did not file an answer to Direct Energy's Amended Crossclaim filed in 2019. Silverman was hired by TMC to send RVMs. Silverman is not represented in this litigation and has not actively participated in the litigation since 2020.

### B. Timeline

- March 4, 2015: Direct Energy and TMC entered into a Teleservices Agreement, which included several initial Statements of Work ("SOWs"). (ECF Nos. 168-2, 168-3).

- March 23, 2015: Direct Energy and TMC entered into an amended SOW for outbound teleservices for a term to conclude on March 23, 2016. (ECF No. 168-4). This SOW was automatically renewed at six-month intervals after its initial term. (ECF No. 168-4 at 5).

- March 29, 2016: Direct Energy and TMC entered into a 30-day "Test Campaign with DMI Partners" in which TMC would enter into a sub-contract with DMI Partners to provide "opt-in leads for the purpose of selling Direct Energy products and services in the State of Texas and the US North Region" (ECF No. 168-5).

- September 2016: Direct Energy and TMC launched an RVM telemarketing campaign without entering into a new statement of work. (ECF No. 172-3, PageID #: 10197-99, 10200-01).

- March 22, 2017: Direct Energy and TMC entered into a SOW addendum for the ongoing RVM and co-registration campaign. (ECF No. 168-10). The addendum states that TMC will use Silverman Enterprises to provide inbound calls generated by RVM technology for the purpose of selling Direct Energy products and services. The addendum incorporates and is subject to the Teleservices Agreement. The addendum was signed by TMC on March 23, 2017, but not by Direct Energy. Direct Energy, however testified that the terms from the RVM SOW governed the program. (ECF No. 172-3, PageID #: 10124-26).

- March 24, 2017: TMC also proposed a separate statement of work for a "Lead Sourcing" program at Direct Energy's request. (ECF No. 172-3, PageID #: 10206-10). Like the RVM program, the Lead Sourcing program launched without being covered by any SOW. (*Id.*, PageID #: 10208). On March 30, 2017, TMC sent a revised draft for the Lead Sourcing program (the "Lead Sourcing SOW") that kept the terms of the initial draft the same but dropped the price to $.45 per lead. (ECF No. 172-3, PageID #: 10211-13). Direct Energy paid for leads invoiced by TMC under this program at the price of $.45 per lead. (*See id.*, PageID #: 10206-09, 10216-17).

- November 3, 2017: Dickson received an RVM which stated: "Hi this is Nancy Brown with Direct Energy. I have some great information for you about the supply portion of your electric account. Please give me a call back at (440) 596-4052 and have a copy of your energy statement to review to see if you qualify." (Doc. 168-25, PageID #: 9296). According to Direct Energy's expert, the RVM was sent by TMC's subvendors JDI and Magnify. (ECF No. 168-35, PageID #: 9938, n.1, PageID #: 9995-97).[1] Thereafter, Dickson wrote to Direct Energy requesting any evidence that it had consent to call him. (ECF No. 172-12, PageID #: 10425; ECF No. 172-1, PageID #: 10113 at ¶ 13). Direct Energy allegedly did not respond.

- January 24, 2018: Dickson filed the instant suit.

---

[1] Direct Energy argues that it did not approve or even know of those vendors. (ECF No. 168-1, PageID #: 9090-91 at ¶ 11; ECF No. 168-27, PageID #: 9917). Direct Energy claims that it only learned of their existence through discovery in this lawsuit. (ECF No. 168-1, PageID #: 9090-91 at ¶ 11).

- March 25, 2018: Direct Energy and TMC entered into a SOW for a 90-day trial period (through June 25, 2018) during which TMC agreed to provide, on behalf of Direct Energy, a "Teledrip Campaign" with subcontractor Silverman Enterprises. The SOW stated that "[c]onsumers who have opted-in through a Silverman co-registration campaign will be contacted regarding Direct Energy energy products or services from Silverman Teledrip Platform" (ECF No. 168-11 at 2).  Direct Energy authorized TMC and its permitted subcontractors, including Silverman Enterprises, to display the Direct Energy logo and name to solicit customers on its behalf. (ECF No. 168-11 at 8).

## II.    Procedural History

Dickson brought this action under the TCPA, alleging that Direct Energy sent him multiple RVMs without his consent. The district court determined that Dickson received only one RVM and dismissed the suit, finding that Dickson suffered no concrete harm and therefore lacked standing. Dickson appealed the order dismissing his claim. The Sixth Circuit Court of Appeals determined that regardless of the number of RVMs Dickson received, his asserted injury bears a close relationship to one recognized at common law: intrusion upon seclusion. The Circuit further found that Direct Energy caused Dickson the type of harm Congress sought to address through the TCPA. Accordingly, the Circuit reversed the order of the district court and remanded the case for further proceedings. *See Dickson*, 69 F.4th 338.

Direct Energy now moves for summary judgment on Dickson's sole claim against it: that Direct Energy violated the TCPA's automated calling provisions through its use of unsolicited RVMs. Direct Energy argues that it cannot be held vicariously liable for the acts of TMC because TMC was an independent agent and was not acting with actual or apparent agency when it violated the TCPA and that it did not ratify the illegal acts of TMC.

## III.    Standard of Review

4

Federal Rule of Civil Procedure 56(a) lays out the standard for summary judgment motions. It provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party asserting that there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, the court views the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Tokmenko v. MetroHealth System*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) ("A dispute about a fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, "[c]redibility judgments and weighing of the evidence

are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party must make a *prima facie* showing that it is entitled to summary judgment, and it bears the burden of production. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.*

If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record that create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871 (N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-moving party must show "more than a scintilla of evidence to overcome summary judgment"; it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). Moreover, the trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citation omitted)).

## IV.  Law

The Sixth Circuit recently explained the history of the TCPA:

> The TCPA is the product of public outrage over abusive telephone marketing practices. Pub. L. 102-243 § 2, ¶ 6 (1991). By the time it was enacted in 1991, companies had begun to use technology that could automatically dial telephone numbers and deliver prerecorded voice messages to potential consumers en masse—reportedly to more than 18 million Americans each day. *Id.* ¶¶ 1, 3; *see also* S. Rep. No. 102–178, at 2 (1991), *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1970 (describing industry developments which expanded the use of robocalls).

Many complained that these unsolicited calls tied up phone lines, crowded answering machines, imposed financial burdens, and disrupted public safety services. Pub. L. 102-243 § 2, ¶¶ 5, 9, 14; S. Rep. No. 102–178, at 1–2, *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1969. Consumers more generally criticized these robocalls as invasions of privacy "regardless of the content or the initiator of the message." Pub. L. 102-243 § 2, ¶ 10. Congress agreed. It found that unrestricted telemarketing *can* be "an intrusive invasion of privacy." *Id.* ¶ 5. Congress thus enacted the TCPA with individual privacy interests among its primary concerns. *Id.* ¶¶ 5, 9–10, 12; *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, —— U.S. ——, 140 S. Ct. 2335, 2348, 207 L.Ed.2d 784 (2020); S. Rep. No. 102–178, at 1–2, 4–5, 9, *as reprinted in* 1991 U.S.C.C.A.N. 1968, 1968–69, 1972–73, 1976.

The TCPA accordingly restricts certain telemarketing practices. Among other things, it prohibits making any call, to any telephone number, "using any automatic telephone dialing system or an artificial or prerecorded voice" absent an emergency or the recipient's prior express consent. 47 U.S.C. § 227(b)(1)(A)(iii). It similarly proscribes the use of robocalls to deliver unsolicited messages. *Id.* § 227(b)(1)(B). Congress delegated authority to the Federal Communications Commission to craft exceptions to the law, provided that those exceptions did not "adversely affect the privacy rights that [it] is intended to protect." *Id.* § 227(b)(2)(B)(ii)(I) (referring to subsection (b)(1)(B)); *see also id.* § 227(b)(2)(C) (stating essentially same in reference to subsection (b)(1)(A)(iii)). The TCPA includes a private right of action to enforce its provisions. *Id.* § 227(b)(3). The law contemplates both injunctive and monetary relief, allowing for an award of $500 for each violation of the statute with the possibility of recovering treble damages. *Id.*

*Dickson*, 69 F.4th at 341.

To state a claim under the TCPA for calls made to a cellular phone, a plaintiff must establish that: (1) a call was made to a cell or wireless phone; (2) by the use of any "automatic dialing system or an artificial or prerecorded voice"; and (3) without the called party's prior express consent. 47 U.S.C. § 227(b)(1)(A). A seller can be held either directly or vicariously liable for violations of this provision of the TCPA. *Keating v. Peterson's Nelnet, LLC*, 615 Fed. Appx. 365, 371 (6th Cir. 2015) (citing *In re Joint Petition Filed by DISH Network, LLC*, 28 FCC Rcd. 6574 (2013)).

It is undisputed that Direct Energy did not directly deliver an RVM to Dickson. (ECF No. 34 at ⁋ 19; ECF No. 172 at 14). Dickson instead seeks to hold Direct Energy vicariously liable for the acts of TMC and TMC's subvendors. "[B]oth the Federal Communications Commission (which implements the TCPA) and federal courts (which interpret it) recognize vicarious liability under the TCPA under 'federal common law principles of agency.'" *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 584 (S.D. Ohio 2016) (quoting *DISH Network,* 28 FCC Rcd. 6574) ("[A] seller...may be held vicariously liable under federal common law principles of agency for violations of [the TCPA] that are committed by third-party telemarketers."); *Imhoff Invest., L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 635 (6th Cir. 2015) ("The *DISH Network* decision further found that the seller may be *vicariously* liable for such violations under federal common law agency principles."); *Keating,* 615 F.App'x at 371(recognizing and exploring vicarious liability under the TCPA). "Any other interpretation of the TCPA 'would allow companies to evade TCPA liability simply by creative contracting.'" *Johansen*, 218 F. Supp. 3d at 584 (quoting *McCabe v. Caribbean Cruise Line, Inc.*, No. 13–cv–6131, 2014 WL 3014874, at *3 (E.D.N.Y. July 3, 2014) (quotation omitted)). An entity may be held vicariously liable under the TCPA under "traditional agency tenets, including not only formal agency, but also principles of apparent authority and ratification." *Lucas v. Telemarketer Calling from (407) 476-5680*, No. 18-3633, 2019 WL 3021233, at *5 (6th Cir. May 29, 2019) (quotation marks and citation omitted).

Dickson argues that questions of material fact preclude summary judgment under the theories of actual authority, apparent authority, and ratification. As detailed below, this Court finds that a question of material fact remains as to whether Direct Energy may be held liable for the acts of TMC or its subvendors for violations of the TCPA.

**V.      Analysis**

For vicarious liability to attach, Dickson must satisfy the initial burden of establishing a principal-agent relationship. *Keating*, 615 F. App'x at 373. "The classical definition of 'agency' contemplates 'the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control.'" *Id.* at 372 (quoting *DISH Network*, 28 FCC Rcd. at 6586–6587). Direct Energy may not be liable if it can show that TMC was an independent contractor rather than an agent. *See id.* at 371-72 (explaining that liability under the TCPA does not extend to independent contractors).

1. **There is a genuine issue of material fact as to whether Direct Energy may be held vicariously liable for the acts of TMC or its subvendors in violation of the TCPA.**

   a. **There is a genuine issue of material fact as to whether Direct Energy and TMC had a principal/agent relationship.**

The parties dispute whether Direct Energy exhibited the requisite control over TMC necessary for an agency relationship. Direct Energy argues TMC was not its agent because the terms of their agreement identified TMC as an "independent contractor" and that TMC was "expressly instructed to send RVMs only with TCPA-compliant opt-in consent." (ECF No. 168 at 21).

"Agency is a 'fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Jayson Rogers, Plaintiff, v. Interstate Nat'l Dealer Servs. Inc., et al., Defendants.*, No. 1:20 CV 00554, 2020 WL 4582689, at *4 (N.D. Ohio Aug. 10, 2020) (quoting *Restatement (Third) of Agency* § 1.01 (2006)). "In particular, '[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.'" *Id.* Whether an agency relationship exists is based on an assessment of the facts of the

9

relationship and not on how the parties define their relationship. *Restatement (Third) of Agency* § 1.02; *see also Jackson v. Novastar Mortg., Inc*., 645 F. Supp. 2d 636, 642 (W.D. Tenn. 2007); *Smith v. Vision Solar LLC*, No. CV 20-2185, 2022 WL 1172985, at *3 (E.D. Pa. Apr. 20, 2022; *Frey v. Frontier Utilities Ne. LLC*, No. CV 19-2372-KSM, 2020 WL 12697468, at *2 (E.D. Pa. Apr. 13, 2020) (vicarious liability turns not only on the language used in a contract between the parties but also on 'the actual practice between the parties.'" (quoting *Klein v. Com. Energy, Inc*., 256 F.Supp.3d 563, 585 (W.D. Pa. 2017)).

Direct Energy argues that the clear wording of the "operative contract" between Direct Energy and TMC precludes a finding that TMC was an agent of Direct Energy rather than an independent contractor. (ECF No. 168 at 22-24 (relying on *Keating*, *Kahler v. Fid. Mut. Life, Inc.*, No. 5:16CV287, 2018 WL 1365836, at *2 (N.D. Ohio Mar. 16, 2018) (Adams, J.), *appeal dismissed*, No. 18-3349, 2018 WL 3494640 (6th Cir. June 18, 2018), and *Worsham v. Direct Energy Servs., LLC*, No. CV SAG-20-00193, 2021 WL 948819 (D. Md. Mar. 12, 2021), *aff'd,* No. 21-1677, 2022 WL 1261998 (4th Cir. Apr. 28, 2022)). In *Keating*, the Sixth Circuit upheld summary judgment in favor of an alleged principal finding no principal/agent relationship existed because 1) the "clear wording of the operative contract" stated that the alleged agent was independent contract and that the alleged agent was not authorized to make or accept any representations on behalf of the alleged principal; and 2) the alleged wrongful acts were not made by the alleged agent, but rather by a third party unbeknownst to the alleged principal or the alleged agent. *Keating*, 615 F. App'x at 372.

Direct Energy cites to paragraph 13.1 of the March 4, 2015 Teleservices Agreement, which states:

> 13.1 <u>Relationship of the Parties.</u> This Agreement is not intended to create, and does not create, any partnership, joint venture, fiduciary, employment, or other

> relationship between the parties, beyond the relationship of independent parties to
> a commercial contract. Neither party is, nor will either party hold itself out to be,
> vested with any authority to bind the other party contractually, or to act on behalf
> of the other party as a broker, agent, or otherwise.

(ECF No. 168-2 at 20). The provision Direct Energy relies upon here is similar to the provision in

*Keating*. However, on March 23, 2015, Direct Energy and TMC amended the initial terms of their

Agreement. The record evidence shows that Direct Energy expressly authorized TMC to (among

other things) close sales on Direct Energy's behalf and thereby bind Direct Energy in contracts

with customers. (*See* ECF No. 168-4 at 3-4). Specifically, the March 23, 2015, SOW provided

that:

> h. Vendor shall call record and verify all telemarketing calls made or received by
> Services Provider and/or CSRs that result in sales to any third party ("Verified
> Sales").
>
> [. . .]
>
> p. Vendor shall evaluate each recorded sale as it pertains to the verification portion
> of the Script and ensure all requirements are met.
>
> q. Vendor shall provide complete daily sales file(s) to Direct Energy in a format
> acceptable to Direct Energy.

(*Id.*). "Indeed, one of the most important features of the agency relationship is that *the principal*

*itself becomes a party* to contracts that are made on its behalf by the agent." *Versatile Helicopters,*

*Inc. v. City of Columbus*, 548 F. App'x 337, 340 (6th Cir. 2013) (emphasis in original)) (citing

*Restatement (Third) of Agency* §§ 6.01, 6.02))). This authority to bind Direct Energy to a contract

distinguishes this matter from that in *Keating*, where there was no evidence that the alleged

principle had authorized the alleged agent to enter into agreements on its behalf.

This matter is further distinguishable from *Keating* in that the facts demonstrate the high

level of control Direct Energy had over TMC and the telemarking campaigns. For example, Direct

Energy had the ability to audit TMC's records to ensure it was in compliance with its contractual

obligations, including any regulatory obligations (ECF No. 168-2 at ⁋ 7.3); could audit TMC's

subcontractors in the same manner (*id*. § 7.3.3); had access to TMC facilities and staff to ensure compliance (*id.* at § 7.3.5); and had the ability to terminate the contract with or without cause (§§ 8.3, 8.6). Additionally, Direct Energy authorized TMC to telemarket on its behalf using the Direct Energy trade name as if Direct Energy itself was making the telemarketing call. (ECF No. 168-2 at §§ 1.1, 6.3).  As such, Dickson has produced evidence from which a reasonable jury could find that Direct Energy exerted such a level of control over TMC such that there was a principle/agent relationship despite Section 13.1's assertion otherwise.

Accordingly, Dickson has produced evidence sufficient to demonstrate a genuine question of material fact as to whether TMC was an authorized agent of Direct Energy. However, principals or employers are only vicariously liable for the acts of their agents or employees in the scope of their authority or employment. *See Meyer v. Holley*, 537 U.S. 280, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003). Thus, the Court must analyze whether Dickson has produced evidence demonstrating that TMC acted within the scope of its actual or apparent authority or that Direct Energy ratified TMC's acts.

> **b.  There is a genuine question of material fact as to whether TMC acted within the scope of its authority.**
> **i.  Actual Authority**

"[A]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Keating,* 615 F. App'x at 373. A party may be held liable for the conduct of a third-party under a theory of actual authority where "(a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." *DISH Network*, 28 F.C.C. Rcd. at 6586. Actual authority may be express or implied. *See Bergin Fin., Inc. v. First Am. Title Co*., 397

Fed. App'x 119, 124 (6th Cir. 2010); *see Damon's Missouri, Inc. v. Davis*, 63 Ohio St.3d 605, 590 N.E.2d 254, 257 (1992) (noting "an agent, acting within the scope of his actual authority, expressly or impliedly conferred, can bind the principal"). Dickson argues that Direct Energy gave both express and implied authority to TMC to contact individuals outside of those who had opted in to receive information regarding products and services from Direct Energy.

"'[E]xpress authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms [.]'" *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 661 (6th Cir. 2005) (quoting *Davis*, 590 N.E.2d at 257). Direct Energy argues that TMC acted without its authority when TMC made unsolicited contact with individuals through RVMs. Direct Energy argues that the Teleservices Agreement and the related SOWs explicitly required TMC to perform all services for Direct Energy in compliance with the TCPA. (ECF No. 168 at 23).

Initially, the parties disagree on the "operative contract." Following the initial Teleservices Agreement in 2015 through the filing of the lawsuit in 2018, Direct Energy and TMC negotiated several SOWs. Occasionally, Direct Energy and TMC began campaigns without SOWs in place and later adopted a SOW specific to the needs already being carried out. There are several SOWs in the record that were not fully executed by one or both parties to the contract. There were also SOWs that had short "trial" periods, which were not always extended past the trial period – or at least not evidenced in the record through a follow-up SOW. Each SOW incorporates and is subject to the terms of the 2015 Teleservices Agreement. However, where there are conflicts, the applicable SOW controls. (*See e.g*. ECF Nos. 168-3, 168-4, 168-5, 168-10, 168-11).

The parties dispute which SOW applies to the calls made to Dickson. Direct Energy argues that the terms of the Teleservices Agreement and the SOW for Opt-In Leads dated March 29, 2016

13

("Opt-In Leads SOW") (ECF No. 168-5) apply. Dickson argues that the terms of the March 2017 Lead Sourcing SOW ("Lead Sourcing SOW") (ECF No. 172-3 at 94) apply.

Regardless of which SOW applies, however, Dickson has not presented evidence that Direct Energy *expressly allowed* TMC to reach out to individuals who had not opted in. The Teleservices Agreement and SOWs expressly required TMC and its subcontractors to comply with federal telemarketing laws. (ECF No. 168-2 at 15, ¶ 9.2(h)-(i) (agreeing to perform "in compliance with all federal, state and local laws, rules, regulations and ordinances"); ECF No. 168-3 at 4, ¶ 1.u (agreeing to "provide all services in accordance with all applicable laws, regulations and rules, including, without limitation, the Telephone Consumer Protection Act of 1991")). Even assuming, as Dickson urges, that the Lead Sourcing SOW applies, Dickson acknowledges, the terms of the Lead Sourcing SOW are brief and notably silent as to any requirements regarding the TCPA and therefore do not conflict with express terms of the Teleservices Agreement. Thus, the terms of the Teleservices Agreement control and required TMC to comply with the TCPA. Accordingly, Dickson has not demonstrated any evidence that TMC had express authority to contact individuals who had not given consent.

Next, the Court must look at whether Dickson has presented evidence demonstrating a question of material fact as to whether Direct Energy gave TMC implied authority to violate the TCPA. "In contrast [to express authority], an agent's implied authority may 'arise from the express delegation of actual authority and unless its extent is otherwise expressly limited, implied authority carries with it the power to do all that which is reasonably necessary to carry into effect the power actually conferred.' " *Id*. at 662. Here, Dickson argues that Direct Energy otherwise led TMC to reasonably believe that it should make telemarketing calls that might violate the TCPA. Specifically, Dickson argues that Direct Energy instructed TMC to source large quantities of leads

while not insisting they come from any particular source, instructed that the leads need not be backed by TrustedForms, and instructed that the leads could consist of generic "opt in" data.  (ECF No. 172 at 24-25). This argument also fails as the record demonstrates that the authority Direct Energy gave TMC expressly limited TMC to market to *opt-in* leads.

In the Teleservices Agreement, Direct Energy gave TMC the express authority to telemarket on its behalf within the confines of state and federal telemarketing laws. This authority was further directed by the various SOWs exploring various telemarking campaigns.

As explained above, the parties dispute which SOW applied to the campaign that led to Dickson being contacted on behalf of Direct Energy. However, even if, as Dickson argues, the Lead Sourcing SOW applies, the record still demonstrates that TMC's authority was expressly limited to opt-in leads. While the Lead Sourcing SOW did not indicate who TMC would use to provide the leads for Direct Energy nor state that consent must be given through TrustedForms, it expressly specified that TMC would provide *opt-in* leads. There is no further clarification regarding "opt-in", but the general terms of the Teleservices Agreement required TMC to follow all telemarketing laws.[2] Dickson relies on the testimony from TMC's Larry Correia, that "everything that was done was done, you know, with the authorization of Direct Energy" (ECF No. 172-6 at 4-5) as evidence that if TMC did something in violation of the TCPA, then Direct Energy impliedly authorized it. However, the email correspondence between Direct Energy and TMC further demonstrates that TMC's authority to market on behalf of Direct Energy was expressly limited to generating opt-in leads and that TMC understood the limits of its authority. (ECF No. 168-1, PageID #: 9089-90; ECF No. 168-24, PageID #: 9274 ("the RVM campaigns that

---

[2] Direct Energy argues in part that this is evidence that terms of the Opt-in Leads SOW, which contained explanations for "opting in" and examples of acceptable opt-in scripts, apply. However, this is a self-serving statement, which the Court will not consider in this analysis.

15

TMC did for Direct Energy all used opt-ins")). Throughout 2017, TMC assured Direct Energy that

it was only sending RVMs to opt-in leads:

- May 22 - Correia emailed Direct Energy that TMC was looking to launch the RVM campaign to "opt-in customers" that week. (ECF No. 168-18, PageID #: 9246).

- May 31 - Correia reiterated that RVMs would be sent to "customers who opt in." (ECF No. 168-18, PageID #: 9249).

- June 15 - After two weeks of slow sales, Correia emailed Direct Energy's Head of Telesales, John Moran, asking that he consider "Wireless RVM" (referring to nonopt-in leads). (ECF No. 168-20, PageID #: 9252). But Correia said TMC "w[ould] still pursue the Opt In RVM initiative" pending approval and asked to increase the amount of opt-ins bought each week. (*Id*.).

- June 21 - Correia emailed Moran "Opt In RVM – Reports." (ECF No. 160-21, PageID #: 9258 – 59).

- July 7 - Correia said "for [TMC] to purchase 50k of opt in leads each week" was challenging, but acknowledged "wireless leads [were] still in limbo" and had not been approved. (ECF No. 168-22, PageID #: 9261–63).

- July 12 - TMC sent Direct Energy a second letter from TMC's attorney, again opining that RVMs are not TCPA calls and suggesting Direct Energy discard its consent requirement. (ECF No. 168-23, PageID #: 9265–70).

- August 2 - Direct Energy "greenlighted [TMC] to expand Opt in as high and as far as you can go." (ECF No. 168-8, PageID #: 9160).

- August 16 - Moran emailed TMC Direct Energy's continuing position "that we only use ringless voicemail for potential customers *who have provided consent to receive calls*." (ECF No. 168-9, PageID #: 9168).

Although Dickson asks this Court to interpret Direct Energy's "greenlight" as implied

authorization to violate the TCPA, he fails to support his position with any facts. Dickson fails to

present evidence of a material fact from which a reasonable jury may find that TMC acted with

implied actual authority when it contacted potential customers without their consent. The

correspondence above refutes any suggestion that either Direct Energy or TMC believed that

authority was given to contact those who had not provided consent. If either party believed that

such authority existed, TMC's numerous requests to engage in such a practice through ringless

RVMs would have been wholly unnecessary.

Accordingly, Dickson has failed to demonstrate a question of material fact showing that TMC acted with actual authority – either express or implied – when it contacted potential consumers who had not opted in to receiving such calls. Nevertheless, the Court must next look at whether Dickson has presented evidence to establish that there is a genuine issue of material fact as to whether TMC acted with apparent authority.

### ii.  Apparent Authority

"Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Restatement (Third) Of Agency* § 2.03 (2006). "Apparent authority exists when (1) the principal manifests that another is the principal's agent, and (2) it is reasonable for a third person dealing with the agent to believe the agent is authorized to act for the principal." *Deschamps v. Bridgestone Ams., Inc. Salaried Employees Ret. Plan*, 840 F.3d 267, 279 (6th Cir. 2016) (citing *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 593 (6th Cir. 1998)). "The apparent power of an agent is to be determined by the act of the *principal* and not by the acts of the *agent*[.]" *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (emphasis added). A principal can create apparent authority "by directing an agent to make statements to third parties or directing or designating an agent to perform acts[,] placing an agent in a position within an organization, or placing the agent in charge of a transaction or situation." *Restatement (Third) Of Agency* § 2.03 cmt. c. The FCC has identified "examples of evidence that may demonstrate that [a] telemarketer" has "apparent authority [sufficient] to make [a company] vicariously liable for the telemarketer's [TCPA] violations." *DISH Network*, 28 FCC Rcd. at 6592. "For example, apparent authority may be supported by evidence that" (1) the company "allow[ed] the outside

sales entity access to information and systems that normally would be within [its] exclusive control," such as "detailed information regarding the nature and pricing of [its] products and services" or "customer information"; (2) the telemarketer could "enter consumer information into [its] sales or customer systems"; (3) the telemarketer had "the authority to use [its] trade name, trademark and service mark"; and (4) it "approved, wrote or reviewed the outside entity's telemarketing scripts." *Id.* These examples, however, are not binding nor entitled to deference. *See Christopher Seri v. Crosscountry Mortg., Inc*., No. 1:16-CV-01214-DAP, 2016 WL 5405257, at *5 (N.D. Ohio Sept. 28, 2016).

In *Keating*, the Sixth Circuit upheld a district court's summary judgment ruling that a defendant did not have any apparent authority over telemarketers where "nothing in the record ... [could] be construed to indicate that the defendants held out to third parties, or to anyone else, that [telemarketer] was authorized to send text messages to individuals who had not agreed to receive them." *Keating*, 615 F. App'x at 374 (citing *DISH Network*, 28 FCC Recd. at 6592). The Sixth Circuit explained that "'[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal.'" *Keating*, 615 F. App'x at 372 (quoting *DISH Network*, 28 FCC Rcd. at 6586–87). Moreover, "a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *Id.* at 374 (citing *DISH Network*, 28 FCC Rcd. at 6592). Thus, a critical factor in assessing apparent authority under *Keating* was whether

18

the principal knew or should have known of an agent's unlawful conduct and failed to take corrective action.

Direct Energy argues that there is no evidence that it indicated to Dickson that TMC or its subcontractor was acting pursuant to Direct Energy's authority when sending the RVMs. (ECF No. 168, PageID #: 9080-1). Direct Energy further asserts that there is no evidence that it knew that TMC's subcontractors sent non-TCPA-compliant RVMs. (*Id*. at PageID #: 9081). Dickson argues that TMC had apparent authority to make the unlawful RVMs because 1) Direct Energy approved the script and authorized TMC to use its trade name when delivering the RVMs; 2) Direct Energy received several thousand complaints regarding the RVMs but did not stop the conduct; and 3) Direct Energy did not require consent to be TCPA-compliant, including requiring the consent to be specific to Direct Energy and compliance with the E-Sign Act. (ECF No. 172 at 10104).

The Court agrees with Dickson. Dickson relies in part on TMC's authorized use of Direct Energy's trade name and Direct Energy's approval of the RVM scripts as evidence that Direct Energy allowed third-party recipients of the RVMs to reasonably believe the RVMs were from Direct Energy. (*Id*., PageID #: 10103–04). Here, the RVM stated that the caller was calling from Direct Energy. There is no dispute that Direct Energy approved the scripts that TMC would use for the RVMs, which required the use of Direct Energy's name. Nevertheless, "[t]he provision and approval of marketing scripts is insufficient to create an issue of fact surrounding apparent authority." *Kahler*, 2018 WL 1365836, at \*4 (citing *In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig*., 223 F. Supp. 3d 514, 521 (N.D.W. Va. 2016), *aff'd sub nom. Hodgin v. UTC Fire & Sec. Americas Corp*., No. 17–1222, 2018 WL 1308605 (4th Cir. Mar. 14, 2018)). The Court also notes that the mere use of a trade name cannot confer apparent authority because it is not an

outward manifestation to a third party that a caller was authorized to act on a principal's behalf. *See id*. at *5 ("This fact is not an 'outward' manifestation in any manner."); *see also In re: Monitronics*, 223 F. Supp. 3d at 521. *See Ortega v. General Motors Corp.,* 392 So.2d 40, 43–44 (Fla.Dist.Ct.App.1981) (truck dealer held not to be apparent agent of truck manufacturer, despite use of tradename); *Apple v. Standard Oil, Division of American Oil Co.,* 307 F.Supp. 107 (N.D.Cal.1969) (gas station held not to be apparent agent of oil company, despite use of tradename on signs and on credit cards); *Westerdale v. Kaiser–Frazer Corp.,* 6 N.J. 571, 80 A.2d 91 (1951) (auto dealer held not to be apparent agent of manufacturer, despite use of tradename).

The Court believes, however, that this line of cases, involving corporations who sell their products through authorized dealers, is significantly different from the instant case, in which Direct Energy authorized TMC's use of its trade name to deliver RVMs to potential customers. Direct Energy directed that TMC explicitly state that the RVMs were coming from Direct Energy, and authorized TMC to enter into contracts on behalf of Direct Energy. Here, the facts indicate more than "mere use" of Direct Energy's trade name.

Moreover, a critical factor in *Keating* was whether the principal knew *or should have known* of an agent's unlawful conduct and failed to take corrective action. *Keating*, 615 F. App'x at 374. In *Keating*, the court found that "Keating offered no evidence that the defendants had any information that would have suggested that unauthorized text messages were being sent until such time as the company received complaint calls alerting them to that fact." *Id.* Further, the court found that upon receiving complaint calls the campaign was immediately suspended on multiple occasions and eventually the campaign was suspended entirely. *Id*. Here, Dickson summarily asserts that because Direct Energy received thousands of complaints, it had knowledge that TMC

was violating the TCPA.[3] Further, in his recitation of the facts, Dickson presents evidence that may reasonably be interpreted as showing that Direct Energy knew or reasonably should have known that TMC was sourcing leads in violation of the TCPA and yet failed to take steps to stop it. Dickson alleges that Direct Energy had been notified thousands of times of persons complaining that they had been contacted without their consent. (ECF No. 172, PageID #: 10087). Dickson's expert Anya Verkhovskaya found that over the course of the RVM campaign from May 15, 2017, through the end of 2017, 13,287 potential class members complained to Direct Energy that they did not want to be called, beginning on the very first day of the campaign. (ECF No. 107-1 at 23–24.).[4] On some days, for example September 28, 2017, Direct Energy received over 600 complaints. (ECF No. 172-3, PageID #: 10288–301). Dickson asserts that Direct Energy did not adequately investigate the large volume of complaints (Feeley Dep. 110:13-111:8.), and instead simply added the number of the complaining consumers to its own internal do not call list.

Direct Energy counters that the complaints do not necessarily indicate a failure to obtain opt-in consent to be contacted. Specifically, Direct Energy argues that the large number of complaints does not necessarily mean that the telemarketing was unlawful, but rather only that the complaining consumers may have opted in and then later changed their minds. (ECF No. 174, PageID #: 10464–65 (quoting Feeley Dep. 108:19–21, 110:22–111:3)). Direct Energy may be correct; however, on summary judgment the court must look at the evidence in the light most

---

[3] Within his apparent authority argument, Dickson fails to offer any specifics about these alleged complaints, their alleged relationship to TMC's actions, their validity, and why they should have prompted action by Direct Energy. (*See* ECF No. 172, PageID #: 10104). However, Dickson addresses Direct Energy's knowledge of alleged complaints under the theory of ratification and in his summary of the facts.

[4] Dickson's expert states that in 2017, 82,381 consumers complained to TMC after receiving Direct Energy telemarketing calls and demanded that such calls cease. (*See* ECF No. 107-1, PageID #: 985).

favorable to the nonmoving party. While Direct Energy's argument is possible, the evidence does not allow for only this one inference. *See Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) ("The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the party against whom judgment was entered.") (quoting *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.,* 395 F.3d 338, 342 (6th Cir.2005) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986))). "In other words, 'at the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *see also Arban v. W. Publ'g Corp.,* 345 F.3d 390, 400 (6th Cir.2003) ("This court does not weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury.")). Here, a reasonable jury could view the evidence as demonstrating that Direct Energy knew or should have known that TMC was unlawfully sourcing leads based on the sheer number of consumer complaints arising at the time of the RVM campaigns and yet Direct Energy failed to take action to stop TMC's unlawful conduct.

Direct Energy cites to *Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1049 (S.D. Cal. 2015) asserting that a "complaint is an allegation of an illegal act, not notice of an illegal act." (*See* ECF No. 174, PageID #: 10465). Direct Energy argues that *Kauffman* supports its argument that the complaints about the telemarketing phone calls do not amount to Direct Energy being on notice that TMC (or its subvendors) was engaging in illegal telemarketing. (*Id.*). However, *Kauffman* is inapposite as it discussed whether the service of a civil complaint, which is later withdrawn, puts a defendant on notice of allegedly illegal acts. *See Kauffman*, 141 F. Supp. 3d at 1049.

Moreover, Dickson does not solely rely on the vast number of consumer complaints alone. Dickson also presents evidence that Direct Energy received more formal complaints from consumers threatening litigation over TMC's telemarketing to them without prior consent. (*See* ECF No. 172-3, PageID #: 10253–87; Feeley Dep. Exs. 25, 26, 27, 28). For example, in October 2017, Direct Energy asked TMC for proof of a complaining consumer's opt-in. TMC's response was to provide the lead information for the consumer without any evidence the consumer had actually opted in. (*Id.* at PageID #: 10268–76; Feeley Dep. Ex. 27). After two weeks Direct Energy again requested the opt-in proof, but TMC did not – perhaps could not – provide it. (*Id.* at PageID #: 10277–88; Feeley Dep. Ex. 28; *id.* at PageID #: 10132–35; Feeley Dep. 100:2-103:20). Despite TMC's failure to produce any proof of an opt-in, the RVM and lead sourcing programs continued.

Finally, Direct Energy argues that the RVMs were sent by TMC's subcontractor of which Direct Energy had no knowledge prior to Dickson filing the instant lawsuit and that it cannot be held vicariously liable for the acts of a subcontractor's unauthorized subcontractor. (*See* ECF No. 168, PageID #: 9081 (citing *Keating*, 615 F. App'x at 374 ("'the unauthorized conduct' in this matter—the sending of the text messages—was not done by a telemarketer 'otherwise authorized to market on the seller's behalf.' Rather, the text messages were sent by [a subvendor], a company unknown to the defendants, who also had no knowledge that [their vendor] had subcontracted its responsibilities.")). Direct Energy argues that the Agreement required TMC to source the leads and forbid TMC from subcontracting such work without prior written consent from Direct Energy. Direct Energy further states that it "did not know of, let alone approve, those subvendors to send RVMs[.]" (*Id.*). Dickson distinguishes this case from the facts of *Keating* "where the telemarketer, in violation of the contract with the seller, subcontracted all of its obligations for a 'click to call' campaign to generate internet leads to a third parties, who then violated the contract's express

23

prohibition against sending text messages." (ECF No. 172, PageID #: 10102 (citing *Keating*, 615 F.App'x at 367-369)). Whereas here, the Agreement acknowledges that third-party vendor support, "such as telephony or computer services," would be required "to support [TMC's] provision of Services or Deliverables to Direct Energy." (ECF No. 168-2, PageID #: 9096 at § 1.14).

Dickson provides evidence that the role of the two subvendors in question here – Just Deliver It and Magnify Telecom – was limited to physically delivering the RVMs— "unquestionably the provision of 'telephony or computer services.'" (ECF No. 172 (citing Subpoena Response of Just Deliver It, attached as Ex. 12 to Misny Decl. (describing Just Deliver It as providing a ringless voicemail service which is provided via Magnify Telecom); *see also Correia Dep*. 19:10-15 (Just Deliver It identified as a dialing company TMC used for RVMs)). Thus, Direct Energy's argument fails. Dickson has provided evidence that TMC simply used third-party telephony services as expressly authorized by the Agreement to send RVMs.  This is distinguishable from *Keating* where the court found that there was no evidence that "the defendants authorized a third party to conduct a text-messaging campaign." *Keating*, 615 F.App'x at 375.

The Court finds that Dickson has presented facts demonstrating that Direct Energy authorized and instructed TMC to use its tradename in its RVMs, approved the scripts used by TMC, and knew or should have known of TMC's improper conduct and that did not take action to prevent that conduct from continuing. *See Keating*, 615 F. App'x at 374. Although Direct Energy attempts to hide behind its correspondence with TMC as evidence that it did not know TMC was actively violating the TCPA, when viewing the evidence in the light most favorable to Dickson, questions of material fact exist as to whether Direct Energy knew or should have known that TMC was obtaining leads through methods that violated the TCPA. Thus, there remains a question of

material fact as to whether TMC acted with apparent authority when it contacted potential consumers who had not opted in to receiving such calls.

Accordingly, this Court recommends denying Direct Energy's motion for summary judgment. However, for the sake of completeness, the Court will also address Direct Energy's ratification argument.

### c. Plaintiff has not demonstrated that Direct Energy ratified TMC's acts.

Finally, Direct Energy argues that it cannot be held vicariously liable for the acts of TMC and its subvendors under the theory of ratification because: 1) TMC was an independent contractor; 2) the Teleservices Agreement specifically stated that TMC had to comply with all federal and state telemarketing laws; 3) it did not receive a benefit from TMC's violations of the TCPA; and 4) there is no evidence that it knew TMC or any of its subvendors was placing RVMs that were not TCPA-compliant. (ECF No. 168 at 30-31).

"[R]atification occurs when an agent acts for the principal's benefit and the principal does not repudiate the agent's actions." *Lucas*, 2019 WL 3021233, at *5 (citing *Sphere Drake Ins. v. Am. Gen. Life Ins.*, 376 F.3d 664, 677 (7th Cir. 2004)). "A principal can ratify an act by 'manifesting assent that the act shall affect the person's legal relations,' or by 'conduct that justifies a reasonable assumption that the person so consents.'" *Eldridge v. Cabela's Inc.*, No. 3:16-cv-536, 2017 WL 4364205, at *6 (W.D. Ky. Sept. 29, 2017) (quoting *Restatement (Third) of Agency* § 4.01(2)). "A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf." *Restatement* § 4.03. Liability under the TCPA based on ratification arises when a seller "ratifies [the unlawful acts] by knowingly accepting their benefits"—for example, "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." *DISH Network*, 28 F.C.C. Rcd. 6574 at ¶ 34). The knowledge requirement is met if the principal either has "actual knowledge" or "choose[s] to affirm without knowing the material

25

facts." *Restatement* § 4.06 cmt. b. Comment d adds that "a factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further investigation." *Id.* § 4.06 cmt. d. This can also be described as "willful ignorance."

As discussed above, Dickson has presented evidence showing a material question of fact as to whether Direct Energy knew or should have known that TMC was violating the TCPA and chose not to take any action including investigating further. However, to be vicariously liable under the theory of ratification, Direct Energy must have also benefitted from TMC's unlawful conduct. *See Keating*, 615 F. App'x at 372 ("[A] seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits."); *Hodgin v. UTC Fire & Sec. Americas Corp*., 885 F.3d 243, 253-54 (4th Cir. 2018) (finding no ratification where plaintiff failed to produce any evidence that the defendant had increased its sales as a result of the unlawful telemarketing); *Kern v. VIP Travel Services*, No. 1:16-cv-8, 2017 WL 1905868 at *7 (W.D. Mich. May 10, 2017) (finding no ratification where "the Resorts did not accept any benefits as a result of [telemarketer]'s actions, because Plaintiffs did not confirm their reservations or make any payments to the Resorts"); *Toney v. Quality Res., Inc*., 75 F. Supp. 3d 727, 745–46 (N.D. Ill. 2014) ("Plaintiff's ratification theory fails because plaintiff does not allege that Sempris or Provell accepted any benefit that stemmed from Quality's telemarketing calls to plaintiff.").

Dickson relies on several cases in his argument that the Court should reject the conclusion that he must present evidence that Direct Energy benefitted from TMC's unlawful acts under the theory of ratification. (ECF No. 172 at (citing *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc*., No. 15-CV-06314-YGR, 2018 WL 3707283, *5 n.4 (N.D. Cal. Aug. 3, 2018) (ratification despite

plaintiff not making a purchase where defendant "received substantial revenue from [its telemarketer]'s marketing and sales efforts"); *Henderson v. United Student Aid Funds, Inc.,* 918 F.3d 1068, 1075 (9th Cir. 2019), *as amended on denial of reh'g and reh'g en banc* (May 6, 2019) (defendant ratified vendors' calling "practices" as opposed to distinct calls to plaintiff); *Aranda v. Caribbean Cruise Line, Inc*., 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016) (ratification where seller was aware telemarketing conducted on its behalf may have been unlawful and "continued to accept business flowing" from those calls)).

This case is distinguishable from two of the cases on which Dickson relies. In *Abante Rooter & Plumbing*, the plaintiff presented evidence that the alleged seller had benefitted by receiving a revenue of over $700,000 stemming from the violative conduct of its telemarketer. 2018 WL 3707283, at *5. The plaintiff in *Henderson* also presented evidence of accepted benefits in the form of loan payments. 918 F.3d at 1075 ("a reasonable jury could conclude that USA Funds accepted the benefits—loan payments—of the collectors' calls while knowing some of the calls may have violated the TCPA. If a jury concluded that USA Funds also had 'knowledge of material facts,' USA Funds' acceptance of the benefits of the collector's unlawful practices would constitute ratification."). This case is more akin to *Aranda*. In *Aranda,* the court did not require evidence of any actual benefit, but rather denied summary judgment on the basis of ratification where "there is evidence that would support a reasonable finding that each of the three defendants now seeking summary judgment was aware of the call campaign and the fact that the campaign *could* drum up business for it." 179 F. Supp. 3d at 833 (emphasis added); *but see Moore v. Charter Commc'ns, Inc.,* 523 F. Supp. 3d 1046, 1054 (N.D. Ill. 2020) (collecting cases) (rejecting ratification argument where plaintiff only alleged that defendant knowingly accepted new contracts based on calls made to a group of consumers but did not allege that the defendant

knowingly accepted any benefit from the calls made to plaintiff directly). However, *Aranda* is not binding on this Court and this Court declines to follow the reasoning in *Aranda*.

Rather, this Court agrees with the decisions in *Kern* and *Hodgin* that to survive summary judgment a plaintiff must present *some* evidence that a principal benefitted from the alleged unlawful conduct of its purported agent to hold the principal liable for the acts of the agent under the theory of ratification. In *Kern*, the court found no ratification where "the Resorts did not accept any benefits as a result of [telemarketer]'s actions, because Plaintiffs did not confirm their reservations or make any payments to the Resorts[.]" 2017 WL 1905868 at *7. Similarly, in *Hodgin*, the United States Court of Appeals for the Fourth Circuit found that summary judgment on the theory of ratification was warranted where "[p]laintiffs failed to proffer any evidence supporting their allegation that illegal telemarketing practices increased VMS's and ISI's sales of home-security products." 885 F.3d at 253-54.

Similarly, Dickson fails to produce evidence that Direct Energy received any benefit from TMC's unlawful telemarketing acts. It is undisputed that Dickson did not contract for services with Direct Energy as a result of the RVM. Dickson fails to even argue how Direct Energy benefitted by TMC's alleged TPCA's violations. (*See* ECF No. 172 at 35). For example, Dickson produces no evidence of *any* contracts that Direct Energy secured as a result of TMC contacting potential consumers who had not given opt-in consent. Pure conjecture that Direct Energy must have benefitted in some way because of the volume of calls made by TMC on its behalf is simply not enough to survive summary judgment. *See Hodgin*, 885 F.3d at 253–54.

Accordingly, Dickson has failed to demonstrate the existence of a material fact as to whether Direct Energy ratified TMC's violations of the TCPA.

**2. Direct Energy is not entitled to summary judgment based on the "adverse-interest exception" to agency law.**

While the Court has found that Dickson has presented evidence that would permit a reasonable jury to find Direct Energy vicariously liable under the theory of apparent authority, the Court must still address Direct Energy's argument that the adverse-interest exception to agency law precludes it from being held vicariously liable for the unlawful acts of TMC.

Under the "adverse-interest exception," "knowledge and conduct . . . will not be imputed to a principal if its agent 'is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act." *In re Fair Fin. Co*., 834 F.3d 651, 676–77 (6th Cir. 2016) (quoting, inter alia, *Restatement (Third) of Agency* § 5.04*)); see also, e.g., Bryant v. Turney*, No. 5:11-CV-000128, 2013 WL 3559132, at *10 (W.D. Ky. July 11, 2013) (finding that adverse-interest exception applied where "agent with authority to operate company vehicles" did so despite being "incompetent to do so by reason of a pattern of alcohol abuse not known to the principals"). Direct Energy argues that "[a]pplication of [this] exception is warranted on this record given TMC's manufactured consent evidence, particularly after its repeatedly rebuffed attempts to secure Direct Energy's consent to the use of non-opt-in leads." (ECF No. 168 at 34). Dickson does not address the adverse-inference exception in his response to the motion for summary judgment.

 It is a long-standing principle of law that "[a] principal is chargeable with the knowledge of, or notice to, his agent that is received by the agent in the due course of the agent's employment and is related to the matters within the agent's authority." *Liggett v. Chesapeake Energy Corp.*, 591 F. App'x 305, 309 (6th Cir. 2014). Under the adverse interest exception, "[s]uch knowledge and conduct, however, will not be imputed to a principal if its agent 'is engaged in committing an independent fraudulent act on his own account, and the facts to be imputed relate to this fraudulent act.' " *In re Fair Fin. Co*., 834 F.3d at 676–77 (quoting *Am. Export & Inland Coal Corp. v.*

*Matthew Addy Co.*, 112 Ohio St. 186, 147 N.E. 89, 92 (1925); *Restatement (Third) of Agency* § 5.04 (2006) ("[N]otice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person.")). "Even when an agent is defrauding his principal, unless the agent has *totally abandoned* the interests of the principal and is acting entirely in his own, or another person's, interest, that agent is acting within the scope of his agency." *Id.* at 679 (quotation marks and citation omitted)(emphasis added).

Applied to the present case, Direct Energy fails to produce any evidence that TMC's allegedly unlawful violation of the TCPA was performed for the sole purpose of benefitting TMC. Rather, the record demonstrates that TMC's actions in generating non-TCPA compliant leads were undertaken in an effort to obtain the necessary leads on behalf of Direct Energy.

Accordingly, summary judgment under the adverse-inference exception should be denied.

## VI.    Recommendation

Dickson has demonstrated a genuine issue of material fact from which a reasonable jury could find that TMC was an agent of Direct Energy and had apparent authority to act on Direct Energy's behalf when it allegedly violated the TCPA. Thus, this Court recommends that Direct Energy's motion for summary judgment be DENIED.

## VII.   Defendants TMC and Silverman Enterprises, LLC

Dickson also alleged that TMC and Silverman Enterprises violated the TCPA by contacting him through RVMs. Direct Energy filed a crossclaim against TMC. Both TMC and Silverman Enterprises initially defended the lawsuit. However, neither TMC nor Silverman Enterprises has engaged in defense of the litigation in any meaningful way since 2019 and 2020, respectively.

Specifically, TMC's counsel was allowed to withdraw in July 2019 by the previously assigned magistrate judge. (*See* ECF No. 85). The Court explained to TMC that a corporation

cannot proceed pro se and must be represented by counsel and that it was responsible for securing new legal counsel. (*Id*.). The Court ordered TMC "to advise the Court on or before August 23, 2019, of its new counsel or its efforts to obtain new counsel in the instant case." (*Id*.). Despite the Court's order and warning, no counsel has made an appearance on behalf of TMC – even after the Court's November 2019 order compelling TMC to produce documents (*see* ECF No. 95) and the filing of Direct Energy First Amended Crossclaim against TMC in May 2020 (*see* ECF No. 106). Although TMC answered Dickson's Second Amended Complaint in July of 2018 (*see* ECF No. 42), TMC never answered Direct Energy's initial or Amended Crossclaim against it.

Similarly, counsel for Silverman Enterprises was allowed to withdraw in April of 2024. Despite this Court providing several extensions for Silverman Enterprises to obtain new counsel, as of the date of this Report and Recommendation, no appearance has been made on behalf of Silverman Enterprises.

It is well-established that corporations may not defend themselves in federal court. *Rowland v. Cal. Men's Colony,* 506 U.S. 194, 201-03 (1993); *Doherty v. Am. Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) ("The rule of this circuit is that a corporation cannot appear in federal court except through an attorney."); *SEC v. Merklinger*, 489 F. App'x 937, 939-40 (6th Cir. 2012) ("A corporate officer may not appear in federal court on behalf of the corporation; rather, the corporation must be represented by counsel.") (citing *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 603 (6th Cir. 2005)).

Despite this, neither TMC nor Silverman Enterprises are presently represented by counsel. It is not apparent to this Court what, if any, discovery has occurred regarding Dickson's remaining claims against TMC and/or Silverman Enterprises or Direct Energy's crossclaim against TMC. Accordingly, TMC and Silverman Enterprises shall show cause as to why default should not be

entered against them for failing to retain substitute counsel. *See Silvertronic Ltd. v. Adaptive Interconnect Elecs., Inc.*, 2019 WL 3387449, at *2 (N.D. Ohio Mar. 1, 2019) (allowing for default judgment against unrepresented business entity that failed to obtain substitute counsel after its initial counsel withdrew after answering the complaint); *see Flagstar Bank, FSB v. A-1 Mortg. Servs., Inc.*, No. 10-11219, 2011 WL 282427, at *2 (E.D. Mich. Jan. 25, 2011) (same).

Rule 55(a) of the Federal Rules of Civil Procedure provides that a default can be entered against a party for failure to plead or otherwise defend the claim. Only attorneys may represent corporations in federal court. *See* 28 U.S.C. § 1654; *United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969); *Honorable Ord. of Kentucky Colonels, Inc. v. Kentucky Colonels Int'l*, No. 24-5511, 2024 WL 3912833, at *1 (6th Cir. Aug. 2, 2024) ("A corporation, partnership, or association may appear in federal courts only through licensed counsel; those entities may not conduct federal litigation through an officer, agent, or shareholder."). Default judgment may be entered against a corporation that fails to obtain counsel. *See U.S. Dep't of Lab. v. Elite Sec. Consultants, LLC*, No. 5:19-CV-2243, 2021 WL 4863015, at *3 (N.D. Ohio Oct. 19, 2021). "[E]ntry of default is appropriate even where, as here, '[d]espite the filing of an initial [a]nswer by former counsel, [d]efendant has shown no ability or willingness to continue or 'otherwise defend' [the] case.'" *Id.* (quoting *Zobele Mexico, S.A. de C.V. v. TSS Tech., Inc.*, No. 1:18-cv-596, 2019 WL 1130752, at *2 (S.D. Ohio Feb. 13, 2019), *report and recommendation* (*adopted by* 2019 WL 1125873 (S.D. Ohio Mar. 12, 2019))) (collecting cases).

Accordingly, TMC's counsel and Silverman Enterprise's counsel SHALL enter appearances within ten days of this Report & Recommendation. If such appearances are not entered, this Court recommends that defaults be entered. *See id.* Following an entry of default,

Plaintiff and Direct Energy may seek entry of a default judgment against the defaulting defendant(s).

Dated: October 4, 2024

*s/Carmen E. Henderson*
Carmen E. Henderson
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).