# EXHIBIT 1-A



## TELESERVICES AGREEMENT

THIS TELESERVICES AGREEMENT (as it may be amended from time-to-time, the "Agreement") is made as of March 4, 2015 ("Effective Date"), by and between **DIRECT ENERGY SERVICES, LLC,** a Delaware limited liability company with its principal office at 1001 Liberty Ave. 12th Floor, Pittsburgh, Pennsylvania 15222 ("Direct Energy"), and **TOTAL MARKETING CONCEPTS, INC.,** a Florida corporation, with its principal office at 4395 St Johns Pkwy, Sanford, FL 32771 (the "Vendor"). This Agreement will include the attached Terms and Conditions, all attached Schedule(s) and Statements of Work ("SOWs"), and any and all attached or referenced and incorporated Direct Energy policies, all of which are hereby incorporated by reference and made a part hereof in the manner set forth herein. In the event of a conflict among a term set forth in the Agreement, the attached Terms and Conditions, a term set forth in a Schedule, and/or an SOW, and a term set forth in an attached or incorporated policy or other document, the following order of precedence will control: (a) the SOW(s); (b) the Agreement, (c) the Schedule(s); and (d) any attached or incorporated Direct Energy policy or other document, if any.

EACH OF THE PARTIES HEREBY AGREES TO ALL TERMS AND CONDITIONS OF THIS AGREEMENT.

**DIRECT ENERGY SERVICES, LLC,**
a Delaware limited liability company

By: _____

Name: _Brian Cain_____

Title: _Operations Category Manager_

**TOTAL MARKETING CONCEPTS, INC.**

By: _____

George Lonabaugh

Its: President



## TERMS AND CONDITIONS

1.  <u>SERVICES</u>.  Vendor shall provide to Direct Energy the services set forth in Sections 1.1 and 1.2 below, and more fully described in one or more separately executed, sequentially numbered SOWs to be attached to, and made subject to the terms set forth in, this Agreement (the "<u>Services</u>"), all in accordance with the following:

1.1.  <u>Outbound/Inbound Customer Telesales</u>. Vendor shall manage one or more outbound, and when specifically requested by Direct Energy, inbound customer telesales campaigns for Direct Energy in various North American territories with respect to one or more Direct Energy customer segments, as detailed in individual sequentially numbered SOWs to be attached to, and made subject to the terms set forth in this Agreement.    Vendor shall monitor and manage the teleservices campaigns with the goal of maximizing performance of each campaign and achieving Direct Energy's desired results, as set forth in each SOW.

1.2.  <u>Additional Services</u>.    From time-to-time, including during and/or at the conclusion of each campaign, Direct Energy and Vendor may agree upon additional services to be performed by Vendor for Direct Energy, or may agree upon modifications to a campaign.  The terms of any such additional services or modifications shall be set forth in additional individual SOWs.

1.3.  <u>Ancillary Functions</u>. Vendor shall perform all set-up and ancillary functions associated with the Services described in the particular SOW, which may include the following: (a) as required by Direct Energy on a campaign-by-campaign basis, Vendor shall, at its expense, develop, or acquire and implement, all computer systems, software applications and other programs required for performance of the Services and any future enhancements or modifications thereto; and (b) Vendor shall properly screen, select and train

representatives to perform the Services in accordance with each SOW and general teleservices industry standards and practices, using only Direct Energy Marketing Materials (as defined herein).

1.4.  <u>Direct Energy Marketing Materials</u>.    As required by Direct Energy, Vendor shall, at its expense, cooperate and collaborate with Direct Energy to create Direct Energy Marketing Materials for each of Direct Energy's offerings, and coordinate the management and implementation of Direct Energy Marketing Materials at Vendor's teleservices call center(s).   Vendor shall not make any change to any of the terms of Direct Energy's offerings, or to any Direct Energy Marketing Materials, without prior written consent of Direct Energy signed by the Program Manager of Direct Energy, which consent may be withheld arbitrarily.

1.5.  <u>Certain Definitions</u>.    For purposes of this Agreement, these definitions shall apply.  The term "<u>Deliverables</u>" means all ideas, concepts, customer acquisition strategies, scripts, lists, offering design, offering information, creative material, works of authorship, information, data and other materials supplied, conceived, originated, prepared, generated or required to be used by Vendor under this Agreement. The term "<u>Documentation</u>" means all written materials and documentation relating to the Services and/or the Deliverables including, without limitation, training information and customer call lists, as well as any written proposals and marketing materials submitted by one party to the other hereunder.    The term "<u>Direct Energy Marketing Materials</u>" means all such Documentation and Deliverables.

1.6.  <u>SOWs</u>.  All SOWs, if any, attached to this Agreement on the date hereof, or subsequently entered into pursuant hereto, must reference this Agreement. Any SOW entered into pursuant hereto, may be entered into by Direct Energy or a Direct

1



Energy affiliate, who may enforce the terms of the SOW and the terms of this Agreement, as if the Direct Energy affiliate was a party hereto and thereafter Vendor may enforce the terms of this Agreement against such Direct Energy affiliate. All SOWs executed by the parties are hereby incorporated by reference into this Agreement. Each SOW will specify, to the extent applicable: (a) the specific objective and goals of the Services to be furnished by Vendor; (b) a description of each of the quantitative and qualitative performance requirements of the Services, as applicable; (c) the time schedule relating to the Services; (d) the applicable fees, and reimbursable costs and expenses for the Services, if any; and (e) any other applicable terms and conditions. In each SOW, each party will designate a "Program Manager" who will be the principal point of contact between the parties for all matters relating to the Services to be provided under such SOW.

1.7.     SOW Change Order Procedure.   If Direct Energy believes that a change in an SOW (whether in time frames, costs Services or any Deliverable) is necessary or desirable, Direct Energy will submit a written change request to the Vendor (a "Change Request").     Vendor will factor into Vendor's estimated time to provide any such Services or Deliverables adequate contingencies for de minimis Change Requests, and such de minimis Change Requests will not impact the hours to be provided under any SOW.   In the event of such a Change Request, Vendor will, within two (2) business days, provide Direct Energy with a written quote describing in detail: (a) any modifications to the Services or Deliverables that will be required as a result of the Change Request; (b) the effect, if any, on overall Services or Deliverables performance and Direct Energy requirements; and (c) the effect, if any, of the Change Request on any applicable performance milestones.   Changes to an SOW will not become effective unless a new SOW or an amendment to an existing SOW is executed by both parties.   Absent the execution of such an SOW or such an amendment, the parties will proceed to fulfill their obligations under the then current SOW.

1.8.     SOW Responsibilities. References to Direct Energy's responsibilities in an SOW (other than Direct Energy's promise to make payments due hereunder) are intended solely for purposes of indicating what is not Vendor's responsibility is. Vendor shall, within one (1) business day, notify the Direct Energy Program Manager in writing if Vendor fails to receive any assistance from Direct Energy, as detailed in the applicable SOW that may impact the timelines for any Services and/or Deliverables hereunder.

1.9.     No Additional Terms.   No additional terms contained in any invoice, order acknowledgment, other correspondence, or written or oral communication between the parties will be valid and such additional or conflicting terms are deemed rejected by the parties unless such terms are contained in an SOW, an amendment to this Agreement or an SOW, or another written agreement executed by authorized representatives of both parties.

1.10.     Vendor Meetings.   Vendor will participate in Service review meetings, whether in-person or via video-conference or teleconference with Direct Energy, as reasonably requested by Direct Energy.

1.11.     Ownership Rights.   Direct Energy will own all right, title, and interest in and to: (a) the Direct Energy Marketing Materials; and (b) all data and information collected from, obtained via or otherwise relating or attributable to the Services or Deliverables including, without limitation, data relating to users of any Direct Energy website, PII (as defined below) and any click stream data (collectively, the items under this Subsection (b) are "Direct Energy Data"). Direct Energy Data will be treated as Confidential Information of Direct Energy.

1.12.     Releases and Rights Clearances.   Subject to the prior written approval of, and the payment of any related, previously approved amounts due to a third party by, Direct Energy in each instance (which third-party amounts, for the avoidance of doubt, Vendor will be responsible for paying in the first instance and then pass-through to Direct Energy without markup),

2



Vendor will be responsible for obtaining all third-party rights, clearances, authorizations, permissions and releases (collectively, "Releases") necessary or required in order for Vendor to produce, and for Direct Energy to use, the Deliverables as set forth in any SOW or in the Documentation, including those Releases necessary to furnish the Services, to obtain images, names, likenesses, marks, music, footage or any other work of authorship used in the Deliverables, and to use all creative elements, appearances, and all third-party materials comprising, appearing in, or otherwise displayed via the Deliverables (including, without limitation, stock footage, visual arts, music, trademarks, service marks, rights of publicity and indicia of identity, literary materials and other works of authorship).

1.13.  Distribution of Marketing Materials. Vendor will not use or disseminate (or cause or permit the use or dissemination of) any Direct Energy Marketing Materials pursuant to this Agreement without, in each instance, obtaining prior written consent from Direct Energy's Program Manager, which consent may be withheld arbitrarily.

1.14.  Vendor Third Party Support.  Except as otherwise instructed in writing by Direct Energy, to the extent Vendor receives services (such as telephony or computer services) or products (such as software) used to support Vendor's provision of Services or Deliverables to Direct Energy (or Direct Energy's use or exploitation of a Service or Deliverable), ("Vendor Third Party Agreement(s)"), Vendor will enter into such Vendor Third Party Agreements on its own behalf and its own expense, and will have no right to bind, nor will it represent that it has any authority to bind, Direct Energy to any such Vendor Third-Party Agreements or any other obligations. Vendor agrees and acknowledges that any Vendor Third Party Agreement will not affect the agreed-upon fees for Services as set forth in an applicable SOW. If any such third party vendor is providing Services or Deliverables directly to Direct Energy on behalf of Vendor, Vendor agrees to pass through the cost for such Services or Deliverables without mark-up to Direct Energy. Vendor is solely responsible for the work product of each such third party vendors, if any. Vendor shall inspect the work product of such third parties and promptly correct any deficiencies and maintain proper performance by such parties.

1.15.  Standards of Performance.  Vendor shall, at all times, perform the Services on behalf of Direct Energy and will cause all of its employees and contractor agents to perform the Services on behalf of Direct Energy: (a) in accordance with the terms and conditions of each SOW, including any service level agreements; and (b) in a professional and business-like manner, consistent with standards and practices of the teleservices industry with respect to performance, timeliness and accuracy; and (c) in accordance in all material respects with the applicable portions of the corporate responsibility policy outlined in Schedule A to this Agreement ("CR Policy"); and (d) in compliance in all material respects the applicable portions of Direct Energy's Abbreviated Information Security Policy attached in Schedule B, as they may be updated from time-to-time in writing. Without limiting the foregoing, Vendor will at all times comply with and will cause all of its employees and contractor agents to comply with all Direct Energy's policies and procedures (the "Direct Energy Policies and Procedures") and business rules in effect from time-to-time, including data privacy and security regulations, policies and requirements applicable to the Services and provided in writing to Vendor. Direct Energy shall be responsible for reasonable costs incurred by Vendor associated with Vendor's compliance with new or updated Direct Energy Policies and Procedures. Vendor shall obtain Direct Energy's written consent prior to Vendor incurring said costs of compliance with the new or updated Direct Energy Policies and Procedures.  In addition to any review rights herein, the Vendor shall allow Direct Energy reasonable access to Vendor's premises and personnel during normal business hours as may be reasonably required in order to review the Vendor's compliance with the CR Policy.

1.16.  Conduct of Vendor Personnel. Vendor agrees that each of its, and its wholly owned subsidiaries' employees, including officers (collectively, "Vendor

3



Personnel") performing Services under this Agreement will at all times carry out the Services courteously, respectfully and in a nondiscriminatory manner.

1.17.  Additional Terms and Conditions for Promoter of Direct Energy Services.  The Additional Terms and Conditions for Promoter of Direct Energy Services, attached as Schedule C, are incorporated herein by reference.

2.  DATA PRIVACY.

2.1.  PII.  Vendor will collect and/or use personally identifiable information relating to customers or prospective customers of Direct Energy, a Direct Energy Affiliate and/or users of Direct Energy-offered products and services ("PII").  Except as provided herein or in an SOW, Vendor agrees that no such PII will be collected or stored by Vendor unless authorized by Direct Energy, and any PII collected by Vendor will be considered Direct Energy's proprietary and Confidential Information.  Vendor will only use such PII for the sole and exclusive purpose of fulfilling its obligations under this Agreement and may not use or permit the use of such PII for any other purpose whatsoever.  PII will include, but will not be limited to: names, addresses, telephone numbers, e-mail addresses, energy usage information and/or deposit balances.  Except as required by law, Vendor will not provide any PII to any third party for any purpose, without: (a) the prior written consent of Direct Energy in each instance, which consent may be withheld arbitrarily; and (b) entering into an agreement with such third party that includes the following: (i) terms governing such third party's collection, storage and use of such PII that are substantially similar, in all material respects, and no less protective of such PII or Direct Energy, than the corresponding terms set forth in this Agreement; (ii) terms causing Direct Energy to be named as a third-party beneficiary of any such agreement; and (iii) terms requiring such third party to (A) obtain insurance coverage identical to that set forth in Section 12 of this Agreement, (B) maintain that insurance during the term of this Agreement plus two (2) years after the end of the term, and (C) require Direct

Energy to be named as an additional insured with a waiver of subrogation on all such policies.

2.2.  Non-PII.  PII excludes demographic or behavioral information or data collected or compiled on an anonymous basis (i.e., without identification of, or correlation to, any individual).  Such information will be considered Direct Energy's proprietary and Confidential Information.  Vendor may not collect, compile or use any such anonymous information for any purpose without the prior written consent of Direct Energy's Program Manager in each instance, which consent may be withheld arbitrarily.

2.3.  Maintenance of PII.  Vendor will remain in compliance with all applicable federal, state and other applicable statutes, regulations, ordinances, and orders with respect to privacy and data security relative to PII and will implement and, at all times during the Term, maintain an effective information security program to protect PII, which program includes administrative, technical, and physical safeguards sufficient to: (a) ensure the security and confidentiality of PII; (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such PII; and (c) protect against unauthorized access to or use of PII that could result in harm or inconvenience to Direct Energy or any of its users, customers or vendors.  Vendor shall provide a copy of the information security program to Direct Energy prior to Services being conducted by Vendor under this Agreement. In the event that Vendor is in material breach of this Section 2, it will immediately advise Direct Energy and take steps to remedy such breach including, but not limited to, protecting Direct Energy and its users, customers and vendors against the consequences of any disclosure or use of PII in violation of this Agreement.  Direct Energy reserves the right to terminate this Agreement immediately upon written notice to Vendor should a breach of this Section 2 occur and to pursue any and all remedies available to Direct Energy, whether under this Agreement, at law, or in equity. Notwithstanding anything to the contrary in this Agreement and in addition to Direct Energy's rights herein, Vendor will also immediately indemnify Direct Energy and Direct Energy Affiliates from and against any costs (including without limitation any

4



costs incurred by any of the foregoing entities in order to comply with federal and/or state security breach notification laws); claims, losses, demands, actions, allegations or liabilities, including reasonable attorneys' fees and costs of investigation, incurred by any of the foregoing as a result of an unauthorized disclosure of any PII.

3.   SECURITY

3.1   Security. In providing the Services, Vendor shall implement, adhere to, maintain and enforce at all times reasonable security standards and procedures, in accordance with industry practices and standards, including establishing and maintaining reasonable physical and electronic safeguards against the disclosure, destruction, loss, theft or alteration of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services, including the Direct Energy hosted applications and other software and systems of Direct Energy.

3.2.   Storage of Direct Energy Data. Vendor will store all Direct Energy Data, computer storable Direct Energy Marketing Materials or other computer storable applications or materials of Direct Energy processed or used at Vendor's facilities in a physically secure Vendor location/facility located within the United States. Vendor will restrict access of third parties to that area and provide physical locks for all physical entries to that area reasonable to prevent unauthorized entry. Vendor will electronically segregate Direct Energy Data and Direct Energy Confidential Information used to provide the Services from all other customers of Vendor.

3.3.   Security Manager. Vendor will designate a member of Vendor's management team for the Services as Vendor's Security Manager, with responsibility for Vendor's compliance with its security obligations hereunder.

3.4.   Notification of Security Breach. Vendor shall promptly notify Direct Energy of any breach of

security, including, any loss, theft, and unauthorized access, or any improper disclosure, copying, use or modification of Direct Energy Data, Direct Energy materials and the software, hardware and other technology or other applications or materials used in providing the Services.

4.   SERVICE LEVEL AGREEMENT FOR DATA HOSTING. If an SOW requires Vendor to serve, host or otherwise maintain, or provide for the serving, hosting or other maintenance of, any Direct Energy Data, which includes PII (collectively, "Vendor-Hosted Data"), the terms of this Section 4 shall apply.

4.1.   Performance. Vendor will provide hosting, support and maintenance of the Vendor-Hosted Data in a manner that provides the following response times, regardless of the number of concurrent users of any Vendor-Hosted Data: (a) the maximum response time to access the Vendor-Hosted Data will not exceed more than three (3) seconds; and (b) the average response time to access the Vendor-Hosted Data during any consecutive sixty (60) minutes will not exceed one and a half (1 1/2) seconds. These response times are to be measured from the time the Vendor-Hosted Data receives a request or query from a user, to the time the response is transmitted back to the requesting server, not including response transmission time.

4.2.   Hosting. Vendor will provide for the hosting of the Vendor-Hosted Data in a manner that provides ninety-nine and nine-tenths percent (99.9%) Uptime during the Term. "Uptime" means the absence of "Downtime," which is defined as any interruption, for fifteen (15) seconds or more, in the availability of the Vendor-Hosted Data, other than scheduled maintenance conducted between the hours of 2:00 a.m. CT and 5:00 a.m. CT, of which Vendor provides Direct Energy with at least forty-eight (48) hours prior written notice ("Scheduled Downtime"). Any other planned downtime will be conducted only with Direct Energy's prior written approval and with at least seventy-two (72) hours prior written notice. Vendor will respond (or cause its vendor to respond)

5



to any Downtime (other than Scheduled Downtime or planned downtime in accordance with the preceding sentence) in accordance with a process to be reasonably specified by Direct Energy.

4.3.    Hardware.  The Vendor-Hosted Data will at all times be maintained on servers and other hardware (the "Primary Hardware") maintained by or on behalf of Vendor that will be located in a data center ("Data Center") that employs industry-leading security measures, with regard to both physical security (e.g., restricted access to servers, etc.) and electronic security (e.g., firewalls).  Vendor will also provide for redundant servers and other hardware ("Redundant Hardware") at such Data Center so that, if the Primary Hardware malfunctions, the Redundant Hardware will immediately host the Vendor-Hosted Data according to the specifications set forth in this Agreement.  Vendor will also provide for additional servers and other hardware (the "Hot Backup Hardware") at a secure location (the "Hot Backup Center") other than the Data Center.  The Hot Backup Hardware will contemporaneously mirror the Vendor-Hosted Data and will be available to host the Vendor-Hosted Data in the event the Primary Hardware and Backup Hardware at the Data Center become unavailable.

4.4.    Back-up.  Without limiting the terms of this Section 4, Vendor, at its sole expense, will make a complete daily back-up of all PII and all other data, information and/or materials relating to Direct Energy, the Services and the Deliverables or collected by or on behalf of Vendor for the benefit of Direct Energy hereunder.  Such back-up copy will be stored in a secure, offsite location under appropriate protection.  Vendor shall, as soon as reasonably possible but no later than five (5) business days, provide Direct Energy with a copy of any and all such PII, data, information and/or materials upon Direct Energy's written request in a manner (via a transmission method) and format reasonably requested by Direct Energy.

4.5.    Monitoring. Vendor will utilize appropriate measurement and monitoring tools and procedures necessary to measure the performance of the Vendor-

Hosted Data hereunder.    Upon Direct Energy's request, Vendor will provide Direct Energy or its' representatives access to such measurement and monitoring tools (including, but not limited to, on-line visibility of such tools) and any other information reasonably necessary to verify compliance by Vendor with the terms of this Agreement. Vendor will provide Direct Energy with a reasonably detailed written monthly report regarding the performance of the Vendor-Hosted Data for the preceding month.

5.    VENDOR'S USE OF SUBCONTRACTORS.

5.1    Subcontracting.  Vendor will not delegate or subcontract other than to Vendor's wholly-owned subsidiaries (which will be deemed to include all entities of which Vendor directly or indirectly owns or controls at least 99%) or as may be set forth in any of Vendor's obligations under this Agreement without Direct Energy's express written consent, which consent will not be unreasonably withheld (each consented subcontractor shall hereinafter be referred to as a "Permitted Subcontractor"). Notwithstanding the foregoing, it shall not be unreasonable for Direct Energy to withhold consent where, without limitation, the Permitted Subcontractor would be responsible for the performance of strategic activities, where the Permitted Subcontractor or the services that it provides would be located outside of North America, or where the use of the Permitted Subcontractor would result in a material change in the way the Services are provided. Direct Energy shall also have the right during the Term to revoke Direct Energy's prior approval of any Permitted Subcontractor or remove any Permitted Subcontractor subject to thirty (30) days' written notice and an opportunity to cure (where cure is possible, otherwise immediately) if the Permitted Subcontractor's performance is materially deficient, or there have been material misrepresentations by or concerning the subcontractor. Upon receipt of written notice of such revocation, Vendor or Direct Energy, at Direct Energy's sole discretion, shall take over performance of the Services from such Permitted Subcontractor subject to a reasonable transition period to prevent a

6



material disruption to, or other material adverse affect on, the performance of the Services within thirty (30) days. For the avoidance of doubt, Vendor's wholly-owned subsidiaries shall always be permitted hereunder and shall be treated like Vendor for the purposes of this Agreement.

5.2     Vendor's Responsibility for Subcontractors. With respect to any obligations of Vendor under this Agreement performed by Permitted Subcontractors, Vendor will remain responsible for those obligations to the same extent Vendor would be responsible for the performance by Vendor's employees. Vendor will cause the Permitted Subcontractors to comply with and adhere to the terms of this Agreement as necessary for Vendor to remain in compliance with its obligations under this Agreement. Vendor will not disclose to any Permitted Subcontractor any of Direct Energy's Confidential Information or Direct Energy Data unless and until that agent or subcontractor has agreed in writing to protect the confidentiality of all of Direct Energy's Confidential Information and the Direct Energy Data and Vendor shall be liable for any breach of Direct Energy Confidential Information by or caused by Permitted Subcontractors. From time-to-time as requested by Direct Energy, Vendor will provide documentation evidencing such written agreements.

## 6.   PROPRIETARY RIGHTS; LICENSES.

6.1     Deliverables.     Vendor acknowledges and agrees that the Deliverables are Confidential Information and the property of Direct Energy. All right, title and interest in and to the Deliverables will vest in Direct Energy and all Deliverables will be deemed to be works made for hire for the benefit of Direct Energy within the meaning of the copyright laws of the United States. To the extent that title to any such Deliverables may not otherwise vest in Direct Energy, or such Deliverables may not be considered works made for hire, Vendor hereby assigns all right, title and interest therein to Direct Energy.     All such Deliverables will belong exclusively to Direct Energy, with Direct Energy having the right to obtain and to hold in its own name, copyright registrations, patents and such other

intellectual property protection as may be appropriate to the subject matter, and any extensions and renewals thereof. Vendor agrees to provide to Direct Energy, and any person designated by Direct Energy, assistance in perfecting or evidencing the rights defined in this Section 6.1 including, without limitation, by executing and delivering all documents requested by Direct Energy for such purposes. Unless otherwise directed by Direct Energy, and except as otherwise required by the Agreement and the SOWs, upon expiration or earlier termination of this Agreement or any applicable SOW, Vendor will immediately turn over to Direct Energy all Deliverables (including all copies thereof) including, but not limited to, working papers, descriptions, reports, notes and data. All Deliverables will bear Direct Energy's copyright and trade secret notices, as specified by Direct Energy, in writing in advance. No rights to the Deliverables will remain with Vendor.

6.2     Vendor Materials.     Notwithstanding Section 6.1 hereof, unless otherwise specifically provided in an SOW, Vendor reserves all rights in and to the materials developed by Vendor, without Direct Energy, prior to and independent of the Services which may be used to provide the Services and are conspicuously marked, "PROPRIETARY VENDOR MATERIALS" or are otherwise the types of templates or other materials re-used by telemarketing businesses in the ordinary course of business ("Vendor Materials"). Deliverables will not include or require for proper use any intellectual property licensed from any third party unless such intellectual property is specifically identified in the applicable SOW and the cost of obtaining the necessary rights to such intellectual property is expressly allocated in the SOW.     In the event and to the extent that the Deliverables contain any intellectual property (including Vendor Materials) that may be proprietary to Vendor or a third party, Vendor hereby grants Direct Energy an irrevocable, fully paid up, enterprise-wide, non-exclusive, and worldwide license to use, execute, reproduce, display, perform, and prepare derivative works based on such intellectual property (including Vendor Materials) that may be contained in the Deliverables, and to

7



authorize others to do any of the foregoing on behalf of Direct Energy; provided, however, that: (a) such license will not include the right to distribute copies of the Vendor Materials to third parties; and (b) except for such license, Vendor will retain all ownership to the Vendor Materials.

6.3     Direct Energy Marks.  Direct Energy hereby grants to Vendor a non-exclusive, revocable and limited license to use the trademarks, service marks, insignias, and logos specified by Direct Energy ("Direct Energy Marks") for the sole and exclusive purpose of performing Vendor's obligations hereunder.   Vendor shall obtain Direct Energy's written approval prior to any public use by Vendor of any Direct Energy Mark. Vendor will display the appropriate proprietary rights notice (e.g., the encircled "R" symbol ("®") and/or the letters "TM" or "SM," as appropriate) in conjunction with its display of Direct Energy Marks and properly acknowledge Direct Energy's ownership of the Direct Energy Marks in any and all publications.  All uses of Direct Energy Marks by Vendor will comply with Direct Energy's branding requirements and will inure to the benefit of Direct Energy.  If Direct Energy reasonably objects to the use of any of the Direct Energy Marks, Direct Energy may, without limiting any other rights or remedies available to Direct Energy, whether under this Agreement, at law or in equity, revoke any and all of Vendor's rights thereto and Vendor shall immediately cease using the Direct Energy Marks in the manner identified by Direct Energy. Nothing in this Agreement will create in Vendor any rights in the Direct Energy Marks. Other than as required to perform Services hereunder, Vendor will not use Direct Energy's name or any abbreviation, contraction or simulation thereof, without Direct Energy's prior review and written consent, which consent may be withheld arbitrarily.

7.     FEES; TAXES; AUDIT RIGHTS.

7.1     Fees and Taxes.  The fees, and all costs and expenses, if any, to be paid by Direct Energy to Vendor for the Services shall be specifically itemized and set forth in the applicable SOW.  Direct Energy shall not be liable for any fees, costs and expenses

other than those specified herein or in an SOW. Notwithstanding any provision in this Agreement to the contrary, payment and timing of payments shall be governed by Section 7.2 below.

Unless expressly stated in an SOW, the fees to be paid by Direct Energy exclude all sales, value-added, and goods and services taxes applicable to provision of the Services by Vendor and Direct Energy shall not be responsible for any such taxes.  Vendor shall be responsible for informing Direct Energy of all such taxes and, upon receipt of an invoice including taxes expressly due from Direct Energy under an SOW, Direct Energy shall pay to Vendor, and Vendor shall remit to the appropriate taxing authorities, all such taxes.  If any such taxes collected by Vendor hereunder are determined not payable by Vendor to an authority, Vendor shall promptly refund Direct Energy all such amounts incorrectly collected from Direct Energy.  Excise taxes, if any, arising as a result of the provision of the Services shall be the responsibility of the Vendor.  Notwithstanding the foregoing, Direct Energy shall be entitled to deduct and withhold from the fees such amounts as are required by applicable law to be so deducted or withheld from the fees, including any amounts on account of withholding taxes or other similar taxes, and to pay such amounts to such governmental authorities as may be required by applicable law; provided, that if Direct Energy is so required to deduct, withhold or pay, Direct Energy shall forward to Vendor, at Vendor's request, a receipt or other documentation   evidencing   such   deduction, withholding or payment.

7.2  Method of Payment and Timing.    Subject to Vendor's compliance with the terms of this Agreement, Direct Energy shall pay Vendor the fees, and any costs and expenses, in accordance with the following:

7.2.1    Invoicing.   By the fifth (5th) day of each calendar month, Vendor shall submit to Direct Energy an invoice for the fees properly due for the calendar month, which invoice shall contain an itemized list of all costs or expenses available for reimbursement pursuant to Section 7.2.3 below.

8



Separate invoices will be provided to Direct Energy by Vendor for each SOW, and invoices will present in detail the Services performed. If requested by Direct Energy, each invoice from Vendor shall also include or be accompanied by a report showing Vendor's compliance with each of the service level agreements in each applicable SOW as of the date most recent to the invoice date on which such report was prepared. All invoicing shall be further subject to Direct Energy's standard policies regarding Direct Energy purchasing, vendor invoicing and vendor payment protocols, as such policies are amended by Direct Energy from time-to-time. Notwithstanding any provision herein to the contrary, Direct Energy shall have the right to offset any and all payments to Vendor for amounts, if any, due to Direct Energy pursuant to the terms and conditions of any SOW or Section 9.4 hereof.

7.2.2  <u>Time Period</u>. Direct Energy will initiate payment of all undisputed and properly invoiced amounts on or before forty five (45) days after receipt of a proper and correct invoice. If Direct Energy disputes any such amounts or deems an invoice improper, it will notify Vendor promptly.

7.2.3  <u>Reimbursement</u>. If invoices include reimbursable costs and expenses as authorized herein, receipts for those expenses will accompany the invoices. Direct Energy will reimburse Vendor for Vendor's reasonable and necessary out-of-pocket expenses directly incurred in rendering the Services, provided that: (a) any single expense over $█ or aggregate expenses over $█ are approved in advance by Direct Energy's Program Manager; and (b) such expenses otherwise comply with Direct Energy's expense reimbursement policy, as such policy is amended from time-to-time.

7.3  <u>Records; Audit</u>. Vendor and its agents will maintain complete and accurate records of its fulfillment of its obligations hereunder during the Term and for a period of at least seven (7) years thereafter (the "<u>Retention Period</u>"); provided, however, that if a dispute arises in connection with this Agreement, the Retention Period will be extended automatically until the resolution of such

dispute becomes final and non-appealable and all obligations of the parties to one another relating to the resolution have been satisfied in full. Vendor and its agents will, upon reasonable request by Direct Energy and at all reasonable times during the Retention Period make such records available for inspection by Direct Energy or its authorized representatives, to perform operational, regulatory, compliance, subcontractor, and security audits, all at the expense of Direct Energy unless the audit was caused by a material breach of this Agreement by Vendor. Direct Energy or its authorized representatives will have the right to take copies of or extracts from any records kept pursuant to this Agreement.

7.3.1  <u>Remedy</u>. Vendor shall, at its expense, deliver a corrective plan of action and promptly remedy any inadequacy or deficiency, which is identified as a result of an operational audit. If an operational audit discloses a material breach by Vendor of its obligations under this Agreement, Vendor shall promptly remedy such breach and reimburse Direct Energy for the out-of-pocket costs incurred by Direct Energy in connection with such audit.

7.3.2  <u>Regulatory Audit</u>. Vendor expressly agrees that any regulatory authority that regulates Direct Energy or any aspect of its business shall have at least the same rights of audit with respect to Vendor. If Direct Energy has notice that Vendor will be audited by a Regulatory Authority, and Direct Energy is permitted to provide notice to Vendor, Direct Energy will provide Vendor with advance notice, as soon as practicable. If practicable, Direct Energy will provide written notice identifying the agency seeking such an audit, describe the nature of the audit, and provide copies of any written requests received by the Regulatory Authority with regard to same. Direct Energy shall have the right to inspect Vendor's general corporate Business Continuity Plan, in accordance with Section 13.15, and shall be entitled to copy any component specific Business Continuity Plan(s) pertaining to the Services provided to Direct Energy hereunder except that at the termination of this Agreement Direct Energy, upon instructions from Vendor, shall either return or

9



destroy any such copies. In addition Direct Energy agrees that it shall not disseminate the Business Continuity Plan to any third parties and shall hold the Business Continuity Plan in strictest confidence in accordance with Section 11.

7.3.3  Subcontractor Audits.  Vendor shall ensure that all agreements with Permitted Subcontractors (as defined herein) entered into after the Effective Date include the right for Direct Energy or its designee to conduct audits of the Permitted Subcontractors and shall provide evidence thereof to Direct Energy. Direct Energy shall be permitted to audit each Permitted Subcontractor retained by Vendor to provide the Services or any part of the Services in the same manner as it is permitted to audit Vendor. Vendor will, not less than once a year, conduct an audit of the operations of its Permitted Subcontractors (including the security policies and procedures of its Permitted Subcontractors), relating to the Services or employ a third party organization to conduct such audit.  At Direct Energy's request, Vendor will enforce its audit rights in any agreement with a Permitted Subcontractor to audit any issues raised by Direct Energy, and will report to Direct Energy the findings of such audit.

7.3.4  Retention.  Vendor shall maintain and retain complete and accurate records in accordance with any applicable laws, but for no less than the Retention Period.

7.3.5  Access.  Without limiting the foregoing, Vendor will provide to Direct Energy and its auditors (including internal audit staff), inspectors, regulatory authorities and other representatives as Direct Energy may from time-to-time reasonably designate in writing, reasonable access to: (a) Vendor's facilities where Services are performed or data related to the Services is stored; (b) Vendor's management employees, contractors, agents and subcontractors providing any of the Services; and (c) reports, data and records in Vendor's possession or control relating to any of the Services. Vendor will provide such access to Direct Energy and Direct Energy's designees during regular business hours upon reasonable notice by Direct Energy, provided that all

such persons adhere to Vendor's customary security and safety policies. Notwithstanding the foregoing, any audit that may involve access to facilities or systems serving other clients of Vendor, shall be performed either by Direct Energy or by an independent third party auditor appointed by Direct Energy, provided that such auditor is not a Vendor Competitor, and provided that if Direct Energy performs the audit it shall not access or attempt to access the information of Vendor's other clients.

7.3.6  Co-operation.  Vendor will assist Direct Energy's auditors, inspectors, regulatory authorities, and representatives as is reasonably required. Vendor will co-operate fully with Direct Energy or its designees in connection with audit functions and with regard to examinations by regulatory authorities.

7.3.7  Expenses.  Direct Energy will bear its own expenses relating to any audit performed pursuant to this Section 7; provided, however, that for any audit that shows an overcharge, Vendor shall promptly reimburse Direct Energy for such overcharge and if the audit shows an overcharge in Vendor's invoices in an amount greater than five percent (5%) of the annual charges: (a) Direct Energy will have no liability to reimburse Vendor on a time and materials basis for such Vendor audit expenses and shall be entitled to an immediate refund; (b) Vendor will credit Direct Energy for such overcharge within thirty (30) days after the conclusion of the audit; and (c) Vendor will reimburse Direct Energy for the reasonable costs of such audit incurred by Direct Energy.

7.3.8  Exit Conference.  Following an audit or examination by Direct Energy, Direct Energy will conduct (in the case of an internal audit), or cause Direct Energy's external auditors or examiners to conduct, an exit conference with Vendor. Vendor will meet with Direct Energy and the auditors to define the resolution to any deficiencies noted during the review and establish a mutually agreed upon timetable to remedy all outstanding issues.

**CONFIDENTIAL**                                    **Direct Energy 000011**



## 8. TERM; TERMINATION; SUSPENSION.

8.1    Term.  This Agreement will be effective as of the Effective Date and, unless sooner terminated in accordance with the terms set forth herein, will continue through the date that Services (including any submission of Deliverables) are to be completed under any SOW, or until March 4, 2016, whichever is later (the "Initial Term").    Subject to sooner termination under any of Sections 8.2 through 8.5 hereof,  this  Agreement  shall  be  renewed automatically on a six (6) month consecutive basis following the end of the Initial Term unless a Party provides to the other Party notice of termination of this Agreement at least sixty (60) days in advance of the date of expiration (such renewal term(s), if any, along with the Initial Term, shall be referred to herein as the "Term").

8.2    Mutual Termination for Cause.  Either party may terminate this Agreement by giving written notice to the other party upon the occurrence of an Event of Default on the part of the other party.  An "Event of Default" will mean: (a) a breach by a party of any material provision of this Agreement, other than a payment provision or one that falls under a Section of this Agreement specified in Section 8.3 hereof, if such breach remains uncured for a period of seven (7) business days following receipt of notice from the non-defaulting party specifying the breach; (b) Direct Energy has failed to pay Vendor fees properly invoiced and due under this Agreement within thirty (30) days after Direct Energy has received notice from Vendor of such non-payment; or (c) if (i) the other party is adjudicated a bankrupt, becomes insolvent, makes an assignment for the benefit of creditors, has a receiver, administrative receiver and/or administrator appointed for it, makes or proposes any arrangement for the liquidation of its debts, or ceases to carry on business, or (ii) any proceeding is commenced against the other party in which such party will be winding up, dissolved or liquidated, and such proceeding is not dismissed within thirty (30) days after its institution.

8.3    Direct Energy Termination with Cause. Vendor shall be in default under this Agreement if:

(a)(i) Vendor is in material violation of any material provision of Schedule C; Section 7, 9, and/or Section 11 in any material respect hereof; (ii) a provision of an SOW; or (iii) Vendor or any Vendor Affiliate, or any of its or their respective controlling shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event (see 9.3 below); and (b) after receiving notice of the breach from Direct Energy, Vendor fails to cure the breach to the satisfaction of Direct Energy on or before the end of the five (5) day period following the date of such notice.  If Vendor is so in default under this Agreement,  this  Agreement  shall  be  terminated automatically without notice, effective at the end of such five (5) day period.

8.4    Termination Without Cause.  Direct Energy may terminate this Agreement or any SOW at any time without cause upon thirty (30) days prior notice to Vendor.

8.5    Effects of Expiration/Termination.    Upon expiration of this Agreement or sooner termination of this Agreement with respect to any or all SOWs and without limiting other applicable provisions contained herein, Vendor shall immediately cease representing, mentioning or holding itself out, in any manner, as a vendor of Direct Energy for the Services described hereunder and discontinue the performance of any Services or other work under this Agreement and comply with Sections 8.5.1 through 8.5.3 below, unless Vendor receives instructions from Direct Energy for Vendor to provide continued Services pursuant to Section 8.5.4 below. Vendor shall facilitate an amicable transition with Direct Energy and Vendor shall not withhold or otherwise prevent access to any Direct Energy property, including any Direct Energy Data, in order to get negotiating leverage or use as a form of ransom.

8.5.1    Return of Materials.  Vendor shall promptly deliver to Direct Energy all original and copies of Deliverables and Direct Energy Marketing Materials, and  all  memoranda,  notes,  records,  drawings, manuals, disks, documents, media, equipment, papers or other information   pertaining to the Services, Deliverables or to Direct Energy's business, or

11



otherwise obtained by Vendor from Direct Energy. Vendor acknowledges that all such materials are the property of Direct Energy. Vendor agrees not to retain any copies of such materials. Notwithstanding anything to the contrary in this Agreement, Vendor shall be permitted to retain an electronic copy of any of the foregoing if required by law or this Agreement (which retained copy will remain Confidential Information under the terms of this Agreement).

8.5.2  Use of Direct Energy Marks. Vendor shall immediately discontinue any and all use of Direct Energy Marks including, but not limited to any use of Direct Energy Marks in Vendor's advertising or business materials.

8.5.3  Return Data and Maintain Confidentiality. Vendor agrees that it shall not during the Term of this Agreement or during the Retention Period, retain, destroy, delay, manipulate or otherwise encumber any Direct Energy Data. Upon termination of the Retention Period, Vendor shall, without notice from Direct Energy, immediately and permanently destroy all Direct Energy Data and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroyed. At anytime during the Term of this Agreement or during the Retention Period, Direct Energy may instruct Vendor to destroy all or any part of Direct Energy Data, upon notice to Vendor and provide Direct Energy with a certificate of destruction for any Direct Energy Data Vendor destroys or disposes of at Direct Energy's instruction or request. Upon receipt of the notice from Direct Energy, Vendor must immediately deliver to Direct Energy or any party designated by Direct Energy or destroy all or any part of the Direct Energy Data in such manner as requested by Direct Energy. Further, Vendor shall, with respect to all Direct Energy Confidential Information under Section 11.1 hereof, comply with the terms of Section 11 hereof.

8.5.4  Continued Services. If Direct Energy, in its sole discretion, provides instructions to Vendor in advance, Vendor shall continue to provide Services at the then-current fees, all in accordance with the terms of this Agreement and applicable SOW, for not more than ninety (90) days following the expiration or

sooner termination of this Agreement (the "Transition Period"). During the Transition Period, Vendor will provide Direct Energy with assistance in transitioning the Services, any Deliverables, Direct Energy Data and any back-up to any provider(s) of Services selected by Direct Energy. At the end of such Transition Period, Vendor will invoice Direct Energy for the Services provided during such period, with the fees for such Services to be billed at the rates set forth in this Agreement, or as otherwise agreed upon by the parties in writing.

8.6  Suspension for Non-Compliance. Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing three (3) days' advance notice to Vendor, immediately suspend for a period up to ninety (90) days any or all activities under this Agreement if Vendor fails to meet a compliance obligation. The notice will also contain provisions relating to Direct Energy's rights during any such suspension, including causing Vendor to receive additional training and/or re-train employees. Upon any such suspension, Vendor shall, at its sole expense: (a) fully cooperate with Direct Energy to immediately investigate all issues and implement all procedures and safeguards required by Direct Energy to prevent any further violations; and (b) resolve all alleged or actual compliance violations to Direct Energy's reasonable satisfaction.

8.7  Suspension for Other Reasons. Direct Energy may, in its sole discretion, without terminating this Agreement and upon providing at least thirty (30) days' advance notice to Vendor, immediately suspend all or any part of Vendor's activities under this Agreement for a period up to one hundred eighty (180) days if, in Direct Energy's sole discretion, adverse regulatory or market conditions exist.

9.  REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION.

9.1  General Representations, Warranties and Covenants. In addition to any specific representations, warranties and covenants contained in an SOW and those set forth elsewhere herein, each party represents, warrants and covenants to the other that: (a) it is a

12



legal entity duly organized, validly existing and in good standing under the laws of the state of its formation; (b) it has all requisite corporate power and authority to execute, deliver and perform its obligations hereunder; (c) it is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the character transacted by it, except when the failure to be so licensed, authorized or qualified would not have a material adverse effect on its ability to fulfill its obligations hereunder; and (d) this Agreement constitutes the valid and binding obligation of the party, enforceable against such party in accordance with its terms, except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights of creditors and general principles of equity.

9.2     General Vendor Representation, Warranties and Covenants.    Vendor represents, warrants and covenants to Direct Energy each of the following: (a) the Services and any Deliverables will be provided in accordance with the highest standards of professional conduct in the applicable area or areas of expertise required to provide such Services and any Deliverables, as well as in accordance with the description of, and specifications for, such Services and any Deliverables set forth in the applicable SOW and any Documentation; (b) the Deliverables, if any, do not and will not contain any virus or any other contaminant, or disabling devices including, but not limited to, codes, commands or instructions that may be used to access, alter, delete, remotely access, damage or disable the Deliverables, other Direct Energy software, Direct Energy Data, Direct Energy's computer network or other Direct Energy property; (c) the Services and any Deliverables will not be libelous or defamatory, will not violate or infringe any common law or statutory right of any third party including, without limitation, any contractual rights, proprietary rights, copyright, trademark, service mark or patent rights, or any rights of privacy or publicity, and will not violate any applicable federal, state or local law, rule, regulation

or ordinance; (d) Vendor will not, without the prior written consent of Direct Energy, include in any Deliverables, or use in conjunction with the performance of Services, any intellectual property licensed from any third party, and Vendor will specifically identify any such third-party intellectual property in writing to Direct Energy; (e) with respect to any third-party intellectual property included within the Deliverables or used in connection with Vendor's performance of the Services, Vendor has all right, title and interest necessary to provide such intellectual property to and/or use such intellectual property for the benefit of Direct Energy; (f) any Deliverables shall be free from any and all liens, encumbrances and/or third party security interest whatsoever; (g) Vendor or any third party providing a support service or software on behalf of the Vendor will not use or distribute PII outside the scope of this Agreement, or for the benefit of the Vendor or third party acting on behalf of the Vendor; (h) Vendor and Vendor Personnel will perform the Services hereunder in compliance with all federal, state and local laws, rules, regulations and ordinances; (i) all of Vendor's employees, agents and independent contractors involved in providing Services shall, while on Direct Energy's property or conducting any Direct Energy related business, comply with all federal, state and local laws, rules, regulations and ordinances, including specifically all laws prohibiting harassment or discrimination of any kind in the workplace; (j) Vendor is not a party to any existing union contract that purports to obligate Direct Energy to a union, either as a successor or assignee of Vendor, or in any other way; (k) Vendor shall avoid deceptive, misleading or unethical practices that could adversely affect the performance of Direct Energy's obligations under this Agreement or damage the reputation of Direct Energy, any Direct Energy Affiliate, or any of their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees; (l) Vendor is duly licensed to conduct telephone sales of retail energy to residential customers ("Telesales License") as required under the laws, rules or regulations of each state in which it conducts Services and will maintain such license(s) in good standing throughout

13



the Term; (m) in addition to any Telesales License, Vendor will obtain any permits and licenses required under the laws, rules or regulations of each state in which it conducts Services and maintain such permits and license(s) in good standing throughout the Term; (n) Vendor is not a party to any agreement with a third party, the performance of which is reasonably likely to affect adversely its ability perform fully its obligations hereunder; and (o) Vendor's performance of its obligations under this Agreement will not violate any other agreement between Vendor and any third party.

9.3     <u>Adverse Vendor Events</u>. Vendor further represents and warrants to Direct Energy that neither Vendor, any Vendor Affiliate, nor any of its or their respective controlling shareholders, controlling members, controlling partners, directors or officers has, in the ten (10) year period preceding the Effective Date: (a) been convicted of, or plead guilty or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to, any state or federal criminal law for fraud, theft, larceny, deceit, or violations of any customer protection or deceptive trade laws in any state; (b) been found liable in a civil proceeding for fraud, theft, larceny, deceit or violations of any customer protection or deceptive trade laws in any state; (c) been found liable in either a civil or criminal proceeding for an antitrust violation; (d) had a license or right to engage in any business or profession revoked, denied, suspended or restrained; (e) been subject to any disciplinary proceeding in connection with a license or right to engage in any business or profession; (f) been subject to a regulatory investigation or regulatory sanctions; (g) filed for bankruptcy or reorganization, or been in control of an entity that has filed a petition for bankruptcy or reorganization.    Each of the foregoing items (a) through (g) shall be referred to as an "<u>Adverse Vendor Event</u>". If during the Term any of Vendor, any Vendor Affiliate, or any of its or their respective shareholders, members, partners, directors and officers becomes the subject of any Adverse Vendor Event, Vendor shall immediately notify Direct Energy and provide full and complete information to Direct Energy regarding the matter. Direct Energy shall be entitled to reasonably investigate the matter

and any actions taken by Direct Energy based on the matter shall be without prejudice to Direct Energy's rights under this Agreement.

9.4 <u>Indemnification</u>.

9.4.1   <u>By Vendor</u>. Vendor shall indemnify, defend, and hold harmless Direct Energy and any individual, corporation, partnership, limited liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Direct Energy ("<u>Direct Energy Affiliate</u>"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any claims, causes of action, suits, judgments, fines, losses, damages and liabilities of any kind (whether the same are based in contract, tort, including negligence, strict liability or otherwise) including, without limitation, all reasonable expenses of litigation, costs of court and/or alternative dispute resolution, reasonable attorneys' fees and expenses (including costs of investigation and any expert witness fees) (each of the foregoing shall be referred to as an "<u>Indemnifiable Liability</u>"), which occurred, or are alleged to have occurred, directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Vendor set forth in this Agreement, any Vendor Personnel Event, or any willful, intentional or negligent action or failure to act by Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy.

9.4.2 <u>By Direct Energy</u>.   Direct Energy shall indemnify, defend, and hold harmless Vendor and any individual, corporation, partnership, limited

14



liability company, association, trust, or other business organization of any kind directly or indirectly controlling, controlled by, or under common control with Vendor ( "Vendor Affiliate"), and its and their respective shareholders, members, partners, officers, directors, managers, trustees, incorporators, agents, attorneys, consultants, servants, representatives, and employees from and against any Indemnifiable Liability, which occurred, or are alleged to have occurred directly or indirectly as a result of or in connection with any material breach or alleged breach of any representation, warranty, covenant or agreement made by Direct Energy set forth in this Agreement, or any willful, intentional or negligent action or failure to act by Direct Energy, any Direct Energy Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Direct Energy Personnel, or any agent of Direct Energy; or as a result of an event in which: (a) Direct Energy has provided to Vendor written Direct Energy Marketing Materials to use for the Services, Vendor has used the Direct Energy Marketing Materials as prescribed by Direct Energy and acted in compliance with all applicable laws, rules and regulations, and there has been a violation of any such laws, rules or regulations related solely to Vendor's use of the Direct Energy Marketing Materials or (b) an event or circumstance in which any of the Direct Energy Marks set forth in the Direct Energy Marketing Materials used to provide the Services has violated or is alleged to have violated the intellectual property rights of any third party other than a Permitted Subcontractor, except to the extent that such Indemnifiable Liability is caused by the sole, joint, concurrent, contributing or comparative negligence or fault of Vendor, any Vendor Affiliate, any of its or their respective shareholders, members, partners, directors and officers, any Vendor Personnel, or any agent of Vendor.

9.4.3  Process.  A party seeking indemnification under this Section 9, as the case may be (the "Indemnified Party"), will give prompt written notice to the other (the "Indemnifying Party") of the claim, loss, demand, cause of action, debt or liability for which it seeks to be indemnified. The failure by an Indemnified Party to give such notice will not relieve the Indemnifying Party of its obligations under this Section 9, except to the extent that such failure results in the failure of actual notice and the Indemnifying Party is damaged as a result of the failure to give notice. The Indemnified Party will allow the Indemnifying Party to direct the defense and settlement of any such claim, with counsel of the Indemnifying Party's choosing, and will provide the Indemnifying Party, at the Indemnifying Party's expense, with information and assistance that are reasonably necessary for the defense and settlement of the claim. The Indemnified Party will have the right to retain separate counsel and to participate in (but not control) any such action, but the fees and expenses of such counsel will be at the expense of Indemnifying Party. Indemnifying Party will not be liable for any settlement of an action effected without its written consent (which consent will not be unreasonably withheld or delayed), nor will an Indemnifying Party settle any such action without the written consent of the Indemnified Party (which consent will not be unreasonably withheld or delayed). Indemnifying Party shall not consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the requirement of the claimant to deliver to the Indemnified Party a signed release from all liability with respect to the claim.

10.  LIMITATION  OF  LIABILITY;  INJUNCTIVE RELIEF.

10.1  Limitation of Liability.  IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL OR SPECIAL (INCLUDING PUNITIVE OR MULTIPLE) DAMAGES, NOR SHALL DIRECT ENERGY BE LIABLE FOR ANY LOSS OF PROFIT, BUSINESS, CONTRACTS, OPPORTUNITY, GOODWILL OR OTHER SIMILAR LOSS.  IN NO EVENT SHALL THE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT (INCLUDING SECTION 9.4 HEREOF), OR OTHERWISE, WHETHER FOR BREACH OF CONTRACT, INDEMNITY, TORT, BREACH  OF  STATUTORY  DUTY  OR

15



OTHERWISE, EXCEED THE FEES PAID TO VENDOR UNDER THIS AGREEMENT. THE PROVISIONS OF THIS SECTION 10 SHALL SURVIVE EXPIRATION OR SOONER TERMINATION OF THIS AGREEMENT.

10.2    Injunctive Relief. Each party understands and agrees that money damages would be both incalculable and insufficient remedy for any breach of this Agreement and that any such breach would cause the other party irreparable harm. Accordingly, each party agrees that in the event of any breach or threatened breach of this Agreement, the non-breaching party, in addition to any other remedies at law or in equity it may have, shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance. Each breaching party waives any and all defenses and claims as to venue, forum or jurisdiction of the person or subject matter, and any others that, if asserted under law or equity, would prevent the timely issuance of injunctive relief to the non-breaching party.

11.    CONFIDENTIALITY/PRIVACY.

11.1    Definition. For purposes of this Agreement, "Confidential Information" includes all non-public business information pertaining to the disclosing party (the "Disclosing Party") including, but not limited to, information relating to: (a) the fees and fee structure set forth in any SOW hereto; (b) the Disclosing Party's customers, customer lists, sales, profits, organizational structure and restructuring; (c) the Disclosing Party's services and products, and how such products and services are administered and managed; (d) the Disclosing Party's financial, sales and marketing strategies and plans of any kind; (e) confidential information of third parties with which the Disclosing Party conducts business; (f) in the case of Direct Energy or a Direct Energy Affiliate, Direct Energy Data and back-ups; or (g) any information that the Disclosing Party deems confidential at the time of disclosure or immediately thereafter, which information is set forth in tangible form and prominently marked "CONFIDENTIAL". Notwithstanding the foregoing, Confidential

Information will not include information that: (x) is or becomes generally known to the public not as a result of a disclosure by the receiving party or a third party acting on the receiving party's behalf (the "Receiving Party"); (y) is rightfully in the possession of the Receiving Party prior to disclosure by the Disclosing Party; or (z) is received by the Receiving Party in good faith and without restriction from a third party, not under a confidentiality obligation to the Disclosing Party and having the right to make such disclosure. The foregoing exceptions do not apply to Direct Energy Data and Direct Energy will retain all right, title and interest in and to all Direct Energy Data.

11.2    Restrictions.    The Receiving Party acknowledges that it may be provided or under this Agreement may come in contact with Confidential Information. Accordingly, the Receiving Party agrees that: (a) it will keep all Confidential Information in strict confidence, using such degree of care as is appropriate to avoid unauthorized use or disclosure, and will safeguard and protect the Confidential Information at least as carefully as the Receiving Party safeguards and protects its own confidential information, but in no event will the Receiving Party use less than all diligent and good faith efforts to safeguard the confidentiality of Confidential Information; (b) it will not, directly or indirectly, disclose any Confidential Information to anyone outside of the Disclosing Party, except with the Disclosing Party's prior written consent in each instance, which consent may be withheld arbitrarily; (c) it will not make use of any Confidential Information for its own purposes (except as necessary to exercise its rights or fulfill its obligations under this Agreement) or for the benefit of anyone other than the Disclosing Party; and (d) (i) upon the expiration or sooner termination of this Agreement; or (ii) at any time the Disclosing Party may so request, the Receiving Party will deliver promptly to the Disclosing Party or, at the Disclosing Party's option, the Receiving Party will destroy all memoranda, notes, records, reports, media and other documents and materials (and all copies thereof) regarding or including any Confidential Information that the Receiving Party may then possess or have

16



under its control and provide the Disclosing Party with a certificate of destruction for any Confidential Information destroyed.

11.3 <u>Permitted Disclosure</u>. Notwithstanding anything in this Agreement to the contrary, the Receiving Party may disclose Confidential Information to its employees and agents having a direct need to know such information in connection with fulfilling its obligations pursuant to this Agreement. The Receiving Party may disclose Confidential Information to the limited extent required by law; provided, however, that the Receiving Party uses commercially reasonable efforts to notify the Disclosing Party in writing in advance of such disclosure, and provides the Disclosing Party with copies of any related information so that the Disclosing Party may take appropriate action to protect the Confidential Information.

12. <u>INSURANCE</u>. As a separate and independent obligation and without limiting the indemnity obligation of Vendor or its insurers, Vendor will, at its sole expense, maintain in force during the Term and for not less than two (2) years after expiration or sooner termination of this Agreement, each of the following insurance coverage:

12.1 <u>Workers' Compensation and Employers' Liability</u>. Vendor shall maintain Workers' Compensation insurance coverage for all employees engaged in the Services provided hereunder in accordance with the statutory requirements of the state in which the work is being performed. Further, Vendor shall maintain Employer's Liability Insurance with limits not less than $1,000,000 per accident/each employee/policy limit covering all employees engaged in the Services provided hereunder.

12.2 <u>Comprehensive General Liability</u>. Vendor shall maintain Commercial General Liability Insurance, including bodily injury, death and property damage, in an amount of not less than $2,000,000 each occurrence and in the aggregate annually. Such coverage shall include, but not be limited to, blanket Contractual Liability (including

liability assumed under this Agreement), Contractual Liability, Cross Liability or Severability of Interests, Advertising Liability, Broad Form Property Damage Liability, Products and Completed Operations Liability.

12.3 <u>Excess Liability</u>. Vendor shall maintain Umbrella Excess Liability Insurance that follows the form of the underlying primary liability insurance required by Section 12.2 (General Liability) in an amount not less than $3,000,000 per occurrence, Combined Single Limit in an amount not less that $100,000 per occurrence and $1,000,000 in the aggregate.

12.4 <u>Additional Requirements</u>. The liability policy(ies) obtained by Vendor pursuant to this Section 12 will name Direct Energy and all Direct Energy Affiliates as additional insureds. As of the Effective Date and thereafter, upon Direct Energy's written request, Vendor will provide Direct Energy with a certificate or certificates of insurance, in form satisfactory to Direct Energy, evidencing that all the insurance requirements set forth herein have been satisfied and specifying that Direct Energy will receive at least thirty (30) days advance written notice of any cancellation or reduction in any coverage. Vendor will obtain the insurance coverage set forth in this Section 12 from an insurance carrier with a minimum A.M. Best Company rating of A-.

12.5 <u>Automobile Insurance</u>. If automobiles are used by Vendor in connection with the Services, Vendor shall maintain automobile liability insurance for all of Vendor's owned, hired and non-owned vehicles, with limits of at least $1,000,000 combined single limit for bodily injury and property damage per occurrence.

12.6 <u>Waiver of Subrogation</u>. All such insurance must be primary and non-contributory, and required to respond and pay prior to any other insurance or self-insurance available. The insurance required by Sections 12.1, 12.2 and 12.3 hereof shall include full waivers of subrogation in favor of Direct Energy and all Direct Energy Affiliates, unless such waiver of subrogation is prohibited by the law governing such

CONFIDENTIAL



insurance.  Vendor agrees that Vendor, Vendor's insurer(s) and anyone claiming by, under or through Vendor's behalf shall have no claim or right of action against Direct Energy, any Direct Energy Affiliate or any of its or their customers based on any claim, loss or liability covered by insurance required hereunder.

13.  GENERAL.

13.1  Relationship of the Parties. This Agreement is not intended to create, and does not create, any partnership, joint venture, fiduciary, employment, or other relationship between the parties, beyond the relationship of independent parties to a commercial contract.  Neither party is, nor will either party hold itself out to be, vested with any authority to bind the other party contractually, or to act on behalf of the other party as a broker, agent, or otherwise.

13.2  No Publicity.  Unless required by law, Vendor will not, without the prior written consent of Direct Energy, make any public statement, publicity releases, press release, presentation, or other announcement relating to the existence or terms of this Agreement or the Services performed by Vendor under this Agreement.

13.3  Waiver.  No waiver of any provision hereof or of any right or remedy hereunder will be effective unless in writing and signed by the party against whom such waiver is sought to be enforced. The waiver or failure of either party to exercise any right provided for herein will not be deemed a waiver of any further right hereunder.  The rights and remedies of the parties set forth in this Agreement are in addition to any rights or remedies the parties may otherwise have at law or equity.

13.4  Severability.  If any provision of this Agreement is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, such provision will be deemed restated, in accordance with applicable law, to reflect as nearly as possible the original intentions of the parties, and the remainder of the Agreement will remain in full force and effect.

13.5  Assignment; Successors.  Vendor may not assign its rights, or delegate its duties, under this Agreement without the prior written consent of Direct Energy, which consent shall not be unreasonably withheld or delayed.  Either party may assign all of its rights and obligations under this Agreement, without obtaining such prior written consent, to: (a) a successor-in-interest as a result of a merger or consolidation or in connection with the sale or transfer of all or substantially all of it business or assets to which this Agreement relates; or (b) any Affiliate.  This Agreement will be binding upon and will inure to the benefit of the parties and their respective successors and permitted assigns.

13.6  Governing Law; Jurisdiction. This Agreement and the parties' respective performance hereunder will be governed by and construed and enforced in accordance with and subject to the internal substantive laws of the State of Texas, without giving effect to any choice of law rules or principles which may direct the application of the laws of any other jurisdiction.  Each party agrees that venue for any suit, action or proceeding arising out of this Agreement will be an appropriate federal or state court located in Houston, Texas.

13.7  Notices.  Any notice provided pursuant to this Agreement will be in writing and will be deemed given: (a) if mailed, five (5) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested; or (b) if sent via overnight courier, upon receipt.  All notices to Vendor pertaining to this Agreement will be delivered to: Total Marketing Concepts, Inc., Attn: President, 4395 ST Johns Parkway, Sanford, FL 32771, with copy to Crocker & Crocker, Attn:  Patrick D. Crocker, 107 W Michigan Avenue, 4th Floor, Kalamazoo, MI 49007.  Notice to be provided to Direct Energy under this Agreement shall be delivered to: Direct Energy, Attn: Teleservices Direct Program Manager, DE Residential, 1001 Liberty Ave. --12th Floor, Pittsburgh, Pennsylvania 15222; with copy to: General Counsel, Direct Energy, 12 Greenway Plaza - Suite 250, Houston, Texas 77046. Either party may change its address or its designated addressee by

18



giving written notice to the other party in accordance with the terms of this Section 13.7.

13.8   Survival.   Any and all provisions in this Agreement which would reasonably be expected to be performed after the expiration or sooner termination of this Agreement will survive and be enforceable after the date of such expiration or sooner termination including, without limitation provisions relating to compliance, confidentiality, ownership of materials, representations and warranties, indemnification, limitations of liability, audit rights, effects of termination, insurance, non-solicitation and governing law.

13.9   Entire Agreement; Amendment.   This Agreement constitutes the complete and exclusive agreement between the parties relating to the subject matter hereof.   It supersedes all prior proposals, understandings and all other agreements, oral and written, between the parties relating to this subject matter.   This Agreement may not be modified or altered except by written instrument duly executed by the parties.

13.10   Third-Party Beneficiaries.   This Agreement is intended for the sole and exclusive benefit of the parties.   It is not intended to benefit any third party, and only the parties may enforce this Agreement.

13.11   Contract Interpretation.   Ambiguities, inconsistencies or conflicts in this Agreement will not be strictly construed against either party, but will be resolved by applying the most reasonable interpretation under the circumstances, giving full consideration to the parties' intentions at the time this Agreement is entered into and common practice in the industry.

13.12   Force Majeure.   Performance of this Agreement shall be pursued by each party with due diligence.   Vendor shall establish and maintain its systems supporting the Services in a commercially reasonable manner with adequate protections and back-up, consistent with the standards of the teleservices industry.   However, subject to the foregoing requirements of this Section 13.12, neither

Party shall be liable for any loss or damage for delay or for non-performance due directly to causes not reasonably within its control including, but not limited to, acts of civil, regulatory or military authority, acts of God, war, riot or insurrection, terrorism, blockades, embargoes, sabotage, epidemics, and natural disasters.   In the event of any delay or non-performance caused by an event of force majeure, the affected Party shall promptly notify the other Party in writing and take commercially reasonable steps to mitigate the effects of such cause and non-performance.

13.13   Non-Compete.   Vendor shall not, during the term of this Agreement and for a period of one (1) year following expiration or sooner termination of this Agreement: (a) use any call lists except to provide the Services; (b) unless Vendor activity included energy offerings prior to the effective date of the SOW, engage, directly or indirectly, for itself, any Vendor Affiliate or other third party, in marketing or provision of teleservices for energy offerings in the same service Territory(ies) covered by each SOW which engagement is, in Direct Energy's reasonable opinion, competitive with Direct Energy's retail energy services business; and (c) do, omit or permit to be done, anything which will place Vendor in a conflict of interest with Direct Energy or any Direct Energy Affiliate or damage the reputation of Direct Energy or any Direct Energy Affiliates.

The parties agree that a breach of this Section would result in damages to Direct Energy or possibly Direct Energy Affiliates, and Direct Energy and such Direct Energy Affiliates would not be adequately compensated by damages alone. Accordingly, without limiting Direct Energy's rights under this Agreement, Vendor agrees that in the event of such breach, in addition to any other remedies available at law or otherwise, Direct Energy and any Direct Energy Affiliate shall be entitled, as a matter of right, to apply to a court of competent jurisdiction for relief by way of injunction, restraining order, decree or otherwise as may be appropriate to ensure compliance with this Section 13.13.

13.14   Reserved.

CONFIDENTIAL                                                      Direct Energy 000020



13.15  Business Continuity Services.  Vendor shall have in place, throughout the Term, a business continuity program, that shall include a fully documented business impact analysis, records management plan, disaster recovery plan, and crisis management plan (collectively, the "Business Continuity Plans"). Vendor shall be responsible for implementing, executing and keeping current the Business Continuity Plans.  As part of implementing a Business Continuity Plan, Vendor shall be required to have the capability to operate and provide call center services on a contingency basis, reconstruct and restore Direct Energy Data, and certify systems recovery. Vendor shall test the Business Continuity Plans on an annual basis.

13.16  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be delivered via facsimile or email/pdf, it being the express intent of the Parties that such Agreement delivered via facsimile or email/pdf shall have the same force and effect as if it was an original.

**CONFIDENTIAL**

Direct Energy 000021



**SCHEDULE A**

1



**SCHEDULE B**

**CONFIDENTIAL**

**Direct Energy 000023**



**SCHEDULE C**

1

**CONFIDENTIAL**

**Direct Energy 000024**